Thomas Edgerton Wheeler, CA Bar #304191
Environmental Protection Information Center
145 G Street, Suite A
Arcata, California 95521
Tel: (707) 822-7711
Email: tom@wildcalifornia.org

Peter Martin Koerber Frost, *pro hac vice*
Western Environmental Law Center
P.O. Box 533
Bend, Oregon 97709
Tel: (541) 359-3238
Email: frost@westernlaw.org

Karli Uwaine, *pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Boulevard, Suite 340
Eugene, Oregon 97401
Tel: (541) 255-0209
Email: uwaine@westernlaw.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ENVIRONMENTAL PROTECTION INFORMATION CENTER, FRIENDS OF THE SHASTA RIVER, CASCADIA WILDLANDS, KLAMATH-SISKIYOU WILDLANDS CENTER, CHRIS DAUGHTERS,<br><br>Plaintiffs,<br><br>vs.<br><br>NATIONAL MARINE FISHERIES SERVICE, U.S. FISH AND WILDLIFE SERVICE, DOUGLAS BURGUM, HOWARD LUTNICK,<br><br>Defendants. | Case No. 3:26-cv-07176-VC<br>Case No. 3:26-cv-07507-VC<br>Case No. 3:26-cv-10071-VC<br><br>(Related)<br><br>**AMENDED COMPLAINT**<br><br>Administrative Procedure Act Case |

Introduction.

1. On April 17, 2025, Defendant National Marine Fisheries Service (NMFS) and Defendant U.S. Fish and Wildlife Service (FWS) et al. (collectively, the Services) gave notice of proposed rulemaking and requested comments on their proposal to adopt a new interpretation of the Endangered Species Act (ESA) related to modifying or destroying habitat for listed species and, separately, to rescind their regulations defining "harm" as a form of "take" under the ESA to include modifying or destroying listed species' habitat. *Rescinding the Definition of "Harm" Under the Endangered Species Act*, 90 Fed. Reg. 16102 (April 17, 2025). On July 14, 2026, the Services published final rules adopting their new interpretation of "harm" as a form of "take" under the ESA and, separately, rescinding their "harm" regulations. *Rescinding the Definition of 'Harm' under the Endangered Species Act*, 91 Fed. Reg. 43300 (July 14, 2026) (Final Rules). Plaintiffs Environmental Protection Information Center et al. (EPIC) allege the Final Rules are unlawful under the National Environmental Policy Act (NEPA), the Endangered Species Act (ESA), and the Administrative Procedure Act (APA). EPIC respectfully requests that the Court issue a declaratory judgment that the Services have violated federal laws, set aside or vacate their actions, and remand to the Services.

Jurisdiction.

2. Pursuant to Civil L.R. 3-5(a), this Court has jurisdiction to resolve claims in this case under 28 U.S.C. § 1131 (federal question) and 16 U.S.C. § 1540(g) (citizen suit provision of the ESA). Final agency action exists that is subject to judicial review under the APA. 5 U.S.C. §§ 702, 704. More than 60 days have elapsed since EPIC gave the Services notice of intent to sue under the ESA. 16 U.S.C. § 1540(g). The relief EPIC seeks is proper under 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 701–06, 28 U.S.C. § 1361, and 16 U.S.C. § 1540(g).

Venue.

3. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1). Populations of many ESA-listed species that find habitat in rivers or on lands within this district are reasonably likely to be extirpated after the Final Rules become effective. A substantial part of the events or omissions

giving rise to the claims occurred in this district, and the consequences of these events or omissions will be felt within the district.

Divisional Assignment.

4. Pursuant to Civil L.R. 3-2(c)–(d), Defendant NMFS has a California Coastal Office in Santa Rosa, California, which is in Sonoma County, and in the San Francisco Division. Plaintiff EPIC resides in Arcata, California, which is in Humboldt County and in the Humboldt Division. Defendant FWS has a field office in Arcata, California, which is in Humboldt County and in the Humboldt Division.

Parties.

5. Plaintiff EPIC is a non-profit conservation group registered under IRS section 501(c)(3) and based in Arcata, California. Since 1977, EPIC has defended the wildlife and wild places of the Klamath Mountains and North Coast Range. EPIC's mission is to use science to protect and restore the resources of northern California. EPIC's advocacy includes community organizing, public education, collaboration, and litigation and substantive commenting on proposals and projects that would negatively impact public and private forestlands, rivers, and fish and wildlife. EPIC has approximately 15,000 members and supporters, many of whom live in northern California and adjacent areas. EPIC and its members will be harmed by NMFS's and FWS's rules related to modifying and destroying ESA-listed species' habitat. EPIC commented on the agencies' proposed rules.

6. Plaintiff Friends of the Shasta River (Friends) is a non-profit conservation group registered under IRS section 501(c)(3) and based in Yreka, California. Friends was formed in 2020 by a group of local citizens who live, work, and recreate in the Shasta River basin. Some members are riparian property owners along the Shasta River. Some members' families have ranched or lived in the Shasta River basin for generations. Some members have worked in professional capacities for volunteer or public agencies to preserve and restore the Shasta River and, especially, its native fish runs. Friends and its members have been and remain deeply concerned about deteriorating conditions and decreasing fish runs in the Shasta River. The professional, personal, aesthetic, spiritual, and other interests of Friends and its members will be

harmed by NMFS's and FWS's rules related to modifying and destroying ESA-listed species' habitat. Friends commented on the agencies' proposed rules.

7. Plaintiff Cascadia Wildlands is a non-profit conservation group registered under IRS Section 501(c)(3) and based in Eugene, Oregon. Representing over 12,000 members and supporters, Cascadia Wildlands is devoted to conserving the Cascadia Bioregion, which extends from northern California to southeastern Alaska. Cascadia Wildlands uses a combination of education, organizing, outreach, litigation, advocacy, and collaboration to defend wild places and promote sustainable, restoration-based forestry. Cascadia Wildlands and its members will be harmed by NMFS's and FWS's rules related to modifying and destroying ESA-listed species' habitat. Cascadia Wildlands commented on the agencies' proposed rules.

8. Plaintiff Klamath-Siskiyou Wildlands Center (KS Wild) is a non-profit conservation group registered under IRS Section 501(c)(3) and based in Ashland, Oregon. KS Wild has over 3,500 members and supporters in more than 10 states, with most members in southern Oregon and northern California. On behalf of its members, KS Wild advocates for the forests, wildlife, and waters of the Rogue and Klamath River Basins and works to protect and restore the extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and northwest California. KS Wild will be harmed by NMFS's and FWS's rules related to modifying and destroying ESA-listed species' habitat. KS Wild commented on the agencies' proposed rules.

9. Plaintiff Chris Daughters is a fishing guide licensed in Oregon as Caddis Fly Guide Service. Mr. Daughters owns Caddis Fly Shop in Eugene, Oregon. Mr. Daughters' guiding business is based in part on fishing for ESA-listed hatchery spring Chinook in the McKenzie River in Oregon. Mr. Daughters will be harmed by NMFS's rules related to modifying and destroying ESA-listed species' habitat. Mr. Daughters commented on the agencies' proposed rules.

10. Defendant National Marine Fisheries Service is an agency of the U.S. Department of Commerce and administers the ESA to protect and recover certain ESA-listed aquatic species.

Many ESA-listed aquatic species will be adversely affected by the Final Rules, and the rules will prevent their survival and recovery.

11. Defendant U.S. Fish and Wildlife Service is an agency of the U.S. Department of the Interior and administers the ESA to protect and recover certain ESA-listed aquatic and terrestrial species. Many ESA-listed aquatic and terrestrial species will be adversely affected by the Final Rules, and the rules will prevent their survival and recovery.

12. Defendant Douglas Burgum is the Secretary of the Interior and oversees FWS. Mr. Burgum is sued in his official capacity. His decisions via oversight and otherwise to approve the Final Rules will adversely affect ESA-listed species and prevent their survival and recovery.

13. Defendant Howard Lutnick is the Secretary of Commerce and oversees NMFS. Mr. Lutnick is sued in his official capacity. His decisions via oversight and otherwise to approve the Final Rules will adversely affect ESA-listed species and prevent their survival and recovery.

Facts.

14. The marbled murrelet (*Brachyramphus marmoratus)* is a seabird. The marbled murrelet is a member of the family *Alcidae*. The marbled murrelet resides in Northern California. Marbled murrelets spend most (greater than ninety percent) of their time at sea. Marbled murrelets feed on fish and invertebrates at sea. In addition to foraging, their activities in the marine environment include preening, social behaviors, loafing, and molting.

15. Marbled murrelets use forests near the coastline to nest. Marbled murrelets are the only Alcid known to nest in trees. Marbled murrelets renest in the same forest stands and trees from year to year. Marbled murrelet nesting sites vary in distance inland from the coastline. Marbled murrelet nests have been documented in the Pacific Northwest nesting fifty-five miles inland from the coastline. Most marbled murrelet nesting habitat exists within fifty miles from the coastline.

16. Marbled murrelet nesting habitat consists of forest stands generally characterized by large trees (>80 centimeters (32 inches) diameter breast height), multi-storied stands, and a moderate to high canopy closure. Marbled murrelet nest habitat forest characteristics, such as tree limb platforms used to nest, require about 175 to 200 years to develop in conifers.

17. Marbled murrelets can fly up to fifty to sixty miles per hour. Marbled murrelets are difficult to detect inland. Marbled murrelet occupancy in forest stands is generally confirmed by audio detections. Marbled murrelets visit nesting habitat outside of periods when they nest.

18. In 1992, FWS listed as threatened under the ESA marbled murrelets within the Washington, Oregon, and California distinct population segment (DPS). *Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Washington, Oregon, and California Population of the Marbled Murrelet*, 57 Fed. Reg. 45328 (Oct. 1, 1992). The primary factor for listing the marbled murrelet DPS is loss and modification of nesting habitat (older forests), primarily due to commercial logging.

19. When FWS listed the marbled murrelet DPS, it found eighty-five to ninety-six percent of old-growth coastal forests in Northern California that once provided marbled murrelet habitat had been logged. When FWS listed the marbled murrelet DPS, it found that in California, about 70,000 acres (or 3.5 percent) of the original old-growth coastal coniferous forest remain. Of the original old-growth coastal coniferous forests in Northern California, 60,000 acres are in state or federal national parks, where logging is precluded. The remaining 10,000 acres in Northern California are privately-owned and may be logged.

20. In 1997, FWS issued a Recovery Plan for the marbled murrelet DPS. The principal factor affecting the DPS is loss of nesting habitat due to logging. The maintenance of marbled murrelet populations on private lands is critical in arresting the decline of the species in the next 50-100 years.

21. The marbled murrelet Recovery Plan divides the range of marbled murrelets in the DPS into six “Conservation Zones.” The Siskiyou Coast Range Zone (Conservation Zone 4) extends from North Bend in Coos County, Oregon, south to the southern end of Humboldt County in California. Conservation Zone 4 contains one of the largest marbled murrelet populations in the DPS. Zone 4 includes marbled murrelets in Redwood National Park, state parks, and habitat on private lands in southern Humboldt County. Zone 4 has large blocks of suitable habitat critical to the three-state marbled murrelet population recovery over the next 100 years. The amount of

habitat protected in the parks alone is insufficient by itself to ensure survival or recovery of marbled murrelets in Southern Oregon and Northern California.

22. In 1993, Northern California was estimated to include 41,840 acres of higher probability marbled murrelet habitat. In 2021, based on 2017 data, Northern California was estimated to include 38,564 acres of higher probability marbled murrelet habitat. The greatest losses of higher probability marbled murrelet habitat in Northern California between 1993 and 2017 occurred on private lands. By 2021, based on 2017 data, there was a loss of 3,458 acres of higher probable nesting and core habitat for marbled murrelets on private lands in Northern California.

23. Green Diamond Resource Company is a forest products company that owns lands in Northern California. Green Diamond Resource Company owns forests in Northern California in which marbled murrelets nest. Approximately 1,400 acres of designated critical habitat for marbled murrelets exists on Green Diamond Resource Company lands in Northern California. Green Diamond Resource Company does not possess an approved Habitat Conservation Plan or an Incidental Take Permit for marbled murrelets on its lands under the Services' prior definition of "harm." Under the Final Rules, Green Diamond Resource Company is reasonably likely to modify or destroy marbled murrelet habitat on its lands in Northern California.

24. Mendocino Redwood Company is a forest products company that owns lands near Leggett south to near Boonville in Mendocino County, California. Marbled murrelets are known to nest in the Lower Alder Creek watershed on Mendocino Redwood Company lands. Lower Alder Creek is approximately sixty acres in size. Parts of the Lower Alder Creek watershed have been logged. Because marbled murrelets have been extirpated from parts of the Lower Alder Creek watershed, any new occupied sites that can be located will be important to protect for this population to have some chance of recovery. There are likely other areas of forest utilized by marbled murrelets on Mendocino Redwood Company land that have not been discovered.

25. Mendocino Redwood Company does not possess an approved Habitat Conservation Plan or an Incidental Take Permit for marbled murrelets on its lands under the Services' prior definition of "harm." Under the Final Rules, Mendocino Redwood Company is reasonably likely to modify or destroy marbled murrelet nesting habitat on its lands in Northern California.

26. In 2024, FWS issued a five-year Status Review of the marbled murrelet DPS. Loss of marbled murrelet nesting habitat due to logging has slowed since listing but continues. Logging accounts for approximately seventy-one percent of gross nesting habitat loss across Conservation Zones 1 through 5, with the majority of losses occurring on non-federal lands. Ninety-six percent of lost nesting habitat for the marbled murrelet DPS between 1993 and 2017 is due to logging on non-federal lands. The marbled murrelet DPS is still negatively impacted by loss and modification of habitat due to logging.

27. FWS's new interpretation of the ESA to exclude modifying or destroying habitat for ESA-listed species as "harm" means the California, Oregon, and Washington DPS of marbled murrelets is unlikely to survive.

28. Coho salmon (*Oncorhynchus kisutch)* is a species of anadromous fish in the salmon family. In Yurok, coho are named cheguen. In Karuk, coho are named achvuun.

29. In 1997, NMFS listed as threatened under the ESA coho salmon within the Southern Oregon/Northern California Coast (SONCC) evolutionarily significant unit (ESU), which extends from the Elk River in Oregon south to the Mattole River in California. *Threatened Status for SONCC ESU of Coho Salmon*, 62 Fed. Reg. 24588 (May 6, 1997). NMFS found modified and degraded habitat caused by dams and water withdrawals, and resulting high water temperatures and low streamflow, as factors to list the ESU.

30. Approximately fifty percent of the lands comprising SONCC ESU habitat in California are privately owned. For the SONCC coho ESU as a whole, approximately sixty-five percent of the habitat in the range of the SONCC ESU is in non-federal ownership.

31. In 2014, NMFS issued a Recovery Plan for SONCC coho ESU. There are forty distinct coho populations within the ESU. The Shasta River coho population is a demographically independent, core population that is among the independent populations that must be at low risk of extinction for the ESU as a whole to recover. To contribute to the viability of the ESU, the Shasta River core population should have at least 4,700 spawners.

32. In 2022, forty-seven adult coho returned to the Shasta River. In 2024, seven adult coho returned to the Shasta River.

33. Agricultural practices on private lands and dams/diversions on the Shasta River pose high and limiting threats to all life stages of coho salmon in the Shasta River. Dwinnell Dam is at river mile 40.6. Dwinnell Dam blocks coho from reaching twenty-two percent of high intrinsic potential value habitat for salmonids in the watershed. Dwinnell Dam impounds the river to capture and divert most flows for irrigation during the summer. Irrigation operations on private lands along the Shasta River impound spring water that would otherwise flow into the river and draw surface water from the river. The owner of Dwinnell Dam does not possess an approved Habitat Conservation Plan or Incidental Take Permit to authorize operations that destroy or modify habitat for coho salmon.

34. In 2016, NMFS issued a Status Review of the SONCC coho ESU. The lack of water for summer rearing juveniles has worsened since the previous status review and is a primary factor inhibiting recovery of the ESU. The SONCC coho salmon population in the Shasta River is at high risk of extinction.

35. NMFS's new interpretation of the ESA to exclude modifying or destroying habitat for ESA-listed species as "harm" means the Shasta River coho population is unlikely to survive.

36. The Lower Klamath River coho population is a demographically independent, core population within the SONCC coho ESU. The Lower Klamath River coho population is among the independent populations that must be at low risk of extinction to achieve recovery for the ESU as a whole. To contribute to the viability of the ESU, the lower Klamath River core population should have at least 5,900 spawners. The current distribution of spawners is well below this minimum threshold because coho salmon are not well distributed throughout the Lower Klamath tributaries and continue to occur at modest to very low densities. The Lower Klamath River coho population is at high risk of extinction.

37. Logging poses a high threat for a majority of the coho salmon life stages because of the extent of logging of forests adjacent to the Lower Klamath tributaries, and the existing poor habitat conditions. Approximately sixty-five percent of the Lower Klamath River sub-basin, which defines the geographic boundary for the Lower Klamath River coho population, is privately-owned. The majority of private land in the Lower Klamath River sub-basin is owned

by Green Diamond Resource Company. Green Diamond Resource Company logs its lands in part pursuant to an Aquatic Habitat Conservation Plan and Incidental Take Permit issued under the Services' prior definition of "harm." Other private landowners in the Lower Klamath River sub-basin own lands that support aquatic habitat for coho salmon. No other private landowner in the Lower Klamath River sub-basin possesses a Habitat Conservation Plan or Incidental Take Permit to log lands that support aquatic habitat for coho salmon.

38. NMFS's new interpretation of the ESA to exclude modifying or destroying habitat for ESA-listed species as "harm" means the Lower Klamath River coho population is unlikely to survive.

39. The northern spotted owl (*Strix occidentalis caurina*) is a dark brown bird that has small white spots and markings. Relative to other owls in North America, northern spotted owls have relatively long lives, and long reproductive life spans.

40. In 1990, FWS listed the northern spotted owl as threatened under the ESA. Reasons for listing the northern spotted owl included habitat loss from logging across its range, and the lack of regulatory mechanisms to protect remaining owls.

41. The historic range of the northern spotted owl includes forests in the Pacific Northwest, from southwestern British Columbia south to Marin County, California. The current range of the northern spotted owl is smaller than its historic range. The northern spotted owl has been extirpated or is now uncommon in areas of British Columbia and Washington state. Recovery of the northern spotted owl across its historic range will depend on the survival and recovery of the northern spotted owl in California.

42. In 2011, FWS issued a northern spotted owl Recovery Plan. The three primary threats to northern spotted owls are historic habitat loss due to logging and fire, current habitat loss due to logging and fire, and the presence of barred owls.

43. In 2020, FWS determined that "uplisting" the northern spotted owl to endangered was warranted, due to continued loss of habitat, and new effects from barred owls. Populations of northern spotted owls in several long-term demographic monitoring areas have declined more than seventy percent since the early 1990s. The overall rate of decline increased since the five-

year Species Status Review in 2011. FWS did not uplist the northern spotted owl because it was precluded by higher priority agency actions.

44. In 2023, FWS issued *Endangered and Threatened Wildlife and Plants; Review of Species That Are Candidates for Listing as Endangered or Threatened; Annual Notification of Findings on Resubmitted Petitions; Annual Description of Progress on Listing Actions*, 88 Fed. Reg. 41560 (June 27, 2023). On non-federal lands, state regulatory mechanisms have not prevented the continued decline of nesting/roosting and foraging habitat for the northern spotted owl. The amount of northern spotted owl habitat on these lands has decreased over the past three decades, including in geographic areas where federal lands are lacking.

45. Mendocino Redwood Company owns lands that include northern spotted owl habitat. Mendocino Redwood Company lands support approximately 181 northern spotted owl territories. FWS northern spotted owl take avoidance guidance for the Coast Redwood Region in Northern California applies to lands owned by Mendocino Redwood Company. FWS northern spotted owl take avoidance guidance for the Coast Redwood Region in Northern California defines a northern spotted owl nest core use area as a 100-acre polygon around a northern spotted owl activity center. FWS northern spotted owl take avoidance guidance directs that 500 acres around a .7-mile radius should be retained as spotted owl habitat. Assuming each northern spotted owl territory on Mendocino Redwood Company lands supports only one northern spotted owl activity center, Mendocino Redwood Company lands would support 18,100 acres of “core” habitat and at least 90,500 acres of total northern spotted owl habitat.

46. In 2016, Mendocino Redwood Company prepared a draft Habitat Conservation Plan under the Services’ prior interpretation of “harm” to include northern spotted owls. The draft Habitat Conservation Plan covered approximately 203,940 acres. Mendocino Redwood Company did not complete or finalize a Habitat Conservation Plan for northern spotted owls.

47. Under the Final Rules, Mendocino Redwood Company is reasonably likely to modify or destroy northern spotted owl habitat on its lands.

48. FWS’s new interpretation of the ESA to exclude modifying or destroying habitat for ESA-listed species as “harm” means the northern spotted owl is unlikely to survive.

49. The McKenzie River in Oregon originates in Clear Lake in the Cascade Mountains and flows roughly ninety miles to its confluence with the Willamette River. The McKenzie River watershed is comprised of approximately 1,300 square miles. Chinook salmon (*Oncorhynchus tshawytscha*) that migrate upstream of Willamette Falls have inhabited the McKenzie River at least since recorded time. Because Chinook salmon could ascend the falls only during spring high flows, this run is called Spring Chinook. Spring Chinook in the McKenzie River depend on healthy riparian and landscape habitat in the watershed to successfully spawn. Approximately seventy percent of the McKenzie River watershed is comprised of federal public lands administered by the U.S. Forest Service (Forest Service) and Bureau of Land Management (BLM).

50. In 1999, NMFS listed natural-origin and hatchery-raised Spring Chinook in the Upper Willamette River basin, including in the McKenzie River, as threatened under the ESA. *Endangered and Threatened Species; Threatened Status for Three Chinook Salmon Evolutionarily Significant Units (ESUs) in Washington and Oregon, and Endangered Status for One Chinook Salmon ESU in Washington*, 64 Fed. Reg.14308 (March 24, 1999). Since then, the Forest Service and/or BLM has issued permits to private companies to build roads in and/or log federal public forests in the McKenzie River basin. The Forest Service and BLM have consulted with NMFS under ESA Section 7 related to logging projects in the McKenzie River basin that may affect Spring Chinook. NMFS has found certain projects will not jeopardize the continued existence of Spring Chinook but are reasonably likely to cause incidental take of Spring Chinook under NMFS's prior interpretation of "harm." NMFS has established terms and conditions in Incidental Take Statements to require setbacks, road contours or culverts, and other conditions to protect habitat for Spring Chinook in the McKenzie River basin.

51. NMFS's new interpretation of the ESA to exclude modifying or destroying habitat for ESA-listed species as "harm" means the Spring Chinook population in the McKenzie River is unlikely to survive.

52. Two-thirds of species listed under the ESA reside on or utilize non-federal lands.

53. The prohibition on degrading or modifying habitat for ESA-listed species to the extent it results in "take" is a predicate to the survival, conservation, and recovery of ESA-listed species.

54. The APA defines "rule" to include "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). The Final Rules are an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy.

55. The Final Rules constitute final agency action under the APA.

56. The Services' rescission of their "harm" regulations constitutes final agency action under the APA.

## Claims for Relief.

## National Environmental Policy Act.

57. Plaintiffs reallege all allegations.

58. The Services' adoption of their new interpretation of the ESA, and their decisions to rescind their regulations, constitute (individually, and collectively) "major Federal actions significantly affecting the quality of the human environment" under NEPA. 42 U.S.C. § 4332(C). Accordingly, the Services are required to prepare a detailed statement evaluating (i) reasonably foreseeable environmental effects of the proposed agency action; (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal; (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented. 42 U.S.C. § 4332(C)(i)-(v). The Services unlawfully did not prepare the required statement[s].

59. NEPA provides that an agency may avoid its duty to prepare a detailed statement if "the proposed agency action is a nondiscretionary action with respect to which such agency does not

have authority to take environmental factors into consideration." 42 U.S.C. § 4336(a)(4). In the Final Rules, NMFS asserts its actions are nondiscretionary because they "are compelled by the best reading of the statutory text." 91 Fed. Reg at 43307. In its NEPA policies, NMFS listed one action for which it believes it is has no discretion to comply with NEPA: when Congress directs spending. Companion Manual for NOAA Administrative Order 216-6A, section II.B.*1*. (https://www.noaa.gov/general-counsel/nepa (visited Sept. 29, 2026)). NMFS's actions here do not constitute nondiscretionary actions under its policies, or apart from its policies.

60. In the Final Rules, FWS asserts its actions are nondiscretionary because they "are compelled by the best reading of the statutory text." 91 Fed. Reg at 43307. In its NEPA policies, FWS listed instances in which it believes it has no discretion to comply with NEPA. 516 [Department Manual] 1 – U.S. Department of the Interior Handbook of National Environmental Policy Act Implementing Procedures (available at https://www.doi.gov/media/document/doi-nepa-handbook (visited Sept. 29, 2026)). FWS's actions here do not constitute actions under its policies, or apart from its policies.

61. NEPA provides that an agency may avoid its duty to prepare a detailed statement if "the proposed agency action is excluded pursuant to one of the agency's categorical exclusions, another agency's categorical exclusions consistent with section 4336c of this title, or another provision of law." 42 U.S.C. § 4336(a)(2). In the Final Rules, FWS and NMFS assert their actions are categorically excluded from the requirement to prepare a detailed statement under NEPA. 91 Fed. Reg. at 43306-07 (citing 43 C.F.R. § 46.210(i) and the U.S. Department of Interior Handbook of National Environmental Policy Act Implementing Procedures, appendix 2). FWS's and NMFS's actions do not fit the categorical exclusion they cite, nor any other. FWS's and NMFS's actions in part do not fit the "preparation of . . . rules [and] regulations" categorical exclusion because FWS's regulations and NMFS's policies require that action "will be subject later to the NEPA process, either collectively or on a case-by-case basis," which will not occur. *Cf.* 43 C.F.R. § 46.210(i); NOAA Administrative Order 216-6A, Companion Manual, Appendix E: List of NOAA's Categorical Exclusions at 14, G7.

62. In the Final Rules, NMFS and FWS assert their Final Rules "will not have a significant individual or cumulative effect on the quality of the human environment for purposes of NEPA." 91 Fed. Reg. at 43307. The agencies are incorrect. The Final Rules will have significant individual and cumulative effects on existing and potential habitat for ESA-listed species, and the species themselves.

63. Extraordinary circumstances exist that preclude the Services from invoking or relying on any categorical exclusion. 43 C.F.R. § 46.215; NOAA Administrative Order 216-6A, Companion Manual, Appendix E: List of NOAA's Categorical Exclusions.

Endangered Species Act.

64. Under Section 7(a)(2) of the ESA, federal agencies must consult to ensure their actions are not "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). The consultation requirement extends to the Services when acting as "action agencies" under Section 7(a)(2). The Final Rules are "agency actions" under Section 7(a)(2). The Final Rules are likely to adversely affect numerous species listed under the ESA. The Services were required under Section 7(a)(2) to consider, evaluate, and disclose, in a biological opinion or similar comprehensive analysis, whether their issuance of the Final Rules is likely to jeopardize listed species or result in the destruction or adverse modification of their habitat. The Services unlawfully failed to consult under Section 7(a)(2) and prepare such an opinion or analysis.

65. The Services' issuance of the Final Rules is an "irretrievable commitment of resources" under Section 7(d) of the ESA. 16 U.S.C. § 1536(d). The Services violated Section 7(d) by making an "irretrievable commitment of resources" before completing consultation under Section 7(a)(2). 16 U.S.C. § 1536(d).

Administrative Procedure Act.

66. Plaintiffs reallege all allegations.

67. For over 50 years, the Services have uniformly interpreted (and defended in court) the meaning of "harm" under the ESA to include actions that modify or destroy habitat for ESA-

listed species. In the Final Rules, the Services abruptly and without reasoned analysis change prior positions and defenses.

68. The Services' new interpretation of "harm" is not permissible under the ESA, nor are there good reasons for it.

69. The Services' rationale to apply *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), misinterprets the Supreme Court's decision and guidance.

70. The Services are required to consider and address that their longstanding interpretation of "harm" under the ESA to include actions that modify or destroy habitat for listed species as a form of "take" has "engendered serious reliance interests that must be taken into account." *Encino Motorcars LLC v. Navarro*, 579 U.S. 211, 221-22 (2016). The Services have not adequately or sufficiently considered or addressed these serious reliance interests.

71. The Services' actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) & (D).

Relief Requested.

A. Declare the Services' actions violate NEPA;

B. Declare the Service's action violate the ESA;

C. Declare the Services' actions violate the APA;

D. Set aside and/or vacate the Services' actions;

E. Remand to the Services for further proceedings;

F. Grant such other relief as Plaintiffs may seek, or the Court deems just and proper.

Date: September 30, 2026.

Respectfully submitted,

/s/ Peter Martin Koerber Frost
Peter Martin Koerber Frost, *pro hac vice*
Thomas Edgerton Wheeler, CA Bar #304191
Karli Uwaine, *pro hac vice*

Attorneys for Plaintiffs