43300 Federal Register / Vol. 91, No. 133 / Tuesday, July 14, 2026 / Rules and Regulations

**DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Part 17**

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Part 222**

**[Docket No. FWS–HQ–ES–2025–0034; FXES11160900000–267–FF09E23000; Docket No. NMFS–250411–0064]**

**RIN 1018–BI38; 0648–BN93**

# Rescinding the Definition of "Harm" Under the Endangered Species Act

**AGENCY:** U.S. Fish and Wildlife Service, Interior; National Oceanic and Atmospheric Administration, Commerce.

**ACTION:** Final rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS; collectively referred to as the "Services") rescind the regulatory definition of "harm" in our Endangered Species Act (ESA or the Act) regulations. This rescission removes the regulatory definition of "harm" from the Code of Federal Regulations (CFR) in Title 50 parts 17 and 222.

**DATES:** This final rule is effective September 14, 2026.

**ADDRESSES:** Public comments and materials received, as well as supporting documentation used in the preparation of this final rule, are available online at *https://www.regulations.gov* in Docket No. FWS–HQ–ES–2025–0034.

**FOR FURTHER INFORMATION CONTACT:** John Tirpak, Acting Assistant Director, Ecological Services, at 703–358–2171 or *ADEcologicalServices@fws.gov* with a subject line of "1018–BI38." Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:**

## Background

The Endangered Species Act, as amended, (hereafter referred to as ESA or the Act; 16 U.S.C. 1531 *et seq.*) prohibits the "take" of endangered wildlife under section 9 (16 U.S.C. 1538). This is part of a detailed statutory scheme that lays different responsibilities, powers, and prohibitions on the federal government and private citizens, as part of an overall effort to protect endangered species. Section 7 of the ESA imposes on the federal government the responsibility to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat which is determined by the Secretary . . . to be critical . . . ." (16 U.S.C. 1536(a)(2)). Section 5 empowers the federal government to purchase private property "to conserve fish, wildlife, and plants, including those which are listed as endangered species or threatened species" (16 U.S.C. 1534). And section 9 prohibits private citizens from "tak[ing]" animals that are members of an endangered species (16 U.S.C. 1538).

"Take" is a term with a traditional meaning, *i.e.*, to kill or capture a wild animal. *See* Oxford English Dictionary (1933; third printing in February 1973). The Act provides its own definition in section 3, which expands that meaning slightly: "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct" (16 U.S.C. 1532). This definition "make[s] clear" that "take," as used in the statute, "include[s] not just a completed taking, but the process of taking, and all of the acts that are customarily identified with or accompany that process . . . so as to include attempts" (*Babbitt* v. *Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 718 (1995) (Scalia, J., dissenting)). This is a slight, sensible, and "not unusual[]" expansion of the traditional definition of "take"; even so, the traditional meaning of "take" remains plainly the core of what is being defined (*Id.*).

Thus, under the statutory scheme as enacted, the government would "insure" that its own actions did not "jeopardize the continued existence of any endangered species or threatened species" or "result in the destruction or adverse modification of" critical habitat (a statutory term that is different from the habitat, simpliciter, of the species). Meanwhile, where government action is *not* involved, the Act protects endangered species in two ways: by directly prohibiting citizens from killing, injuring, or capturing any member of those species (or attempting to do so), and by purchasing the land of private citizens to assist in conservation. To complete this regime, Section 10 then creates an incidental-take regime for when such take is nonetheless inevitable in the pursuit of some other activity, as when fishing for a non-endangered species of fish will, inadvertently but inevitably, lead to the catch of an endangered species of fish.

But starting in 1975, FWS promulgated regulatory definitions of "harm" that dramatically expanded the plain meaning of "take," to sweep in (and thus prohibit) actions that impair the habitat of protected species. That year, FWS published a final rule that defined "harm" as "...an act or omission which actually injures or kills wildlife, including acts which annoy it to such an extent as to significantly disrupt essential behavioral patterns, which include, but are not limited to, breeding, feeding or sheltering; *significant environmental modification or degradation* which has such effects is included within the meaning of 'harm' (40 FR 44412 at 44416, Sept. 26, 1975) (emphasis added)).[1] Indeed, the history of this regulation suggests that FWS's original goal was not to define "harm," but to prohibit habitat modification by private citizens, irrespective of means: When the Service first proposed the regulation, it incorporated a prohibition on habitat modification as part of the definition of a completely different word, "harass" (see 40 FR 28712). Only at the final-rule stage did FWS shift this prohibition into the definition of "harm," with little to no explanation of why (see 40 FR 44413).[2]

In 1981, FWS drew back slightly, redefining "harm" in 1981 to "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential

---

[1] It is indicative that the end in mind was prohibiting habitat modification by private citizens, rather than construing the meaning of "harm," that the Service initially proposed this rule in a form that would have made a prohibition on habitat modification a part of the definition of a completely different word, "harass." See 40 FR 28712.

[2] What little explanation the final rule provided for this change suggests that FWS was by that time focused on principles of intent and causation. The rule noted that FWS was modifying the definition of "harass" and that "[t]he concept of environmental damage being considered a 'taking' has been retained, but is now found in a new definition, of the word 'harm'" (*Id.*). It then went on state that '"[h]arm covers actions or omissions which actually, (as opposed to potentially), cause injury," and that, "[i]n addition, the definition of 'harass' has been modified by restricting its application to acts or omissions which are done intentionally or negligently. In the proposal, 'harass' would have applied to any action, regardless of intent or negligence" (*Id.*). None of this explains why the Services suddenly had concluded that habitat modification was an intrinsic part of the word "harm," or why it was no longer part of the word "harass."

behavioral patterns, including breeding, feeding or sheltering'' (46 FR 54748 at 54750, Nov. 4, 1981). FWS explained its modification on the grounds that the previous definition could have been construed as prohibiting habitat modification even where there was no injury to the listed endangered or threatened wildlife, which would ''go beyond the intent of Congress'' (46 FR 54748, November 4, 1981). Nonetheless, the fundamental shift had already occurred, and the 1981 rulemaking did not undo it: FWS has transformed section 9 by the issuance of regulatory definitions from a prohibition on private citizens hunting, capturing, or otherwise attempting to kill or injure certain specifically protected *animals* into a sweeping *land-use* regulation. Against that backdrop, section 10's ''incidental take'' regime became a land-use regime.

NMFS did not define ''harm'' in regulations until 1999 (see 64 FR 60731,Nov. 8, 1999). When it did so, it adopted a definition similar to FWS's 1981 redefinition but included NMFS-specific modifiers: ''an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering'' (*Id.*).

In *Babbitt* v. *Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687 (1995; *Sweet Home*), the Supreme Court rejected a challenge to FWS's regulation by applying *Chevron* deference and determining that FWS's interpretation of the ESA was a ''reasonable''—even if not the best—interpretation of the statute[3] (*Id.* at 697, 703). In a dissent that has literally become textbook,[4] Justice Scalia, joined by then-Chief Justice Rehnquist and Justice Thomas, explained why FWS's construction was not the best reading of the statute; indeed, Justice Scalia would have held that FWS's interpretation of ''harm'' was not even a permissible reading of the statute under *Chevron,* given its inconsistency with the structure and text of the ESA. As Justice Scalia observed, ''[i]f 'take' were not elsewhere defined in the Act, none could dispute what it means, for the term is as old as the law itself. To 'take,' when applied to wild animals, means to reduce those animals, by killing or capturing, to human control'' (515 U.S. at 717 (Scalia, J., dissenting)).[5] And here, under the *noscitur a sociis* canon, the term ''harm,'' like the other nine verbs in the definition of ''take,'' should be construed to require an ''affirmative act[] . . . directed immediately and intentionally against a particular animal—not [an] act[] or omission[] that indirectly and accidentally cause[s] injury to a population of animals (515 U.S. at 719–720 (Scalia, J., dissenting); see also *id.* at 719 ('''Harm' is merely one of 10 prohibitory words in [the ESA's definition of ''take''], and the other 9 fit the ordinary meaning of 'take' perfectly.'')).

Justice Scalia also explained that FWS's definition of ''harm'' does not fit with the use of ''take'' throughout the Act, including where provisions like section 1538(a)(1)(D) which prohibits the possession, sale, and transport of ''species taken in violation'' of the Act ''would apply to taking only in the ordinary sense, and are meaningless as applied to species injured by environmental modification'' (*Id.* at 723). Nor does FWS's definition of ''harm'' work with the ''broader structure of the Act,'' noting that ''Congress's explicit prohibition of habitat modification in the [Section 7 of the ESA] would bar the inference of an implicit prohibition of habitat modification in [Section 9 of the ESA]'' (*Id.* at 724; see also *id.* (stating that statutes should be read as far as possible to give independent effect to all their provisions)).[6]

The Supreme Court recently abrogated the doctrine of *Chevron* deference in *Loper Bright Enterprises* v. *Raimondo,* 603 U.S. 369 (2024) (After *Loper Bright*), ''the question that matters'' in regulatory litigation is whether ''the *statute* authorizes the challenged agency action'' (603 U.S. at 406 (emphasis added)). In other words, does the agency's regulation match the single, best meaning of the statute?

We have concluded that the Services' existing regulations, which contain the definition of ''harm'' contested in *Sweet Home,* do not match the single, best meaning of the statute. As Justice Scalia's dissent in *Sweet Home* explains, the regulations' interpretation of the statutory language runs afoul of the *noscitur a sociis* canon and is inconsistent with the structure of the ESA. We adopt Justice Scalia's rationale as articulated in *Sweet Home* and conclude that the Services' regulatory definitions are unlawful, notwithstanding the Court's prior upholding of the regulatory definition under *Chevron* deference.

We recognize that the Supreme Court held in *Loper Bright* that its ''prior cases that relied on the *Chevron* framework . . . are still subject to statutory *stare decisis*'' (603 U.S. at 412). But under the then-prevailing *Chevron* framework, *Sweet Home* held only that the existing regulation is a permissible reading of the ESA, not the only possible such reading. Indeed, even during the *Chevron* era, the Services would have been free to change their interpretation of the Act, even after a court had applied *Chevron* deference to uphold that earlier interpretation, as in *Sweet Home.* See generally *Nat'l Cable & Telecomms. Ass'n* v. *Brand X internet Servs.,* 545 U.S. 967 (2005); see also *Sweet Home,* 515 U.S. at 714 (O'Connor, J., concurring) (''[N]othing the Court says today prevents the agency itself from narrowing the scope of its

[3] The Services are aware that at least one intermediate court has suggested that *Sweet Home* did not ground its ruling in *Chevron* deference. *See Cargill* v. *Garland,* 57 F.4th 447, 467 (5th Cir. 2023), *aff'd sub nom. Garland* v. *Cargill,* 602 U.S. 406 (2024). *But cf. Lubow* v. *U.S. Dep't of State,* 783 F.3d 877, 884 (D.C. Cir. 2015) (citing *Babbitt* for the proposition that a court can proceed directly to *Chevron* Step Two without a threshold determination of ambiguity). The Services do not agree that *Sweet Home* was not a *Chevron* case. The Court in *Sweet Home* explained explicitly that it ''need not decide whether the statutory definition of 'take' compels the Secretary's interpretation of 'harm,' because [the Court's] conclusions that Congress did not unambiguously manifest its intent to adopt respondents' view and that the Secretary's interpretation is reasonable suffice[d] to decide th[e] case'' (515 U.S. 687, 703 (1995) (citing *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984))). The Court described its ''conclusion that the Secretary's definition of 'harm''' as ''rest[ing] on a *permissible* construction of the ESA'' (515 U.S. at 704 (emphasis added); *see also id.* at 708 (''When Congress has entrusted the Secretary with broad discretion, we are especially reluctant to substitute our views of wise policy for his. *See Chevron,* 467 U.S. at 865–66. In this case, that reluctance accords with our conclusion, based on the text, structure, and legislative history of the ESA, that the Secretary reasonably construed the intent of Congress when he defined 'harm' to include 'significant habitat modification or degradation that actually kills or injures wildlife.''')).

Furthermore, the *Sweet Home* Court explicitly refrained from ''decid[ing] whether the statutory definition of 'take' compels the Secretary's interpretation of 'harm''' (*Id.* at 703). Thus, regardless of the doctrinal reasoning underlying that conclusion, *Sweet Home* does not bear the preclusive effect that some would ascribe to it.

[4] *See, e.g.,* Mikva, et al., *Legislative Process* 749 (5th ed. 2025); Manning & Stephenson, *Legislation and Regulation, Cases and Materials* 1201 (5th ed. 2025).

[5] *See, e.g.,* 11 Oxford English Dictionary (1933) (defining ''take'' as to kill or capture a wild animal); Webster's New International Dictionary of the English Language (2d ed. 1949) (take defined as ''to catch or capture by trapping, snaring, etc., or as prey''); *Geer* v. *Connecticut,* 161 U.S. 519, 523 (1896) (''All the animals which can be taken upon the earth, in the sea, or in the air, that is to say, wild animals, belong to those who take them'') (quoting the Digest of Justinian); 2 W. Blackstone, Commentaries 411 (1766) (''Every man . . . has an equal right of pursuing and taking to his own use all such creatures as are *ferae naturae*'').

[6] Although *Sweet Home* was focused on FWS's regulation at 50 CFR 17.3, NMFS's definition of ''harm'' at 50 CFR 222.102 is substantially the same.

regulation at a later date."). That was because a *Chevron* deference-grounded precedent did not hold that an agency's "construction follow[ed] from the *unambiguous* terms of the statute and thus l[eft] no room for agency discretion"; rather, such a precedent only established that the agency's construction was only one of potentially multiple permissible interpretations of the statute (*Brand X,* 545 U.S. at 982 (emphasis added)). Though, in *Loper Bright,* the Court declared that statutory stare decisis would protect specific regulations upheld under *Chevron* from future litigation challenges, the Court left open the possibility that the executive branch could itself depart from regulations that do not match the single, best meaning of the statute—so long as the new regulations reflect that best meaning (see *Loper Bright,* 603 U.S. at 412). This makes particular sense given *Loper Bright's* focus on the propriety of executing the laws as written by Congress and the Executive Branch's constitutional obligation to "take Care that the Laws be faithfully executed" (U.S. Const. art. II, section 3).

In light of their determination of illegality, the Services have determined that the best path forward is to rescind the regulatory definition entirely—instead of keeping part of it—and to refrain from implementing a replacement definition (see *Dep't of Homeland Security* v. *Regents,* 591 U.S. 1, 25 (2020)).[7] We have also concluded—after careful consideration of the alternatives—that no replacement definition is needed.

The Services understand that they are "not writing on a blank slate," and thus the Services have considered reliance interests—including those raised in public comments—in maintaining the existing definition or at least *some* definition (*Regents,* 591 U.S. at 33 (requiring such consideration when agency is "not writing on a blank slate")). Below, the Services' responses to public comments address these reliance interests. At the outset, however, the Services acknowledge that the existence of a regulatory definition, as such, has provided some certainty to regulated entities. Further, the Services acknowledge that, in at least some circumstances, "longstanding policies may have 'engendered serious reliance interests that must be taken into account'" (*Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 221–22 (2016) (*quoting FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009))).

Having taken these interests into account, the Services have concluded that such interests do not outweigh the need for a full rescission. The ESA itself defines "take," which is the operative term prohibited under section 9 (16 U.S.C. 1532(19)). It is true that Justice Scalia's dissent in *Sweet Home* does not call into question the legality of the first sentence of the regulatory definition of "harm": "*Harm* in the definition of 'take' in the Act means an act which actually kills or injures wildlife." But the current regulations were promulgated and amended as a single, integrated interpretive framework. The first sentence has functioned as the introductory clause to the more-elaborate restrictions that follow, and the Services have determined that those restrictions are unlawful. Thus, the Services believe that retaining even part of the unlawful regulation here would risk creating uncertainty about which aspects of the prior agency interpretations remain operative and which do not. Moreover, maintaining the first sentence on its own would not materially enhance regulatory clarity relative to the statutory text itself. In the Services' judgment, preserving that sentence as a standalone regulation therefore would provide limited independent guidance while risking confusion about the continuing legal significance of the rescinded portions of the regulation.

Nor do the Services choose to add a new regulatory definition for "harm." Given that "take" is defined in the statute, and that the role and meaning of the term "harm" within the larger definition of "take" was expertly explicated by Justice Scalia in his *Sweet Home* dissent—an interpretation which we have herein adopted—we find that maintaining a freestanding definition of "harm" is unnecessary. Moreover, at least in this situation and given the history detailed above, inserting a regulatory definition within a statutory definition that was otherwise clear appears to have been an attempt to arrogate to the Services authorities which Congress never granted. Returning to the statutory definition as the operative language is therefore especially appropriate.

Because our regulations that define "harm" do not accord with the single, best meaning of the statutory text, the Services published a proposed rule in the **Federal Register** to rescind the definitions of "harm" from title 50 CFR 17 and 222 (90 FR 16102, April 17, 2025). In that proposed rule, we provided background and rationale for rescinding the definitions of "harm." We solicited public comments on the proposed rule through May 19, 2025.

Following consideration of all public comments received in response to our proposed rule, and for the reasons outlined in our proposed rule and in this final rule, we are rescinding the regulatory definition of "harm." By finalizing the rescission of the regulatory definition of "harm," the Services are relying on the plain text of the statute as the standard going forward, but nothing in this final rule is intended to require that any prior permit or incidental take statement issued by the Services that relied on the prior definition of "harm" be reevaluated on the basis of this final regulation. Such incidental-take statements, and indeed the entire section 7 analysis, were but one input among many into the ultimate decision whether and how to authorize a given action (*Cf. Seven Cnty. Infrastructure Coal.* v. *Eagle Cnty., Colorado,* 605 U.S. 168, 180 (2025) (noting that an environmental impact statement issued under the National Environmental Policy Act is "only one input into an agency's decision," and that the ultimate locus of analysis, for purposes of administrative law, is "the agency's final decision")). Disturbing the finality of the overall permitting decision would be highly disruptive to settled expectations, as well as immensely time-consuming and difficult, in return for at most speculative gains. Therefore, permits or incidental take statements finalized prior to the effective date of this rule will not be required to be reevaluated under this final rule. (For the effective date of this rule, see **DATES**, above.)

## Public Comments and Responses

By the close of the public comment period on May 19, 2025, we received approximately 358,000 public comments on the proposed rule to rescind the regulatory definition of "harm." Comments were received from a range of sources including individual members of the public, States, Tribes, industry organizations, legal foundations and firms, and environmental organizations. During the public comment period, we received multiple requests for public hearings. However, as public hearings are not required for this type of rulemaking, we elected not to hold them. We also received several requests for an extension of the 30-day public comment period. After consideration, we determined that 30 days provided sufficient time for the public to submit

[7] To be sure, the Services note that both *Regents* and *State Farm* involved two-pronged policies. Here, the Services' rescission involves a single regulatory definition.

meaningful comments and therefore we did not extend the comment period.

Some commenters expressed support for the rule while other commenters requested that the proposed rule not be finalized. Among the submissions we received were multiple letters from organizations signed by individuals expressing general opposition to the proposed rule. Many of the individual comments we received were non-substantive in nature, expressing either general support for, or opposition to, the proposed rule with no supporting information or analysis. We also received many detailed substantive comments expressing support for, or opposition to, the proposed rule for specific reasons. All public comments were reviewed and considered prior to developing this final rule. Summaries of substantive comments and our responses are provided below. Similar comments are combined where appropriate. We did not, however, consider or respond to comments that are not relevant to or are beyond the scope of this particular rulemaking. For example, some commenters responded to unrelated **Federal Register** notices and proposed rulemakings (*e.g.,* the U.S. Forest Service's Consent for Geothermal Leasing Project), congressional bills (*e.g.,* H.R. 845 (Pet and Livestock Protection Act of 2025) and H.R. 1897 (ESA Amendments Act of 2025), or statutory provisions outside the ESA (*e.g.,* Animal Welfare Act).

*Comment 1:* Some commenters stated that Congress did not intend for the ESA prohibition on "take" to include habitat modification as defined under the term "harm." They discussed that the legislative history show that "take" was meant to cover direct, affirmative actions against individual animals, not indirect, incidental, or unintentional impacts to species such as habitat modification or degradation. Several cited Justice Scalia's dissent in *Sweet Home* and the removal of habitat language from early drafts of the ESA as evidence that Congress deliberately chose to address habitat protection through other provisions, such as sections 5 and 7. Commenters stated that these sections were designed to address habitat conservation through land acquisition and Federal agency responsibilities, not through the "take" prohibition in section 9. Commenters also stated that the Services' current definition of "harm" unlawfully expands the scope of "take" beyond congressional intent and creates regulatory burdens that hinder land management and conservation practices. Other commenters disagreed, however, asserting that Congress intended "harm" to include habitat destruction or modification that indirectly or unintentionally results in injury or death to listed species. They pointed to the broad language of the ESA, its legislative history, and the statute's overarching goal stated in section 2 of the Act to conserve ecosystems upon which endangered and threatened species depend. Several commenters also stated that Congress deliberately included "harm" in the definition of "take" to broaden its scope beyond traditional notions of hunting or capturing, and that the Services' reinterpretation ignores this legislative intent.

*Response:* The Services acknowledge the divergent views expressed by commenters relying on congressional intent. The Services recognize that the legislative history contains references both to direct actions against wildlife in section 9 and separately to broader ecosystem conservation goals in section 2. "[L]egislative history," however, "is not the law" (*Epic Sys. Corp.* v. *Lewis,* 584 U.S. 497, 523 (2018)).

Upon reevaluation and consideration of comments received, the Services have concluded that the regulatory definition of "harm" is not the single, best meaning of the text of the statute. As Justice Scalia's dissent in *Sweet Home* explains, the regulation's interpretation of the statutory language runs afoul of the *noscitur a sociis* canon, is inconsistent with the structure of the ESA, which provides distinct mechanisms for habitat protection under sections 5 and 7, and disregards the absence of habitat-related language in the definition of "take" in section 3 itself. For more discussion, see Background, above. We also affirm our stated position in the proposed rule that no replacement definition is needed. The ESA itself defines "take," and the regulatory elaboration of one subcomponent of that definition — "harm"— has had the effect of exceeding the proper bounds of the statute and asserting power that Congress never actually gave to the executive branch.

"Even if legislative history were a legitimate and reliable tool of interpretation," moreover, "[b]oth the Senate and House floor managers of the bill explained it in terms which leave no doubt that the problem of habitat destruction on private lands was to be solved principally by the land acquisition program of section 1534, while section 1538 solved a different problem altogether the problem of takings" (*Sweet Home,* 515 U.S. at 727–28 (Scalia, J., dissenting) (citing to relevant legislative history)). "Habitat modification and takings, in other words, were viewed as different problems, addressed by different provisions of the Act" (*Id.* at 728).

Accordingly, the Services conclude that rescinding the regulatory definition of "harm" is consistent with the single, best reading of the ESA and with the statute's overall framework, which clearly distinguishes between prohibitions on "take" and broader habitat conservation responsibilities.

*Comment 2:* Multiple commenters stated that the best reading of the ESA does not support the Services' proposed rule. Several commenters supported the rescission, citing the Supreme Court's decision in *Loper Bright,* which ended *Chevron* deference and emphasized that courts must apply the single, best reading of a statute. These commenters aligned with Justice Scalia's dissent in *Sweet Home,* asserting that "take" under the ESA refers only to direct, affirmative acts against individual animals themselves, not to indirect effects such as habitat modification. They opined that the current definition improperly extends liability to unintended consequences and lacks statutory grounding under section 9. Others, however, contended that the Services' proposal misreads the statute and ignores the ESA's structure, purpose, and legislative history. They asserted that habitat protection is central to the ESA, citing multiple statutory provisions and decades of judicial and agency interpretation affirming that "harm" includes habitat destruction that results in injury or death to wildlife. These commenters stated that the Services' reliance on *Sweet Home's* dissent is misplaced, as the majority opinion upheld the current definition based on statutory text, purpose, and legislative history independent of *Chevron.* They also noted that Congress amended the ESA after *Sweet Home* without altering the definition of "take," implicitly endorsing the broader interpretation. Overall, the comments reflect a divergence of opinions over whether the best reading of the ESA supports or rejects the inclusion of habitat modification in a definition of "harm."

*Response:* After careful review of comments received, the Services have determined that the regulatory definition of "harm" runs contrary to the single, best reading of the ESA. As stated by Justice Scalia in his dissenting opinion in *Sweet Home,* the term "take," defined in section 3, applies to actions that result in actual injury or death to listed species. The Services find that considering habitat degradation or modification that kills or

injures wildlife by significantly impairing improper essential behavioral patterns stretches the term "harm" beyond its natural meaning and creates overlap with other provisions of the ESA, such as sections 5 and 7, which are specifically designed to address habitat conservation.

For more discussion, see Background, above, and our response to Comment 1. We reject the majority's interpretation of the ESA as articulated in *Sweet Home.* The Services conclude that rescinding the definition of "harm" supports the single, best reading of the ESA.

*Comment 3:* Multiple commenters opined that the rescission of the definition of "harm" would weaken the effectiveness of section 7 consultations by excluding incidental take resulting solely from habitat modification or degradation. They expressed concern that this narrower interpretation would lead to incomplete jeopardy analyses and undermine the legal and scientific basis for "no jeopardy" determinations. Commenters asserted that section 7 requires ongoing oversight and reinitiation of consultation when new information or changes in actions affect listed species or their designated critical habitat. They highlighted that incidental take statements are a critical mechanism for monitoring and limiting "harm," and that these statements must include enforceable thresholds and measures to minimize impacts to species. Commenters also pointed to the legislative history of the ESA, asserting that Congress intended section 7 to encompass habitat-related impacts as a form of "take," and that this intent is reflected in the statute's structure and amendments. They contended that rescinding the definition of "harm" and not considering habitat modification or degradation as a form of "take" would contradict this intent and reduce the ability of Federal agencies to ensure that their actions do not jeopardize listed species.

*Response:* The rescission of the definition of "harm" does not alter the statutory requirement that Federal agencies ensure their actions are not likely to jeopardize the continued existence of listed species or "*result in the destruction or adverse modification of [critical] habitat of such species*" (16 U.S.C. 1536(a) (emphasis added)). "Destruction or adverse modification" is a separate regulatory consideration from "take." Thus, not only is the statutory prohibition in section 7 against habitat modification not affected at all by the deletion of the definition of "harm" (which itself defines, in part, "take"), but the presence of this separate and distinct provision in the statutory text regarding habitat modification reinforces the Services' conclusion that habitat modification is not properly part of the definition of "take," as such a construction would violate the canon against surplusage. The Services emphasize that section 7 remains fully applicable to Federal actions that may affect listed species or their designated critical habitat. This rulemaking also does not change any species classifications or critical habitat designations.

The rescission of the regulatory definition of "harm" does not limit the Services' ability to assess impacts to listed species and critical habitat from all components of the action agency's proposed action through the section 7 process. Yet, imposing the current incidental take regime on activities beyond those authorized by the statute is not an appropriate option that the Services believes they should avail themselves of (even if it were permissible under *Loper Bright*'s dicta regarding the statutory-stare-decisis value of prior cases), given the executive branch's duty to see that the laws are faithfully executed. What commenters are suggesting is, in short, that we continue to subject a swath of activities to the incidental-take regime, which otherwise would not be subject to this regime on the best reading of the statute, simply because that would allow the Services to better monitor and accomplish some other goal, *i.e.,* monitoring and limiting true "harm." The Services reject this invitation as not being a proper implementation of the law, because it would impose burdens on the citizenry that are not authorized by statute.

*Comment 4:* Multiple commenters stated that the proposed rescission of the definition of "harm" would significantly reduce the incentive for landowners to voluntarily seek permits under section 10(a) and would weaken the functional basis of section 10 permitting. They emphasized that the current definition of "harm" is essential for implementing habitat conservation plans (HCPs) and the associated incidental take permits (ITPs), as well as conservation benefit agreements (CBAs) and their associated enhancement of survival (EOS) permits. These tools provide regulatory assurances for landowners and enable proactive, voluntary conservation. Commenters warned that removing the definition would reduce incentives to seek ITPs, increase unpermitted "take," and lead to greater habitat destruction. They also opined that the change would create legal uncertainty and diminish the effectiveness of conservation strategies, arguing that section 10(a) permitting depends on a regulatory framework that recognizes habitat modification or degradation as a form of "take."

*Response:* Commenters are correct that private parties seeking ITPs and EOS permits pursuant to section 10(a) of the ESA will no longer need to articulate the "impact" to species' habitat, explain how they will "minimize and mitigate" habitat modification or degradation, or consider alternatives in service of mitigating habitat modification or degradation in their conservation plans in order to obtain an incidental take permit. This rulemaking takes the position that the Services' requiring private parties to do so is unlawful, and thus impermissible for the agency to require.

Relatedly, in issuing an incidental take permit, the Secretary of the Interior will no longer consider the effects of a proposed action on the species' habitat, nor will the permit contain terms and conditions requiring permittees to take into account habitat modification and degradation when executing the permitted take. Because the Services believe that the Act's prohibition on "take" does not properly include habitat modification (and thus have removed the regulatory definition of "harm," which swept habitat modification into the statutory definition of "take"), it follows that permits for *incidental* take are no longer required to engage in such activities. The attempt of at least one Commenter to argue that, because "conservation plans" are mandated by section 10, therefore *habitat* conservation plans are mandated by statute (and, *mutatis mutandis,* ITPs and related instruments must account for habitat modification), gets the matter precisely backward (16 U.S.C. 1539(a)(1)(B) & (a)(2)(A)). The word "habitat" appears nowhere in section 10. Rather, section 10's incidental-take regime is symmetrical to what would otherwise be take prohibited as "take" under section 9. If habitat modification were banned as take, then an ITP, along with a conservation plan and all the other requirements of section 10, would be necessary to modify such habitat. But because the Act does *not* ban habitat modification as take in the first place, therefore no ITP, conservation plan, or other instrument, is required to engage in such activities.

The same Commenter also charged that the Services' regulations addressing HCPs are now "inconsistent" with the rescission. The Services are studying the extent to which its regulations governing such permits, *e.g.,* 50 CFR 17.22, 17.32, may need to be updated to reflect this final rule and the best

reading of the Act, though the Services note also that other parts of the Act affect habitat modification, as noted in this final rule. In all events, this has not altered the Services' conclusion as to the best meaning of the text of the Act, which is what has driven this final rule.

The rescission of the regulatory definition of "harm" does not eliminate the Services' ability to issue ITPs or EOS permits where there is an affirmative conduct intentionally directed against a particular animal or animals. Additionally, the Services will continue to work with applicants to ensure that HCPs and CBAs are developed and permitted to address species-specific impacts and that conservation and mitigation measures are commensurate with the ESA's definition of "take."

This rulemaking also does not prohibit willing landowners from implementing conservation plans and agreements that are more comprehensive than what sections 9 and 10 of the ESA require. Nor does this rulemaking prohibit entities (including state governments) from engaging in habitat-conservation efforts that could be supported by other provisions of the ESA.

*Comment 5:* Multiple commenters opined that rescinding the regulatory definition of "harm" would introduce significant regulatory uncertainty and inconsistency in ESA implementation. They emphasized that the long-standing definition has provided clarity and stability for decades, supporting conservation programs, permitting frameworks, and legal agreements across agencies and stakeholders. Removing it without a clear alternative would lead to confusion, delays, litigation, and weakened conservation outcomes. Some of these commenters further asserted that the reasoning of Justice Scalia's dissent compelled the retention of the first sentence of the regulations, which—in these commenters' view—would be consistent with the Trump Administration's policy priorities. In contrast, some commenters supported the proposed rule, asserting that the current definition imposes excessive regulatory burdens, particularly through its inclusion of habitat modification. These supporters argued that rescission would reduce red tape, alleviate economic impacts on land use sectors, and allow for more targeted, science-based conservation efforts.

*Response:* By rescinding the regulatory definition of "harm," the Services are aligning the definition of "take" with the single, best reading of the statute, consistent with *Loper Bright*. Although the current definition of "harm" has been in place for decades, its inclusion of habitat modification or degradation where it actually kills or injures wildlife "by significantly impairing essential behavioral patterns" as a form of "take" has led to interpretive challenges and regulatory uncertainty, particularly in determining when habitat modification rises to the level of "take." Although rescinding the definition of "harm" may reduce inconsistency and regulatory uncertainty by focusing on acts which actually kill or injure listed species, the Services are rescinding the definition of "harm" because it does not accord with the best meaning of the statute. The Services have also concluded that no replacement definition is needed. The ESA itself defines "take" (16 U.S.C. 1532(19)), and that definition is clear and robust.

By rescinding the definition of "harm," the Services are relying on the plain text of the statute as the standard going forward. But previously issued permits or incidental take statements will not be required to be reevaluated solely because of this final rule, nor does this final rule invalidate prior conservation agreements or other conservation or recovery efforts already in effect. Such incidental-take statements, and indeed the entire section 7 analysis, were but one input among many into the ultimate decision whether and how to authorize a given action (*Cf. Seven Cnty. Infrastructure Coal.* v. *Eagle Cnty., Colorado,* 605 U.S. 168, 180 (2025) (noting that an environmental impact statement issued under the National Environmental Policy Act is "only one input into an agency's decision," and that the ultimate locus of analysis, for purposes of administrative law, is "the agency's final decision")). Disturbing the finality of the overall permitting decision would be highly disruptive to settled expectations, as well as immensely time-consuming and difficult, in return for at most speculative gains. Moreover, the regulations governing HCPs include assurances to permittees in case of changed or unforeseen circumstances (see 50 CFR 17.22(b)(5), 17.32(b)(5)). The Services have considered that these regulations reassure permittees that the Services would not impose additional requirements,[8] whereas rescinding the definition of harm might in some situations lessen existing burdens (*e.g.,* if the permittee is mitigating only for habitat impacts that were considered prohibited as take when their permit was issued, the permittee may choose to return their permit in order to not have to continue expending resources to mitigate). Nonetheless, such situations are speculative, while the central offer of these regulations to permittees is repose and certainty. These values counsel very strongly—and decisively—against not disturbing previously issued permits.

*Comment 6:* Multiple commenters requested that if the Services finalize the proposed rule, they must issue clear guidance on how "harm" and "take" will be interpreted and applied. Commenters emphasized that without a regulatory definition, the regulated community faces uncertainty about what actions may constitute "take" under section 9 and when particular requirements will need to be met, especially in section 7 consultations and permitting under section 10(a). Commenters requested examples and clarification to ensure consistent implementation and avoid delays or inconsistent decisions. They also urged the Services to confirm how the rule applies to pending consultations and to update existing guidance documents or include clarifications in the final rule's preamble.

*Response:* The definition of "take" in section 3 of the Act remains unchanged and will stand on its own as the best reading of the Act. In addition, under the *noscitur a sociis* canon, the term "harm," like the other nine verbs in the definition of "take," should be construed to require an "affirmative act[] . . . directed immediately and intentionally against a particular animal—not [an] act[] or omission[] that indirectly and accidentally cause[s] injury to a population of animals" (515 U.S. at 719–720).

The Services intend to review each specific situation and species' response to a proposed action to determine whether it may or may not constitute "harm" to a species. As stated above, this rule is setting prospective standards only; previously issued permits or incidental take statements will not be required to be reevaluated solely because of this final rule. Such incidental-take statements, and indeed the entire section 7 analysis, were but one input among many into the ultimate decision whether and how to authorize a given action (*Cf. Seven Cnty. Infrastructure Coal.* v. *Eagle Cnty., Colorado,* 605 U.S. 168, 180 (2025)). Disturbing the finality of the overall permitting decision would be highly

[8] *E.g.,* 50 CFR 17.22(b)(5)(iii)(A) ("In negotiating a response to unforeseen circumstances, the Director will not require the commitment of additional land, water, or financial compensation or additional restrictions on the use of land, water, or other natural resources beyond the level otherwise agreed upon for the species covered by the conservation plan without the consent of the permittee.").

disruptive to settled expectations, as well as immensely time-consuming and difficult, in return for at most speculative gains. For more on this rule's impact on future section 10(a) permits, see the Services' responses to Comments 5 and 20. For a description of the ways in which this rule does not impact future section 7 consultations, see the Services response to Comment 4.

The Services also acknowledge that reliance interests have built up around this regulatory definition. Rescinding the regulatory definition—without a replacement at this time—promotes the lawful operation of executive branch regulatory programs, and the Services believe that this core value outweighs the reliance interests that have built up around the continued maintenance of an unlawful regulatory definition, even if such were possible. For further responses to reliance interests, see Comments 13, 16, 18, 20, and 21.

*Comment 7:* Multiple commenters stated that removing habitat modification from the definition of "take" would severely weaken the Act's ability to protect imperiled species. They emphasized that significant habitat modification or degradation often results in injury or death to wildlife by impairing essential behaviors such as feeding, breeding, and sheltering. Without recognizing these indirect but biologically consequential impacts as "take," the Services would be unable to regulate many of the most common and damaging threats to species survival. Commenters stated that habitat loss is the leading driver of species decline and extinction and excluding it from the definition of "take" would eliminate a critical legal mechanism for preventing such outcomes. They wrote that by narrowing the scope of what qualifies as "take," the Services would be forced to ignore the ecological realities that species cannot survive without intact, functional habitats. Commenters stated that this shift would not only violate the purpose of the ESA but also increase the likelihood of extinction for many species by allowing habitat destruction to proceed without consequence.

*Response:* The Services emphasize that the rescission of the regulatory definition of "harm" does not diminish the importance of habitat loss or degradation as a significant threat to many species listed under the ESA. Habitat protection and conservation play a critical role in species conservation and recovery efforts. Rather, this rule clarifies that "take" applies only to an "affirmative act[] . . . directed immediately and intentionally against a particular animal—not [an] act[] or omission[] that indirectly and accidentally cause[s] injury to a population of animals" (515 U.S. at 719–20 (Scalia, J., dissenting)). Habitat-related impacts are considered and addressed under other provisions of the ESA, including section 7 consultations section 5 land acquisition, and cooperation with willing landowners through voluntary conservation programs. The Services will continue to use these tools to address threats to species and to help chart the path to recovery and delisting. The rescission of the definition of "harm" intends to align the implementation of the Act with the single, best reading of the statute by making clear that habitat modification or degradation does not qualify as "take."

*Comment 8:* Multiple commenters opined that the proposed rule's basis for rescinding the definition of "harm" directly undermines the purpose and function of critical habitat designations under the ESA. They emphasized that critical habitat is essential for species survival and recovery, and rescinding the definition of "harm" would lead to increased degradation of these areas, pushing species closer to extinction. Commenters also contended that the rule would violate the agencies' statutory duties to designate and protect critical habitat. They disagreed with the reliance on a narrow legal interpretation that disregards the legislative history and structure of the ESA, particularly the 1982 amendments that clarified the importance of habitat in incidental take authorizations. These amendments, they stated, affirm that impacts to habitat can constitute "take" and that section 7 requires Federal agencies to avoid actions that would destroy or adversely modify critical habitat. Commenters maintained that without a regulatory definition of "harm" that includes habitat modification or degradation, the Services would not be able to minimize effects to critical habitat.

*Response:* The Services recognize the importance of critical habitat designations in promoting the conservation and recovery of listed species. The definition of critical habitat in section 3(5)(A) and the process and requirements of designating critical habitat in section 4(b)(2) of the Act will remain separate and distinct from the definition of "take" in section 3.[9] The rescission of the regulatory definition of "harm" does not alter the statutory obligations for the Services to use the best scientific data available to designate critical habitat under section 4(b)(2) of the Act.

The Services maintain that habitat protection remains a central component of the ESA's conservation framework. This rescission has no impact on the requirements of Federal agencies under section 7(a)(2) to avoid the destruction or adverse modification of designated critical habitat. We will continue to analyze effects to the physical or biological features of designated critical habitat.

The Services conclude that "take" applies only to an "affirmative act[] . . . directed immediately and intentionally against a particular animal—not [an] act[] or omission[] that indirectly and accidentally cause[s] injury to a population of animals" (515 U.S. at 719–20 (Scalia, J., dissenting)). We do not find persuasive the argument that the 1982 amendments to the ESA, which allowed the Secretary of the Interior to issue incidental take permits, suggests that Congress understood section 9 to prohibit indirect as well as deliberate takings. Habitat modification is not the only activity that might incidentally cause a prohibited taking. For example, fishing for unprotected salmon may inadvertently but unavoidably cause takes of an endangered species of salmon (515 U.S. at 729).

*Comment 9:* Commenters contended that the Services misinterpreted *Loper Bright* as exempting interpretive rulemakings from the National Environmental Protection Act (NEPA; 42 U.S.C. 4321 *et seq.*). They stated that the decision addressed judicial review, not agency obligations, and that the Services remain bound by prior precedent, including *Sweet Home,* until overturned by the courts.

*Response: Loper Bright* did not alter or exempt agencies from their responsibilities under NEPA. The Services do not rely on *Loper Bright* to justify the use of a categorical exclusion in this rulemaking. Rather, the Services have independently evaluated the applicability of NEPA and determined that the rule qualifies for a categorical exclusion under 43 CFR 46.210(i) and the U.S. Department of the Interior Handbook of National Environmental Policy Act Implementing Procedures, appendix 2. As the Services noted in the proposed version of this rule, two recent proposed and final rulemakings addressing a regulatory definition of "habitat" under the Endangered Species Act found that these categorical exclusions applied. See Endangered and

[9] Indeed, the presence of these separate and distinct provisions in the statutory text regarding habitat modification reinforces the Services' conclusion that habitat modification is not properly part of the definition of "harm" and, thus, of "take," as such a construction would violate the canon against surplusage.

Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat, 87 FR 37757, June 24, 2022; Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat, 86 FR 59353, October 27, 2021; Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat, 85 FR 81411, December 16, 2020; Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat, 85 FR 47333, August 5, 2020.

The Services have also concluded that, because this rescission is compelled by the best reading of the statutory text, "the proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action." (42 U.S.C. 4336(a)(4); see *Dep't of Transp.* v. *Pub. Citizen,* 541 U.S. 752, 766–70 (2004)).

Our rescission of the regulation definition of "harm" on the ground that it does not reflect the best reading of the statutory text effectuates the Executive Branch's obligation to "take Care that the Laws be faithfully executed," U.S. Const. art. II, section 3, and is consistent with *Loper Bright* and *Sweet Home.* At bottom, the Services are engaged in legal interpretation, and the Services have determined that the bottom-line policy here (the rescission of the regulations) is nondiscretionary in light of the regulations' unlawfulness, even if the interstitial particulars of effectuating that policy (*e.g.,* whether to rescind the whole regulation and whether to implement a new definition, regardless of what it would say) require an exercise of discretion that has nothing to do with environmental factors.

*Comment 10:* Several commenters challenged the Services' use of a categorical exclusion, asserting that the proposed rule is not merely procedural and will have significant environmental effects. They opined that the Services failed to justify the categorical exclusion and did not evaluate whether extraordinary circumstances apply.

*Response:* The Services considered whether the proposed rule qualifies for a categorical exclusion and whether any extraordinary circumstances exist that would preclude its use. The Services determined that the proposed agency action is non-discretionary, and in the alternative, that the proposed regulation changes themselves will not have a significant individual or cumulative effect on the quality of the human environment for purposes of NEPA—notwithstanding potential indirect follow-on economic impacts or impacts on small entities (*Cf. Seven Cnty. Infrastructure Coal.* v. *Eagle Cnty.,* 605 U.S. 148, 183 (2025) ("A reviewing court may not 'substitute its judgment for that of the agency as to the environmental consequences of its actions.'" (quoting *Kleppe* v. *Sierra Club,* 427 U.S. 390, 410 n.21 (1976)))). The Services have applied a categorical exclusion to comply with the NEPA. As the Services noted in the proposed rulemaking and above, two recent proposed and final rulemakings addressing a regulatory definition of "habitat" under the Endangered Species Act found that the exact same categorical exclusions invoked in this rulemaking applied. See Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat, 87 FR 37757, June 24, 2022; Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat, 86 FR 59353, October 27, 2021; Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat, 85 FR 81411, December 16, 2020; Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat, 85 FR 47333, August 5, 2020. The Services have determined that extraordinary circumstances do not apply. For a detailed discussion of the Services' NEPA analysis see *National Environmental Policy Act* in the Required Determinations section, below, and the environmental action statement and supporting categorical exclusion documentation available at *https://www.regulations.gov* in Docket No. FWS–HQ–ES–2025–0034.

*Comment 11:* One commenter stated that the Services' failure to prepare an EIS violates NEPA, citing *Sierra Club* v. *Marsh,* 816 F.2d 1376, 1387 (9th Cir. 1987), as precedent. They emphasized that the proposed rule would significantly affect the human environment by weakening habitat protections for endangered species, which–in their view–meets the threshold for requiring an EIS. Commenters noted that *Sierra Club* v. *Marsh* established that agencies must assess environmental impacts before making irreversible commitments, and that deferring such analysis undermines NEPA's core purpose. They asserted that the Services' reliance on categorical exclusions or claims of nondiscretionary action does not meet the legal standard set by this case.

*Response:* The Services respectfully disagree with the assertion that the proposed rule constitutes an irreversible commitment of resources or a major Federal action with significant environmental effects. This rule does not, by itself, authorize any specific activity or project. It does not alter the statutory requirements of the ESA, including the obligation of Federal agencies to consult under section 7 and to avoid jeopardizing listed species or adversely modifying critical habitat. The Services have determined that the rule qualifies for a categorical exclusion and that no extraordinary circumstances exist that would warrant preparation of an EIS.

*Comment 12:* Multiple commenters contended that the Services are exercising discretion in proposing to rescind the definition of "harm," and therefore cannot claim the action is nondiscretionary to avoid NEPA review. They emphasized that interpreting statutory language involves judgment, and that NEPA applies to discretionary actions with potential environmental impacts.

*Response:* The Services acknowledge the comments asserting that the proposed rule is a discretionary action. As the Services stated in the proposed rule, we are undertaking this recission because we believe it is compelled by the best reading of the statutory text. Accordingly, we believe that "the proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action" (42 U.S.C. 4336(a)(4); see *Dep't of Transp.* v. *Pub. Citizen,* 541 U.S. 752, 766–70 (2004)).

Moreover, commenters have cited no case, and the Services are aware of none, standing for the proposition that NEPA review applies to questions of pure legal interpretation. This would be a novel interpretation that would dramatically expand the scope of NEPA—*e.g.,* does it cover briefing in pending cases—and the Services will not, without more, adopt this new proposition.

In the alternative, the Services applied a categorical exclusion to comply with NEPA. The Services have determined that the rule qualifies for a categorical exclusion because it is "of an administrative, financial, legal,

technical or procedural nature'' (43 CFR 46.210(i)). The Services have also evaluated whether any extraordinary circumstances apply and have concluded that none are present. Accordingly, the use of a categorical exclusion is appropriate and consistent with NEPA and applicable agency regulations and procedures. As the Supreme Court recently held in *Seven County Infrastructure Coal.* v. *Eagle County, Colorado,* ''NEPA is a purely procedural statute,'' ''not a substantive roadblock,'' and is an area where ''substantial deference'' is due to ''agency choices so long as they fall within a broad zone of reasonableness'' (605 U.S. 168, 173, 183 (2025); see *id.* at 182–83 (''When assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry . . . . Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness.'')). To the extent NEPA applies at all to this question, the Services believe it is readily satisfied by the existing categorical exclusion, which has, moreover, been repeatedly applied, under the administrations of Presidents of both major political parties, to rulemakings in this exact area, see responses to Comments 9 and 10.

*Comment 13:* Multiple commenters stated that the Services' rescission of the regulatory definition of ''harm'' is arbitrary and capricious under the APA. Commenters asserted that the Services did not provide a detailed justification for this reversal, nor did they address the serious reliance interests built around the existing definition. Commenters opined that rescinding the current definition of ''harm'' switches course on decades of regulatory and judicial interpretation, including the Supreme Court's majority opinion in *Sweet Home.* Commenters asserted that the proposal appears to be driven by political motivations rather than sound reasoning or legal necessity, and that it lacks the transparency and consistency required by the APA.

*Response:* The Services disagree with the characterization of this rule as arbitrary and capricious under the APA. The rule is based on a reevaluation of the statutory text of the ESA. The Services' rescission of the regulatory definition of ''harm'' on the ground that it does not reflect the best reading of the statutory text effectuates the Executive Branch's obligation to ''take Care that the Laws be faithfully executed'' (U.S. Const. art. II, section 3).

In proposing to rescind our regulatory definition of ''harm,'' the Services noted that they were ''considering whether there are legitimate reliance interests on the regulations under reexamination,'' but that ''because it is the President's duty to see that the laws are faithfully executed, in all but the most unusual cases, we believe that reliance interests likely will be outweighed by the constitutional interest in repealing regulations that do not reflect the best reading of the statute.'' 90 FR 16102, at 16104, (*citing Dep't of Homeland Sec.* v. *Regents of the Univ. of California,* 591 U.S. 1, 30–32 (2020; *Regents*)). We asked for comment on reliance interests specifically (*Id.*). After reviewing comments we received on reliance interests, the Services affirm that reliance interests are outweighed by the constitutional interest in repealing regulations that do not reflect the best reading of the statute.

Commenters raised four principal arguments regarding reliance interests. The first is the reliance interests of those who provide services related to mitigation. Commenters noted that if habitat modification is no longer regulated under section 9 of the ESA, then conservation-financing, species-mitigation, and habitat-restoration markets, participation in which was once necessary to obtain an incidental take permit under section 10 of the ESA, will be eliminated. The appetite for these services among permittees will disappear, leaving existing and pending offsets as essentially stranded investments without a market. Commenters estimated approximately $483 million has been spent to date on species habitat and that the proposed rescission alone has chilled an additional $300 million in planned investments. Additionally, commenters stated the broader economic impact of habitat-restoration activities is estimated to approach $10 billion overall and supports more than 53,000 jobs.

The Services recognize that a restoration and mitigation industry has developed under the prior regulatory framework. Commenters are correct that changes in the regulatory system may influence market demand for certain mitigation efforts focused on habitat conservation that were once necessary to obtain an incidental take permit under section 10 of the ESA. As noted in the preamble, the magnitude of such impacts is uncertain and not amenable to reliable quantification. What is more, however, is that the services sold in these markets are essentially regulatory rents. Where there is no justification in law for imposing the relevant regulation, imposing such costs is inherently illegitimate—and pleas to keep them, though cast in the form of reliance interests, are essentially rent-seeking. The Services therefore, in accord with *Regents,* has decided that ''reliance interests in benefits [*i.e.,* regulatory rents] that it views as unlawful are entitled to no or diminished weight'' (591 U.S. at 32). This reliance interest is addressed further at Comment 21.

The second, and closely related, class of reliance interests articulated by comments is that of those who sell services related to voluntary conservation programs, multi-year HCPs (including the investment in planning for an HCP, the investment in implementing the HCP, and land management practices, including voluntary conservation measures. Commenters noted that, if habitat modification is no longer regulated as ''take'' under section 9, then such services will no longer be needed to obtain an incidental take permit under section 10, and, as a result, their market will dry up.

The Services recognize that these industries had developed under the prior regulatory framework. Commenters are correct that changes in the regulatory system may influence market demand for certain mitigation efforts focused on habitat conservation that were once necessary to obtain an incidental take permit under section 10 of the ESA. This revision is prospective only and does not affect permits that have been granted as of the date this rule becomes final. That is, no conservation agreement or habitat management plan that is in effect as of the date of this rule becomes final will be affected by it. Going forward, the Services intend to review each specific situation and species' response to a proposed action to determine whether it may or may not constitute ''harm'' to a species pursuant to section 3 of the ESA. The Services will continue to work with applicants to ensure that HCPs and CBAs are developed and permitted to address species-specific impacts and that conservation and mitigation measures are commensurate with the ESA's definition of ''take.'' This rulemaking does not prohibit willing landowners from implementing conservation plans and agreements that are more comprehensive than what sections 9 and 10 of the ESA require. However, yet again, beyond situations in which private persons *voluntarily* wish to purchase such mitigation services or need to purchase them to satisfy other provisions of law, the

market for such services under sections 9 and 10 is a creation of regulations that, in the view of the Services, are not authorized by law—and that, as such, the services sold in these markets are essentially regulatory rents. Where there is no justification in law for imposing the relevant regulation, imposing such costs is inherently illegitimate—and pleas to keep them, though cast in the form of reliance interests, are essentially rent-seeking. The Services therefore, in accord with *Regents,* has decided that "reliance interests in benefits [*i.e.,* regulatory rents] that it views as unlawful are entitled to no or diminished weight" (591 U.S. at 32). This reliance interest is addressed further at Comment 18.

The third main class of reliance interests articulated by commenters is that of persons interested in the protection of wildlife and habitats. Commenters noted that habitat protections were important to ecological stability, ecosystem services, pollination, and clean water; that aesthetic and recreational interests would be injured; that the wildlife-watching industry would be damaged; and that the sport-fishing industry would suffer.

The Services emphasize that the rescission of the regulatory definition of "harm" does not diminish the importance of habitat loss or degradation as a significant threat to many species listed under the ESA. Habitat protection and conservation play a critical role in species conservation and recovery efforts. Rather, this rule clarifies that "take" applies only to actions that cause actual injury or death to listed species. Habitat-related impacts are considered and addressed under other provisions of the ESA, including section 7 consultations, critical habitat designations, section 5 land acquisition authorities, and cooperation with willing landowners through voluntary programs. The Services will continue to use these tools to address threats to species and to help chart the path to recovery and delisting. The rescission of the definition of "harm" intends to align the implementation of the Act with the single, best reading of the statute by removing habitat modification or degradation as a form of prohibited "take." This rulemaking does not prohibit willing landowners from implementing conservation plans and agreements that are more comprehensive than what sections 9 and 10 of the ESA require. Beyond these responses, the Services note that much of what such Commenters are casting as reliance interests are really policy disagreements: Commenters wish that Congress had, or the Administration would continue to, set the balance between habitat preservation and the rights of landowners differently than, in the Service's view, the Act in fact does. The Services are determined, by contrast, to adhere to what is in their view the best reading of the law.[10] These comments are addressed further at Comments 18 and 20.

The fourth main class of reliance interests articulated by comments is that of State reliance interests: States wrote to claim that the existing definition of harm bolsters state laws, or that states rely on Federal definition of harm when state does not have a law on point, and that in any event, the existence of the current federal definition of harm has ensured consistency across state lines.

The Services respond that the rescission of the definition of "harm" in the Act does not alter the ability of States to implement their own conservation programs or to regulate habitat impacts under State law. Federal law and regulations create a legal floor (or minimum standard). Congress preserved the authority of any state to enact and enforce laws or regulations that provide species protections more stringent than federal protections while maintaining the ESA's preemption over any state law that would permit what is prohibited under the ESA or prohibit what is authorized under the ESA (16 U.S.C. 1535(f)). Nor does this final rule affect the Services' commitment to cooperative federalism and coordination with State agencies, which takes place pursuant to section 6 cooperative agreements, section 10(a) permits, and section 7 consultations, not through the implementation of section 9 take prohibitions. For example, section 6 of the ESA permits the Secretary of the Interior to "enter into agreements with any State for the administration and management of any area established for the conservation of endangered species or threatened species" (16 U.S.C. 1535(b)). The Secretary of the Interior may also enter into agreements with States, that "establish[ ] and maintain[ ] an adequate and active program for the conservation of endangered species and threatened species" and plants (*Id.* at 1535(c)).[11] This rule does not change any species or critical habitat designations. The Services will continue to work with States to support species recovery and habitat protection through section 6 cooperative agreements, section 7 consultations, and other collaborative mechanisms. Beyond these responses, though, the Services note that much of what these state commenters are casting as reliance interests are really policy disagreements: These states wish that Congress had, or the Administration would continue to, set the federal floor differently than, in the Service's view, the Act in fact does. The Services are determined, by contrast, to adhere to what is in their view the best reading of the law. Indeed, in this particular context, federalism concerns counsel heavily in favor of rejecting these states' purported reliance interests, for if the federal government were to maintain the elevated federal floor these states request (and which is not authorized by the best reading of the statute), other states would not have any freedom to try other approaches. These comments are addressed further at Comment 16.

To return to the commenters' overall point, the Services hold that reliance on an unlawful regulatory definition is unjustified because the regulatory certainty provided by an unlawful definition is illegitimate. Thus, the Services do not believe that these reliance interests overcome the executive branch's important interest in maintaining and enforcing only lawful regulations. The Services believe that a full rescission, without the implementation of a replacement definition at this time, best achieves this interest. The Services understand that at least one court has stated that "an agency must always consider serious reliance interests, even when it concludes an earlier policy was unlawful," but that the agency may determine that such reliance interests "are entitled to no or diminished weight" because of the unlawfulness of the earlier policy (*A.C.R.* v. *Noem,* 809 F. Supp. 3d 103, 122 (E.D.N.Y. 2025)). The Services have considered the reliance interests and determined that they are entitled to no or diminished weight.

The Services further acknowledge the well-established principle that when an agency changes position, "provid[ing]

[10] One commenter also argued that animal rescue programs would be increasingly burdened, because without habitat modification being included in the definition of "harm," more animals would be hurt and need rescue. As for effects to Animal Rescue Programs, rescinding the regulatory definition of "harm" will not negate the fact that actions that directly result in injury or death to listed wildlife still constitutes "take" under the ESA. This rule would not result in the large-scale habitat changes that the commenter asserts would result in higher instances of animal injury. As stated above, habitat-related impacts will be addressed under other provisions of the ESA.

[11] The Services note, again, that the explicit provisions for habitat protection in so many other parts of the ESA reinforces their conviction that the portion of section 9 forbidding "take" was not meant to address habitat modification.

reasoned explanation'' has required that the agency ''display awareness that it *is* changing position'' and ''show that there are good reasons for the new policy'' (*FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009)). We have satisfied that requirement in making this final decision. In the Services' proposed rule, the Services included a discussion of the statutory framework, *Sweet Home,* and our rationale for concluding that the definition of ''harm'' does not support the best meaning of the Act, the specific proposed regulation change, and asked for public comment. We have now reviewed the public comments and in this final rule have provided responses to unique, substantive comments. Thus, the process that we used to promulgate this rule complied with the applicable requirements of the APA.

*Comment 14:* Multiple commenters asserted that the Services' proposal lacks the reasoned analysis required by the APA, as articulated in *Motor Vehicle Manufacturers Ass'n* v. *State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29 (1983; *State Farm*). They assert that the Services failed to examine relevant information or provide a satisfactory explanation for abandoning the longstanding definition of ''harm.'' Commenters stated that the Services did not assess the impacts of the change on species conservation, habitat protection, or regulatory programs such as ITPs and HCPs. Instead, they assert that proposal relies on a narrow legal rationale and a misreading of recent case law, without addressing the statutory purpose of the ESA or the practical consequences of the change. Commenters concluded that this failure to consider important aspects of the problem and to offer a rational connection between the facts found and the choice made renders the proposal legally deficient under *State Farm.*

*Response:* The Services respectfully disagree that the proposed rule lacks the reasoned analysis required under the APA. To begin, commenters appear to misapprehend the nature of the arbitrary-and-capricious standard. That standard simply ''requires that agency action be reasonable and reasonably explained'' (*FCC* v. *Prometheus Radio Project,* 592 U.S. 414, 423 (2021)). ''Judicial review under that standard is deferential'': ''A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision'' (*Id.*). In accordance with *State Farm,* the Services have provided a reasoned explanation for the proposed rescission of the regulatory definition of ''harm.'' The Services explained that they were rescinding the regulatory definition of ''harm'' because it does not reflect the best reading of the ESA. This includes a detailed analysis of the statutory text, structure, and purpose of the ESA, as well as the legal implications of the Supreme Court's decision in *Loper Bright.* That is a complete explanation that satisfies *State Farm.* The Services have also now considered public comments received. This rule reflects the agency's view of the best interpretation of the ESA, which does not permit agencies to factor in habitat modification or degradation in the context of section 9 prohibited take. The Services have addressed reliance interests, including reliance interests of those involved in regulatory programs such as ITPs and HCPs, throughout responses to comments, including the Services' responses to Comments 5, 13, 20, and 23. The Services have satisfied their obligations under the arbitrary-and-capricious standard and *State Farm.*

*Comment 15:* Multiple commenters contended that the Services must conduct intraservice consultation under section 7 of the ESA before finalizing the proposed rescission of the definition of ''harm.'' They asserted that the action is not exempt from consultation requirements and may adversely affect numerous listed species, particularly those species where the primary threat is habitat loss. Commenters cited the Endangered Species Consultation Handbook and joint regulations, which require consultation for agency actions, including rulemakings, that may affect listed species or critical habitat. They asserted that the Services must prepare a biological opinion evaluating species-specific impacts and ensure the action does not jeopardize species' continued existence.

*Response:* As stated in the Required Determinations section, below, the Services are acting in their unique statutory role as administrators of the Act and are engaged in a legal exercise of interpreting the standards of the Act. The Services' administration of the Act is not in itself subject to the Act's provisions, including section 7(a)(2). The Services have a historical practice of issuing their general regulations under the ESA without undertaking section 7 consultation (see *Endangered Species Act* in the Required Determinations section below). This practice accords with the plain language, structure, and purposes of the ESA, which does not place a consultation obligation on the Services' administration of the Act. Furthermore, from a pragmatic point of view, the proposed consultation requirement would be impracticably elaborate, even nonsensical. Were commenters correct, the Services would be required to conduct an analysis as to every single endangered species on the list and speculate as to how the new legal definition would produce different consequences as to each—as section 7 still mandated habitat protection through an entirely different regime that this rule does not touch, see the Services' response to Comment 3. Little wonder, then, that such a recursive and reticulated procedure was not undertaken when this rule was promulgated in 1975 and has *never* been the Services' practice when it comes to changes to the ESA implementing regulations themselves.

*Comment 16:* Multiple commenters asserted that the proposed rule would create significant inconsistencies with existing State regulations and undermine State-led conservation efforts. Many states, such as New Mexico and Oregon, have developed their own definitions of ''take'' or ''harm'' that include habitat modification as a key component. Commenters opined that the recission would weaken State protections, disrupt established conservation frameworks, and jeopardize long-standing agreements. Commenters emphasized that this change would introduce regulatory uncertainty, delay conservation planning, and reduce the effectiveness of State investments in species conservation and habitat protection.

*Response:* The rescission of the definition of ''harm'' in the Act does not alter the ability of States to implement their own conservation programs or to regulate habitat impacts under State law. Federal law and regulations create a legal floor (or minimum standards); States may legislate and regulate over and above what Federal law or regulations permit.

Under the ESA's section 6 ''conflict between Federal and State laws'' clause, Congress preserved the authority of any state to enact and enforce laws or regulations that provide species protections more stringent than federal protections while maintaining the ESA's preemption over any state law that would permit what is prohibited under the ESA or prohibit what is authorized under the ESA (16 U.S.C. 1535(f)). Where a state lists a species or designates habitat protections under a state endangered species law, such as California's Endangered Species Act, the state protections will apply to those state listed species as long as the state laws do not conflict with the ESA.

Consequently, species listed under state laws will retain full protections under those laws and will remain unaffected by the removal of an unnecessary federal regulatory layer of protections. For state and local governments, businesses, organizations, and individuals, the ESA's cooperative federalism structure provides durable legal security for long-term reliance interests that will not be upset by the removal of an unnecessary federal ESA regulation. For example, habitat mitigation instruments developed to satisfy both federal ESA requirements and state law mitigation standards create layered contractual and real estate obligations that persist regardless of federal ESA regulation. Conservation obligations that run with the land or are attached to mitigation instruments will remain enforceable against subsequent landowners, thereby preventing disruption to markets and organizations that have an interest in ESA protections.

Nor does this final rule affect the Services' commitment to cooperative federalism and coordination with State agencies, which takes place pursuant to section 6 cooperative agreements, section 10(a) permits, and section 7 consultations, not through the implementation of section 9 take prohibitions. For example, section 6 of the ESA permits the Secretary of the Interior to "enter into agreements with any State for the administration and management of any area established for the conservation of endangered species or threatened species" (16 U.S.C. 1535(b)). The Secretary of the Interior may also enter into agreements with States, that "establish[] and maintain[] an adequate and active program for the conservation of endangered species and threatened species" and plants (*Id.* at 1535(c)).[12] This rule does not change any species or critical habitat designations. The Services will continue to work with States to support species recovery and habitat protection through section 6 cooperative agreements, section 7 consultations, and other collaborative mechanisms. Moreover, other provisions of the ESA such as sections 5 and 7 are specifically designed to address habitat conservation will remain unchanged.

The Services acknowledge that the States have asserted that this rulemaking will result in an increased financial and administrative burden. However, States continuing to implement laws and policies that go beyond that which is required by the ESA is not germane to this rulemaking. States may make a policy decision to discontinue implementing more stringent species protections in order to relieve themselves of this additional burden. Alternatively, states may choose to bear the increased costs that go along with their preferred policy preferences. The Services, however, reject the invitation to ignore the best meaning of the federal statute passed by Congress (and to impose increased costs and burdens on other states and individual citizens), in order to accommodate the policy preferences of this minority of states.

*Comment 17:* Commenters emphasize that the rule fails to account for impacts to ecosystem services (tangible benefits of natural habitats to human communities), existence values (intangible value placed on knowing a species or habitat exists), option values (retaining ability to use a resource in the future), and the cost of recovery (monetary cost of recovering species or habitats). They also state that habitat degradation would lead to lost ecosystem services such as pollination, water filtration, carbon sequestration, and flood prevention. They state that healthy habitats increase recreational opportunities, thereby supporting local economies. The commenters argue that these effects should be included in the analysis.

*Response:* The Services emphasize that the rescission of the regulatory definition of "harm" does not diminish the importance of habitat conservation under the ESA. Habitat-related impacts will be addressed under other provisions of the ESA—as was intended—including through section 7 consultations and critical habitat designations. The Services will continue to use these tools to conserve habitat for listed species and as such will continue to address the importance of ecosystem services, and other issues raised by the commenters. The Services have fulfilled their requirements under *State Farm, Department of Homeland Security* v. *Regents,* and all other applicable law (see the Services' Responses to Comments 13, 15 and 16).

*Comment 18:* Some commenters stated that significant public investments—Federal, State, local, and Tribal—have been made in conservation agreements and habitat management plans that are based the long-standing interpretation of "harm" under the ESA, which includes habitat modification or degradation. A change in this interpretation threatens to invalidate or delay these efforts, putting at risk financial resources, staff positions, and political commitments. The resulting regulatory uncertainty could lead to the discontinuation of landowner support programs and a reduction in service levels, undermining the current and anticipated infrastructure built to support species recovery.

Commenters stated these investments were designed to meet the needs of permittees operating under the current ESA framework. If habitat modification is no longer regulated, the market for conservation offsets collapses, leaving existing and pending investments stranded. This shift would not only jeopardize ongoing recovery efforts critical to delisting species and supporting industries like commercial fisheries, but it would also erode the economic and environmental resilience built through decades of coordinated public and private restoration work. The proposed policy change represents a sudden and destabilizing departure from decades of consistent ESA implementation. Commenters state this change could potentially lead to increased habitat destruction, jeopardizing both Tribal and commercial use of natural resources. The resulting confusion and regulatory gaps would place additional economic burdens on communities that depend on sustainable natural resources.

*Response:* This comment is incorrect in asserting that habitat modification is no longer regulated. This rulemaking does not change any species classifications or critical habitat designations. The Services will continue to work with States to support species recovery and habitat protection through section 6 cooperative agreements, section 7 consultations, and other collaborative mechanisms.

As stated in the response to comment 5, the rescission of the regulatory definition of "harm" does not eliminate the Services' ability to issue ITPs or EOS permits where there is an affirmative conduct intentionally directed against a particular animal or animals. Additionally, the Services will continue to work with applicants to ensure that HCPs and CBAs are developed and permitted to address species-specific impacts and that the conservation and mitigation measures are commensurate with the ESA's definition of "take."

This revision is prospective only and does not affect permits that have been granted as of the date this rule becomes final. That is, no conservation agreements and habitat management plans that are in effect as of the date of this rule becomes final are affected. As noted above, such agreements and plans were but one input among many into the ultimate decision whether and how

[12] The Services note, again, that the explicit provisions for habitat protection in so many other parts of the ESA reinforces its conviction that the portion of Section 7 forbidding "take" was not meant to address habitat modification.

to authorize a given action (*Cf. Seven Cnty. Infrastructure Coal.* v. *Eagle Cnty., Colorado,* 605 U.S. 168, 180 (2025)). Disturbing the finality of the overall permitting decision would be highly disruptive to settled expectations, as well as immensely time-consuming and difficult, in return for at most speculative gains. It would also contradict the assurance of repose given to permittees in regulations governing HCPs (see 50 CFR 17.22(b)(5), 17.32(b)(5); response to Comment 5, above). Going forward, the Services intend to review each specific situation and species response to the action to determine whether it may or may not constitute "harm" to a species pursuant to section 3 of the ESA. The Services will continue to work with applicants to ensure that HCPs and CBAs are developed and permitted to address species-specific impacts and that conservation and mitigation measures are commensurate with the ESA's definition of "take." This rulemaking does not prohibit willing landowners from implementing conservation plans and agreements that are more comprehensive than what sections 9 and 10 of the ESA require.

However, beyond situations in which private persons *voluntarily* wish to purchase such mitigation services or need to purchase them in order to comply with other provisions of law, the market for such services under ESA sections 9 and 10 is a creation of regulations that, in the view of the Services, are not authorized by the Act. Where there is no justification in law for imposing the relevant regulation, imposing such costs is inherently illegitimate—and pleas to keep them, though cast in the form of reliance interests, are essentially regulatory rent-seeking. The Services therefore, in accord with *Regents,* has decided that "reliance interests in benefits [*i.e.,* regulatory rents] that it views as unlawful are entitled to no or diminished weight" (591 U.S. at 32).

*Comment 19:* Several commenters stated that Tribal activities associated with the environment and natural resources are not merely economic activities but are a deeply rooted cultural, spiritual, and subsistence practice. For example, treaty fishing rights are essential to preserving their way of life, with nearly every household participating in the fish harvest. Communities rely on salmon and other species for food, income, and cultural continuity. Any weakening of ESA protections—particularly the definition of "harm"—would significantly threaten Tribal abilities to maintain these practices, leading to widespread negative impacts on their economy and social fabric.

*Response:* The Services acknowledge the sovereign status of Tribal Nations and recognize that Tribal stewardship of natural resources is deeply rooted in cultural, spiritual, and subsistence traditions that are integral to Tribal identity and self-determination. The Services also reaffirm their commitment to honoring tribal treaty rights in full. However, the requirements imposed by the ESA are separate and distinct from treaty rights. When it comes to the ESA, the Services acknowledge the significance of the policy interests articulated by the tribes, but emphasize that this final rule is a legal correction to align the regulatory definition of "harm" with the single, best reading of the ESA's statutory text. This action does not change any species classifications or critical habitat designations and ensures that the Services' regulations are legally sound and align with the best reading of the ESA. The ESA, properly understood, addresses habitat-related impacts through other provisions of the ESA, including section 7 consultations and section 5 land acquisition authorities. The Services remain committed to meaningful coordination and consultation with Tribal Nations to ensure that their voices, knowledge, and sovereignty are respected in the conservation and recovery of endangered and threatened species.

*Comment 20:* Several commenters highlighted the substantial economic value of healthy habitats and native species, particularly for outdoor recreation, tourism, and biodiversity-dependent industries. They warned that weakening protections—such as redefining "harm" under the Endangered Species Act—could lead to wildlife declines, increased extinction risks, and economic losses for communities reliant on natural resources. Commenters also criticized the proposed rule as misleading, arguing it overlooks the effects to small businesses that benefit from strong wildlife protections, such as eco-tourism businesses, Tribal communities, research institutions, and conservation organizations. They called for a thorough economic impact analysis that includes all affected stakeholders, not just development interests.

*Response:* The Services disagree that the entities mentioned by the commenters should be included in an economic impact analysis because they are not directly regulated entities for the purpose of the Regulatory Flexibility Act (RFA; 5 U.S.C. 601 *et seq.*). The businesses listed by the commenters are not subject to the requirements of the rule and are only indirectly affected. Only directly regulated entities are required to be considered under the RFA. The extent to which any impacts assessed are not limited to development interests as the commenters suggest.

The Services emphasize that the rescission of the regulatory definition of "harm" does not diminish the importance of habitat loss or degradation as a significant threat to many species listed under the ESA. Habitat protection and conservation play a critical role in species conservation and recovery efforts. Rather, this rule clarifies that "take" applies only to actions that cause actual injury or death to listed species. Habitat-related impacts are considered and addressed under other provisions of the ESA, including section 7 consultations, critical habitat designations, section 5 land acquisition authorities, and cooperation with willing landowners through voluntary programs. The Services will continue to use these tools to address threats to species and to help chart the path to recovery and delisting. The rescission of the definition of "harm" intends to align the implementation of the Act with the single, best reading of the statute by removing habitat modification or degradation as a form of prohibited "take." This rulemaking does not prohibit willing landowners from implementing conservation plans and agreements that are more comprehensive than what sections 9 and 10 of the ESA require. The Services have fulfilled their requirements under *State Farm, Department of Homeland Security* v. *Regents,* and all other applicable law. See the Services' Responses to Comments 13, 15, and 16.

*Comment 21:* Commenters emphasized that the existing definition of "harm" has supported the growth of a multi-billion-dollar mitigation and restoration industry. They cited investments in ecological restoration services, mitigation banking, and conservation offsets, warning that rescinding the definition could strand existing investments, reduce demand for offsets, and diminish compliance options. They argued that such changes would stall new projects, eliminate markets built around habitat-based regulation, and weaken both environmental outcomes and related economic activity.

*Response:* The Services recognize that a restoration and mitigation industry has developed under the prior regulatory framework. Commenters are correct that changes in regulatory drivers may influence market demand

for certain mitigation efforts focused on habitat conservation that were once necessary to obtain an incidental take permit under section 10 of the ESA. As noted in the preamble, the magnitude of such impacts is uncertain and not amenable to reliable quantification. Also, as noted above in response to Comment 16, state-law regimes remain in place, and, where applicable, will still support this industry. This partially mitigates the impact of this rule change on the reliance interests addressed by these commenters. However, such markets are essentially regulatory rents. The best reading of sections 9 and 10 of the Act provide no justification for imposing these costs. As such, imposing them is inherently illegitimate—and pleas to keep them, though cast in the form of reliance interests, are essentially rent-seeking. The Services therefore, in accord with *Regents,* has decided that "reliance interests in benefits [*i.e.,* regulatory rents] that it views as unlawful are entitled to no or diminished weight" (591 U.S. at 32).

The Services note again that this rulemaking does not change the regulatory regimes for species recovery and habitat protection through section 4 critical habitat designations, section 5 land acquisition authorities, section 6 cooperative agreements, section 7 consultations, and other collaborative mechanisms.

In other words, conservation outcomes will continue through other legally appropriate mechanisms. Additionally, this rulemaking does not prohibit willing landowners from implementing conservation plans and agreements that are more comprehensive than what sections 9 and 10 of the ESA require.

This revision is prospective only and does not affect permits that have been granted as of the date this rule becomes final. That is, no conservation agreements and habitat management plans that are in effect as of the date of this rule becomes final are affected.

By rescinding the regulatory definition of "harm," the Services are restoring clarity to the statutory framework by aligning the definition of "take" with the single, best reading of the statute. The Services are not taking this action on the basis of any potential economic impacts. The Services have fulfilled their requirements under *State Farm, Department of Homeland Security* v. *Regents,* and all other applicable law. See the Services' Responses to Comments 15 and 16.

*Comment 22:* Several commenters stated that reducing habitat protections now could increase long-term costs to government and taxpayers. They stressed that preventive measures—such as conserving intact habitat—are generally more cost-effective than emergency interventions or species recovery programs after populations have declined. In their view, the proposed rule shifts costs into the future by lowering preventive protections today.

*Response:* The Services acknowledge the general economic principle that preventive action often reduces the need for more expensive recovery measures later. Maintaining habitat quality typically requires fewer resources than restoring degraded ecosystems or supporting species once they are at risk of extinction. While the Services are not the sole implementers of habitat protection, we work closely with Federal, State, Tribal, local, and private partners to support proactive conservation efforts that reduce long-term risks and costs, and we remain committed to leveraging these partnerships to achieve shared conservation outcomes under the ESA.

The Services are restoring clarity to the statutory framework by aligning the definition of "take" with the single, best reading of the statute. The Services note that other statutory tools, such as section 5 land acquisition and section 7 consultations, remain in place to support preventive conservation.

*Comment 23:* Commenters stated that the proposed rule lacks any quantitative economic analysis. They emphasized that no cost-benefit assessment is presented, nor are there empirical estimates of compliance savings, industry impacts, or foregone ecological and social benefits. They argued that this absence undermines transparency and hinders evaluation of trade-offs.

*Response:* The Services acknowledge that the proposed rule did not include a formal quantitative cost-benefit analysis. The magnitude of many potential effects—such as reliance investments-and ecological outcomes—is unknown and not amenable to reliable monetization with current data. Rescinding the definition of "harm" is expected to reduce certain regulatory burdens, and the scale of those savings was determined to be economically significant. A Regulatory Impact Analysis was conducted, and the Services estimated annualized quantified cost savings of $361.3 million at a 3 percent discount rate and $521.0 million at a 7 percent discount rate, reflecting reduced planning, negotiation, mitigation, and implementation costs for HCPs. A regulatory flexibility analysis is not required if an agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. After conducting both an initial regulatory flexibility analysis and a final regulatory flexibility analysis, the Services certify that this rule will not have a significant economic effect on a substantial number of small entities.

*Comment 24:* Multiple commenters argued that the proposed rescission of the regulatory definition of "harm" raises constitutional concerns related to the separation of powers and the faithful execution of laws. They emphasized that under Article I of the U.S. Constitution, Congress holds the authority to enact statutes such as the ESA, while Article II obligates the executive branch to faithfully execute those laws. Commenters asserted that removing the definition of "harm" does not relieve the Services of their duty to enforce the ESA as written by Congress, including its provisions for protecting both species and their habitats. They expressed concern that the proposed rule appears to disregard longstanding statutory interpretations and judicial precedent, potentially undermining the legislative intent behind the ESA. Some commenters argued that eliminating the definition of "harm" could weaken key regulatory mechanisms, such as HCPs and section 7 consultations, thereby reducing the effectiveness of the ESA and violating the executive branch's constitutional responsibility. Others suggested that the rule may overstep the authority granted to agencies under Article II by attempting to reinterpret or narrow statutory terms that Congress has already defined. Overall, commenters maintained that the Services must uphold their constitutional obligation to implement the ESA in a manner consistent with congressional intent and judicial interpretation, and that the proposed rule risks disrupting this balance of powers.

*Response:* The Services' current regulatory definition of harm does not accord with the single, best meaning of the text. Implementing the text as written by Congress is exactly how the executive branch should be respecting separation of powers in this instance. Nothing in *Loper Bright* prohibits the executive branch from reevaluating prior statutory interpretations to ensure compliance with the statute's text, and, given the opinion's insistence on applying the best meaning of the text of a law, it would be shocking if it did so. This rule rescinds the regulatory definition of "harm" on the grounds that it does not reflect the best reading of the statutory text, thereby effectuating the executive branch's obligation to

"take Care that the Laws be faithfully executed" (U.S. Const. art. II, section 3.). This recission is fully consistent with Congress's definition of "take" in section 3 and with the dissent in *Sweet Home.* We are executing the law as written by Congress by addressing habitat-related impacts through other provisions of the ESA, including section 7 consultations and section 5 land acquisition authorities. See our response to Comment 20 for the Services' discussion on potential impacts to HCPs.

*Comment 25:* Several commenters opposed the rescission of the regulatory definition of "harm" and cited a series of judicial decisions— *Palila* v. *Hawaii Dep't of Land & Nat. Res.,* 471 F. Supp. 985 (D. Haw. 1979); *Palila* v. *Hawaii,* 639 F.2d 495 (9th Cir. 1981; *Palila*), *Sierra Club* v. *Yeutter,* 926 F.2d 429 (5th Cir. 1991; *Yeutter*), *Cascadia Wildlands* v. *Scott Timber Co.,* 618 F. Supp. 3d 1038 (D. Or. 2022), aff'd, 105 F.4th 1144 (9th Cir. 2024; *Cascadia Wildlands*), *Pacific Rivers Council* v. *Thomas,* 30 F.3d 1050 (9th Cir. 1994; *Pacific Rivers Council*), and *Tennessee Valley Authority* v. *Hill,* 437 U.S. 153 (1978; *TVA* v. *Hill*)—as evidence that the ESA has long been interpreted to prohibit habitat destruction that impairs essential behavioral patterns of listed species. These commenters stated that the courts in these cases recognized that habitat modification can constitute a prohibited "take" under the ESA, and that rescinding the regulatory definition of "harm" would be inconsistent with this precedent and undermine the ESA's conservation mandate.

*Response:* We acknowledge the cited decisions. However, these cases do not require the continued use of the regulatory definition of "harm".

To begin, two of these cases do not even address the statutory-construction question at the heart of this rulemaking. *Yeutter* mentions the word "harm" only in the facts section, see 926 F.2d at 433 & n.2, while the word "harm" does not appear in *Pacific Rivers Council* at all. Three other decisions appear only to apply the regulatory definition of "harm," not to answer the question of whether that regulatory definition is a correct construction of the statutory text. See *Cascadia Wildlands,* 618 F. Supp. 3d. at 1067 (reciting the statutory and regulatory definitions, noting the holding of *Sweet Home,* and applying those definitions); 105 F.4th at 1156–57 (similar); *Palila,* 471 F. Supp. at 995. To the extent the remaining decision—the Ninth Circuit's *Palila* decision—does address the question of whether the statutory "take" (via "harm") correctly includes habitat destruction, the analysis is extremely cursory and uses outdated modes of analysis: It addresses the merits of this question in one, spare, four-sentence paragraph, which relied primarily on "legislative history" (639 F.2d at 497–98).[13] The bottom line is that the Services do not find these decisions persuasive.

Turning to the two Supreme Court cases cited, *TVA* v. *Hill* is not on point. Its reflections on legislative history and Congressional purpose are interesting, and taken by the Services for what they are worth. But *Hill* does not address or answer the statutory-interpretation question at answer in this rulemaking. The case that does is *Sweet Home.* The majority's holding in that case, applying *Chevron,* is that the construction then proffered by the Services was "reasonable." For the reasons explained pervasively in this final rule and in the proposed rule, the Services are persuaded instead by Justice Scalia's analysis as to what the *correct* construction of the statutory text is.

We recognize that the Supreme Court held in *Loper Bright* that its "prior cases that relied on the *Chevron* framework . . . are still subject to statutory *stare decisis*" (603 U.S. at 412). But under the then-prevailing *Chevron* framework, *Sweet Home* held only that the existing regulation is a permissible reading of the ESA, not the only possible such reading. Our rescission of the regulatory definition on the grounds that it does not reflect the best reading of the statutory text thus is fully consistent with *Sweet Home.*

Accordingly, while these decisions illustrate how the prior regulatory definition of "harm" was applied in specific factual contexts, they did not determine that the regulatory definition of harm constituted the single best reading of the ESA and thus do not preclude the Services from rescinding that definition in favor of a reading that better aligns with the statutory text.

*Comment 26:* Some commenters cited *Skidmore* v. *Swift & Co.,* 323 U.S. 134 (1944; *Skidmore*), and *Kimble* v. *Marvel Entertainment, LLC,* 576 U.S. 446 (2015; *Kimble*), to argue that the Services should retain the regulatory definition of "harm" out of respect for longstanding agency interpretations and the principle of *stare decisis.* These commenters contended that even if *Chevron* deference no longer applies, the Services' decades-long interpretation of "harm" should still be afforded weight under *Skidmore,* and that the principle of *stare decisis,* as reaffirmed in *Kimble,* counsels against rescinding a settled regulatory interpretation absent a compelling justification.

*Response:* The Services recognize the importance of consistency and stability in interpretation of the ESA; however, neither case compels the retention of the regulatory definition of "harm," which runs contrary to the text and structure of the ESA.

Under *Skidmore,* agency interpretations may be entitled to respect *by courts* to the extent they have the "power to persuade." It is true, furthermore, that courts have opined that "respect" has been "especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time" (*Loper Bright,* 603 U.S. at 386). "'Respect,' though, was just that" (*Id.*). A court should never afford respect to an agency interpretation—under *Skidmore* or any other precedent—when that interpretation runs contrary to the text and structure of the statutory language, as Justice Scalia's *Sweet Home* dissent observed. In this rulemaking, the Services have determined that the prior regulatory definition of "harm" does not reflect the best meaning of the statutory text. Moreover, the Services are, to begin, not a court, and thus *Skidmore* deference is arguably inapposite.

As for *Kimble,* it is inapt, because it addresses the considerations that *courts* must consider when repudiating their own prior precedents regarding how to interpret a statute, *i.e.,* what the *best* reading of the statute is. By contrast, the idea of applying *stare decisis* to agency action is inconsistent with a core tenet of administrative law: agencies may change positions. See, *e.g., FDA* v. *Wages & White Lion Investments, L.L.C.,* 604 U.S. 542, 569–70 (2025). In other words, there is no such thing as stare decisis for agency interpretation. Agencies are permitted to revise or rescind prior interpretations when warranted by changes in law, policy, or interpretive standards.

Accordingly, while the Services respect the values of consistency and institutional experience, those values do not override the obligation to interpret the ESA in accordance with its best reading.

**Required Determinations**

*Regulatory Planning and Review—Executive Orders 12866 and 13563*

Executive Order (E.O.) 12866 provides that the Office of Information and Regulatory Affairs (OIRA) in the Office

[13] That the named plaintiff in *Palila* is a species of bird also indicates to the Services that its mode of jurisprudence would not accord with best modern practices.

of Management and Budget will review all significant rules. OIRA has determined that this rule is significant.

E.O. 13563 reaffirms the principles of E.O. 12866 while calling for improvements in the Nation's regulatory system to promote predictability, to reduce uncertainty, and to use the best, most innovative, and least burdensome tools for achieving regulatory ends. E.O. 13563 directs agencies to consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public where these approaches are relevant, feasible, and consistent with regulatory objectives. E.O. 13563 emphasizes further that regulations must be based on the best available science and that the rulemaking process must allow for public participation and an open exchange of ideas. We have developed this final rule in a manner consistent with these requirements.

*Unleashing Prosperity Through Deregulation—E.O. 14192*

This final rule is an E.O. 14192 deregulatory action.

*Regulatory Flexibility Act (5 U.S.C. 601 et seq.)*

Under the Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA; title II of Pub. L. 104–121, March 29, 1996), whenever a Federal agency is required to publish a notice of rulemaking for any proposed or final rule, it must prepare, and make available for public comment, a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.,* small businesses, small organizations, and small government jurisdictions). However, no regulatory flexibility analysis is required if the head of an agency, or that person's designee, certifies that the rule will not have a significant economic impact on a substantial number of small entities. SBREFA amended the RFA to require Federal agencies to provide a statement of the factual basis for certifying that a rule will not have a significant economic impact on a substantial number of small entities. We certify that this rule will not have a significant economic impact on a substantial number of small entities. The following discussion explains our rationale.

This final rule is deregulatory and is generally expected to benefit small entities regulated by the ESA, primarily those entities that voluntarily seek and are subsequently issued section 10(a) permits. To the extent that fewer future ESA section 10(a) permits are issued, lower administrative and recordkeeping costs are likely. Additionally, to the extent that future permits are not issued or are issued in a more limited capacity, some portion of otherwise-affected small entities would benefit by avoiding implementation costs. Furthermore, dependent on the extent to which a reduced number of section 10(a) permits are issued, a reduction in activities on the part of entities engaged in restoration and habitat protection activities could result. However, we do not expect this potential effect to rise to the level of a significant economic effect nor affect a substantial number of small entities. Therefore, we certify that this rule will not have a significant economic effect on a substantial number of small entities.

*Unfunded Mandates Reform Act (2 U.S.C. 1501 et seq.)*

In accordance with the Unfunded Mandates Reform Act (2 U.S.C. 1501 *et seq.*):

(a) On the basis of information presented under *Regulatory Flexibility Act,* above, this rule will not "significantly or uniquely" affect small governments. We have determined and certify pursuant to the Unfunded Mandates Reform Act that this final rule will not impose a cost of $100 million or more in any given year on local or State governments or private entities. A small government agency plan is not required. As explained above, small governments will not be affected because the final rule will not place additional requirements on any city, county, or other local municipalities.

(b) This rule will not produce a Federal mandate on State, local, or Tribal governments or the private sector of $100 million or greater in any year; that is, this final rule is not a "significant regulatory action" under the Unfunded Mandates Reform Act. This final rule will impose no obligations on State, local, or Tribal governments.

*Takings—E.O. 12630*

In accordance with E.O. 12630, this rule will not have significant takings implications. This rule does not pertain to "taking" of private property interests, nor will it directly affect private property. A takings implication assessment is not required because this final rule (1) will not effectively compel a property owner to suffer a physical invasion of property and (2) will not deny all economically beneficial or productive use of the land or aquatic resources. This rule substantially advances a legitimate government interest (eliminating regulatory definitions that do not align with the best meaning of the ESA) and will not present a barrier to all reasonable and expected beneficial use of private property.

*Federalism—E.O. 13132*

In accordance with E.O. 13132, we have considered whether this rule will have significant federalism effects and have determined that a federalism summary impact statement is not required. This rule rescinds the regulatory definition of "harm" and will not have substantial direct effects on the States, on the relationship between the Federal Government and the States, or on the distribution of power and responsibilities among the various levels of government.

*Civil Justice Reform—E.O. 12988*

This final rule does not unduly burden the judicial system and meets the applicable standards provided in sections 3(a) and 3(b)(2) of E.O. 12988. This final rule rescinds the regulatory definition of "harm".

*Government-to-Government Relationship With Tribes—E.O. 13175*

In accordance with the President's memorandum of April 29, 1994 ("Government-to-Government Relations With Native American Tribal Governments;" 59 FR 22951, May 4, 1994), E.O. 13175 ("Consultation and Coordination with Indian Tribal Governments"), the President's memorandum of November 30, 2022 ("Uniform Standards for Tribal Consultation;" 87 FR 74479, December 5, 2022), and the Department of the Interior's manual at 512 DM 2, and the National Oceanic and Atmospheric Administration (NOAA) Administrative Order (NAO) 218–8 (April 2012), we considered the possible effects of this rule on federally recognized Tribes. After the opening of the public comment period, we received multiple requests for coordination or Government-to-Government consultation from multiple Tribes: Cheyenne River Sioux Tribe, Great Lakes Indian Fish and Wildlife Commission, Pueblo of San Felipe, Fond du Lac Band of Lake Superior Chippewa, Swinomish Indian Tribal Community, Fallon Paiute Shoshone Tribe, Lower Elwha Klallam Tribe, Quinault Indian Nation, Confederated Tribes and Bands of the Yakama Nation, Cowlitz Indian Tribe, and Bishop Paiute Tribe.

The Service concludes that this rule is general in nature and does not directly affect any specific Tribal lands, treaty rights, or Tribal trust resources. This

regulation, which removes the definition of "harm" from 50 CFR 17 and 222, does not have direct, substantial effects on one or more Indian Tribes, as the Services issue permits to Indian Tribes on a very limited basis, but rather consult and coordinate with Tribes on a case-by-case basis. This rule is general in nature and does not directly affect any specific species, Tribal lands, treaty rights, or Tribal trust resources. Therefore, we conclude that this regulation does not have "tribal implications" under section 1(a) of E.O. 13175 and formal government-to-government consultation is not required by E.O. 13175 and related policies of the Department of the Interior and the Department of Commerce. We will continue to collaborate with Tribes on issues related to federally listed species and work with them as we implement the provisions of the Act. See Joint Secretary's Order 3206 ("American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act," June 5, 1997).

*Paperwork Reduction Act (44 U.S.C. 3501 et seq.)*

This final rule does not contain any new collection of information that requires approval by the OMB under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*). An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

*National Environmental Policy Act (42 U.S.C. 4321 et seq.)*

We have analyzed this rule in accordance with the National Environmental Policy Act (NEPA, 42 U.S.C. 4321 *et seq.*), the Department of the Interior National Environmental Policy Act implementing regulations at 43 CFR part 46, the Department of the Interior Handbook of National Environmental Policy Act Implementing Procedures (516 DM 1), the NOAA Administrative Order 216–6A, and the NOAA Companion Manual (CM), "Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities" (effective June 30, 2025).

The Services have determined that the "proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action" (42 U.S.C. 4336(a)(4); *see Dep't of Transp.* v. *Pub. Citizen,* 541 U.S. 752, 766–70 (2004)).

The Services have also determined, in the alternative, that there will be no significant individual or cumulative effect on the quality of the human environment with the rescission of the definition of "harm" in 50 CFR part 17.3 and have applied a categorical exclusion to comply with the NEPA, specifically, the Department of the Interior categorical exclusion for "Policies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case" (43 CFR 46.210(i)), which NOAA has adopted, consistent with NOAA's NEPA procedures (NOAA CM V(F)). We have also determined the extraordinary circumstances listed in 43 CFR 46.215 do not apply to the direct effects of the proposed action.

We completed an environmental action statement for the categorical exclusion for the rescission of the definition of "harm" in 50 CFR part 17.3. The environmental action statement and supporting categorical exclusion documentation is available at *https://www.regulations.gov* in Docket No. FWS–HQ–ES–2025–0034.

*Energy Supply, Distribution or Use—E.O. 13211*

E.O. 13211 (Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use) requires agencies to prepare statements of energy effects "to the extent permitted by law" when undertaking actions identified as significant energy actions (66 FR 28355; May 22, 2001). E.O. 13211 defines a "significant energy action" as an action that (i) is a significant regulatory action under E.O. 12866 (or any successor order); and (ii) is likely to have a significant adverse effect on the supply, distribution, or use of energy. This final rule is not expected to affect energy supplies, distribution, and use. Therefore, this action is not a significant energy action, and there is no requirement to prepare a statement of energy effects for this action.

*Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.)*

In finalizing this rule, the Services are acting in their unique statutory role as administrators of the Act and are engaged in a legal exercise of interpreting the standards of the Act. The Services' administration of the Act is not in itself subject to the Act's provisions, including section 7(a)(2). The Services have a historical practice of issuing their general regulations under the ESA without undertaking section 7 consultation. This practice accords with the plain language, structure, and purposes of the ESA, which does not place a consultation obligation on the Services' administration of the Act. Although the Services consult on actions through intra-agency consultations where appropriate (*e.g.,* issuance of permits under section 10(a) and actions under statutory authorities other than the ESA), the Services in those instances are acting principally as an "action agency" carrying out provisions of the Act or other statutes. Here, by contrast, the Services are acting solely in their role as administrators of the ESA; we are also not administering the Act to propose or take a specific action. The Services are carrying out the most fundamental exercise of our role as administrators of the ESA, and the Act cannot reasonably be construed as requiring the Services to "consult" with themselves under section 7(a)(2) in such cases.

**Authority**

We issue this final rule under the authority of the Endangered Species Act, as amended (16 U.S.C. 1531 *et seq.*).

**List of Subjects**

*50 CFR Part 17*

Endangered and threatened species, Exports, Imports, Plants, Reporting and recordkeeping requirements, Transportation, Wildlife.

*50 CFR Part 222*

Administrative practice and procedure, Endangered and threatened species, Exports, Reporting and recordkeeping requirements, Transportation.

**Regulation Promulgation**

For the reasons set out in the preamble, we hereby amend part 17 of chapter I and part 222 of chapter II, title 50 of the Code of Federal Regulations, as set forth below:

## PART 17—ENDANGERED AND THREATENED WILDLIFE AND PLANTS

■ 1. The authority citation for part 17 continues to read as follows:

**Authority:** 16 U.S.C. 1361–1407; 1531–1544; and 4201–4245, unless otherwise noted.

### Subpart A—Introduction and General Provisions

**§ 17.3 [Amended]**

■ 2. Amend § 17.3 by removing the definition for "Harm".

## PART 222—GENERAL ENDANGERED AND THREATENED MARINE SPECIES

■ 3. The authority citation for part 222 continues to read as follows:

**Authority:** 16 U.S.C. 1531 *et seq.;* 16 U.S.C. 742a *et seq.* Section 222.403 also issued under 16 U.S.C. 1361 *et seq.*

### Subpart A—Introduction and General Provisions

**§ 222.102 [Amended]**

■ 4. Amend § 222.102 by removing the definition for "Harm".

**Kevin Lilly,**

*Principal Deputy Assistant Secretary for Fish and Wildlife and Parks, Exercising the Delegated Authority of the Assistant Secretary for Fish and Wildlife and Parks.*

**Timothy R. Petty,**

*Assistant Secretary of Commerce for Oceans and Atmosphere and Deputy NOAA Administrator, Department of Commerce.*

[FR Doc. 2026–14195 Filed 7–10–26; 5:00 pm]

BILLING CODE 3510–22–P–4333–15–P

**Incorporation by Reference**

Class E5 airspace designations are published in Paragraph 6005 of FAA Order JO 7400.11, Airspace Designations and Reporting Points, which is incorporated by reference in 14 CFR 71.1 on an annual basis. This document proposes to amend the current version of that order, FAA Order JO 7400.11J, dated July 31, 2024, and effective September 15, 2024. These updates will be published in the next update to FAA Order JO 7400.11. FAA Order JO 7400.11J is publicly available as listed in the ADDRESSES section of this document.

FAA Order JO 7400.11J lists Class A, B, C, D, and E airspace areas, air traffic service routes, and reporting points.

**The Proposal**

The FAA proposes an amendment to 14 CFR part 71 that would amend the Class E airspace extending upward from 700 feet above the surface designated for Chambersburg, PA. Controlled airspace is necessary for the safety and management of instrument flight rules (IFR) operations in the area. The VOR portion of the St. Thomas VORTAC was decommissioned on November 30, 2023, and only the TACAN remains as a functional part of the NAVAID. This rule would change the associated references in the airspace legal description from St. Thomas VORTAC to St. Thomas TACAN. This action would also amend the airspace by updating the airport coordinates and the airport name in the airspace legal description to reflect the current information.

**Regulatory Notices and Analyses**

The FAA has determined that this proposed regulation only involves an established body of technical regulations for which frequent and routine amendments are necessary to keep them operationally current. It, therefore, (1) is not a "significant regulatory action" under Executive Order 12866; (2) is not a "significant rule" under Department of Transportation (DOT) Regulatory Policies and Procedures (44 FR 11034; February 26, 1979); and (3) does not warrant preparation of a regulatory evaluation as the anticipated impact is so minimal. Since this is a routine matter that will only affect air traffic procedures and air navigation, it is certified that this proposed rule, when promulgated, will not have a significant economic impact on a substantial number of small entities under the criteria of the Regulatory Flexibility Act.

**Environmental Review**

This proposal will be subject to an environmental analysis in accordance with FAA Order 1050.1F, "Environmental Impacts: Policies and Procedures," prior to any final regulatory action by the FAA.

**Lists of Subjects in 14 CFR Part 71**

Airspace, Incorporation by reference, Navigation (air).

**The Proposed Amendment**

In consideration of the foregoing, the Federal Aviation Administration proposes to amend 14 CFR part 71 as follows:

**PART 71—DESIGNATION OF CLASS A, B, C, D, AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS**

■ 1. The authority citation for 14 CFR part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(f), 106(g), 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

**§ 71.1 [Amended]**

■ 2. The incorporation by reference in 14 CFR 71.1 of FAA Order JO 7400.11J, Airspace Designations and Reporting Points, dated July 31, 2024, and effective September 15, 2024, is amended as follows:

*Paragraph 6005 Class E Airspace Areas Extending Upward From 700 Feet or More Above the Surface of the Earth.*

* * * * *

**AEA PA E5 Chambersburg, PA [Amended]**

Franklin County Regional Airport, PA
(Lat. 39°58′23″ N, long. 77°38′36″ W)
St. Thomas TACAN
(Lat. 39°56′00″ N, long. 77°57′03″ W)

That airspace extending upward from 700 feet above the surface within a 6.5-mile radius of Franklin County Regional Airport and within a 7-mile radius of Franklin County Regional Airport extending clockwise from a 039° bearing from the airport to a 061° bearing from the airport and within a 13.1-mile radius of Franklin County Regional Airport extending clockwise from a 061° bearing from the airport to a 135° bearing from the airport and within a 7-mile radius of Franklin County Regional Airport extending clockwise from a 135° bearing from the airport to a 174° bearing from the airport and within 3.5 miles each side of the St. Thomas TACAN 082° radial extending from the TACAN to 25.2 miles east of the TACAN and excluding that portion within the Hagerstown, MD, Class E airspace area.

* * * * *

Issued in College Park, Georgia, on April 14, 2025.

**Patrick Young,**

*Manager, Airspace & Procedures Team North, Eastern Service Center, Air Traffic Organization.*

[FR Doc. 2025–06570 Filed 4–16–25; 8:45 am]

BILLING CODE 4910–13–P

---

**DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Part 17**

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Part 222**

**[Docket No. FWS–HQ–ES–2025–0034; FXES1111090000–256 FF09E23000; 250411–0064]**

**RIN 1018–BI38; 0648–BN93**

## Rescinding the Definition of "Harm" Under the Endangered Species Act

**AGENCY:** U.S. Fish and Wildlife Service, Interior; National Oceanic and Atmospheric Administration, Commerce.

**ACTION:** Notice of proposed rulemaking; request for comments.

**SUMMARY:** The U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) (collectively referred to as the Services or we) are proposing to rescind the regulatory definition of "harm" in our Endangered Species Act (ESA or the Act) regulations. The existing regulatory definition of "harm," which includes habitat modification, runs contrary to the best meaning of the statutory term "take." We are undertaking this change to adhere to the single, best meaning of the ESA.

**DATES:** Comments must be received by May 19, 2025.

**ADDRESSES:** A plain language summary of this proposed rule is available at *https://www.regulations.gov* in Docket No. FWS–HQ–ES–2025–0034. You may submit comments by one of the following methods:

(1) *Electronically:* Go to the Federal eRulemaking Portal: *https://www.regulations.gov.* In the Search box, enter FWS–HQ–ES–2025–0034, which is the docket number for this rulemaking. Then, click on the Search button. On the resulting page, in the panel on the left side of the screen, under the Document Type heading,

check the Proposed Rule box to locate this document. You may submit a comment by clicking on "Comment."

(2) *By hard copy:* Submit by U.S. mail to: Public Comments Processing, Attn: FWS–HQ–ES–2025–0034, U.S. Fish and Wildlife Service, MS: PRB/3W, 5275 Leesburg Pike, Falls Church, VA 22041–3803.

We request that you send comments only by the methods described above. Comments must be submitted to *https://www.regulations.gov* before 11:59 p.m. (Eastern Time) on the date specified in **DATES**. We will not consider mailed comments that are not postmarked by the date specified in **DATES**.

We will post your entire comment—including your personal identifying information—on *https://www.regulations.gov.* If you provide personal identifying information in your comment, you may request at the top of your document that we withhold this information from public review. We cannot guarantee, however, that we will be able to do so. Anonymous comments will be considered. Comments and materials we receive, as well as supporting documentation we used in preparing this proposed rule, will be available for public inspection on *https://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Gina Shultz, Acting Assistant Director, Ecological Services, at 703–358–2171 or *ADEcologicalServices@fws.gov* with a subject line of "1018–BI38." Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States. For a summary of the proposed rule, please see the proposed rule summary document in Docket No. FWS–HQ–ES–2025–0034 on *https://www.regulations.gov.*

**SUPPLEMENTARY INFORMATION:**

## Background

The Endangered Species Act (ESA) prohibits the "take" of endangered species.[1] Under the ESA, "[t]he term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."[2] This makes sense in light of the well-established, centuries-old understanding of "take" as meaning to kill or capture a wild animal.[3] Regulations previously promulgated by FWS expanded the ESA's reach in ways that do not reflect the best reading of the statute, to prohibit actions that impair the habitat of protected species: "Harm in the definition of 'take' in the Act means an act which actually kills or injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."[4] NMFS' definition is materially identical: "Harm in the definition of 'take' in the Act means an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering."[5]

In *Babbitt* v. *Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687 (1995), the Supreme Court upheld FWS' regulation under *Chevron* deference.[6] Justice Scalia dissented, joined by Chief Justice Rehnquist and Justice Thomas, and would have held that even under *Chevron* this interpretation was unsustainable.[7] As Justice Scalia observed, "[i]f 'take' were not elsewhere defined in the Act, none could dispute what it means, for the term is as old as the law itself. To 'take,' when applied to wild animals, means to reduce those animals, by killing or capturing, to human control."[8] In addition, under the *noscitur a sociis* canon, the definition of "harm," like the other nine verbs in the definition, should be construed to require an "affirmative act[ ] . . . directed immediately and intentionally against a particular animal—not [an] act[ ] or omission[ ] that indirectly and accidentally cause[s] injury to a population of animals."[9]

The Supreme Court, nearly 30 years after *Sweet Home,* overruled the *Chevron* doctrine in *Loper Bright Enterprises* v. *Raimondo,* 603 U.S. 369, 400 (2024). Under *Loper Bright,* "the question that matters" is whether "the *statute* authorizes the challenged agency action."[10] In other words, does the agency's regulation match the single, best meaning of the statute?[11]

We have concluded that our existing regulations, which still contain the definition of "harm" contested in *Sweet Home,* do not match the single, best meaning of the statute. As Justice Scalia's dissent in *Sweet Home* explains, the regulations' interpretation of the statutory language violates the *noscitur a sociis* canon, did not properly account for over a thousand years of history, and is inconsistent with the structure of the ESA. Nor is any replacement definition needed. The ESA itself defines "take,"[12] and further elaborating on one subcomponent of that definition—"harm"—is unnecessary in light of the comprehensive statutory definition.

We recognize that the Supreme Court held in *Loper Bright* that its "prior cases that relied on the *Chevron* framework . . . are still subject to statutory *stare decisis.*"[13] But under the then-prevailing *Chevron* framework, *Sweet Home* held only that the existing regulation is a permissible reading of the ESA, not the only possible such reading. Our rescission of the regulation definition on the ground that it does not reflect the best reading of the statutory text thus would not only effectuate the Executive Branch's obligation to "take Care that the Laws be faithfully executed,"[14] but would also be fully consistent with *Sweet Home.*

Accordingly, because our regulations do not accord with the single, best meaning of the statutory text, we propose to rescind the regulatory definition of "harm" and rest on the statutory definition of "take." This revision would be prospective only and would not affect permits that have been granted as of the date the regulation becomes final.

## No Reliance in Unlawful Regulations

In proposing to rescind our regulatory definitions of harm, we are considering whether there are legitimate reliance interests on the regulations under reexamination. *Dep't of Homeland Sec.* v. *Regents of the Univ. of California,* 591

[1] 16 U.S.C. 1538(a)(1)(B)–(C).

[2] 16 U.S.C. 1532(19).

[3] *See, e.g.,* 11 Oxford English Dictionary (1933); Webster's New International Dictionary of the English Language (2d ed. 1949); *Geer* v. *Connecticut,* 161 U.S. 519, 523 (1896); 2 W. Blackstone, Commentaries 411 (1766).

[4] 50 CFR 17.3.

[5] 50 CFR 222.102.

[6] 515 U.S. at 703. Although *Sweet Home* concerned FWS's regulation at 50 CFR 17.3, it applies equally to 50 CFR 222.102 given the definitions are substantially the same.

[7] *Id.* at 715. The D.C. Circuit also rejected the Secretary's definition. *See Sweet Home Chapter of Communities for a Great Oregon* v. *Babbitt,* 17 F.3d 1463 (D.C. Cir. 1994); *id.* at 1472 (Sentelle, J., concurring); *but see id.* at 1473 (Mikva, C.J., dissenting).

[8] 515 U.S. at 717.

[9] *Id.* at 719–20.

[10] 603 U.S. at 406 (emphasis added).

[11] *Id.* at 400.

[12] 16 U.S.C. 1532(19).

[13] 603 U.S. at 412.

[14] U.S. Const. art. II, § 3.

U.S. 1, 30 (2020). However, because it is the President's duty to see that the laws are faithfully executed, in all but the most unusual cases, we believe that reliance interests likely will be outweighed by the constitutional interest in repealing regulations that do not reflect the best reading of the statute.[15]

We are aware that there are parties who are likely to provide comments concerning their reliance interests on environmental and aesthetic grounds, even as we are aware there are property owners and regulated entities who are likely to provide comments regarding interests in not being subject to a regime Congress may never have authorized. We therefore solicit public comment on reliance interests.

**Regulatory Planning and Review—Executive Orders 12866 and 14192**

This proposed rule has been determined to be significant for purposes of Executive Order 12866. This proposed rule, if finalized as proposed, is expected to be an E.O. 14192 deregulatory action.

**Regulatory Flexibility Act**

Under the Regulatory Flexibility Act (as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996; 5 U.S.C. 601 *et seq.*), whenever a Federal agency is required to publish a notice of rulemaking for any proposed or final rule, it must prepare and make available for public comment a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.*, small businesses, small organizations, and small government jurisdictions). No regulatory flexibility analysis is required if the head of an agency or an appropriate designee certifies that the rule will not have a significant economic impact on a substantial number of small entities. Here, if adopted as proposed, this rulemaking may have a significant economic impact on a substantial number of small entities. The following discussion explains our rationale.

This proposed rule seeks comment on rescission of the definition of "harm" for both NMFS and FWS. In the proposed rule seeking to codify the redefinition of the FWS regulations defining harm, the Department of the Interior noted its determination that the rule would not have a significant economic impact on a substantial number of small entities under the RFA. See 46 FR 29490 (June 2, 1981). As for NMFS, in the preamble to the proposed rule that proposed to codify NMFS's then-current interpretation of "harm," the Assistant General Counsel for Legislation and Regulation of the Department of Commerce certified that the proposed rule, if adopted, would not have a significant economic impact on a substantial number of small entities because "NMFS is not implementing a new policy or definition. NFMS [sic] definition of harm would remain the same whether or not it is codified. . . ." 63 FR 24148 at 24149–24150 (May 1, 1998).

In response to public comments at that time, NMFS developed a final regulatory flexibility analysis that analyzed the rule's potential effects on agriculture, residential or commercial construction, mining, and municipal water, sewer, and waste management. NMFS concluded that the analysis "indicates that this regulation may pose some incremental cost for some small entities; however it remains uncertain whether these costs constitute a significant economic impact on a substantial number of small entities."

Because this proposed rule would rescind that definition of "harm" for both NMFS and FWS, it is expected that incremental costs on small entities imposed by that prior definition will be relieved, and this rulemaking, if adopted as proposed, may have a significant economic impact by reducing burden on a substantial number of small entities relative to the previous rulemaking. As a result, an initial regulatory flexibility analysis has been prepared and is provided as follows.

The reasons for this deregulatory action are set out above, along with a succinct statement of the objectives and legal basis for the proposed rule. *See* 5 U.S.C. 603(b)(1)–(2). An estimate of the potentially large number of small entities that could be impacted by this deregulatory action is unknown at this time because the 1981 rulemaking record does not contain that information and because the proposed rule will impact any small entity complying with the Endangered Species Act. *See* 5 U.S.C. 603(b)(3). As part of the public comment process and for its final regulatory flexibility analysis under 5 U.S.C. 604, the Services will undertake that estimation process in consultation with the Office of Advocacy. This deregulatory action would not impose projected reporting, recordkeeping, or other compliance activities. *See* 5 U.S.C. 603(b)(4). No other agency actions duplicate, overlap, or conflict with this deregulatory action. *See* 5 U.S.C. 603(b)(5). Finally, by eliminating a legally incorrect definition of "harm" under the Endangered Species Act, this proposed rule, if adopted, would be deregulatory and would benefit small entities impacted by the Endangered Species Act. The alternative to this proposed deregulatory action is the status quo, which does not need to be analyzed. *See* 5 U.S.C. 603(c).

**National Environmental Policy Act**

We are analyzing this proposed rule in accordance with the National Environmental Policy Act (NEPA, 42 U.S.C. 4321 *et seq.*), the Department of the Interior regulations on Implementation of the National Environmental Policy Act (43 CFR 46.10–46.450), the Department of the Interior Manual (516 DM 8), the NOAA Administrative Order 216–6A, and the NOAA Companion Manual (CM), "Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities" (effective January 13, 2017).

We are proposing to undertake this revision because we believe it is compelled by the best reading of the statutory text. As such, we believe that "the proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action" (42 U.S.C. 4336(a)(4); *see Dep't of Transp.* v. *Pub. Citizen*, 541 U.S. 752, 766–70 (2004)). In the alternative, we believe that the proposed regulation changes are within a category of actions that the Department of the Interior and NOAA have each found have no significant individual or cumulative effect on the quality of the human environment and are therefore excluded from the requirement to prepare an environmental assessment or an environmental impact statement, specifically, the Department of the Interior categorical exclusion for "Policies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case" (43 CFR 46.210(i)), and the NOAA categorical exclusion for "[P]reparation of policy directives, rules, regulations, and guidelines of an administrative, financial, legal, technical, or procedural nature, or for which the environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will be subject later to the NEPA

[15] See *Regents*, 591 U.S. at 30–32.

process, either collectively or on a case-by-case basis" (CM Appendix E, G7).

In this regard, we note that the two recent proposed and final rulemakings addressing a regulatory definition of "habitat" under the Endangered Species Act found that these categorical exclusions applied. *See Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat,* 87 FR 37757, June 24, 2022; *Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat,* 86 FR 59353, October 27, 2021; *Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat,* 85 FR 81411, December 16, 2020); *Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat,* 85 FR 47333, August 5, 2020).

We are continuing to consider the extent to which our proposed regulation changes may have a significant effect on the human environment or fall within one of the categorical exclusions for actions that have no individual or cumulative significant effect on the quality of the human environment. We invite the public to comment on these or any other aspects of the NEPA analyses of these revisions. We will complete our analysis in accordance with NEPA and applicable regulations before finalizing this proposed rule.

**Endangered Species Act**

In developing this proposed rule, the Services are acting in their unique statutory role as administrators of the Act and are engaged in a legal exercise of interpreting the standards of the Act. The Services' promulgation of rules that govern their implementation of the Act is not an action that is in itself subject to the Act's provisions, including section 7(a)(2). The Services have a historical practice of issuing their general implementing regulations under the ESA without undertaking section 7 consultation. Given the plain language, structure, and purposes of the ESA, we find that Congress never intended to place a consultation obligation on the Services' promulgation of implementing regulations under the Act. In contrast to actions in which we have acted principally as an "action agency" in implementing the Act to propose or take a specific action (*e.g.,* issuance of section 10 permits and actions under statutory authorities other than the ESA), here the Services are carrying out an action that is at the very core of their unique statutory role as administrators—promulgating general implementing regulations or revisions to those regulations that interpret the terms and standards of the Act.

**Authority**

We issue this proposed rule under the authority of the Endangered Species Act, as amended (16 U.S.C. 1531 *et seq.*).

**List of Subjects**

*50 CFR Part 17*

Endangered and threatened species, Exports, Imports, Plants, Reporting and recordkeeping requirements, Transportation, Wildlife.

*50 CFR Part 222*

Administrative practice and procedure, Endangered and threatened species, Exports, Reporting and recordkeeping requirements, Transportation.

**Proposed Regulation Promulgation**

For the reasons set out in the preamble, we hereby propose to amend part 17 of chapter I and part 222 of chapter II, title 50 of the Code of Federal Regulations, as set forth below:

## PART 17—ENDANGERED AND THREATENED WILDLIFE AND PLANTS

■ 1. The authority citation for part 17 continues to read as follows:

**Authority:** 16 U.S.C. 1361–1407; 1531–1544; and 4201–4245, unless otherwise noted.

### Subpart A—Introduction and General Provisions

**§ 17.3 [Amended]**

■ 2. Amend § 17.3 by removing the definition for "Harm".

## PART 222—GENERAL ENDANGERED AND THREATENED MARINE SPECIES

■ 3. The authority citation for part 222 continues to read as follows:

**Authority:** 16 U.S.C. 1531 *et seq.*; 16 U.S.C. 742a *et seq.* Section 222.403 also issued under 16 U.S.C. 1361 *et seq.*

### Subpart A—Introduction and General Provisions

**§ 222.102 [Amended]**

■ 4. Amend § 222.102 by removing the definition for "Harm".

**Maureen Foster,**

*Chief of Staff, Exercising the Delegated Authority of the Assistant Secretary for Fish and Wildlife and Parks, Department of the Interior.*

**Laura Grimm,**

*Chief of Staff, Exercising the Delegated Authority of the Under Secretary of Commerce for Oceans and Atmosphere and NOAA Administrator, Department of Commerce.*

[FR Doc. 2025–06746 Filed 4–16–25; 8:45 am]

BILLING CODE 4333–15–P; 3510–22–P

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington D.C. 20240

May 7, 2026

In Reply Refer To:
FWS/AES/082672

The Honorable Sheldon Whitehouse
Ranking Member
Committee on Environment and Public Works
United States Senate
Washington, DC 20510

Dear Ranking Member Whitehouse:

Thank you for your letter regarding the proposed rule published on April 17, 2025, to rescind the regulatory definition of "harm" under the Endangered Species Act of 1973 (ESA).

The proposed rescission is consistent with the Supreme Court's decision in Loper Bright Enterprises v. Raimondo, 603 U.S. 369, 400 (2024), which overturned Chevron deference and held that an agency's regulation match the single, best meaning of the statute rather than an agency's own preferred interpretation. Further, the proposed rule aligns the definition with the plain text of the ESA, as informed by historical and legal interpretations of "take" as an affirmative act directly affecting wildlife.

If you have questions or need further assistance please contact Lisa Jones, Office of Congressional and Legislative Affairs, U.S. Department of the Interior, at lisa_m_jones@fws.gov.

Sincerely,

Brian R. Nesvik
Director

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington D.C. 20240

May 7, 2026

In Reply Refer To:
FWS/AES/082672

The Honorable Adam B. Schiff
United States Senator
Ranking Member
Subcommittee on Fisheries, Water and Wildlife
Washington, DC 20510

Dear Ranking Member Schiff:

Thank you for your letter regarding the proposed rule published on April 17, 2025, to rescind the regulatory definition of "harm" under the Endangered Species Act of 1973 (ESA).

The proposed rescission is consistent with the Supreme Court's decision in Loper Bright Enterprises v. Raimondo, 603 U.S. 369, 400 (2024), which overturned Chevron deference and held that an agency's regulation match the single, best meaning of the statute rather than an agency's own preferred interpretation. Further, the proposed rule aligns the definition with the plain text of the ESA, as informed by historical and legal interpretations of "take" as an affirmative act directly affecting wildlife.

If you have questions or need further assistance please contact Lisa Jones, Office of Congressional and Legislative Affairs, U.S. Department of the Interior, at lisa_m_jones@fws.gov.

Sincerely,

Brian R. Nesvik
Director

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington D.C. 20240

May 7, 2026

In Reply Refer To:
FWS/AES/082672

The Honorable Cory A. Booker
United States Senator
Washington, DC 20510

Dear Senator Booker:

Thank you for your letter regarding the proposed rule published on April 17, 2025, to rescind the regulatory definition of "harm" under the Endangered Species Act of 1973 (ESA).

The proposed rescission is consistent with the Supreme Court's decision in Loper Bright Enterprises v. Raimondo, 603 U.S. 369, 400 (2024), which overturned Chevron deference and held that an agency's regulation match the single, best meaning of the statute rather than an agency's own preferred interpretation. Further, the proposed rule aligns the definition with the plain text of the ESA, as informed by historical and legal interpretations of "take" as an affirmative act directly affecting wildlife.

If you have questions or need further assistance please contact Lisa Jones, Office of Congressional and Legislative Affairs, U.S. Department of the Interior, at lisa_m_jones@fws.gov.

Sincerely,

Brian R. Nesvik
Director

# HOH INDIAN TRIBE

P.O. Box 2196, Forks, WA 98331
(360) 374-6582 · *hohtribe-nsn.org*

Darlene Hollum CHAIRWOMAN
Maria Lopez VICE CHAIRWOMAN
Tahnee Hudson SECRETARY
Josephine Ward TREASURER
Rosetta Leitka MEMBER
Walter Ward-Bos V MEMBER
Cynthia Sheriff MEMBER


May 21, 2025

Secretary Doug Burgum
Department of Interior
1849 C Street NW
Washington, DC 20240

Secretary Howard Lutnick
Department of Commerce
1401 Constitution Ave NW
Washington, DC 20230

RE: Comments of the Hoh Tribe and Request for Formal Consultation on Proposed Rule Rescinding the Definition of "Harm" Under the Endangered Species Act, Docket No. FWS-HQ-ES-2025-0034.

Dear Secretaries Burgum and Lutnick,

The Hoh Indian Tribe hereby submits comments on the above referenced proposed rule and requests formal government-to-government consultation on this matter.

As signatory to the 1856 Treaty of Olympia,[1] the Hoh Tribe holds reserved, sovereign rights to fish, hunt, gather and manage the resources of our usual and accustomed places and aboriginal lands of the Olympic Peninsula in Northwest Washington. Our rights are federally recognized, affirmed by the Supreme Court, and carry Constitutional authority under Article II, reserving with other Treaty Tribes the right to harvest half of all fish and shellfish in Washington, and as many as 40 miles into the Pacific Ocean. As a resource manager, we share responsibility with other Tribes, the State of Washington, and the Federal Government to ensure the survival, conservation, and recovery of all cultural and treaty-reserved species, including those protected under the ESA.

This proposed change to the ESA carries tremendous impacts for our Tribe, our reserved rights, and our sovereign prerogative to manage our resources on behalf of our members. Yet, thus far, proper and meaningful consultation, on a government-to-government basis between the United States and the Hoh Tribe as sovereigns, has not occurred. Meaningful consultation requires engaging directly with our tribal government at a pre-decisional stage, when our input, objectives and rights can shape the outcome. We hereby request formal consultation on this proposed rule, and until this occurs, request no decision be taken. These comments, and any response to them, do not constitute formal consultation.

[1] Treaty of Olympia, 12 Stat. 971 (Jan. 6, 1856).

As it stands, the Hoh Tribe opposes removal of the definition of 'Harm' from the ESA as against the overall purpose of the Act, its plain meaning, and settled precedent. This proposal would eliminate the federal government's ability to hold private actors accountable who plainly 'take' species by destroying their essential habitat. By arbitrarily narrowing the settled meaning of 'harm', this proposed rule stands to exacerbate the threatened and endangered status of all listed species by disregarding a key factor in their decline: namely, the loss and degradation of habitats critical to conservation and recovery.

The Hoh Tribe has direct sovereign and economic interests in maintaining the full scope of the ESA's Section 9 'Take' provisions. These protections are critical not only for species recovery and survival, but for the continued exercise of our time-immemorial subsistence, ceremonial, and commercial harvest practices. The exercise of our treaty rights depends on the availability of healthy and functioning habitats and ecosystems. Eliminating the definition of 'harm'—and with it, the federal government's power to protect habitat from private destruction—challenges the fundamental integrity of our treaty rights.

Tribal treaty rights are reliance interests that go to the heart of the federal trust responsibility and Constitutional obligations to tribal nations. Our treaty reserved not only the right to fish, but the right *to secure a harvest*.[2] If the species we depend on have dwindled to extinction, these rights have been abrogated. By eliminating one of the ESA's core provisions, this proposed rule would unjustly shift the cost and burden of the Act onto Tribes and other resource users. The impact on the Northwest would be particularly strong, as the entities causing habitat destruction face little restrictions, while Treaty fishers may be compelled to further withhold their treaty-reserved harvests. Treaty resources are integral to tribal sovereignty, economic security, and the health and welfare of our communities.

The Hoh Tribe is also concerned by the lack of statutory authority or reasoned justification for this proposed change. The existing interpretation of 'harm' is well supported under the express purpose of the Act. Congress enacted the ESA "... to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species..."[3] The Section 9 'Take' provisions are the primary enforcement mechanism for this purpose. The statutory definition of 'Take' includes "to harass, harm, pursue..." etc., "or to attempt to engage in any such conduct,"[4]—a broad definition that reflects Congress' broad intent. The current definition of 'harm,' also reflects what scientific consensus and tribal ecological knowledge understand harm to mean, including habitat modifications or degradations that "...injures wildlife by significantly impairing essential behavioral patterns including, breeding, spawning,

[2] *Washington v. Washington State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 678 (1979), modified sub nom. Washington v. U.S., 444 U.S. 816 (1979); *U.S. v. Winans*, 198 U.S. 371, 381 (1905).
[3] 16 U.S. Code § 1531, *Congressional findings and declaration of purposes and policy.*
[4] 16 U.S.C. § 1532(19).

**HOH INDIAN TRIBE**
P.O. Box 2196, Forks, WA 98331
(360) 374-6582 · *hohtribe-nsn.org*

Darlene Hollum CHAIRWOMAN
Maria Lopez VICE CHAIRWOMAN
Tahnee Hudson SECRETARY
Josephine Ward TREASURER
Rosetta Leitka MEMBER
Walter Ward-Bos V MEMBER
Cynthia Sheriff MEMBER

rearing, migrating, feeding or sheltering."[5] This interpretation accords with Congress' express purpose to "provide a means to protect ecosystems" through comprehensive federal enforcement.

The current definition of "harm" has been affirmed by the Supreme Court and is now settled precedent. In *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, the Court held that habitat destruction leading to the death or injury of protected species is a valid interpretation of the ESA's prohibition against "take," and fully supported by the purpose of the Act.[6] Yet, the proposed rule and accompanying Notice dismisses the Court's binding precedent without statutory authority let alone scientific evidence. Instead, the Services' seem to conclude that the Court's decision in *Sweet Home* was wrongly decided. Referencing the 2024 case, *Loper Bright Enterprises v. Raimondo*, they argue that the current regulations are not "the single best meaning of the statute" and should be eliminated without replacement.[7] At the same time, the notice alludes – again, without authority or justification—that the agencies will enforce a new interpretation of "harm," taken explicitly from the dissent in *Sweet Home*, as an "affirmative act … directed immediately and intentionally against a particular animal."[8] This definition is arbitrary, overly narrow, and unsupported.

This argument also represents an alarming overreach of agency discretion. The Court's decision in *Loper Bright* does not give agencies complete authority to reinterpret statutes against Supreme Court precedent. In *Loper Bright*, the Court stated clearly that agencies only have discretion to interpret statutory meaning within the boundary of their authority and with "reasoned decision-making."[9] Further, the Court held that "mere reliance on [its decision to overturn *Chevron*]" – the standard that governed the Court's decision in *Sweet Home* – "is not enough to justify overruling a statutory precedent." Likewise, the Court's decision to overrule *Chevron* cannot now independently justify a new interpretation of the Act. Without more, executive agencies must follow Congressional intent. The current definition of "harm" accords with the Act and should remain.

Finally, the Hoh Tribe takes issue with the suggestion in the Notice that this proposed rule "will not have a significant economic impact on a substantial number of small entities."[10] Tribal and commercial fisheries across the Pacific Northwest depend on the protection of the ESA. For

---

[5] 50 C.F.R. 222.102.
[6] *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 698 (1995).
[7] *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024); Rescinding the Definition of "Harm" Under the Endangered Species Act, 90 Fed. Reg. 16,102 (April 17, 2025).
[8] Fed. Reg. at 16,103.
[9] *Loper Bright*, 603 U.S. at 412.
[10] Fed Reg. at 16,104 (referencing the Regulatory Flexibility Act of 1996, 5 U.S.C. 601 *et seq.*).

decades, our region has coordinated across Federal, Tribal, and State jurisdictions to invest in habitat restoration critical for the survival of salmon and other fish species. Working collectively on recovery plan implementation, coordinating investments, and committing a vast network of human and financial resources, managers have been able to conserve and recover critical species to healthy and harvestable populations. This sudden and arbitrary shift in ESA protections would undermine decades of recovery projects and billions of dollars invested to date.

Removing protections upstream will cause major economic consequences for the region and its fisheries downstream. Such a recission to the definition of 'harm' produces an undue burden on State, Tribal, and local economies and communities that depend on long term sustainable fisheries for their livelihoods. Without habitat protections, Tribal and State commercial fisheries will face further risk of reduction and closure while upstream habitat degradation continues to push fisheries to the brink. Finally, this clear economic risk to commercial fisheries in the Pacific Northwest is in direct conflict with the goals of the recent Executive Order 14276, titled "Restoring American Seafood Competitiveness." Without habitat protections, fisheries are neither sustainable nor productive.

The Hoh Tribe strongly opposes the Fish and Wildlife Service and the National Marine Fisheries Service eliminating the definition of 'harm' under the ESA. As this proposal represents a significant impact to our Tribe, we request meaningful government-to-government consultation before any decision is made.

Sincerely,

Darlene Hollum

Darlene Hollum

Chairwoman, Hoh Indian Tribe

000101

**Cc:**
Hoh Tribal Business Committee
Senator Cantwell
Senator Murray
Representative Randall

RECEIVED
2025 JUN 16 PM 12: 21
OFFICE OF THE
EXECUTIVE SECRETARIAT

# POINT NO POINT TREATY COUNCIL

Port Gamble S'Klallam * Jamestown S'Klallam

May 15, 2025

Assistant Administrator Eugenio Pineiro Soler
National Marine Fisheries Service
1315 East-West Highway, 14th Floor
Silver Spring, Maryland 20910

Acting Director Paul Souza
US Fish and Wildlife Service
1849 C Street, NW
Washington DC 20240

**Re: Rescinding the Definition of 'Harm' under the Endangered Species Act [Docket No. FWS-HQ-ES-2025-0034]**

Dear Assistant Administrator Pineiro Soler and Acting Director Souza:

On behalf of our Tribes, the Point No Point Treaty Council (PNPTC) writes in strong opposition to U.S. Fish and Wildlife Service's (FWS) and National Marine Fisheries Service's (NMFS) Notice of Proposed Rulemaking: *Rescinding the Definition of 'Harm' under the Endangered Species Act (ESA)*.

The PNPTC is a natural resources management consortium that works exclusively on behalf of the Jamestown S'Klallam Tribe and Port Gamble S'Klallam Tribe, both federally recognized Tribes in Western Washington descended from signatories to the 1855 Treaty of Point No Point. Both of our Tribes have constitutionally protected, Treaty-reserved rights to harvest, consume, and otherwise manage fish, shellfish and wildlife within our usual and accustomed areas, on and off reservations, and other Treaty reserved resources.

Our Tribes oppose removing the definition of 'harm' from the ESA as it not only undermines achieving the overall purpose and goals of the Act, but stands to further contribute and exacerbate the threatened and endangered status of the species we depend on by arbitrarily disregarding a key factor in species decline: the on-going loss and degradation of habitats critical to species' survival, conservation, and ultimate recovery.

This proposed change to the ESA, in substance and procedural implementation, also has tremendous implications for all tribes, tribal reserved treaty rights, and the management of treaty reserved resources, all of which are dependent upon habitats and ecosystems that are healthy and functioning in ways that support species recovery and continued survival.

Eliminating the definition of 'harm,' and thus the subsequent consideration and role that habitats play in the conservation of species, challenges the integrity of tribal treaty rights and

resources, and threatens to severely impinge, if not abrogate altogether, the effective and meaningful exercise of tribal treaty rights. Tribal rights and natural resources are integral to supporting tribal economies and play a vital role in protecting and ensuring the economic security, health, and welfare of tribal nations and their communities. To this end, our Tribes unequivocally oppose removing the definition of 'harm' from the Endangered Species Act.

***The definition of 'Harm' is consistent with Congressional intent, supporting the purposes and goals of the ESA.***

Removing 'harm' from the definition(s) under the ESA is inconsistent with the overall intent, purpose and goals of the act wherein the condition, quality, and quantity of habitat plays a significant role in both the recovery of, and conservation of threatened and/or endangered species. In fact, the expressed purpose of the Act is " *to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species"*[1].

Removing the regulatory definition of 'harm,' which currently includes habitat modifications or degradations that "*injures wildlife by significantly impairing essential behavioral patterns including, breeding, spawning, rearing, migrating, feeding or sheltering*" would significantly weaken the ESA, stripping it of key mechanisms that allow for agencies to address habitat-based threats to species- which are recognized as one of the leading factors affecting species survival and conservation.

In Washington state, for example, listing decisions and the resulting Recovery Plans for Puget Sound Chinook, Steelhead and Hood Canal Summer Chum salmon identify the loss, continuous degradation, and adverse modification of habitats as key limiting factors for species recovery and conservation. Moreover, in subsequent assessments of the implementation and adaptive management of these Recovery Plans, NOAA-NMFS has repeatedly acknowledged that salmonid populations continue to decline despite their listings because the rate of habitat loss and degradation outpaces habitat protections and restoration.

In 2011, after nearly a decade of Recovery Plan implementation for Puget Sound Salmonids, NMFS further cited that *"The region need[ed] to increase its scrutiny of the sources of habitat decline, and the tools [used] to protect habitat sites and ecosystem processes,"* noting that recovery efforts for these listed species rely heavily on the protection of remaining habitat within the species range, in addition to the need of continuing to restore habitats and ecosystem processes essential to species conservation.[2]

[1] 16 U.S. Code § 1531, *Congressional findings and declaration of purposes and policy*
[2] *A Qualitative Assessment of Implementation of the Puget Sound Chinook Salmon Recovery Plan.* Millie Judge, for National Marine Fisheries Services. 2011. Pp.6,14-21.

Additionally, in the previous 5-year Status Review of Puget Sound Chinook, Steelhead and Hood Canal Summer Chum salmon the NMFS concluded that these species should remain listed as threatened based on the review of the five listing factors. In their five-factor analysis, which includes analysis of protection efforts and regulations to protect habitats, NMFS noted that there remains concern regarding effectiveness of existing regulatory mechanisms, which are still enabling direct and indirect species take as a result of adverse habitat effects and degradation.[3]

The removal of the definition of 'harm' from the ESA, and consequently any considerations of habitat and habitat protections from adverse modification(s), blatantly disregards best available science and decades of analysis and scientific consensus that have concluded- *time and again*- that habitat and the destruction and modification thereof is the leading cause of species decline. Rescinding the current definition of 'harm' would further impede, if not effectually terminate, salmon recovery and conservation efforts in the Pacific Northwest all together. Maintaining the current definition of 'harm' is thus not only reasonable, but it is essential to carry out the expressed purpose and goals of the Act.

***Legal Foundation***

Additionally, the current definition of "harm" was upheld by the Supreme Court in *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon (1995),* holding that habitat destruction leading to the death or injury of protected species is a legitimate interpretation of the ESA's prohibition against "take." The court noted that the Act's broader purpose was to protect endangered species, and that a narrow interpretation of "harm"-i.e. one that did not include both direct and indirect effects on species, would undermine that purpose.

Presently, however, the Services seem to challenge this legal foundation, alluding in the Federal Register Notice that when the 2024 *Loper Bright Enterprises v. Raimondo* overruled the *Chevron* deference that the Court relied on in the *Sweet Home* decision, that somehow nullified *Sweet Home* as well. While we recognize that the *Loper Bright* decision altered standard for agency deference, it did not invalidate *Sweet Home's* reasoning or its conclusion. The Services' proposed rescission therefore misinterprets the Court's intent and unnecessarily undermines well-established precedent.

***Economic Impacts & Economic Burden resulting from rescinding 'Harm' definition from ESA.***

Salmon in the Pacific Northwest, and specifically within Puget Sound, have been listed under the Endangered Species Act for over 20 years. In that time this region has coordinated across Federal, Tribal, and State jurisdictions, working collectively on recovery plan implementation for listed species, coordinating financial investments, and committing a vast network of human

[3] National Marine Fisheries Service. *5-Year Review: Summary & Evaluation of Puget Sound Chinook Salmon Hood Canal Summer-run Chum Salmon Puget Sound Steelhead*. 2016. West Coast Region, Portland, OR.

resources. The sudden and arbitrary shift in a decades-long policy and on the ground implementation creates confusion, and a lack of clarity, of what is considered to be 'harm'. In doing so, the recession jeopardizes not only current and future species recovery and conservation work, but it would also undermine decades of financial commitments at the federal, state, local, and tribal levels

While rescinding this definition is not only scientifically and ecologically unsound; it is equally going to produce harmful economic consequence(s). Such a rescission to the definition of 'harm' also produces an undue economic burden on, and harm to, state, local and tribal economies and communities that depend on long term, sustainable, productive fisheries for their economic security. It is also likely to increase, rather than decrease, litigation because without the critical habitat that important species depend on , commercial fisheries are at further risk of being reduced or closed all together.

Furthermore, such an economic threat to commercial fisheries in the Pacific Northwest and Washington is in direct conflict with the most recent proclamation and Presidential action by the Trump Administration to "Restore American Seafood Competitiveness."[4] Without high-quality habitat to ensure their reproductive success and growth, fisheries are neither productive nor sustainable, thereby reducing harvest opportunities and subsequently, America's market competitiveness.

Our Tribes strongly urge the Fish and Wildlife Service and the National Marine Fisheries Service to retain or develop an even stronger definition of harm with even fewer loopholes to clearly and deliberately protect endangered species and their habitat. Doing so is consistent with longstanding legal precedent, the bipartisan Congressional intent, and the findings that establish the Endangered Species Act. It is essential to fulfilling the expressed purpose of the Act in conserving endangered and threatened species and the ecosystems upon which they depend.

Sincerely,

Chris Tom, Vice Chair
Port Gamble S'Klallam Tribe
ctom@pgst.nsn.us
(360) 509-5865

W. Ron Allen, Chairman/CEO
Jamestown S'Klallam Tribe
rallen@jamestowntribe.org
(360) 681-4621

[4] "Restore American Seafood Competitiveness." Presidential Action, Proclamation. April 17, 2025. *Accessed:* https://www.whitehouse.gov/presidential-actions/2025/04/restoring-american-seafood-competitiveness/

# United States Senate

WASHINGTON, DC 20510

May 5, 2025

The Honorable Doug Burgum
Secretary
U.S. Department of the Interior
1849 C Street NW
Washington, DC 20240

The Honorable Howard Lutnick
Secretary
U.S. Department of Commerce
1401 Constitution Ave NW
Washington, DC 20230

Dear Secretary Burgum and Secretary Lutnick:

We write to express serious concerns regarding the extreme rule being proposed by the U.S. Fish and Wildlife Service (FWS) and National Marine Fisheries Service (NMFS) to delete the definition of "harm" from Endangered Species Act regulations.[1] By amputating this critical part of Endangered Species Act rules that has been on the books for more than 40 years, the administration would permit the widespread degradation and elimination of habitat for species that Congress enacted the Endangered Species Act to protect.

It is widely understood that a species cannot live without a safe place to call home. That is why, for decades, administrations of both parties have continued to interpret the Endangered Species Act as prohibiting actions that "may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."[2] Under the administration's reading of the statute as laid out in the proposed rule, while it would continue to be unlawful to contribute to a protected species' extinction by shooting it with a firearm, it would be perfectly lawful to contribute to a protected species' extinction by bulldozing the habitat it relies on for survival. This represents an end run around the Endangered Species Act and completely negates Congress's intent in passing the Act, which was to prevent threatened or endangered species from going extinct.

FWS and NMFS have both repeatedly stated that habitat loss is the primary driver of species extinction. A large body of independent, peer-reviewed scientific evidence supports this conclusion. It is then puzzling why agencies under your leadership would now propose to allow private entities to degrade the habitat of species protected under the Endangered Species Act. Congress made clear its intent in the law to protect the habitat of critical species.

Furthermore, combined with efforts by the administration and DOGE to expel expert personnel from federal agencies like FWS and the National Ocean and Atmospheric Administration – which houses NMFS – and starve these agencies of resources, the proposed rule raises the question of how FWS and NMFS will be able to enforce the Endangered Species Act at all.

---

[1] https://www.regulations.gov/document/FWS-HQ-ES-2025-0034-0001
[2] 50 CFR 17.3

Congress should be kept fully informed throughout this rulemaking process. Therefore, we request answers to the following questions:

1. What analysis have FWS and NMFS performed to support this proposed rule?
2. Which external stakeholders provided input on this proposed rule?
3. Did any external stakeholders help draft this proposed rule? If so, which?
4. How do FWS and NMFS intend to prevent the reduction of population numbers or the extinction of threatened and endangered species if private entities are allowed to degrade or destroy the habitat of these species?

President Richard Nixon signed the Endangered Species Act in 1973, after the Senate unanimously passed the Act. Protecting wildlife should not be a partisan issue, and wildlife and the habitats they depend on generate innumerable benefits for humanity, including providing stability for our food systems and clean air and water. It is important that the administration not lose sight of Congress's intent when it passed the Act.

Thank you, and we look forward to your response.

Sincerely,

Adam B. Schiff
United States Senator
Ranking Member
Subcommittee on Fisheries, Water, and Wildlife

Sheldon Whitehouse
United States Senator
Ranking Member
Committee on Environment and Public Works

Cory A. Booker
United States Senator

**U.S. Fish and Wildlife Service**
**CATEGORICAL EXCLUSION DOCUMENTATION FOR NEPA COMPLIANCE**
**Final rule for the Rescission of the regulatory definition of "harm"**

**Introduction**
The U.S. Department of the Interior (DOI), Fish and Wildlife Service (FWS) has prepared this categorical exclusion documentation that includes an Environmental Action Statement pursuant to the National Environmental Policy Act (NEPA; 42 U.S.C. 4321 *et seq.*), the DOI NEPA Implementing Regulations, as amended, (43 CFR 46), and the DOI Handbook of NEPA Implementing Procedures (516 DM 1) for the proposed rescission of the final action of rescinding the regulatory definition of "harm" in the FWS's Endangered Species Act Regulations – Endangered and Threatened Wildlife and Plants (50 CFR 17.3).

The Endangered Species Act, as amended, (hereafter referred to as ESA or the Act; 16 U.S.C. 1531 et seq.) prohibits the "take" of endangered wildlife under Section 9 (16 U.S.C. 1538). "Take" is defined in Section 3 of the Act as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct" (16 U.S.C. 1532). In 1973, when the Act was signed, the Oxford English Dictionary defined "take" as meaning to kill or capture a wild animal (Oxford English Dictionary (1933; third printing in February 1973)).

In 1975, FWS published a final rule that included the first regulatory definition of "harm" as "...an act or omission which actually injures or kills wildlife, including acts which annoy it to such an extent as to significantly disrupt essential behavioral patterns, which include, but are not limited to, breeding, feeding or sheltering; significant environmental modification or degradation which has such effects is included within the meaning of "harm" (40 FR 44416, September 26, 1975). FWS redefined "harm" in 1981 to "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering" (46 FR 54748, November 4, 1981). FWS redefined harm because the previous definition could have been construed as prohibiting the modification of habitat even where there was no injury to the listed endangered or threatened wildlife (46 FR 54748, November 4, 1981).

The National Marine Fisheries Service (NMFS) first defined "harm" in regulations in 1999 (64 FR 60731, November 8, 1999), which was similar to FWS' 1981 redefinition but contained NMFS-specific modifiers: "an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering."

In rescinding the regulatory definition of "harm," a term within the ESA statutory definition of

"take," the FWS is merely resorting to the plain meaning of the statute rather than the agencies' extraneous regulatory definition of "harm." In the recent Supreme Court case, *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the Court specifically rescinded its previous Chevron deference standard which gave agencies broad discretion in promulgating regulations interpreting statues, in favor of a stricter standard requiring agencies to administer statutes within the confines of the Congressionally enacted provisions of such statutes.

Thus FWS is proposing to rescind the regulatory definition of "harm", last revised in 1981 – Endangered and Threatened Wildlife and Plants (50 CFR 17.3) to allow for a more direct interpretation of the meaning of "harm" as provided in the ESA definition of "take." The rescission of the definition of "harm" in the existing ESA regulations is being done to accord with the single best meaning of the ESA statutory text. The FWS does not intend to provide a new definition of "harm" because the ESA itself defines "take," and further elaborating on one subcomponent of that definition —"harm"— is unnecessary in light of the comprehensive statutory definition of "take." Accordingly, the FWS proposes to rescind the regulatory definition of "harm" in 50 CFR 17.3 and instead rely on the direct, statutory interpretation of "take". Rescinding the regulatory definition of "harm" would not require that any prior permit or incidental take statement issued by FWS that relied on the prior definition of "harm" be reevaluated.

**Part I. Proposed Action**

The FWS proposes to rescind the regulatory definition of "harm" in 50 CFR 17.3. The proposed rule would rescind the regulatory definition of "harm" currently found in FWS and NMFS (collectively the Services) regulations, which states that "harm" includes significant habitat modification that directly or indirectly injures wildlife by impairing essential behaviors such as breeding, feeding or sheltering. Habitat-related effects to federally listed species that cause injury or mortality to federally listed fish and wildlife species would continue to still be deemed take (e.g., tree clearing that results in direct injury or mortality to adult, juvenile, or eggs of federally listed bird species) even if they occurred at a later point in time than the action itself. Habitat modification or degradation that results in injury or death of individuals will still be considered prohibited "take" as defined under section 3 of the Act.

The rescission of the definition of "harm" does not alter the statutory requirement that federal agencies ensure their actions are not likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat. The rescission of the regulatory definition of "harm" does not limit the Service's ability to assess impacts to listed species and critical habitat from all components of the action agency's proposed action through the section 7 process.

The rescission of the definition of "harm" at 50 CFR 17 would not affect critical habitat designations or evaluations. Nothing in this revision would require that any prior ESA section

10(a) permit or section 7 incidental take statement that relied on the prior definition of "harm" be reevaluated.

**Part II. Categorical Exclusion Identifier**
The DOI categorical exclusion being applied to achieve NEPA compliance for the proposed action is: 43 CFR 46.210(i). *"Policies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case."*

**Part III. Categorical Exclusion Justification**
The FWS's proposed rescission of the definition of "harm" in FWS's Endangered Species Act Regulations – Endangered and Threatened Wildlife and Plants (50 CFR 17.3) is an action that is administrative, legal, and of a procedural nature, and therefore meets the terms of DOI's categorical exclusion at 43 CFR 46.210(i). Essentially, the FWS, in consultation with the Solicitor's office has determined that the statutory definition of "take" more accurately reflects the intent of Congress in administering the ESA than the regulatory definition that is to be rescinded. The action repealing the regulatory definition of "harm," in no way directly dictates the future implementation of the ESA by the FWS. The only result of this action is that the FWS will provide all the protections of the ESA, based on the language of the ESA, without the addition of extraneous definitions enacted by the agencies instead of the Congress.

**Part IV. Extraordinary Circumstances**
The FWS has evaluated the extraordinary circumstances provided in DOI's NEPA Implementing Regulations (43 CFR 46.215) and determined that none apply to the application of DOI's categorical exclusion at 43 CFR 46.210(i) to FWS' rescission of the regulatory definition of "harm" in the FWS's ESA Regulations – Endangered and Threatened Wildlife and Plants (50 CFR 17). While a number of the nine "Extraordinary circumstances" which must be considered before proceeding with a categorical exclusion could be pointed to by some as being germane to this action (i.e. references to "significant impacts on listed species;" the action is directly related to "other actions that implicate potentially significant environmental effects;" or, "involve unique or unknown environmental risks;"), the federal action of rescinding the definition of "harm" regulation, and relying on the plain language of the ESA statute does not directly implicate any of these extraordinary circumstances because the rescission of the FWS's ESA regulatory definition of "harm" does not directly authorize or result in any physical changes to the environment. The FWS will continue to administer the ESA and provide all the protections of the ESA as Congress intended when it enacted the ESA and its subsequent amendments.

**Part V. Agency, Public, and Tribal Coordination**
The proposed recission of the regulatory definition of "harm" was published in the *Federal*

*Register* on April 17, 2025 (90 FR 16102), with a 30-day public review and comment period. By the close of the public comment period on May 19, 2025, we received approximately 358,000 public comments on the proposed rule to rescind the regulatory definition of "harm." Comments were received from a range of sources including individual members of the public, States, Tribes, industry organizations, legal foundations and firms, and environmental organizations. Public input provided during the comment period has been considered in determination of the appropriate level of NEPA review and the development of this NEPA compliance documentation.

*Pursuant to the National Policy Act of 1969 as amended (NEPA), and the U.S. Department of the Interior (DOI) NEPA Implementing Regulations (43 CFR 46), and the DOI Handbook of NEPA Implementing Procedures (516 DM 1):*

The proposed action is covered by the DOI Categorical Exclusion 43 CFR 46.210(i) and no extraordinary circumstances in 43 CFR 46.215 (a)-(i) apply. The Department of the Interior has found that the categories of actions would not have a direct, significant effect on the quality of the human environment and are, therefore, categorically excluded from the requirement for completion of an environmental assessment or environmental impact statement. No further NEPA documentation will therefore be prepared.

**Fish and Wildlife Service signature approval:**

Brian R. Nesvik
Director
U.S. Fish and Wildlife Service

**UNITED STATES FISH AND WILDLIFE SERVICE**
**ENVIRONMENTAL ACTION STATEMENT**

Pursuant to the National Environmental Policy Act (NEPA) of 1969, as amended, and the U.S. Department of the Interior (DOI) National Environmental Policy Act Implementing Regulations (43 CFR 46), the DOI Handbook of National Environmental Policy Act Implementing Procedures (516 DM 1) and other statutes, orders, and policies that protect fish and wildlife resources, I have established the following decision record and determined that the proposed action of (*describe proposed action*):

Rescinding the regulatory definition of "harm" in 50 CFR part 17.3

Check One:

☒ falls under one or more DOI, bureau, or adopted categorical exclusions in 43 CFR 46.210 or the 516 DM 1, Appendix 2, and no extraordinary circumstances in 43 CFR 46.215 (a)-(i) apply. No further NEPA documentation will therefore be made.

☐ is found not to have reasonably foreseeable significant effects as determined by the attached environmental assessment and finding of no significant impact.

☐ is found to have reasonably foreseeable significant effects and, further consideration of this action will require a notice of intent to be published in the *Federal Register* announcing the decision to prepare an environmental impact statement.

☐ is not approved because of unacceptable environmental damage, or violation of Fish and Wildlife Service mandates, policy, regulations, or procedures.

☐ is an emergency action within the context 43 CFR 46.150. Only those actions necessary to control the immediate impacts of the emergency will be taken. Other related actions remain subject to NEPA review.

Other supporting documents (*list*):

see attached document on rescinding the regulatory definition of "harm"

Signature Approval:

| BRIAN NESVIK Digitally signed by BRIAN NESVIK Date: 2026.07.10 09:49:28 -04'00' | Director, U.S. Fish and Wildlife Service | |
|---|---|---|
| Signature | Title | Date |
| | | |
| Signature | Title | Date |
| | | |
| Signature | Title | Date |
| | | |
| Signature | Title | Date |

# Regulatory Impact Analysis

## Final Rule Rescinding the Regulatory Definition of "Harm"

### 1 Executive Summary

This analysis evaluates the final rule rescinding the regulatory definition of "harm" under the Endangered Species Act. By removing habitat modification as a basis for prohibited take, the rule may reduce the number of Habitat Conservation Plans (HCPs) and Conservation Benefit Agreements (CBAs) developed or maintained. The Services estimate annualized quantified cost savings of $521.0 million at a 7% discount rate and $361.3 million at a 3% discount rate, reflecting reduced planning, negotiation, mitigation, and implementation costs for HCPs under mid-cost -scenario assumptions. These quantitative savings complement broad qualitative cost savings anticipated for land-dependent sectors such as agriculture, energy, timber, mining, utilities, infrastructure, and homebuilding.

Because habitat modification would no longer constitute take, some entities may no longer seek incidental take permits, though activities involving direct injury or mortality would still require them. While potential disbenefits—including habitat loss, increased incidental take, and reductions in ecosystem services—remain possible, these impacts are not reliably quantified and are therefore discussed qualitatively. The Services anticipate the cost savings to outweigh the potential disbenefits.

### 2 Summary of the Final Rule

The U.S. Fish and Wildlife Service and the National Marine Fisheries Service (collectively referred to as the "Services") rescind the regulatory definition of "harm" from the Code of Federal Regulations (CFR) in Title 50 parts 17 and 222 to align with the single, best meaning of the statute. In the ESA, "take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct" (16 U.S.C. 1532). The Services' existing regulations, which contain the definition of "harm," do not match the single, best meaning of the statute in light of the Supreme Court's 2024 decision in *Loper Bright Enterprises v. Raimondo*. As Justice Scalia's dissent in *Babbitt* v. *Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995; *Sweet Home*) explains, the regulations' interpretation of the statutory language runs afoul of the *noscitur a sociis* canon and is inconsistent with the structure of the ESA. The rescission does not alter the ESA's statutory definition of "take."

The Services conclude that this will be a deregulatory action and will reduce burden on entities that voluntarily apply for permits issued under section 10(a) of the ESA. The Services issue Incidental Take Permits (ITPs) associated with Habitat Conservation Plans (HCPs) and Enhancement of Survival Permits (EOS) associated with Conservation Benefit Agreements (CBAs) under section 10(a) of the ESA, which allows the Secretary to issue permits authorizing "take" that is otherwise prohibited under section 9 of the ESA. Permits are issued for scientific or recovery purposes, to enhance the survival of listed species (including under CBAs), and for take

that is incidental to otherwise lawful activities (associated with HCPs). The extent of the impact of the rescission of the regulatory definition of "harm" is ultimately unknown. It may have an impact on reducing the number of permits applied for, and ultimately the number of HCPs or CBAs permitted. The potential reduction in the number of permit applications is not knowable or estimable because of the voluntary nature of permitting under section 10(a). That is, entities that seek "take" coverage to avoid violating section 9 prohibitions of the ESA may not want or need to seek a section 10(a) permit. However, if fewer ITPs and their associated HCPs, as well as CBAs and their associated EOS permits, are an outcome and if already permitted plans and agreements are amended, there may be significant economic impacts.

For the reasons stated above, the Services have deemed this rulemaking Economically Significant. The Services have provided a range of estimates on the economic impact of rescinding the definition of "harm". Some impacts are difficult to quantify, and in some cases, only qualitative impacts are considered, such as the benefits to resource extracting or land dependent industries, an increase in incidental take, which may result in losses in population to endangered species, losses in habitat, and reductions in ecosystems services.

Where possible, we provide quantitative estimates of cost savings from a lowered burden resulting from the rescission of the regulatory definition of "harm."

**Table 1.** Summary of quantitative estimates of cost savings resulting from this rulemaking. (millions)

| **Type of Cost Savings** | **Median scenario with 7% discount rate** | **Median scenario with 3% discount rate** |
|---|---:|---:|
| **Annualized Cost Large-scale HCPs** | $433.6 | $300.6 |
| **Annualized Cost Project-scale HCPs** | $87.4 | $60.7 |
| **Total** | $521.0 | $361.3 |

## 3 Need for Deregulatory Action

The deregulatory action to rescind the regulatory definition of "harm" is needed to restore consistency in implementing the ESA by aligning agency regulations with what the Services have identified as the statute's "single, best meaning," consistent with *Loper Bright*. The existing regulatory definition, which includes habitat modification, runs contrary to the best meaning of the statutory term "take", requiring corrective action to ensure that regulatory text does not extend beyond statutory authority. Removing the definition therefore responds both to a statutory-interpretation need, while allowing the Services to implement the ESA using its plain statutory text without reliance on a regulatory definition that stakeholders have argued is confusing, overly broad, or inconsistent with the Act.

This rule is a deregulatory action intended to ease the burden on landowners and land users who currently negotiate and administer expensive HCPs and CBAs that address a definition of "harm" not consistent with the ESA. The benefit of this deregulatory action will accrue to future

permit applicants who may not seek a permit and to existing permittees who decide to amend their HCPs and CBAs. In some instances where permittees amend their permits, it is conceivable that they may no longer be required to spend money on administration, compensatory mitigation or habitat restoration, monitoring, or public conservation and management to implement the HCP. For potential applicants that no longer have to apply for a permit, they would not have the cost of planning for an HCP and CBA, as well as the potential lost revenue caused by delaying the project in order to apply for and receive the permit.

While there may be some costs of the deregulation, such as a reduction in habitat quantity and quality, a reduction in ecosystem services, and a potential interest by permittees to amend already permitted plans and agreements, those costs are difficult if not impossible to calculate. For example, the extent of habitat loss and listed species population loss that could result from the rule are unknown, and available literature does not allow for monetization of such losses for many species and their habitats. The cost savings as well as ancillary benefits from regulatory relief should, in the Services' opinion, easily outpace the costs and result in a rule that has a positive net benefit for the American people.

# 4 Baseline and Affected Entities

## 4.1 Baseline

The baseline is designed to reflect conditions in the absence of this regulatory action. The Services assume that without this action, all HCPs and CBAs will continue to be implemented as permitted, and a similar number of new HCPs and CBAs, as compared to historical averages, will continue to be permitted.

## 4.2 Affected Entities

Section 7 of the ESA requires Federal agencies to ensure that their activities are not likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitats. The rescission of the regulatory definition of "harm" will not affect jeopardy or adverse modification determinations. However, if a no jeopardy/adverse modification determination is reached, this rescission may affect the reasonable and prudent measures (RPMs) necessary or appropriate to minimize the impact of the incidental take on the species. With habitat modification or degradation no longer considered "take," there may be fewer RPMs described in incidental take statements as well as less "take" exempted in biological opinions. Overall, the rule will not change the number of consultations but may have a small economic benefit to entities regulated by the Federal agencies complying with the ESA.

HCPs are voluntary planning documents prepared as part of an application for an incidental take permit (ITP), describing the anticipated effects of the proposed taking, how impacts will be minimized or mitigated, and how the plan will be funded; non-Federal entities seek an ITP when their otherwise lawful activities may result in incidental take of listed species. By rescinding the regulatory definition of "harm," the Services remove the mechanism by which habitat modification or degradation alone is treated as prohibited take under section 9, meaning that applicants whose activities affect only habitat would no longer need incidental take authorization. As a result, some entities that previously sought an ITP—and developed an HCP solely because their actions modified habitat—may choose not to seek new permits, may allow

existing permits to expire without renewal, or may seek authorization only for project components that involve direct injury or death of listed species. Entities whose ITP needs arise exclusively from activities that cause direct take, such as wind energy operations that may result in mortality of listed species, would still be required to obtain permits and are not expected to be affected by the rescission.

A CBA is a voluntary agreement involving private or other non-federal property owners where the actions in the agreement contribute to the conservation or recovery of the agreement's covered species. Non-federal entities voluntarily seek an EOS permit when their activities would result in take of listed species, but otherwise provide a net conservation benefit. If a CBA's covered actions involve only habitat modification (e.g., vegetation management, non-lethal changes to structure, hydrology, or cover), then—because such modification no longer constitutes "harm"—the activity may no longer result in "take" and therefore may no longer require a Section 10(a) permit.

The Services issue approximately 108 ITPs and 11 EOS permits each year (see table below).

**Table 2.** Average Annual ESA Section 10(a) Permits, 2020-2024

| ESA SECTION 10(a) PERMIT TYPE | NUMBER OF ESA SECTION 10(a) PERMITS PER YEAR[1] | PERCENT |
|---|---|---|
| ITP permits (for HCPs) | 108 | 91% |
| EOS Permits (for CBAs)[2] | 11 | 9% |
| **Total ESA section 10(a) permits** | **119** | **100%** |

Source: E-permits data provided by FWS, September 2025.

[1] NMFS reporting indicates that it issues approximately two ESA section 10(a) permits per year that are not included in these totals. National Oceanic and Atmospheric Administration, Permits for Incidental Taking of Endangered or Threatened Species, OMB Control No. 0648-0230 Supporting Statement Part A, Paperwork Reduction Act. Accessed at https://www.reginfo.gov/public/do/DownloadDocument?objectID=147054100

[2] As of April 12, 2024 (89 FR 26070), SHAs and candidate conservation agreements with assurances (CCAA) were combined into CBAs. For purposes of this analysis these agreement types are combined.

As of December 2024, there are approximately 502 active HCPs[1]. As of September 2025, there are approximately 145 active CCAAs, SHAs, and CBAs[2].

## 5 Costs and Benefits

The difficulty of measuring the impacts of this rulemaking is largely due to the potential breadth of impacts of the ESA across different sectors of the economy. In particular, impacts are greatly heterogenous between different species and habitats. A relatively small number of species' habitats conflicts directly and uniquely with highly valuable economic activity. It is impossible

1 National Habitat Conservation Plan Coalition. (2026). *HCP List*. Retrieved May 11, 2026, from https://www.nhcpcoalition.org/hcp-list/

2 U.S. Fish and Wildlife Service. (n.d.). Conservation Plans by Type and Region. ECOS. Retrieved May 11, 2026, from https://ecos.fws.gov/ecp/report/conservation-plans-type-region

to quantify all of these potential impacts. The Services often list many of these costs and benefits as qualitative in order to avoid overly speculative analysis.

All HCPs create costs, and those costs are often enumerated in their planning documents. CBAs are more flexible, more varied in structure, and intended to be used in a much broader range of contexts than HCPs. These are non-Federally-funded, voluntary tools designed to encourage more nimble conservation without the full complexity of an HCP. A CBA is also not required to enumerate costs in their planning documents. Therefore, this analysis focuses its quantitative analysis on cost savings from HCPs.

### 5.1 Costs

There is a great deal of uncertainty in the impact that this rulemaking will have on HCPs and CBAs. This uncertainty is largely due to limited understanding of both the extent to which the rulemaking will reduce the number of existing and future HCPs and CBAs and the typical costs of developing and implementing HCPs and CBAs. Surrey et al. have estimated the median planning and implementation costs of HCPs for plans of varying size and across different industries. For example, the authors note that the development industry had a median implementation stage cost of $180 million compared to the next highest industry, which was $30 million for the infrastructure industry. The Services rely on estimates from Surrey et al. to project cost savings of the rulemaking because it is the best and most complete analysis available while noting the considerable limitations of the data informing the estimates, which the authors acknowledge.

*CBA Cost Savings*
Because the rescission results in habitat degradation or modification to no longer be considered "take," some landowners and project proponents who previously sought CBAs to address potential liability for habitat-modifying activities may no longer perceive a need for an agreement, as those activities would no longer lead to "take" of listed species. Some activities that previously created incentives to enter into a CBA for protection against "take" liability may now proceed without requiring such agreements. This reduction in the number of CBAs would generate cost savings by decreasing the administrative, monitoring, negotiation, and implementation costs that applicants would otherwise incur in developing and implementing CBAs.

*HCP Cost Savings*
In order to establish a quantitative measure of cost savings, the Services project the very unlikely maximalist view of the impact where all existing ITPs will be surrendered and no future ITPs and associated HCPs will be developed. We then summarize all costs for planning and implementing existing HCPs in the next ten years as cost savings.

The quantitative cost of implementing an HCP depends on the scale of the plan. A large-scale plan is a regional, area-wide, or multi-project plan covering a large area. For the purposes of this analysis, any HCP over 10,000 acres is assumed to be a large-scale plan. Surrey et al. estimate the median total planning and implementation cost for an HCP of this scale to be approximately

$100,000,000[3] in 2020 dollars. These plans have an average permit term of 40 years[4]. Therefore, using these estimates, each large-scale HCP costs approximately $2,500,000 annually in 2020 dollars.

Project-scale plans are those for smaller areas, typically for single projects, and for purposes of this analysis are categorized to be under 10,000 acres. Surrey et al. estimate the median total planning and implementation cost for an HCP of this scale to be approximately $4,000,000[5]. These plans have an average permit term of 20 years[6]. According to the Surrey et al. estimate, therefore, each project-scale HCP costs approximately $200,000 annually.

Based on the 5-year average of 108 ITPs issued per year, we assume 31 new large-scale HCPs and 77 project-level HCPs would be issued per year.

All future quantitative benefits and costs are to be discounted using both 7 percent and 3 percent discount rates (OMB Circular A-4). We calculated the total present value and annualized cost for both the 7 and 3 percent discount rates for both large-scale and project-scale HCPs.

Each table shows the first ten years of costs, 2026 through 2035, plus the final year of the time period for large-scale HCPs (40 years) and project-scale HCPs (20 years). All the discounted values were calculated using either 40 years or 20 years for large-scale HCPs and project-scale HCPs respectively.

These tables present median and maximum scenarios for cost savings first for large-scale HCPs and then median and maximum scenarios for project-scale HCPs. Our "primary" scenario is the median scenario. The maximum scenario assumes that no new HCPs are negotiated, and the median scenario assumes that 50% of the previous average number of new HCPs are negotiated.

**Table 3a: Maximum Scenario. Large-Scale HCPs.**
**Costs Discounted at 7 % over 40-year project life. (2025 dollars)** [7]

3 Surrey, K. C., Iacona, G., Madsen, B., Newman, C., & Gerber, L. R. (2022). *Habitat conservation plans provide limited insight into the cost of complying with the Endangered Species Act. Conservation Science and Practice*, *4*(3), e12673. https://doi.org/10.1111/csp2.12673

4 National Habitat Conservation Plan Coalition. (2026). *HCP List*. Retrieved May 11, 2026, from https://www.nhcpcoalition.org/hcp-list/

5 Surrey, K. C., Iacona, G., Madsen, B., Newman, C., & Gerber, L. R. (2022). *Habitat conservation plans provide limited insight into the cost of complying with the Endangered Species Act. Conservation Science and Practice*, *4*(3), e12673. https://doi.org/10.1111/csp2.12673

6 National Habitat Conservation Plan Coalition. 2026. "HCP List." Accessed May 11, 2026. https://www.nhcpcoalition.org/hcp-list/.

7 Table calculated using *Surrey et al* (2022).

| *year* | *Existing HCPs* | *New HCPs* | *Existing HCP Costs* | *Newly Negotiated Costs* | *Total Costs* |
|---|---|---|---|---|---|
| ***2026*** | 143 | 31 | $357,500,000 | $77,500,000 | $435,000,000 |
| ***2027*** | 174 | 31 | $435,000,000 | $77,500,000 | $512,500,000 |
| *2028* | 205 | 31 | $512,500,000 | $77,500,000 | $590,000,000 |
| *2029* | 236 | 31 | $590,000,000 | $77,500,000 | $667,500,000 |
| *2030* | 267 | 31 | $667,500,000 | $77,500,000 | $745,000,000 |
| *2031* | 298 | 31 | $745,000,000 | $77,500,000 | $822,500,000 |
| *2032* | 329 | 31 | $822,500,000 | $77,500,000 | $900,000,000 |
| *2033* | 360 | 31 | $900,000,000 | $77,500,000 | $977,500,000 |
| *2034* | 391 | 31 | $977,500,000 | $77,500,000 | $1,055,000,000 |
| *2035* | 422 | 31 | $1,055,000,000 | $77,500,000 | $1,132,500,000 |
| *2065* | 1,352 | 31 | $3,380,000,000 | $77.500,000 | $3,457,500,000 |
| ***Total Present Value*** | | | **$8,554,731,619** | **$717,124,730** | **$9,271,856,349** |
| ***Annualized Cost*** | | | **$598,831,213** | **$50,198,731** | **$649,029,944** |

| **Table 3b: Maximum Scenario. Large-Scale HCPs. Costs Discounted at 3 % over 40-year project life. (2025 dollars)** [8] | | | | | |
|---|---|---|---|---|---|
| *year* | *Existing HCPs* | *New HCPs* | *Existing HCP Costs* | *Newly Negotiated Costs* | *Total Costs* |
| ***2026*** | 143 | 31 | $357,500,000 | $77,500,000 | $435,000,000 |
| ***2027*** | 174 | 31 | $435,000,000 | $77,500,000 | $512,500,000 |
| *2028* | 205 | 31 | $512,500,000 | $77,500,000 | $590,000,000 |
| *2029* | 236 | 31 | $590,000,000 | $77,500,000 | $667,500,000 |
| *2030* | 267 | 31 | $667,500,000 | $77,500,000 | $745,000,000 |
| *2031* | 298 | 31 | $745,000,000 | $77,500,000 | $822,500,000 |
| *2032* | 329 | 31 | $822,500,000 | $77,500,000 | $900,000,000 |
| *2033* | 360 | 31 | $900,000,000 | $77,500,000 | $977,500,000 |
| *2034* | 391 | 31 | $977,500,000 | $77,500,000 | $1,055,000,000 |
| *2035* | 422 | 31 | $1,055,000,000 | $77,500,000 | $1,132,500,000 |
| *2065* | 1,352 | 31 | $3,380,000,000 | $77.500,000 | $3,457,500,000 |
| ***Total Present Value*** | | | **$14,276,174,335** | **$1,086,817,137** | **$15,362,991,472** |
| ***Annualized Cost*** | | | **$428,285,230** | **$32,604,514** | **$460,889,744** |

[8] Table calculated using *Surrey et al* (2022).

| Table 4a: Median Scenario. Large-Scale HCPs. Costs Discounted at 7 % over 40-year project life. (2025 dollars) [9] | | | | | |
|---|---|---|---|---|---|
| *year* | *Existing HCPs* | *New HCPs* | *Existing HCP Costs* | *Newly Negotiated Costs* | *Total Costs* |
| ***2026*** | 143 | 15 | $357,500,000 | $37,500,000 | $395,000,000 |
| ***2027*** | 158 | 15 | $395,000,000 | $37,500,000 | $432,500,000 |
| *2028* | 173 | 15 | $432,500,000 | $37,500,000 | $470,000,000 |
| *2029* | 188 | 15 | $470,000,000 | $37,500,000 | $507,500,000 |
| *2030* | 203 | 15 | $507,500,000 | $37,500,000 | $545,000,000 |
| *2031* | 218 | 15 | $545,000,000 | $37,500,000 | $582,500,000 |
| *2032* | 233 | 15 | $582,500,000 | $37,500,000 | $620,000,000 |
| *2033* | 248 | 15 | $620,000,000 | $37,500,000 | $657,500,000 |
| *2034* | 263 | 15 | $657,500,000 | $37,500,000 | $695,000,000 |
| *2035* | 278 | 15 | $695,000,000 | $37,500,000 | $732,500,000 |
| *2065* | 726 | 15 | $1,820,000,000 | $37,500,000 | $1,857,500,000 |
| ***Total Present Value*** | | | **$5,846,755,032** | **$346,995,837** | **$6,193,750,869** |
| ***Annualized Cost*** | | | **$409,272,852** | **$24,289,708** | **$433,562,560** |

| Table 4b: Median Scenario. Large-Scale HCPs. Costs Discounted at 3 % over 40-year project life. (2025 dollars) [10] | | | | | |
|---|---|---|---|---|---|
| *year* | *Existing HCPs* | *New HCPs* | *Existing HCP Costs* | *Newly Negotiated Costs* | *Total Costs* |
| ***2026*** | 143 | 15 | $357,500,000 | $37,500,000 | $395,000,000 |
| ***2027*** | 158 | 15 | $395,000,000 | $37,500,000 | $432,500,000 |
| *2028* | 173 | 15 | $432,500,000 | $37,500,000 | $470,000,000 |
| *2029* | 188 | 15 | $470,000,000 | $37,500,000 | $507,500,000 |
| *2030* | 203 | 15 | $507,500,000 | $37,500,000 | $545,000,000 |
| *2031* | 218 | 15 | $545,000,000 | $37,500,000 | $582,500,000 |
| *2032* | 233 | 15 | $582,500,000 | $37,500,000 | $620,000,000 |
| *2033* | 248 | 15 | $620,000,000 | $37,500,000 | $657,500,000 |
| *2034* | 263 | 15 | $657,500,000 | $37,500,000 | $695,000,000 |
| *2035* | 278 | 15 | $695,000,000 | $37,500,000 | $732,500,000 |
| *2065* | 726 | 15 | $1,820,000,000 | $37,500,000 | $1,857,500,000 |
| ***Total Present Value*** | | | **$9,495,378,436** | **$525,879,260** | **$10,021,257,696** |

[9] Table calculated using *Surrey et al* (2022).

[10] Table calculated using *Surrey et al* (2022).

| | | | | | |
|---|---|---|---|---|---|
| ***Annualized Cost*** | | | **$284,861,353** | **$15,776,377** | **$300,637,730** |

**Table 5a: Maximum Scenario. Project-Scale HCPs.**
**Costs Discounted at 7 % over 20-year project life. (2025 dollars)** [11]

| ***year*** | ***Existing HCPs*** | ***New HCPs*** | ***Existing HCP Costs*** | ***Newly Negotiated Costs*** | ***Total Costs*** |
|---|---|---|---|---|---|
| ***2026*** | 359 | 77 | $71,800,000 | $15,400,000 | $87,200,000 |
| ***2027*** | 436 | 77 | $87,200,000 | $15,400,000 | $102,600,000 |
| *2028* | 513 | 77 | $102,600,000 | $15,400,000 | $118,000,000 |
| *2029* | 590 | 77 | $118,000,000 | $15,400,000 | $133,400,000 |
| *2030* | 667 | 77 | $133,400,000 | $15,400,000 | $148,800,000 |
| *2031* | 744 | 77 | $148,800,000 | $15,400,000 | $164,200,000 |
| *2032* | 821 | 77 | $164,200,000 | $15,400,000 | $179,600,000 |
| *2033* | 898 | 77 | $179,600,000 | $15,400,000 | $195,000,000 |
| *2034* | 975 | 77 | $195,000,000 | $15,400,000 | $210,400,000 |
| *2035* | 1052 | 77 | $210,400,000 | $15,400,000 | $225,800,000 |
| *2045* | 1822 | 77 | $364,400,000 | $15,400,000 | $379,800,000 |
| ***Total Present Value*** | | | **$1,706,952,349** | **$142,499,623** | **$1,849,451,972** |
| ***Annualized Cost*** | | | **$119,486,664** | **$9,974,973** | **$129,461,637** |

**Table 5b: Maximum Scenario. Project-Scale HCP.**
**Costs Discounted at 3 % over 20-year project life. (2025 dollars)** [12]

| ***year*** | ***Existing HCPs*** | ***New HCPs*** | ***Existing HCP Costs*** | ***Newly Negotiated Costs*** | ***Total Costs*** |
|---|---|---|---|---|---|
| ***2026*** | 359 | 77 | $71,800,000 | $15,400,000 | $87,200,000 |
| ***2027*** | 436 | 77 | $87,200,000 | $15,400,000 | $102,600,000 |
| *2028* | 513 | 77 | $102,600,000 | $15,400,000 | $118,000,000 |
| *2029* | 590 | 77 | $118,000,000 | $15,400,000 | $133,400,000 |
| *2030* | 667 | 77 | $133,400,000 | $15,400,000 | $148,800,000 |
| *2031* | 744 | 77 | $148,800,000 | $15,400,000 | $164,200,000 |
| *2032* | 821 | 77 | $164,200,000 | $15,400,000 | $179,600,000 |
| *2033* | 898 | 77 | $179,600,000 | $15,400,000 | $195,000,000 |
| *2034* | 975 | 77 | $195,000,000 | $15,400,000 | $210,400,000 |
| *2035* | 1052 | 77 | $210,400,000 | $15,400,000 | $225,800,000 |

[11] Table calculated using *Surrey et al* (2022).

[12] Table calculated using *Surrey et al* (2022).

| | | | | | |
|---|---|---|---|---|---|
| *2045* | 1822 | 77 | $364,400,000 | $15,400,000 | $379,800,000 |
| ***Total Present Value*** | | | **$2,847,489,911** | **$215,961,082** | **$3,063,450,993** |
| ***Annualized Cost*** | | | **$85,424,697** | **$6,478,832** | **$91,903,529** |

**Table 6a: Median Scenario. Project-Scale HCPs.**
**Costs Discounted at 7 % over 20-year project life. (2025 dollars)** [13]

| *year* | *Existing HCPs* | *New HCPs* | *Existing HCP Costs* | *Newly Negotiated Costs* | *Total Costs* |
|---|---|---|---|---|---|
| ***2026*** | 359 | 38 | $71,800,000 | $7,600,000 | $79,400,000 |
| ***2027*** | 397 | 38 | $79,400,000 | $7,600,000 | $87,000,000 |
| *2028* | 435 | 38 | $87,000,000 | $7,600,000 | $94,600,000 |
| *2029* | 473 | 38 | $94,600,000 | $7,600,000 | $102,200,000 |
| *2030* | 511 | 38 | $102,200,000 | $7,600,000 | $109,800,000 |
| *2031* | 549 | 38 | $109,800,000 | $7,600,000 | $117,400,000 |
| *2032* | 587 | 38 | $117,400,000 | $7,600,000 | $125,000,000 |
| *2033* | 625 | 38 | $125,000,000 | $7,600,000 | $132,600,000 |
| *2034* | 663 | 38 | $132,600,000 | $7,600,000 | $140,200,000 |
| *2035* | 701 | 38 | $140,200,000 | $7,600,000 | $147,800,000 |
| *2045* | 1081 | 38 | $216,200,000 | $7,600,000 | $223,800,000 |
| ***Total Present Value*** | | | **$1,178,896,914** | **$70,324,489** | **$1,249,221,403** |
| ***Annualized Cost*** | | | **$82,522,784** | **$4,922,714** | **$87,445,498** |

**Table 6b: Median Scenario. Project-Scale HCPs.**
**Costs Discounted at 3 % over 20-year project life. (2025 dollars)** [14]

| *year* | *Existing HCPs* | *New HCPs* | *Existing HCP Costs* | *Newly Negotiated Costs* | *Total Costs* |
|---|---|---|---|---|---|
| ***2026*** | 359 | 38 | $71,800,000 | $7,600,000 | $79,400,000 |
| ***2027*** | 397 | 38 | $79,400,000 | $7,600,000 | $87,000,000 |
| *2028* | 435 | 38 | $87,000,000 | $7,600,000 | $94,600,000 |
| *2029* | 473 | 38 | $94,600,000 | $7,600,000 | $102,200,000 |
| *2030* | 511 | 38 | $102,200,000 | $7,600,000 | $109,800,000 |
| *2031* | 549 | 38 | $109,800,000 | $7,600,000 | $117,400,000 |

[13] Table calculated using *Surrey et al* (2022).

[14] Table calculated using *Surrey et al* (2022).

| | | | | | |
|---|---|---|---|---|---|
| *2032* | 587 | 38 | $117,400,000 | $7,600,000 | $125,000,000 |
| *2033* | 625 | 38 | $125,000,000 | $7,600,000 | $132,600,000 |
| *2034* | 663 | 38 | $132,600,000 | $7,600,000 | $140,200,000 |
| *2035* | 701 | 38 | $140,200,000 | $7,600,000 | $147,800,000 |
| *2045* | 1081 | 38 | $216,200,000 | $7,600,000 | $223,800,000 |
| ***Total Present Value*** | | | **$1,915,234,711** | **$106,578,196** | **$2,021,812,907** |
| ***Annualized Cost*** | | | **$57,457,041** | **$3,197,345** | **$60,654,386** |

*Additional cost savings*

During the public comment for the proposed rule. many commentators suggested that the current regulatory definition of "harm" restricted various kinds of economic activities. Those economic activities, which include agriculture, timber, mining, utilities, infrastructure, and home building, among others, may experience significant regulatory relief resulting from the recission of the regulatory definition of "harm." For example:

The Coalition of Arizona/ New Mexico Counties for Stable Economic Growth stated that, "New Mexico dropped from an average of 123.6 million board feet (MMBF)/year between 1976 and 1985 to just 27.7 MMBF/year between 1996 and 2003—a 78% decrease. This was due to the 1995 federal injunction halting logging in Arizona and New Mexico's national forests to protect the Mexican spotted owl habitat from "harm." Additionally, between 1980 and 2025, Arizona and New Mexico has experienced notable declines in Animal Unit Months (AUMs) for livestock grazing on public lands managed by the Bureau of Land Management (BLM). There were several reasons for the reductions but the primary impact was due to species habitat protection. Much the same declines occurred in the two states' national forest grazing lands." (FWS-HQ-ES-2025-0034-159944)

The Property Owners Association of Riverside County stated that, "the water crisis that occurred in the Klamath Basin in 2001 was the forerunner for subsequent water crises in California. Earthjustice and other environmental activist groups filed a lawsuit in 2001 to protect three endangered fish species: Lost River sucker, shortnose sucker, and Coho salmon. In the face of a debilitating drought in 2001, a court ruling directed the U.S. Bureau of Reclamation to cut off water deliveries to 1,400 farmers in the Klamath Basin on the border of California and Oregon to protect the fish. Armed federal agents closed water diversion gates to the irrigation canals. The damage to agriculture cost the regional economy more than $130 million with 2,000 jobs lost, according to a joint report by Oregon State University and the University of California, Berkeley." (FWS-HQ-ES-2025-0034-223159)

The Property Owners Association of Riverside County also stated that, "Regional habitat conservation plans serve as a massive growth boundary around the Los Angeles metropolitan area and the greater Southern California urbanized area. These plans prevent outlying areas from accommodating future population growth and make the supply of residential land increasingly

scarce, which drives up the cost of land, making housing less affordable and homeownership less attainable for an increasing number of residents. For example, in Southern California, roadbuilding and homebuilding are curtailed to protect coastal sage scrub habitat for a bird – the federally threatened coastal California gnatcatcher, and for numerous other species. It appears that activists are seeking to force people off the land into denser cities, to return the land to nature." (FWS-HQ-ES-2025-0034-223159)

The North Dakota Department of Agriculture stated that "Rescinding the definition of "harm" will create a much more coherent, predictable, and principled enforcement regime — one that will provide much needed regulatory certainty. It will bolster agricultural production, streamline infrastructure permitting processes, boost energy development, and spur economic growth while better aiding recovery and ensuring protection of at-risk species." FWS-HQ-ES-2025-0034-242879

The NRECA (National Rural Electric Cooperative Association) supports the rule and stated, "this clarification and simplification of an often confusing term will help facilitate more predictable and efficient consultation and project planning processes as cooperatives work to meet surging energy demand across the nation." FWS-HQ-ES-2025-0034-232850

The American Petroleum Institute commented that :"in Marbled Murrelet v. Babbitt, the Northern California district court enjoined a timber harvest plan on private land because the timberlands were "suitable nesting habitat for the marbled murrelet." Under the landowners' timber plan, 40% to 60% of the trees in the area would have been harvested, but the district court held that this would cause the "threat of future harm." Relying on the second sentence of the "harm" definition, the Ninth Circuit affirmed, explaining that the habitat modification provision allowed the court to enjoin the activity for its potential to cause future harm from the threat of impairing the animals' breeding." FWS-HQ-ES-2025-0034-223179

The Georgia Farm Bureau stated that, "this proposal is a critical step toward reducing regulatory overreach, providing clarity for landowners, and ensuring the economic sustainability of Georgia's agricultural sector, which contributes over $91 billion annually to the state's economy and supports countless rural communities. The economic implications of this proposal cannot be overstated. Georgia's agricultural sector supports jobs, food security, and rural communities that are vital to the state's identity. By removing unnecessary obstacles to land use, the Services will enable farmers to invest in modern equipment, expand operations, and contribute to the state's economic growth." FWS-HQ-ES-2025-0034-232827

What is clear is that rescinding the regulatory definition of "harm" could potentially create widespread benefits for many governments and private entities. Because the benefits are so uncertain and specific to each local case, we have therefore chosen to enumerate them as sources of qualitative benefits.

## 5.2 Benefits

*Disbenefits*

Beyond cost savings, many commenters mentioned possible disbenefits (the opposite of a benefit) from the potential reduction in protections to habitats and ultimately to listed endangered

and threatened species themselves. With the rescission of the regulatory definition of "harm", non-Federal entities will no longer be required to minimize and mitigate for habitat modification on non-Federal lands under Section 10, potentially increasing risk to long-term species conservation and recovery to the extent such habitat protections previously relied on the "harm" definition. Without this requirement, activities that alter or degrade habitat may proceed without the former, habitat-focused mitigation obligations, reducing one pathway by which indirect impacts to listed species were previously identified and addressed under Section 10. Just as with the cost savings, the Services acknowledge that because the outcome of this rulemaking is uncertain, the costs of the disbenefits are also uncertain.

If HCPs and CBAs are no longer developed at the same rate as prior to this rulemaking, the Services acknowledge possible disbenefits that may include loss of habitat, increased incidental take of listed species, losses from broad categories of ecoservices such as fishing opportunities, ecotourism and recreation, flood and storm protection, water purification, pollination and pest control. Commenters cited examples such as the Edwards Aquifer, the Catskill/Delaware watershed, and southern California chaparral ecosystems to illustrate how habitat protection under the ESA has safeguarded drinking water supplies, reduced wildfire risks, and avoided costly infrastructure investments. Several submissions also highlighted the economic contributions of habitat-related recreation and tourism, such as birding and ecotourism, which support local economies and generate billions in revenue.

*Annualized Cost and Benefits of the Rule*
While the Services are unable to quantify many of the costs and benefits, we believe that the quantitative cost savings and qualitative benefits will be larger than the qualitative disbenefits. In Table 7, we summarize the quantitative cost savings from Tables 3-6 in Section **5.1 Costs**, above. The annualized quantified costs are based on the total of large-scale HCPS and project-scale HCPs at the median scenario level.

**Table 7**. Summary of quantitative and qualitative cost savings and qualitative disbenefits.

| | **3%** | **7%** |
|---|---|---|
| **Annualized Quantified Costs** | -$361,292,116 | -$521,008,058 |
| **Qualitative Cost Savings** | Opening up economic activity to land users and natural resource extraction industry. These include agriculture, timber, mining, utilities, infrastructure, and home building. | |
| **Qualitative Disbenefits** | Possible disbenefits may include loss of habitat, increased incidental take of listed endangered and threatened species, losses from ecoservices such as fishing opportunities, ecotourism and recreation, flood and storm protection, water purification, pollination and pest control.<br><br>Increased costs to public and private entities may occur if existing HCPs and CBAs are amended . | |
| **Annualized Quantified Benefits** | n/a | n/a |

# 6 Uncertainty

Consistent with OMB Circular A-4, this analysis acknowledges several areas where uncertainty affects the estimation of costs, benefits, and behavioral responses associated with rescinding the regulatory definition of "harm." There is substantial uncertainty stemming from incomplete administrative data on key programs. The Services do not maintain a comprehensive or fully accurate database of HCPs or CBAs, and available internal FWS systems are inconsistently populated due to staffing shortages and staff turnover. This analysis relies on an external dataset that may not be complete or may have a bias toward certain HCP types (i.e., only tracking large-scale HCPs).

Additionally, the Services do not collect actual cost information for development or implementation of HCPs or CBAs. As a result, cost estimates rely on an external dataset that is incomplete and may contain biases towards more expensive HCPs.

The effects of the rule on permittee behavior span a wide range—from "maximalist" scenarios in which no new HCPs are developed and existing HCPs are amended, to "minimalist" scenarios in which behavior remains unchanged. Permittees may choose not to amend HCPs that provide necessary compliance with state or local environmental laws (e.g., California Environmental Quality Act). Others may choose not to abandon HCP negotiations due to the prior investment in the planning necessary to apply for a permit (i.e., sunk cost fallacy). Because the magnitude of any shift in applicant decisions (e.g., pursuing an incidental take permit, developing an HCP, adopting a CBA, or avoiding regulated activity) cannot be reliably predicted, this analysis presents quantitative estimates where feasible and qualitative descriptions where uncertainty makes quantification infeasible.

This analysis relies on scenario-based analysis to bound uncertainty. This uncertainty is compounded by the long temporal scope of existing HCPs (20–40 years) and variable implementation costs. This analysis therefore reports best-estimate and high-bound values for key effects, reflecting plausible ranges rather than point-precision.

# 7 Other Applicable Statutes and Executive Orders

## 7.1 Executive Order 12866

Executive Order (E.O.) 12866 provides that the Office of Information and Regulatory Affairs (OIRA) in the Office of Management and Budget will review all significant rules. OIRA has determined that this rule is significant.

E.O. 13563 reaffirms the principles of E.O. 12866 while calling for improvements in the Nation's regulatory system to promote predictability, to reduce uncertainty, and to use the best, most innovative, and least burdensome tools for achieving regulatory ends. E.O. 13563 directs agencies to consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public where these approaches are relevant, feasible, and consistent with regulatory objectives. E.O. 13563 emphasizes further that regulations must be based on the best available science and that the rulemaking process must allow for public participation and an

open exchange of ideas. We have developed the final rule in a manner consistent with these requirements.

### 7.2 Paperwork Reduction Act (PRA)

The final rule does not contain any new collection of information that requires approval by the OMB under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.). An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

### 7.3 Unfunded Mandates Reform Act (UMRA)

In accordance with the Unfunded Mandates Reform Act (2 U.S.C. 1501 et seq.):

(a) On the basis of information presented under Regulatory Flexibility Act, above, this rule will not "significantly or uniquely" affect small governments. We have determined and certify pursuant to the Unfunded Mandates Reform Act that this final rule will not impose a cost of $100 million or more in any given year on local or State governments or private entities. A small government agency plan is not required. As explained above, small governments will not be affected because the final rule will not place additional requirements on any city, county, or other local municipalities.

(b) The rule will not produce a Federal mandate on State, local, or Tribal governments or the private sector of $100 million or greater in any year; that is, the final rule is not a "significant regulatory action" under the Unfunded Mandates Reform Act. The final rule will impose no obligations on State, local, or Tribal governments.

# 516 DM 1 – U.S. Department of the Interior Handbook of National Environmental Policy Act Implementing Procedures

February 2026

Citations to this Handbook should be styled in the following format, using these specific citations as examples: DOI NEPA Handbook § 2.3(a)(3) or DOI NEPA Handbook Appendix § 2.

# TABLE OF CONTENTS

**PART 0—PURPOSE AND POLICY**
Section 0.1 Purpose and policy. 1
Section 0.2 Applicability. 1

**PART 1—NEPA AND AGENCY PLANNING**
Section 1.1 Determining when NEPA applies. 2
Section 1.2 Determine the appropriate level of NEPA review. 3
Section 1.3 NEPA and agency decision-making. 5
Section 1.4 Categorical exclusions. 6
Section 1.5 Environmental assessments. 7
Section 1.6 Findings of no significant impact. 10
Section 1.7 Lead and cooperating agencies. 10
Section 1.8 Notices of intent and scoping. 11

**PART 2—ENVIRONMENTAL IMPACT STATEMENTS**
Section 2.1 Preparation of environmental impact statements. 12
Section 2.2 Purpose and need. 13
Section 2.3 Analysis within the environmental impact statement. 13
Section 2.4 Page limits. 14
Section 2.5 Deadlines. 15
Section 2.6 Publication of the environmental impact statement. 16

**PART 3—EFFICIENT ENVIRONMENTAL REVIEWS**
Section 3.1 Reliance on existing environmental documents 16
Section 3.2. Programmatic environmental impact statements or environmental assessments and tiering. 17
Section 3.3 Publishing pre-decisional environmental documents. 19
Section 3.4 Combining documents. 19
Section 3.5 Incorporation by reference. 19
Section 3.6 Supplements to environmental impact statements. 19
Section 3.7 Integrity and completeness of information. 20
Section 3.8 Integrating NEPA with other environmental requirements. 20
Section 3.9 Elimination of duplication with State, Tribal, and local procedures. 20
Section 3.10 Proposals for regulations. 21
Section 3.11 Unique identification numbers. 21
Section 3.12 Emergencies. 21

**PART 4—AGENCY DECISION-MAKING**
Section 4.1 Decision documents. 21
Section 4.2 Filing requirements. 22

PART 5—PROCEDURES FOR APPLICANT-PREPARED AND CONTRACTOR-PREPARED ENVIRONMENTAL IMPACT STATEMENTS AND ENVIRONMENTAL ASSESSMENTS AND OTHER ENVIRONMENTAL DOCUMENTS

Section 5.1 Procedures for applicant-prepared environmental impact statements and environmental assessments. 22
Section 5.2 Using a bureau-directed contractor to prepare environmental documents. 22

**PART 6—DEFINITIONS**
Section 6.1 Definitions. 23

**PART 7—SEVERABILITY**
Section 7.1 Severability. 26

**APPENDIX 1 - IMPLEMENTATION GUIDANCE TO BUREAUS**

Scoping and Public Involvement 27
Categorical Exclusions (CE) and Extraordinary Circumstances Review Protocol 31
Using Existing NEPA Reviews 33
Analytical Elements Common to Environmental Assessments (EA) and Environmental Impact Statement (EIS) 37
Reasonably Foreseeable Effects of the Proposed Action and Any Action Alternatives. 41
Significance, including Reaching a Finding of No Significant Impact (FONSI) 42
Formal Aspects of Environmental Documents 44
Documenting Decisions 46
Applicant-Prepared and Contractor-Prepared EAs and EISs 47
Cooperating Agencies 50

**APPENDIX 2 - BUREAU CATEGORICAL EXCLUSIONS**

Office of Native Hawaiian Relations 54
U.S. Fish and Wildlife Service (Service) 54
U.S. Geological Survey (USGS) 57
Bureau of Indian Affairs (BIA) 59
Bureau of Land Management (BLM) 64
National Park Service (NPS) 85
Office of Surface Mining Reclamation and Enforcement (OSMRE) 90
Bureau of Reclamation (USBR) 92
Bureau of Ocean Energy Management (BOEM), Bureau of Safety and Environmental Enforcement (BSEE) 96
Categorical Exclusions Adopted from Other Agencies 99

## PART 0—PURPOSE AND POLICY

Section
0.1 Purpose and policy.
0.2 Applicability.

**Section 0.1 Purpose and policy.**

The purpose of these procedures is to integrate compliance with the National Environmental Policy Act (NEPA) into bureau decision-making processes. Specifically, the procedures: describe how bureaus determine what actions are subject to NEPA's procedural requirements and the appropriate level of NEPA review where applicable; ensure that relevant environmental information, including, as appropriate, economic information, is identified and considered early in the process to ensure informed decision-making; enable bureaus to conduct coordinated, consistent, predictable and timely environmental reviews; reduce unnecessary burdens and delays; and implement NEPA's mandates regarding lead, joint-lead, participating Federal and cooperating agency roles and responsibilities, page and time limits, and preparation of environmental impact statements or environmental assessments by applicants or applicant-directed contractors under Federal agency supervision.[1]

(a) *Procedural and Interpretive Guidance.* This document, along with 43 CFR Part 46, sets forth the Department of the Interior (DOI or Department) procedures for implementing NEPA. It further explains the Department's interpretation of certain key terms in NEPA. It does not, nor does it intend to, govern the individual rights and obligations of either regulated entities or persons. Additionally, this Handbook focuses only on the procedures governing bureau compliance with NEPA; in addition to the procedures set forth in this Handbook, bureaus must continue to comply with the requirements of other applicable laws and regulations and should comply with applicable policies.

(b) *Consultation with the Council on Environmental Quality.* In addition to the process for establishing or revising categorical exclusions set forth in section 1.4(b) and (d), the Department will consult with the Council while developing or revising its NEPA implementing procedures, in accord with NEPA section 102(2)(B), 42 U.S.C. section 4332(B).

**Section 0.2 Applicability.**

(a) *Applicability.* This Handbook is applicable to all DOI bureaus, as bureau is defined in 6.1.

(b) *Authority.* NEPA imposes certain procedural requirements on the exercise of the Department's legal authority in relevant circumstances. Nothing contained in these procedures is intended or should be construed to abrogate or limit the Department's other authorities or legal responsibilities.

[1] This Handbook is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person. Although the Handbook may in places restate statutory or regulatory requirements, the procedures in this Handbook themselves do not have the force or effect of law.

## PART 1—NEPA AND AGENCY PLANNING

Section
1.1 Determining when NEPA applies.
1.2 Determining the appropriate level of NEPA review.
1.3 NEPA and agency decision-making.
1.4 Categorical exclusions.
1.5 Environmental assessments.
1.6 Findings of no significant impact.
1.7 Lead and cooperating agencies.
1.8 Notices of intent and scoping.

### Section 1.1 Determining when NEPA applies.

(a) The Responsible Official may document a determination that NEPA does not apply to a proposed action when:

(1) The activities or decision do not result in final agency action under the Administrative Procedure Act, *see* 5 U.S.C. section 704, or other relevant statute that also includes a finality requirement;

(2) The proposed action is expressly exempted from NEPA by law;

(3) Compliance with NEPA would clearly and fundamentally conflict with the requirements of another provision of law;

(4) A statute has prescribed direction with sufficient completeness and precision that the bureau retains no residual discretion to take environmental factors into consideration when determining whether to take the proposed action;

(5) The proposed action is an action for which another statute's requirements serve the function of the DOI bureau's compliance with NEPA; or

(6) The proposed action is not a "major Federal action."

(i) The terms "major" and "Federal action," each have independent force. NEPA applies only when both criteria are met. Such a determination is bound up in the facts and circumstances of each individual situation and is thus reserved to the judgment of the bureau in each instance.

(ii) NEPA does not apply to non-Federal actions. Therefore, for example, under the terms of the statute, NEPA does not apply to actions with no or minimal Federal funding, or with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project. NEPA section 111(10)(B)(i), 42 U.S.C. section 4336e(10)(B)(i). Control over only a small part of an action is generally not sufficient to make an action "Federal" such that a NEPA obligation attaches.

(iii) In addition to the illustrative general categories set forth in NEPA section 111(10), 42 U.S.C. section 4336 e (10), bureaus have determined that the following non-exhaustive list of activities presumptively do not require preparation of an environmental document because they may not be major Federal actions and usually do not have significant environmental effects:

(A) All functions of the Office of Natural Resources Revenue including, but not limited to, such activities as: approval of royalty payment procedures, including royalty oil contracts; and determinations concerning royalty quantities and values, such as audits, royalty reductions, collection-procedures, reporting procedures, and any actions taken regarding royalty collections (including similar actions, relating to net profit and windfall profit taxes).

(B) All functions of the Bureau of Trust Funds Administration including, but not limited to, managing and disbursing the financial assets of American Indians held in trust by the Department, and maintaining the official archive of American Indian Records.

(C) Development of a National Outer Continental Shelf Oil and Gas Leasing Program by the Bureau of Ocean Energy Management and associated approval by the Secretary of the Interior. 43 U.S.C. section 1344.

(D) Certain decisions made by the U.S. Fish and Wildlife Service under the Endangered Species Act (ESA) do not require preparation of an environmental document under NEPA:

(i) Determinations whether a species should be listed as threatened or endangered;

(ii) Determinations that a species should be delisted;

(iii) Determinations that a species should be reclassified as threatened or endangered; and

(iv) Determinations whether to designate, amend, or rescind critical habitat;

(v) Creating protective regulations for threatened species pursuant to ESA section 4(d) that are promulgated concurrently with ESA section 4(a) decisions.

(7) The issuance or update of the Department's NEPA procedures is not subject to NEPA review.

(b) In determining whether NEPA applies to a proposed agency action, the Department should consider only the proposed action, not other actions or activities carried out by third parties.

**Section 1.2 Determine the appropriate level of NEPA review.**

(a) If the Responsible Official determines under section 1.1 that NEPA applies to a proposed action, the Responsible Official should determine the appropriate level of NEPA review, exercising discretion as appropriate for its particular proposed action, in the following sequence and manner. At all steps in the following process, the Responsible Official should consider the proposed action and its effects.

(1) If the bureau has established, or adopted pursuant to NEPA section 109, 42 U.S.C. section 4336c, a categorical exclusion that covers the proposed action, the Responsible Official should apply the categorical exclusion, where determined appropriate, pursuant to 43 CFR 46.205.

(2) If another agency has already established a categorical exclusion that covers the proposed action and the bureau has not yet adopted it pursuant to NEPA section 109, 42 U.S.C. section 4336c, the bureau should consider whether to adopt that exclusion pursuant to section 1.4(c) so that it can be applied to the proposed action at issue, and to future activities or decisions of that type, pursuant to section 1.4(e).

(3) If the proposed action warrants the establishment of a new categorical exclusion, or the revision of an existing categorical exclusion, pursuant to section 1.4(b), the bureau should consider whether to so establish or revise, and then may apply the categorical exclusion to the proposed action pursuant to section 1.4(e), if appropriate. To establish a new or revise an existing categorical exclusion, the bureau must work with the Department and follow the procedures at 43 CFR 46.205(h).

(4) If the Responsible Official cannot apply a categorical exclusion to the proposed action consistent with paragraphs (a)(1)-(a)(3), the Responsible Official will prepare an environmental assessment or environmental impact statement before issuing any decision to authorize the proposed action.

(5) When preparing an environmental assessment or an environmental impact statement, the bureau should analyze the reasonably foreseeable effects of the proposed action consistent with the definition of "effects" in section 6.1(k), and reasonable alternatives consistent with paragraph (b), and:

(i) Should develop an environmental assessment, as described in section 1.5, if it is not reasonably foreseeable that the proposed action would have significant effects on the quality of the human environment or the significance of the reasonably foreseeable effects is unknown; or

(ii) Will develop an environmental impact statement, as described in part 2 of this Handbook, if it is reasonably foreseeable that the proposed action would likely have significant effects on the quality of the human environment.

(b) When considering whether the reasonably foreseeable effects of the proposed action or action alternatives would be significant, the Responsible Official should focus only on adverse environmental effects, considering any beneficial effects that directly offset those adverse effects to that specific resource value, and compare them to the potentially affected environment and evaluate the degree of the anticipated effects of the action. A Responsible Official may use any reliable data source, consistent with Secretary's Order 3441, *Implementing the Requirements of Executive Order 14303, Restoring Gold Standard Science* and should not undertake new research unless it is essential to evaluating alternatives or the significance of the impact, and the cost and time of obtaining it are not unreasonable.

(1) In considering the potentially affected environment, the Responsible Official should consider, as appropriate to the proposed action, any connected actions, the scope of the affected area (national, regional, or local), reasonably foreseeable trends and planned actions within that area, and the affected area's natural and cultural resources.

(2) In considering the degree of the effects, the Responsible Official should also consider the following criteria, as appropriate to the proposed action:

(i) Both short- and long-term effects;

(ii) Both beneficial and adverse effects;

(iii) Effects on public health and safety;

(iv) Economic effects; and

(v) Effects on the quality of life of the American people.

**Section 1.3 NEPA and agency decision-making.**

(a) Responsible Officials should integrate the NEPA process with other planning, funding, permitting, and authorization processes at the earliest reasonable time to avoid delays and ensure that the bureau considers environmental effects in its planning and decisions.

(b) *Limitations on actions during the NEPA process.*

(1) While a NEPA review is ongoing, a bureau will take no action concerning the proposed action that:

(i) limits the choice of reasonable alternatives; or.

(ii) is not independently justified and accompanied by an adequate environmental review. During the preparation of an environmental impact statement or environmental assessment evaluating a program or plan, the Responsible Official may implement any major Federal action when that action is within the scope of, and analyzed in, an existing environmental impact statement or environmental assessment supporting the current plan or program, or can be approved in reliance on a categorical exclusion, so long as there is adequate environmental analyses and documentation to support the individual action.

(c) *Actions developed in response to third-party applications*. Acceptance for review of an application or proposal submitted by a third party for bureau consideration may result in the bureau proposing an action that requires preparation of an environmental assessment or environmental impact statement. Any such environmental assessment or environmental impact statement can be prepared by a bureau or bureau contractor, or by the applicant or a contractor directed by the applicant under bureau supervision. Bureau procedures for applicant-prepared environmental assessments and environmental impact statements are included in part 5 of this Handbook and 43 CFR 46.107. Where the proposed action consists of approval of an application for funding or implementation of a project, the Responsible Official should:

(1) coordinate with the applicant as early as reasonable to inform the entity what information the bureau requires to comply with NEPA, including to initiate the NEPA process.

(2) Establish a schedule for the applicant to provide information during the application process and the bureau to complete data collection and to establish milestone steps in the NEPA process, which are consistent with NEPA's statutory deadlines and any internal bureau NEPA schedule requirements; and

(3) determine whether NEPA applies, as described in section 1.1, and if it does, determine the appropriate level of NEPA review, as described in section 1.2, as soon as practicable after receiving the complete application.

(4) independently evaluate the environmental document and take responsibility for the contents.

(5) If a bureau is considering an application from a non-Federal entity and becomes aware that the applicant is about to take an action within the bureau's jurisdiction that would meet either of the criteria in section 1.3(b), the bureau should promptly notify the applicant that the bureau will take appropriate action to ensure that the objectives and procedures of NEPA are achieved. This section does not preclude development by applicants of plans or designs or performance of other activities necessary to support an application for Federal, State, Tribal, or local permits or assistance.

(d) *Rulemaking*. For informal rulemaking conducted pursuant to the Administrative Procedure Act, 5 U.S.C. section 553, if a bureau seeks public comment on an environmental assessment or draft finding of no significant impact or an environmental impact statement that evaluates the effects of a proposed rule, any such public comment period should generally run concurrently with the public comment period for the proposed rule.

(e) Mitigation

(1) *Authority for mitigation*. While NEPA requires bureaus to consider reasonable mitigation measures, it does not require bureaus to evaluate or select any specific form of mitigation. In addition, NEPA itself does not authorize bureaus to approve or implement mitigation; any such authority must be provided by other applicable laws.

(2) *Considering mitigation measures in NEPA reviews.*

(i) *Bureau proposed action*. The review of the proposed action and any alternatives must include review of the environmental effects of the proposed action and alternatives as well as the environmental effects of mitigation measures or best management practices considered. The environmental effects of mitigation measures can be reviewed either as elements of alternatives or in a separate discussion of mitigation.

(ii) *Bureau-proposed action regarding an application for Federal authorization*. An application presented to a bureau for NEPA review prior to any approval must include any elements (including stipulations, conditions, or best management practices) designed to reduce or preclude adverse environmental effects that are required to make the application conform to applicable legal requirements, as well as any such design elements the applicant may volunteer to include. Further, the environmental effect of any mitigation measures in addition to such elements designed to reduce or preclude adverse environmental effects that the applicant includes in the application whether by requirement or choice should also be subjected to NEPA review. This NEPA review can be structured as consideration of alternatives to approving the application or as consideration of separate mitigation measures to be imposed on any alternative selected for implementation.

**Section 1.4 Categorical exclusions.**

(a) *Generally.* This section describes the process that bureaus use for establishing and revising categorical exclusions, for adopting other agencies' categorical exclusions, and for applying categorical exclusions to a proposed action. Categorical exclusions available to bureaus—including CEs established and substantiated consistent with Department NEPA procedures, legislatively established or directed CEs, and CEs adopted from other agencies—are listed in 43 CFR 46.210 or in bureau-specific lists provided in Appendix 2.

(b) *Establishing and revising categorical exclusions. See* 43 CFR 46.205(h).

(c) *Adopting categorical exclusions from other Federal agencies.* Consistent with NEPA section 109, 42 U.S.C. § 4336c, a bureau may adopt a categorical exclusion listed in another agency's NEPA procedures. When adopting a categorical exclusion, the bureau will:

(1) Consult with the agency that established the categorical exclusion to ensure that the proposed adoption of the categorical exclusion is appropriate; and

(2) Publish notice in the Federal Register that the bureau is adopting the categorical exclusion, including a brief description of the proposed action or category of proposed actions to which the bureau intends to apply the adopted categorical exclusion.

(d) *Removal of categorical exclusions. See* 43 CFR 46.205(i).

(e) *Applying categorical exclusions. See* 43 CFR 46.205. If a bureau modifies a proposed action by incorporating design elements that reduce or eliminate adverse impacts to resource values, the modified proposal is considered a new proposal for categorical exclusion consideration under DOI NEPA procedures. Considering the modified proposal a "new proposal" for purposes of categorical exclusion consideration does not require starting over with other aspects of the NEPA review. A bureau must evaluate the proposed action for the presence of any of the extraordinary circumstances listed at 43 CFR 46.215 before that bureau relies on a categorical exclusion.

(f) *Documentation of categorical exclusion determinations.* When the Responsible Official relies on a categorical exclusion to fulfill bureau obligations under NEPA, the Responsible Official will document its evaluation of the applicability of a categorical exclusion if required by law, regulation, or as specified in DOI or bureau policy.

(g) *Reliance on categorical exclusion determinations of other agencies. See* 43 CFR 46.205(e) and Appendix 1 § 3.

(h) *Applying multiple categorical exclusions. See* 43 CFR 46.205(f) and Appendix 1 § 2.

(i) *List of categorical exclusions. See* 43 CFR 46.210 and Appendix 2.

(j) Appendix 2 of this Handbook lists categorical exclusions that are available for use by each bureau.

(k) *Use of other bureau categorical exclusions. See* 43 CFR 46.205(g) and Appendix 1 § 2.

**Section 1.5 Environmental assessments.**

(a) *Generally.* Bureaus should prepare environmental assessments for actions described in 1.2(a)(5)(i). Bureaus should be mindful of statutory direction that environmental assessments are to be "concise." NEPA § 106(b)(2); 42 U.S.C. § 4336(b)(2).

(b) *Elements.* To provide evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact, environmental assessments will:

(1) Briefly discuss the:

(i) Purpose and need for the proposed action based on the bureau's statutory authority. When the proposed action concerns the bureau's duty to act on an application for authorization, the purpose and need for the proposed action will also be informed by the goals of the applicant;

(ii) The proposed action and alternatives to the extent required by NEPA section 102(2)(H), 42 U.S.C. § 4332(2)(H); and

(iii) The reasonably foreseeable effects of the proposed action and any action alternatives.

(c) *Scope of analysis*.

(1) In preparing the environmental assessment, the bureau should focus its analysis on those environmental effects of the proposed action that may be significant.

(2) Similarly, the bureau should document in the environmental assessment where and how it drew a reasonable and manageable line relating to its consideration of any environmental effects from the proposed action that extend outside the geographical territory of the project or might materialize later in time.[2]

(3) To the extent it assists in reasoned decision-making, the bureau may, but is not required to by NEPA, analyze environmental effects from other projects separate in time, or separate in place, or that fall outside of the bureau's regulatory authority, or that would have to be initiated by a third party. If the bureau determines that such analysis would assist it in reasoned decision-making regarding the proposed action, it should document this determination in the environmental assessment and explain where it drew a reasonable and manageable line relating to the consideration of such effects from such separate projects.

(d) *Page limits*.

(1) The text of an environmental assessment must not exceed 75 pages, not including citations or appendices.

(2) Appendices are to be used for voluminous materials, such as scientific tables, collections of data, statistical calculations, and the like, which substantiate the analysis provided in the environmental assessment.

(3) Environmental assessments should be formatted for an 8.5"x11" page with one-inch margins in an electronic or paper format with 12-point proportionally spaced font, single spaced. Footnotes may be in 10-point font. Such size restrictions do not apply to explanatory maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information, although pages containing such material do count towards the page limit. When an item of graphical material is larger than 8.5"x11", each such item counts as one page. Pages do not include citations or appendices.

(4) *Certification Related to Page Limits*. The breadth and depth of analysis in an environmental assessment should be tailored to ensure that the environmental analysis does not exceed this page limit. In this regard, as part of the finalization of the environmental assessment, the Responsible Official should certify (and the certification should be incorporated into the environmental assessment) that the bureau has considered the factors mandated by NEPA; that the environmental assessment represents the bureau's good-faith effort to prioritize documentation of the most important considerations required by the statute within the congressionally mandated page limits; that this prioritization reflects the bureau's expert judgment; and that any considerations addressed briefly or left unaddressed were, in the bureau's judgment, comparatively not of a substantive nature that meaningfully

[2] *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S. 168 (2025).

informed the consideration of environmental effects and the resulting decision on how to proceed.

(e) *Deadlines*. Bureaus should complete environmental assessments in a prompt and timely manner. Prompt and timely *completion* of environmental assessments requires, at a minimum, compliance with the statutory deadlines set by NEPA section 107(g), 42 U.S.C. § 4336a, or NEPA section 112, 42 U.S.C. § 4336f, as applicable, subject only to the rare case where an extension of that deadline is warranted, as described below.

(1) For proposed actions initiated in response to a third-party application or proposal, bureaus should document their receipt of an application or other written proposal, or any initial meeting with the third party. Within 60 days of receiving an application or proposal, or holding an initial meeting, the bureau should request in writing any additional information that it needs from the third party to initiate the NEPA process, unless a longer period is determined necessary by a policy maker in the Department in consultation with the Department's Office of the Solicitor. No later than 30 days after receiving that information, the bureau should initiate its NEPA process as described in paragraph (2) below.

(2) For environmental assessments subject to NEPA section 107(g), the bureau should complete the environmental assessment not later than the date that is 1 year after the earliest of the following dates:

(i) the date on which the Responsible Official determine that NEPA requires preparation of an environmental assessment for the proposed action;

(ii) the date on which the Responsible Official notifies an applicant that the application for a right-of-way (ROW) is complete; or

(iii) the date on which the bureau issues a notice of intent (NOI) for the proposed action.

(3) Where a project sponsor has paid the fee for expedited environmental review under NEPA section 112, 42 U.S.C. § 4336f, the bureau will complete the environmental assessment not later than the date that is 180 days after the payment of the fee by the project sponsor.

(4) The completion date for an environmental assessment is the issuance of the environmental assessment, or in the case of an environmental assessment issued for public review followed by a revised environmental assessment, the issuance date of the revised environmental assessment.

(5) The environmental assessment or revised environmental assessment in the case of an environmental assessment issued for public review, will issue (unless the deadline is extended pursuant to the provision below), at the latest, on the day the deadline elapses, in as substantially complete form as is possible.

(6) *Deadline extensions*. Bureaus should, to the maximum extent practicable, endeavor to meet the deadline prescribed by NEPA section 107(g)(1)(B), 42 U.S.C. § 4336a(g)(1)(B). To accomplish this goal, bureaus should develop schedules for their environmental assessments, monitor those schedules, and revise them as necessary. If a bureau finds, upon developing or revising its schedule, that it is unlikely to meet the statutory deadline, it should confer with the Office of the Solicitor to identify options for expediting its preparation of an environmental assessment. After conferring with the Office of the

Solicitor, if a bureau concludes that it is essential to seek additional time, it must consult with the applicant, if any, pursuant to NEPA section 107(g)(2), 42 U.S.C. § 4336a(g)(2). After any such consultation, and for cause stated, the bureau may recommend a new deadline to the Office of the Deputy Secretary for review and approval. Cause for establishing a new deadline is only established if the environmental assessment is so incomplete, at the time at which the bureau determines it is not able to meet the statutory deadline, that issuance pursuant to subsection (5) above would, in the bureau's view, result in an inadequate analysis. Any such new deadline should provide only so much additional time as is necessary to complete the environmental assessment.

(7) *Certification Related to Deadline.* When the environmental assessment is published, the Responsible Official should certify (and the certification should be incorporated into the environmental assessment) that the resulting environmental assessment represents the bureau's good-faith effort to fulfill NEPA's requirements within the congressional timeline; that such effort is substantially complete; that, in the bureau's expert opinion, it has thoroughly considered the factors mandated by NEPA; and that, in the bureau's judgment, the analysis contained therein is adequate to inform and reasonably explain bureau's decision regarding the proposed Federal action.

**Section 1.6 Findings of no significant impact.**

(a) The Responsible Official will prepare a finding of no significant impact if the Responsible Official determines, based on the environmental assessment, not to prepare an environmental impact statement because the proposed action would not have significant effects. The finding of no significant impact should:

(1) Include the environmental assessment or incorporate it by reference;

(2) State and document the reasons why the Responsible Official has determined that the selected alternative would not have a significant effect on the quality of the human environment;

(3) State the authority for and describe any mitigation that the Responsible Official has adopted and any applicable monitoring or enforcement provisions. If the Responsible Official finds that the proposed action will not have significant effects due to mitigation, the mitigated finding of no significant impact will identify the mitigation measures that will be undertaken to avoid significant effects and the mechanisms to ensure their implementation.

(b) The bureau should make environmental assessments, any mitigation commitments, and findings of no significant impact available on a public website.

**Section 1.7 Lead and cooperating agencies.**

A proposed action may involve multiple Federal agencies (*e.g.*, where multiple Federal authorizations are required with respect to a project sponsor's overall purpose and goal). When multiple agencies are involved in a proposed action, the agencies shall determine which of them will be the lead agency pursuant to the criteria identified in NEPA section 107(a)(1)(A), 42 U.S.C. § 4336a(a)(1)(A). When serving as the lead agency, a bureau is ultimately responsible for completing the NEPA process. When a joint lead relationship is established pursuant to NEPA section 107(a)(1)(B), 42 U.S.C. § 4336a(a)(1)(B), the bureau and the other joint lead agency or agencies are collectively responsible for completing the NEPA process.

(a) *How to designate lead agencies*. *See* 43 CFR 46.220.

(b) *How to select cooperating agencies*. *See* 43 CFR 46.225.

**Section 1.8 Notices of intent and scoping.**

(a) When a proposed action cannot be categorically excluded, the bureau should document the anticipated scope of environmental effects of the proposed action as a preliminary step to determining whether the bureau will prepare an environmental assessment or an environmental impact statement.

(b) *Notice of intent*. As soon as practicable after determining that a proposal is sufficiently developed to allow for meaningful public comment and requires an environmental impact statement, the bureau should publish in the Federal Register a notice of intent to prepare an environmental impact statement. If the Responsible Official intends to prepare an environmental assessment for a proposed action, the bureau may publish a notice of intent to prepare an environmental assessment.

(1) The notice of intent to prepare an environmental impact statement should include a description of the purpose and need for the proposed action, and a preliminary description of the proposed action and alternatives the environmental impact statement will consider and must include a request for public comment on alternatives or effects and on relevant information, studies, or analyses with respect to the proposed agency action. NEPA section 107(c); 42 U.S.C. § 4336a(c).

(2) The notice of intent for any environmental impact statement or environmental assessment may include:

(i) The purpose and need for the proposed action;

(ii) A brief summary of expected effects;

(iii) Anticipated permits and other authorizations (*i.e.*, anticipated connected actions);

(iv) A schedule for the decision-making process;

(v) A description of the public scoping process, including any scoping meetings;

(vi) Contact information for a person within the bureau who can answer questions about the proposed action and the environmental document; and

(vii) Identification of any cooperating and participating Federal agencies, and any information that such agencies require to facilitate their decisions or authorizations.

(c) *Scoping*. Bureaus should use an early and open process to determine the scope of issues for analysis in an environmental impact statement, including identifying substantive issues, which meaningfully inform the consideration of environmental effects and the resulting decision on how to proceed, and eliminating from further study non-substantive issues, and determining whether connected actions should be addressed in the same environmental document. Scoping may be used for an environmental assessment to identify issues that warrant assessment and issues that do not warrant assessment. Scoping should begin as soon as practicable after the proposal for action is sufficiently developed for consideration. Scoping may include appropriate pre-application procedures or work conducted prior to publication of the notice of intent, where applicable.

## PART 2—ENVIRONMENTAL IMPACT STATEMENTS

Section
2.1 Preparation of environmental impact statements.
2.2 Purpose and need.
2.3 Analysis within the environmental impact statement.
2.4 Page limits.
2.5 Deadlines.
2.6 Publication of the environmental impact statements.

### Section 2.1 Preparation of environmental impact statements.

(a) A bureau should prepare an environmental impact statement only with respect to proposed actions that the bureau reasonably foresees would have a significant effect on the quality of the human environment. NEPA section 106(b)(1); 42 U.S.C. § 4336(b)(1). Whether an impact rises to the level of "significant" is a matter for a bureau's expert judgment.

(b) During the preparation of an environmental impact statement, the Responsible Official:

(i) Will request the comments of:

(A) Any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact from the proposed action or is authorized to develop or enforce environmental standards that govern the proposed action, including cooperating agencies;

(B) Appropriate State, Tribal, and local agencies that are authorized to develop and enforce environmental standards.

(C) State, Tribal, or local governments that may be affected by the proposed action;

(D) Any agency that has requested it receive statements on actions of the kind proposed; and

(E) the applicant, if any.

(ii) May request the comments of the public, including by affirmatively soliciting comments in a manner designed to inform those persons or organizations who may be interested in or affected by the proposed action.

(c) This process of obtaining and requesting comments pursuant to (b) above may be undertaken at any time that is reasonable in the process of preparing the environmental impact statement and seek to provide 30 days, to the extent practicable. The bureau should ensure that the process of obtaining and requesting comments pursuant to (b) above, and the bureau's analysis of and response to those comments, does not cause the bureau to violate the congressionally mandated deadline for completion of an environmental impact statement.

(d) *Addressing Comments*. The bureau should address any substantive comments received consistent with paragraph (b) of this section in the environmental impact statement.

(e) Bureaus should provide information about their NEPA practice and environmental review documents for public comment through the following websites:

(i) Bureau of Ocean Energy Management https://www.boem.gov/environment/environmental-assessment/nepa/national-environmental-policy-act-nepa

(ii) Bureau of Safety and Environmental Enforcement https://www.bsee.gov/what-we-do/environmental-compliance/environmental-programs/nepa-compliance

(iii) Bureau of Reclamation https://www.usbr.gov/nepa/

(iv) Office of Surface Mining Reclamation and Enforcement https://www.osmre.gov/laws-and-regulations/nepa and https://www.osmre.gov/laws-and-regulations/nepa/projects

(v) National Park Service https://parkplanning.nps.gov

(vi) Bureau of Land Management https://eplanning.blm.gov

(vii) Indian Affairs https://www.bia.gov/service/nepa-compliance

(viii) U.S. Geological Survey https://www.usgs.gov/legal/nepa

(ix) U.S. Fish and Wildlife Service https://fws.gov/program/national-environmental-policy-act

(x) Office of Native Hawaiian Relations https://www.doi.gov/hawaiian

(xi) Office of Insular Affairs https://www.doi.gov/oia/NEPA-documentation

**Section 2.2 Purpose and need.**

The statement should develop the purpose and need for the proposed action based on the bureau's statutory authority. When the proposed action concerns a bureau's duty to act on an application for authorization, the purpose and need for the proposed action should also be informed by the goals of the applicant.

**Section 2.3 Analysis within the environmental impact statement.**

(a) The environmental impact statement will include a detailed statement on:

(1) reasonably foreseeable environmental effects of the proposed action;

(2) effects of any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;

(3) a reasonable range of alternatives to the proposed action, including an analysis of any positive or beneficial environmental impacts of implementing the proposed action or any reasonable alternatives, that, in the bureau's expert judgment, are technically and economically feasible, and meet the bureau's purpose and need for action and are within the bureaus' legal authority to implement;

(4) the relationship between local short-term uses of the human environment and the maintenance and enhancement of long-term productivity;

(5) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed action should it be implemented; and

(6) Any means identified to mitigate adverse environmental effects of the proposed action. Bureaus are mindful that NEPA itself does not require or authorize a Responsible Official to impose any mitigation measures.

(b) *Scope of analysis*.

(1) In preparing the environmental impact statement, the bureau should focus its analysis on whether the environmental effects of the proposed action are significant.

(2) Similarly, the bureau should document in the environmental impact statement where and how it drew a reasonable and manageable line relating to its consideration of environmental effects from the proposed action that extend outside the geographical territory of the project or might materialize later in time.

(3) To the extent it assists in reasoned decision-making, the bureau may, but is not required to by NEPA, analyze environmental effects from other projects separate in time, or separate in place, or that fall outside of the bureau's regulatory authority, or that would have to be initiated by a third party. If the bureau determines that such analysis would assist it in reasoned decision-making regarding the proposed action, it should document this determination in the environmental impact statement and explain where it drew a reasonable and manageable line relating to the consideration of such effects from such separate projects.

(c) *Proportionate analysis*. Environmental impact statements should discuss effects in proportion to their significance. With respect to issues that are not significant, there should be no more than a brief discussion to explain why those issues are not significant and therefore do not warrant further analysis. Environmental impact statements should be analytic, concise, and no longer than necessary to comply with NEPA consistent with its page limits and deadlines.

**Section 2.4 Page limits.**

(a) *Page limits*. Except as provided in paragraph (b), the text of an environmental impact statement will not exceed 150 pages, not including citations or appendices.

(b) An environmental impact statement for a proposed action of extraordinary complexity may not exceed 300 pages, not including any citations or appendices. The Responsible Official should determine at the earliest possible stage of preparation of an environmental impact statement whether the conditions for exceeding the page limit in paragraph (a) are present.

(c) Appendices are to be used for voluminous materials, such as scientific tables, collections of data, statistical calculations, and the like, which substantiate the analysis provided in the environmental impact statement.

(d) Environmental impact statements should be formatted for an 8.5"x11" page with one-inch margins in an electronic or paper format with 12-point proportionally spaced font, single spaced. Footnotes may be in 10-point font. Such size restrictions do not apply to explanatory maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information, although pages containing such material do count towards the page limit. When an item of graphical material is larger than 8.5"x11", each such item counts as one page. Pages do not include citations or appendices.

(e) *Certification Related to Page Limits*. The breadth and depth of analysis in an environmental impact statement should be tailored to ensure that the environmental impact

statement does not exceed these page limits. In this regard, as part of the finalization of the environmental impact statement, the Responsible Official should certify (and the certification should be incorporated into the environmental impact statement) that the bureau has considered the factors mandated by NEPA; that the environmental impact statement represents the bureau's good-faith effort to prioritize documentation of the most important considerations required by the statute within the congressionally mandated page limits; that this prioritization reflects the bureau's expert judgment; and that any considerations addressed briefly or left unaddressed were, in the bureau's judgment, comparatively unimportant or frivolous.

**Section 2.5 Deadlines.**

Bureaus should complete environmental impact statements in a prompt and timely manner. Prompt and timely completion of environmental impact statements requires, at a minimum, compliance with the statutory deadlines set by NEPA section 107(g), 42 U.S.C. § 4336a(g), subject only to the rare case where an extension of that deadline is warranted, as described below, or NEPA section 112, 42 U.S.C. § 4336f, as applicable.

(a) For proposed actions initiated in response to a third-party application or proposal, bureaus should document their initial receipt of an application or other written proposal, or any initial meeting with the third party. No later than 60 days of that initial review or meeting, the bureau should request, in writing, any additional information that it needs from the third party to initiate the NEPA process. No later than 30 days of receiving that information, the bureau should initiate its NEPA process as described in paragraph (b) below.

(b) For environmental impact statements subject to NEPA section 107(g), the bureau should complete and issue the environmental impact statement not later than the date that is 2 years after the earliest of the following dates:

(1) the date on which the Responsible Official determines that NEPA requires preparation of an environmental impact statement for the proposed action,
(2) the date on which the Responsible Official notifies an applicant that the application for a ROW is complete, or
(3) the date on which the bureau issues a notice of intent (NOI) for the proposed action.

(c) Where a project sponsor has paid a fee for expedited environmental review under NEPA section 112, the bureau will complete the environmental impact statement not later than the date that is 1 year after the bureau issues an NOI.

(d) The environmental impact statement will publish (unless the deadline is extended pursuant to the provision below) on the day the deadline elapses, in as substantially complete form as is possible.

(e) Bureaus should, to the maximum extent practicable, endeavor to meet the deadline prescribed by NEPA section 107(g)(1)(A), 42 U.S.C. § 4336a(g)(1)(A), or NEPA section 112, 42 U.S.C. § 4336f, as applicable. To accomplish this goal, bureaus, working with lead and cooperating agencies and the project applicant, if any, should develop schedules for their environmental impact statements, monitor those schedules, and revise them as necessary. If a bureau finds, upon developing or revising its schedule, that it is unlikely to meet the statutory deadline, it should confer with the Office of the Solicitor to identify options for expediting its preparation of an environmental impact statement. After conferring with the Office of the Solicitor, if a bureau concludes that it is essential to seek additional time, it must consult with

the applicant, if any, pursuant to NEPA section 107(g)(2), 42 U.S.C. § 4336a(g)(2). After any such consultation, and for cause stated, the bureau may recommend a new deadline to the Office of the Deputy Secretary for review and approval. Cause for establishing a new deadline is only established if the environmental impact statement is so incomplete, at the time at which the bureau determines it is not able to meet the statutory deadline, that issuance pursuant to subsection (d) above would, in the bureau's view, result in an inadequate analysis. Any such new deadline must provide only so much additional time as is necessary to complete the environmental impact statement.

(f) *Certification Related to Deadlines*. When the environmental impact statement is published, the Responsible Official should certify (and the certification should be incorporated into the environmental impact statement) that the resulting environmental impact statement represents the bureau's good-faith effort to fulfill NEPA's requirements within the Congressional timeline; that such effort is substantially complete; and that, in the bureau's expert opinion, it has thoroughly considered the factors mandated by NEPA; and that, in the bureau's judgment, the analysis contained therein is adequate to inform and reasonably explain bureau's decision regarding the proposed Federal action.

**Section 2.6 Publication of the environmental impact statement.**

The Responsible Official should make the entire environmental impact statement available by publishing it on a public website and a notice in the Federal Register through the process managed by the Environmental Protection Agency (EPA), Federal Activities Division.

## PART 3—EFFICIENT ENVIRONMENTAL REVIEWS

Section

3.1 Reliance on Existing Environmental Documents
3.2 Programmatic environmental impact statements or environmental assessments and tiering.
3.3 Publishing Pre-Decisional Documents.
3.4 Combining documents.
3.5 Incorporation by reference.
3.6 Supplemental environmental impact statements.
3.7 Integrity and completeness of information.
3.8 Integrating NEPA with other environmental requirements.
3.9 Elimination of duplication with State, Tribal, and local procedures.
3.10 Proposals for regulations.
3.11 Unique identification numbers.
3.12 Emergencies.

**Section 3.1 Reliance on existing environmental documents**

If a proposed action has been adequately evaluated in an earlier environmental impact statement or environmental assessment, the Responsible Official may prepare a Determination of NEPA Adequacy (DNA), memorandum to file, or other writing to document that a proposed action is adequately analyzed in an existing environmental impact statement or environmental assessment. Before using existing NEPA analysis, the Responsible Official should reevaluate the analysis to

ensure the analysis and assumptions to be relied upon remain valid, considering whether any new and substantial information or circumstances not previously analyzed may result in substantially different environmental effects. The Responsible Official should document this reevaluation including the basis for the determination that the existing analysis adequately assesses the environmental effects of the new proposed action, and the analysis and assumptions remain valid.

(a) Generally. The bureau may rely on an environmental impact statement, environmental assessment, or portion thereof, provided that the statement, assessment, or portion thereof meets the standards for an adequate statement or assessment under these procedures. When relying on an environmental impact statement, environmental assessment, or portion thereof, the bureau should cite the document, briefly describe the content and relevance to the environmental document, and may make modifications that are necessary to render the relied-upon document, or portion thereof, fit for fulfilling NEPA's analytic requirements for evaluating the environmental effects of the proposed action and reasonable alternatives.

(b) Substantial Similarity.

(1) If the actions covered by the original environmental impact statement or environmental assessment and the proposed action are substantially the same, the bureau may, and generally will, republish the relied-upon statement or assessment.

(2) If the previously analyzed and proposed actions are not substantially the same, the bureau may modify the statement or assessment as necessary to render the statement fit for fulfilling NEPA's analytic requirements for evaluating the environmental effects of the proposed action and reasonable alternatives, and publish the relied-upon statement or assessment, as modified. Where appropriate, the bureau may solicit comment to the extent that solicitation of comment would assist the bureau in expeditiously adapting the relied-upon statement or assessment so that it is fit for the bureau's purposes.

**Section 3.2. Programmatic environmental impact statements or environmental assessments and tiering.**

(a) Bureaus may prepare environmental documents for programmatic Federal actions, such as new agency programs. Bureaus may evaluate programmatic Federal actions in one of the following ways:

(1) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(2) By type of action, including actions that have relevant similarities, such as common timing, effects, alternatives, methods of implementation, media, or subject matter.

(3) By stage of technological development.

(b) A Responsible Official may rely on analysis included in a programmatic environmental impact statement or programmatic environmental assessment for which judicial review was available to support a decision on a new proposed action as follows:

(1) If the bureau initiates NEPA review of a proposed action fewer than five years after a bureau has issued a programmatic environmental impact statement or environmental assessment, the Responsible Official may rely on the analysis in the programmatic

environmental impact statement or environmental assessment without additional NEPA review if the Responsible Official determines there are no substantial new circumstances or information about the significance of adverse effects that bear on the analysis.

(2) If the bureau initiates NEPA review on a new proposed action more than five years after an agency has issued a programmatic environmental impact statement or environmental assessment, the Responsible Official may rely on the analysis in the programmatic environmental impact statement or environmental assessment after evaluating it and verifying that reliance on the analysis remains valid. When conducting such an evaluation, the Responsible Official may rely on previously completed reviews, if any, of the programmatic environmental impact statement or environmental assessment.

(c) Where a bureau's existing environmental document is relevant to a later proposed action, a bureau may employ tiering, whereby the bureau uses existing analysis from broader environmental documents, including programmatic reviews, in subsequent narrower reviews.

(1) When a bureau prepares a subsequent environmental document that tiers to analysis from a programmatic review, the Responsible Official should first determine whether the existing analysis adequately covers the new proposed action. The tiered document should discuss the relationship between the tiered document and the previous review; summarize and incorporate by reference the issues discussed in the broader document; concentrate on the issues specific to the subsequent action, analyzing site-, phase-, or stage-specific conditions and reasonably foreseeable effects; and identify where the earlier document is publicly available.

(2) Tiering is appropriate when the sequence from an environmental impact statement or environmental assessment is:

(i) From a programmatic, plan, or policy environmental impact statement or environmental assessment to a program, plan, or policy statement or assessment of lesser or narrower scope or to a site-specific statement or assessment; or

(ii) From an environmental impact statement or environmental assessment prepared to support a specific action at an early stage to a subsequent environmental impact statement or environmental assessment prepared to support a specific action at a later stage.

(3) An environmental assessment may be prepared, and a finding of no significant impact reached, for a proposed action with significant effects, if the environmental assessment is tiered to an environmental impact statement that fully analyzes those significant effects. Tiering to a broader-scoped environmental impact statement may allow for the preparation of an environmental assessment and a finding of no significant impact for the individual proposed action, so long as any previously unanalyzed effects are not significant. A finding of no significant impact other than those already disclosed and analyzed in the environmental impact statement to which the environmental assessment is tiered may also

be called a "finding of no *new* significant impact" or a "finding of no *additional* significant impact."

**Section 3.3 Publishing pre-decisional environmental documents.**

During the process of preparing any environmental document provided for by these procedures, a bureau may publish such draft, pre-decisional materials as in the bureau's judgment may assist in fulfilling its responsibilities under NEPA and these procedures.

**Section 3.4 Combining documents.**

Bureaus should combine, to the fullest extent practicable, any environmental document or other NEPA compliance document with any other bureau document to reduce duplication and paperwork, ensuring that any findings or other required determinations are clearly identified and set forth. The page limits for environmental assessments and environmental impact statements apply to that portion of a jointly prepared Federal-state environmental compliance document that addresses NEPA compliance.

**Section 3.5 Incorporation by reference.**

(a) Bureaus may incorporate material, such as planning studies, analyses, or other relevant information, into environmental documents by reference when the effect will be to reduce the length of an environmental document without impeding bureau and public review of the action. When incorporating material by reference, the bureau will identify, briefly describe the content and relevance to the environmental document, cite (by specific page number where applicable), and make the materials reasonably available for review by potentially interested parties. Bureaus are encouraged to incorporate by reference wherever appropriate, including to reduce the length of environmental impact statements and environmental assessments.

(b) Though NEPA itself does not require cost-benefit analysis, other authorities may require a bureau to conduct such an analysis. To the extent that such cost-benefit analysis is relevant to any alternatives analysis a bureau is conducting pursuant to NEPA, the bureau should incorporate the cost-benefit analysis by reference or append it to the environmental document to avoid duplication in evaluating the environmental effects. In such cases, the environmental document should discuss the relationship between that analysis and any analyses of unquantified environmental effects, values, and amenities.

**Section 3.6 Supplements to environmental impact statements.**

(a) *When a supplement must be prepared*. A bureau should prepare supplements to environmental impact statements only if a major Federal action remains to occur, and:

(1) The bureau makes substantial changes to the proposed action that are relevant to environmental concerns; or

(2) The bureau determines, in its discretion, that there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its effects.

(b) When preparing supplements, bureaus have discretion concerning how they facilitate public participation. A supplement need not be published or circulated in the same manner as the document being supplemented; rather, the Responsible Official may publish or circulate a supplement as appropriate to the scope of the supplement and the proposed action.

**Section 3.7 Integrity and completeness of information.**

(a) A bureau should not undertake new scientific and technical research to inform its analyses unless the bureau anticipates that the results of that research would be essential to a reasoned choice among alternatives and the overall costs and time frame of such undertaking are not unreasonable. Rather, the bureau should make use of reliable existing data and resources.

(b) When a bureau is evaluating an action's reasonably foreseeable significant effects on the human environment, and there is incomplete or unavailable information that cannot be obtained at a reasonable cost or the means to obtain it are unknown, the bureau should make clear in the relevant environmental document that such information is lacking, and the bureau has decided not to rely on such data or information.

**Section 3.8 Integrating NEPA with other environmental requirements.**

(a) To the fullest extent possible, bureaus should prepare environmental documents or other NEPA compliance documents concurrently with and integrated with analyses and related surveys and studies required by other Federal statutes and regulations.

(b) Bureaus should combine an environmental document or other document prepared in compliance with NEPA with any other agency document to reduce duplication and paperwork. Thus, bureaus may combine an environmental document or other NEPA compliance document with related plans, rules, or amendments as a single consolidated document. The consolidated document should contain and clearly identify the required sections of the environmental or other NEPA compliance document.

(c) If comments on a notice of intent or other aspects of a scoping process identify consultations, permits, or licenses necessary under other environmental laws, the environmental document or other NEPA compliance document should contain a section briefly listing the applicable requirements and how the bureau has met or will meet any such requirements that apply to the proposed action (*e.g.*, permits applied for or received, consultations initiated or concluded).

**Section 3.9 Elimination of duplication with State, Tribal, and local procedures.**

(a) Bureaus may cooperate with State, Tribal, and local agencies that are responsible for preparing environmental documents.

(b) To the fullest extent practicable unless specifically prohibited by law, bureaus should coordinate environmental reviews and project approaches with State, Tribal, and local agencies to reduce duplication between NEPA and State, Tribal, and local requirements, including through use of studies, analysis, and decisions developed by State, Tribal, or local agencies. Such cooperation may include:

(1) Joint planning processes,

(2) Joint environmental research and studies,

(3) Joint public hearings (except where otherwise provided by statute), or

(4) Joint environmental documents.

**Section 3.10 Proposals for regulations.**

Where the proposed action is the promulgation of a rule or regulation, procedures and documentation pursuant to other statutory or Executive order requirements may satisfy one or more requirements of this subchapter. When a procedure or document satisfies one or more requirements of this subchapter, a bureau may substitute it for the corresponding requirements in this subchapter and need not carry out duplicative procedures or documentation. Bureaus should identify which corresponding requirements in this subchapter are satisfied and consult with the Council on Environmental Quality to confirm such determinations.

**Section 3.11 Unique identification numbers.**

For all proposed actions requiring documented environmental review under NEPA, bureaus should provide a unique identification number for tracking purposes, which bureaus will refer to on all associated environmental review documents prepared for the proposed action and in any database or tracking system for such documents. Bureaus should coordinate with the Council on Environmental Quality concerning their use of identification numbers.

**Section 3.12 Emergencies.**

Procedures for emergency alternate arrangements for NEPA are addressed in the DOI NEPA regulations at 43 CFR 46.150.

## PART 4—AGENCY DECISION-MAKING

Section

4.1 Decision documents.
4.2 Filing requirements.

**Section 4.1 Decision documents.**

(a) At the time of its decision on a proposed action evaluated by an environmental impact statement or environmental assessment, a bureau should timely prepare and publish a concise public decision document or joint decision document notifying the public that the Responsible Official has certified that the bureau has considered all relevant information raised in the NEPA process and that the NEPA process has closed. When reaching a decision, agencies have discretion to select from among or from a blend of the alternatives they have evaluated.

(1) Bureaus should document a decision on a proposed action in a record of decision when the bureau has prepared an environmental impact statement to evaluate the proposed action.

(2) Bureaus should document a decision on a proposed action in a Decision Record or other appropriate decision document when the bureau has prepared an environmental assessment, supported by a finding of no significant impact.

(b) Bureaus should document, and may publish, a decision on a proposed action in a Decision Record or other appropriate decision document when the bureau relies on a documented categorical exclusion, determination of NEPA adequacy, or similar documentation demonstrating compliance with NEPA.

### Section 4.2 Filing requirements.

Bureaus should file all environmental impact statements, including draft, final, or supplemental statements, together with any comments and responses with the Environmental Protection Agency, Federal Activities Division for publication on their website and of a notice of availability in the *Federal Register*.

## PART 5—PROCEDURES FOR APPLICANT-PREPARED AND CONTRACTOR-PREPARED ENVIRONMENTAL IMPACT STATEMENTS AND ENVIRONMENTAL ASSESSMENTS AND OTHER ENVIRONMENTAL DOCUMENTS

Section
5.1 Procedures for applicant-prepared environmental impact statements and environmental assessments.
5.2 Using a bureau-directed contractor to prepare environmental documents.

### Section 5.1 Procedures for applicant-prepared environmental impact statements and environmental assessments.

Procedures for applicant-prepared NEPA reviews are addressed in the DOI NEPA regulations at 43 CFR 46.107.

### Section 5.2 Using a bureau-directed contractor to prepare environmental documents.

Procedures for bureau-directed contractors preparing environmental documentation are addressed in the DOI NEPA regulations at 43 CFR 46.105.

## PART 6—DEFINITIONS

**Section 6.1 Definitions.**

As used in these implementing procedures, terms have the meanings provided in NEPA section 111, 42 U.S.C. section 4336e. In addition:

(a) *NEPA* means the National Environmental Policy Act, as amended (42 U.S.C. section 4321, *et seq.*).

(b) *Affected Environment* means the environmental conditions that would prevail in the absence of the implementation of the proposed action or action alternatives. It includes any reasonably foreseeable environmental trends and planned actions in the area to be affected by implementation of the proposed action or action alternatives.

(c) *Applicant* means a project sponsor or other third party seeking an authorization from a bureau or the Department.

(d) *Authorization* means any license, permit, approval, finding, determination, or other administrative decision issued by an agency that is required or authorized under Federal law that may be the subject of a proposed action.

(e) *Bureau* means bureau, office, or service within the Department of the Interior. The Department and its bureaus are "agencies" within the meaning of NEPA.

(f) *Categorical Exclusion* (CE) means a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment.

(g) *Connected action* means a separate Federal action within the authority of a Federal agency that is closely related to the proposed action and should be addressed in a single environmental document because the proposed agency action:

(1) Automatically triggers the separate Federal action, which independently would require the preparation of additional environmental documents;

(2) Cannot proceed unless the separate Federal action is taken previously or simultaneously; or

(3) Is an interdependent part of a larger Federal action that includes a separate Federal action, which mutually depend on the larger Federal action for their justification.

(h) *Cooperating Agency* means any Federal, State, Tribal, or local agency that has been designated as a cooperating agency under section 107(a)(3) of NEPA.

(i) *Design features* (sometimes called *design elements*) means specific means, measures, or practices incorporated into the proposed action or action alternatives. Mitigation measures included in the proposed action or any action alternative and evaluated through the NEPA process are design features.

(j) *Determination of NEPA Adequacy (DNA)* means the Responsible Official's documentation of their evaluation as to whether the environmental effects of a proposed action lie within the scope of and have been analyzed in one or more existing environmental assessments or environmental impact statements and there are no new circumstances, new information, or potential for unanticipated or unanalyzed environmental effects that warrant new or supplemental analysis before the proposed action can be implemented. A determination of

NEPA adequacy is not an environmental document; rather it confirms the existence of environmental documentation adequate to fulfill NEPA compliance requirements.

(k) *Effects* or *impacts* means changes to the human environment from the proposed action or action alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or action alternatives.

(1) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, local custom and culture or health effects. Effects appropriate for analysis under NEPA may be either beneficial or detrimental, or both, with respect to these values.

(2) A "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. Effects should generally not be considered if they are remote in time, geographically remote, or the product of a lengthy causal chain, but may be considered to the extent it assists in reasoned decision-making. Effects do not include those effects that the agency has no ability to prevent due to the limits of its regulatory authority, or that would occur regardless of the proposed action, or that would need to be initiated by a third party.

(l) *Environmental document* means an environmental impact statement, an environmental assessment, or a finding of no significant impact.

(m) *Human environment* means comprehensively the natural and physical environment and the relationship of Americans with that environment. (*See also* the definition of "effects" in paragraph (j) of this section.)

(n) *Jurisdiction by law* means agency authority to approve, veto, or finance all or part of the proposal.

(o) *Mitigation* means measures that avoid, minimize, or compensate for effects caused by a proposed action or alternatives as described in an environmental document or record of decision and that have a nexus to those effects. While NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation. Mitigation includes:

(1) Avoiding the impact altogether by not taking a certain action or parts of an action.

(2) Minimizing effects by limiting the degree or magnitude of the action and its implementation.

(3) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(4) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(5) Compensating for the impact by replacing or providing substitute resources or environments.

(p) *NEPA process* means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

(q) *Notice of intent* means a public notice that an agency will prepare and consider an environmental impact statement or environmental assessment.

(r) *Page* means an 8.5"x11" electronic or paper sheet with one-inch margins using a word processor with 12-point proportionally spaced font, single spaced, excluding graphics, maps, diagrams, tables, citations, and appendices.

(s) *Proposed Action* means a proposal or a recommendation for agency approval that is subject to NEPA. It includes agency-initiated and third party–initiated (e.g., applicant-initiated) proposals that exist at a stage when an agency, subject to NEPA, has a goal or is actively preparing to decide on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. Proposed action includes a bureau's exercise of discretion over a non-Federal entity's planned activity that falls under a Federal agency's authority to issue permits, licenses, grants and cooperative agreements, rights-of-way, or other common Federal approvals, funding, or regulatory instruments. As the Supreme Court has explained, "'the 'proposed action'" is "the project at hand—not other future or geographically separate projects."[3] As a unit of analysis, therefore, the "proposed action" excludes (1) other projects that are "separate in time"; (2) other projects that are "separate in … place"; (3) other projects that "fall outside the [DOI's] authority"; and (4) other projects that "would be initiated, if at all, by third parties." *Id.* at 1515.

(t) *Publish* and *publication* mean methods found by the agency to efficiently and effectively make environmental documents and information available for review by interested persons, including electronic publication.

(u) *Related action* means an action undertaken by an agency, e.g., a permitting action, some other type of authorization action, an analysis required by statute, or the like, that bears a relationship to other actions undertaken by other agencies relevant to NEPA, e.g., that a set of related actions are all related to one overarching project.

(v) *Reasonable alternatives* means a reasonable range of alternatives that are technically and economically feasible, meet the purpose and need for the proposed action, are within the jurisdiction of the bureau, and, where applicable, meet the goals of the applicant.

(w) *Reasonably foreseeable* means sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision.

(x) *Record of Decision* means a concise public document that explains what the bureau decision is, describes the alternatives considered, discusses any preferences among alternatives based on relevant factors including economic and technical considerations and bureau statutory missions, and states whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and, if not, why they were not. A record of decision may include any mitigation, monitoring, or enforcement plan as appropriate.

(y) *Responsible Official* is the bureau employee who is delegated the authority to make and implement a decision on a proposed action and is responsible for ensuring compliance with NEPA.

(z) *Scope* consists of the range of actions, alternatives, and effects to be considered in the NEPA process. The scope of an individual environmental impact statement or environmental assessment may depend on its relationships to other environmental impact statements or

[3] *Seven County*, 605 U.S. at 186-87.

environmental assessments or the relationship between the proposed action and other agency actions.

(aa) *Tiering* refers to the reliance on and incorporation by reference of discussions of general matters in broader environmental impact statements or environmental assessments (such as national program or policy statements) in subsequent narrower or environmental analyses (such as regional or basin-wide program environmental impact statements or environmental assessments or ultimately site -specific environmental impact statements or environmental assessments).

(bb) *Tribe* means an Indian Tribe under section 102 of the Federally Recognized Indian Tribe List Act of 1994 (25 U.S.C. 5131).

## PART 7—Severability.

### Section 7.1 Severability.

The sections of this Handbook are separate and severable from one another. If any section or portion therein is stayed or determined to be invalid, or the applicability of any section to any person or entity is held invalid, it is Interior's intention that the validity of the remainder of those parts will not be affected. The remaining sections, portions therein, and applications shall continue in effect.

# DOI Handbook of NEPA Procedures Appendix 1

## Implementation Guidance to Bureaus

U.S. Department of the Interior
February 2026

Because NEPA imposes only procedural requirements on federal agencies, this appendix provides further guidance on nine procedural concepts to assist bureaus as they develop and review proposed actions under NEPA: 1. Scoping and Public Involvement; 2. Categorical Exclusions (CE) and Extraordinary Circumstances Review Protocol; 3. Using Existing NEPA; 4. Analytical Elements Common to Environmental Assessments (EA) and Environmental Impact Statements (EIS); 5. Reasonably Foreseeable Effects of the Proposed Action and Action Alternatives; 6. Significance, Including Reaching a Finding of No Significant Impact (FONSI); 7. Formal Aspects of Environmental Documents; 8. Documenting Decisions; 9. Applicant-Prepared and Contractor-Prepared EAs and EISs; and 10. Cooperating Agencies.

### 1. Scoping and Public Involvement

This section discusses both mandatory and discretionary scoping and public involvement considerations specific to NEPA. NEPA does not require scoping, and NEPA only requires the solicitation of public comment on a Notice of Intent to prepare an EIS. As discussed below, there may be reason to engage the public further, depending on the proposed action. There may also be other statutes, regulations, or guidance specific to the proposed action that may require scoping or further public involvement. For example, public scoping may include official Tribal consultation as a part of the scoping process, although Tribal consultation and public scoping are not one and the same, and if the proposed action has implications for Federally recognized Tribal members, assets, or resources, Tribal consultation is required. The Responsible Official should determine whether the proposed action requires any public involvement over and above what NEPA requires.

*Introduction to scoping.* Scoping is a process where bureaus collect information to learn more about potentially significant issues related to a proposed action. Issues may point to significant environmental effects—including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, or health effects—and a bureau's recognition of issues can help shape its

evaluation of the proposed action and alternatives.[4] Comments and questions received during scoping should be addressed, as appropriate, in the environmental review process and typically do not need specific responses.

While scoping is not required by NEPA, it is often a useful tool. Through scoping, bureaus can lay the groundwork for coordinating and consulting with other Federal agencies, and, where appropriate, State, Tribal, or local agencies or governments, or the public. Where applicants are involved, scoping can bring them into the process to identify necessary information, how other environmental reviews, which include ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects, can be integrated into the NEPA document, and any obstacles that can cause delays. Scoping can also assist bureaus as they identify resources for preparation of the environmental document, including staff time, data, and funding.

*Mechanics of scoping.* Bureaus should initiate scoping as soon as practicable after the bureau has sufficiently developed the proposal for action and evaluation. Scoping should be flexible and tailored to the proposed action being considered. Scoping can occur at any stage of the NEPA process, but it is most useful when accomplished early in that process. Scoping can assist the bureau in identifying potential impacts as part of determining whether a CE applies or the extent to which certain issues may warrant evaluation in an environmental document. Information can come from a variety of sources, including, for example, intra-agency personnel, inter-agency personnel, Tribal governments, State and local governments, or interested stakeholders (e.g., community residents, visitors, commercial users, traditional/subsistence users). The bureau may hold public meetings, as appropriate. The bureau may seek various kinds of information, for example:

- Significant resource issues
- Interested parties
- Alternatives to be considered
- The potentially affected geographical area
- Land Status (e.g., Federal, Tribal Trust, Private, State, Individual Indian Allotment, Fee Lands, Split Estate)
- Economic impacts
- Other impacts on the human environment

As part of scoping, Responsible Officials may find it useful to frame potential issues in a manner that would draw out potential cause-and-effect relationships and assist in defining the scope of analysis. Analysis can be streamlined by identifying the specific aspect of the action that may have an effect and the specific aspect of the resource that may be affected. For example:

- How would construction and operation of wind turbines affect sage grouse nesting?
- How would sediment production from road construction affect water quality in Elk Creek?
- How would a prescribed burn affect the short-term and long-term visitor experience for recreational users of the Pacific Crest Trail?

---

[4] "Environmental effects" under NEPA includes ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects. DOI NEPA Handbook 6.1(k)(1).

- How would quarry expansion affect local employment opportunities?

Simply naming a resource, such as "wildlife" or "air quality," without identifying the quality and function of the specific resource and how the proposed action may affect the resource, does not adequately identify an issue. This approach would not meaningfully inform a bureau's evaluation or identify a potential cause-and-effect relationship with the proposed action.

*Public involvement requirements when using a Categorical Exclusion.* NEPA does not require public involvement when a bureau uses a CE. Some legislatively established or legislatively directed CEs may include their own public involvement requirements that must be fulfilled when using such CEs.

*Public involvement requirements when preparing an Environmental Assessment.* NEPA does not require public involvement when a bureau prepares an EA. Therefore, the Responsible Official has discretion to determine whether to involve the public, when to involve the public, and what kind of public involvement is most appropriate when the bureau is preparing an EA to support decision-making on a proposed action and anticipates reaching a Finding of No Significant Impact (FONSI). A Responsible Official may determine that the proposed action to be evaluated in an EA is of sufficient public interest or that the bureau would benefit from receiving information from the public such that the bureau elects to involve the public in the preparation of an EA. In general, public involvement may include virtual or in-person meetings, or may be limited to electronic submission of comments. Public comment periods, if offered, should generally not be fewer than 15 days or more than 30 days.

*Public involvement requirements when preparing an Environmental Impact Statement.* NEPA requires that a bureau solicit public comment only when the bureau publishes a Notice of Intent to prepare an EIS in the Federal Register. NEPA does not require any further public involvement when preparing an EIS. Therefore, the Responsible Official has discretion to determine whether any further public involvement would be helpful, and the parameters of that involvement within the two-year EIS timeframe. When soliciting public comment, bureaus should provide 30 days for public comment periods for an EIS, to the extent practicable.

*Specific considerations concerning discretionary public involvement.* The Department recommends that the Responsible Officials determine whether public involvement over and above the NEPA's requirements would be helpful prior to initiating the NEPA process to inform the schedule. Early coordination with interested parties helps to identify issues that would benefit from additional public involvement such as impacts to the local environment, including economic impacts or the effects on quality of life. Members of the public may have unique insight into issues that warrant consideration in the environmental document such as emerging uses of public lands important to the local community.

i. Consider whether and to what degree public review or comment would be useful, including by considering the following:
   1. Public Interest: From the number of potentially substantive public issues raised in scoping for the project, is engagement with the public likely to provide new insights or information the bureau lacks?

2. Complexity: Is the project so complex that public discussion is likely to generate significant substantive stakeholder information the bureau lacks?
3. Process Efficiency: Would public input improve the overall efficiency of the process, perhaps by providing information the bureau lacks?

ii. Public involvement may occur at any point in the NEPA process or at multiple points during the NEPA process, and may include any or all the following:
1. Public notification: This is often achieved by creating and publishing a project webpage with a description of the proposed action and other early information such as preliminary alternatives and issues. While the bureau might not specifically request comments, any received comments should be considered and documented.
2. External scoping: As discussed above, this involves actively soliciting public input early in the process.
3. Public meetings: These provide a forum for direct engagement and discussion, and can be held in person, virtually, or both.
4. Public review and comment: If the Responsible Official elects to invite public review or comment on an EA or a draft document, such as a draft EIS, the Responsible Official should publish such material for review. If the Responsible Official publishes such material for public review, specify the period, preferably no more than 30 days, when possible, and method for comments.

*Addressing and responding to public comments.*
When responding to public comments, responses are based on their 'substantive' and 'non-substantive' relation to the proposed project. Substantive comments do one or more of the following:

- Question, with a reasoned basis related to the analysis, the accuracy of information in the EIS or EA.
- Question, with a reasoned basis related to the analysis, the adequacy of, methodology for, or assumptions used for the analysis.
- Present new information relevant to the analysis.
- Present reasonable alternatives or issues outside those analyzed in the EIS or EA, or those mentioned in the Notice of Intent.
- Present relevant additional issues for analysis in the EIS or EA.
- Prompt potential changes or revisions to one or more of the alternatives.

Non-substantive comments would include the following:

- Comments for or against the proposed action or alternatives without supporting criteria (such as "we disagree with Alternative Two and believe the bureau should select Alternative Three").
- Comments that only agree or disagree with bureau policy or resource decisions but do not provide justification or supporting data (e.g., "less grazing should be permitted").
- Comments that do not pertain to the proposed project (e.g., "the government should eliminate all dams" for a proposed grazing permit).
- Open-ended question or vague comments.

- Comments citing other comments or sources without providing substantive reasoning (e.g., "consider the following list of scientific papers …" or "consider all of our previous comments on other projects" without citing specific examples).

Bureaus are not required to address comments that are non-substantive.

Bureaus have several options for addressing substantive comments, including:
- Modifying one or more alternative(s);
- Developing and evaluating suggested alternatives not previously given serious consideration by the bureau;
- Supplementing, improving, or modifying the analysis;
- Making factual corrections; or
- Explaining why the comments do not warrant further bureau response, citing sources, authorities, or reasons to support the bureau's position.

A bureau is not required to respond to comments that are received after the close of the comment period. However, bureaus should review untimely comments to consider whether they are relevant to the adequacy of the environmental document, particularly comments from agencies with jurisdiction by law or special expertise.

Documenting any comments or responses: If a bureau solicits public comments, it should document how those comments were addressed. When responding to comments, bureaus may summarize comments and respond to common topics or issues.

**2. Categorical Exclusions (CE) and Extraordinary Circumstances Review Protocol**

*Available CEs.* There are three methods by which CE categories may become available for use by a bureau:

1) The Department or any of its bureaus may administratively establish CEs through a verification process established by DOI that relies on existing bureau NEPA analysis, research, or benchmarking to another agency's established CEs;
2) A bureau may adopt and apply a CE listed in another agency's NEPA procedures (42 U.S.C. 4336c); or
3) Congress may legislatively establish or direct establishment of CEs; use of these CEs must occur according to the terms of the legislation.

A bureau may also rely on another agency's CE determination for a particular proposed action by using that determination, if that bureau's action is substantially the same as the action the other agency has concluded can be approved in using a CE. This reliance on another agency's determination is done on a proposed action-by-proposed action basis. See *Relying on Another Agency's Categorical Exclusion Determination* for more information.

*Identifying potential CEs for use.* To determine whether a proposed action is covered under a CE, begin by verifying that the proposed action fits within one or more of the CEs available to the bureau. The Responsible Official should review the available CEs to determine if the proposed action falls into one of the listed categories. Some proposed actions may be covered in

their entirety by more than one CE and bureaus should select the CE that most closely matches and is specific to the proposed action. The Responsible Official should first consider whether one of their own bureau CEs or one of the CEs listed at 43 CFR 46.210 may apply, or, if not, whether another bureau has a CE that would cover the action. If so, cite the applicable CE according to 43 CFR 46.210 or Appendix 2 of this Handbook. The Responsible Official may also consider whether a CE adopted by their own or another bureau may apply. Before using on a CE established by another bureau or one adopted by another bureau or the Department, Responsible Officials should familiarize themselves with the other bureau's CE or the adopted CE to ensure a sound understanding of how that CE is used; the Responsible Official should confer with the other bureau, or the agency from whom the CE was adopted if needed. Depending on the terms of the CE, the CE may not include specific mention of the proposed action; however, the proposed action must fit readily within the category of actions described in the CE.

A Responsible Official may use several CEs to support a proposed action that consists of several elements each of which falls within a CE; however, this use must be documented and include a finding that none of the elements of the proposed action would result in significant impacts on the quality of the human environment, taken separately or as included together in the proposed action. This documentation must be included in the official record supporting the decision to be made, as evidence that the decision was preceded by a NEPA review.

*Reviewing for extraordinary circumstances.* If a proposed action is covered by a CE or its component elements are covered by multiple CEs available to the bureau, unless exempt from such review by statute, the bureau must review the proposed action for the presence of extraordinary circumstances that would, if present, preclude use of the CE or CEs. DOI's extraordinary circumstances are listed in 43 CFR 46.215 and must be considered when using on administratively established or adopted categorical exclusions; any exceptions to the extraordinary circumstances review requirement is noted in the terms of the categorical exclusion itself. If the proposed action, considered together with any connected actions, would implicate any of the extraordinary circumstances, and the bureau cannot eliminate those extraordinary circumstances by modifying the proposed action to reduce or remove potentially significant impacts, then the bureau would need to develop an environmental assessment or environmental impact statement.

If the proposed action or its component elements meet the terms of the CE (or CEs) and no extraordinary circumstances are present for the proposed action, then the Responsible Official can approve the proposed action using the CE(s). There are limited exceptions to the requirement that a Responsible Official must conduct review for extraordinary circumstances when using a CE. When using certain statutorily established CEs, bureaus do not need to evaluate the presence of extraordinary circumstances. In other circumstances, statutorily established CEs direct bureaus to consider a different set of extraordinary circumstances. For example, the BLM must review any proposed use of the CEs established under section 40806 of the Infrastructure Investment and Jobs Act (Pub. L. 117-58) against the U.S. Forest Service extraordinary circumstances at 36 CFR 220.6. Refer to the authorizing statute for any requirements regarding use of legislatively established or legislatively directed CEs. When bureaus adopt CEs established by other agencies, the adopting bureau can provide for consideration of other extraordinary circumstances, in addition to DOI extraordinary circumstances, if the DOI extraordinary circumstances do not

adequately address the potential for significant effects from an action covered by the CE. When bureaus rely on another agency's categorical exclusion determination, no separate DOI extraordinary circumstances review is necessary.

*Documenting CE use.* Documentation requirements for CEs vary. When a Responsible Official relies on a CE to comply with NEPA, documentation is required for all CEs notated in Appendix 2 with an asterisk (*). When a bureau relies on multiple CEs in combination to cover a single proposed action with multiple elements, it must document that use, even if use of each CE on its own would not require documentation. Legislatively established or legislatively directed CEs may have specific documentation requirements. A Responsible Official may always elect to document use of a CE; for example, a Responsible Official may elect to document use of another bureau's CE. In addition, individual bureaus may have program-specific requirements or policy regarding public notification of a decision supported by a CE that may include publication of documentation of CE use.

### 3. Using Existing NEPA Reviews

The Department recommends that Responsible Officials use existing environmental analyses to disclose effects associated with a proposed action when doing so would avoid redundancy while still providing a coherent and logical record of the analytical and decision-making process. Bureaus may rely on existing analyses as the basis for decision-making (following a Determination of NEPA Adequacy (DNA) or similar documentation, or reliance on another agency's NEPA analysis) or may rely on components of those analyses through tiering and incorporation by reference, as set forth in the DOI NEPA Procedures and described below. The DOI NEPA Procedures allows for the use of a DNA, memorandum to file or other writing to document this evaluation. For simplicity, DNA will be used to refer to this evaluation throughout the guidance.

*Using existing bureau NEPA documentation in its entirety.* Not all new proposed actions will require a new environmental analysis. A bureau may use a DNA, following appropriate review and evaluation, if the effects of a proposed action are already adequately analyzed in an existing bureau environmental document. Before relying on existing environmental documents, the bureau must ensure that the existing environmental document adequately analyzes the proposed action and must evaluate the analysis to ensure the analysis and its assumptions remain valid, considering whether any new and substantial information or circumstances not previously analyzed may result in substantially different environmental effects, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects. This review and evaluation process may reveal a need for additional analysis, or the evaluation may determine that supplementation is not necessary and that the existing environmental document can be relied on in its entirety. For example, if a bureau receives an application for a special recreation permit from an entity that held a similar permit in the same or similar area in previous years, the bureau may be able to rely on the environmental document prepared to support approval of the original special recreation permit, depending on the results of the bureau's review and evaluation of that environmental document.

Before relying on an existing environmental document, the Responsible Official should review the existing environmental document and answer the following questions to determine whether they adequately cover a proposed action currently under consideration:

- Is the new proposed action a feature of, or substantially the same as an alternative analyzed in the existing environmental document?
- Is the proposed action within the same analysis area, or if the location of the proposed action is different, are the geographic and resource conditions sufficiently like those analyzed in the existing environmental document? If there are differences, can the bureau explain why they are not substantial?
- Is the range of alternatives analyzed in the existing environmental document appropriate with respect to the new proposed action, given current environmental concerns and resource values?
- Is the existing analysis valid considering any new information or circumstances relevant to the proposed action? Can the bureau reasonably conclude that new information and new circumstances do not warrant substantial change to the analysis of the new proposed action?
- Are the environmental effects (e.g., ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, or health effects) that would result from implementation of the new proposed action similar (both quantitatively and qualitatively) to those analyzed in the existing environmental document?

The Responsible Official should document responses to these questions and include specific citations to the existing EA or EIS. If the Responsible Official answers "yes" to the above questions, additional analysis will not be necessary. If the Responsible Official answers "no" to any of the above questions, the bureau must prepare additional NEPA analysis. However, it may still be appropriate to prepare new NEPA analysis that tiers to or incorporates by reference material from the existing EA or EIS, including by supplementing the existing EIS (provided that the Federal action has not yet been implemented).

In addition to answering the above questions, the Responsible Official should evaluate whether any public involvement and interagency review associated with existing EAs or EISs are adequate for the new proposed action. Providing public involvement or interagency review for the preparation of a DNA or similar document is at the discretion of the Responsible Official, as is the level of public involvement. Bureau-specific requirements may exist for public involvement for the preparation of a decision supported by a DNA or similar document.

Bureaus may rely on one or several existing environmental documents to comply with NEPA for a new proposed action. For example, environmental documents that may be relevant include:

- EISs and EAs associated with land use or management plans as applicable to individual bureaus
- EISs or EAs for programmatic actions
- EISs or EAs associated with project specific bureau approval actions
- EISs or EAs prepared by other agencies

If the existing document is an EIS or EA prepared by another agency, the bureau should follow the procedures to rely on the EIS or EA, detailed below.

*Incorporation by Reference and Tiering.* Incorporation by reference and tiering provide opportunities to reduce paperwork, shorten the length of an environmental document, and avoid redundant analysis in the NEPA process. While related, incorporation by reference and tiering are distinct concepts with specific meanings and approaches.

Incorporation by reference refers to other available documents that cover similar issues, effects, or resources considered in the NEPA analysis you are currently preparing. Incorporation by reference allows you to briefly summarize the relevant portions of these other documents rather than repeat them.

Tiering refers to the reliance on and incorporation by reference of discussions of general matters in broader EISs or EAs in subsequent narrower circumstances.

Incorporation by reference is a necessary step in tiering, but tiering is not the same as incorporation by reference:

- Tiering allows a Responsible Official to narrow the scope of the subsequent analysis and focus on issues that are necessary for decision-making and exclude from consideration issues already decided or not yet ripe. Incorporation by reference does not.
- A Responsible Official may only tier to previous EAs or EISs evaluating proposed actions with which the new proposed action is consistent, whereas material may be incorporated by reference from any type of document.

**Incorporation by Reference.** Incorporation by reference is useful in preparing both EAs and EISs. It involves two steps: citation and summarization.

1. Cite the source of the incorporated material, including hyperlinks (if available) or other information sufficient to "make the materials reasonably available for review." Give the name of the document and (to the extent possible) page numbers where the incorporated material can be found. Make this citation as specific as possible so there is no ambiguity for the reader about what material is being incorporated. If unpublished, state where cited material is available. For citing information that is not publicly available or cannot be made available to the public, Responsible Officials should refer to the appropriate attorneys in the Office of the Solicitor, as each reference is matter- and context-specific.
2. Summarize the incorporated material. Briefly describe the content and relevance of the incorporated material. For example, if analysis is incorporated by reference from one environmental document into another, summarize the previous analysis, and explain any conclusion based on that previous analysis and how it relates to the action in question. The summary of the incorporated material should be sufficient to allow the Responsible Official and other readers to follow the analysis and arrive at a conclusion.

**Tiering.** Tiering uses the existing analysis from a broader environmental document, such as a programmatic EA or EIS, to a subsequent narrower review; however, a Responsible Official should first evaluate the broader environmental document to determine if it sufficiently analyzed site-specific effects and considered the current proposed action in the context of evaluating the original proposed action that was the subject of the broader environmental

document. If the Responsible Official determines that the existing analysis is sufficient to address any site-specific effects that may result from the new proposed action, the Responsible Official may be able to prepare a DNA or similar document rather than need to prepare a subsequent, tiered environmental document.

In the tiered document, bureaus need only reexamine alternatives analyzed in the broader document or re-analyze effects on resources fully analyzed in the broader document that are relevant to the new proposed action. Tiering can be particularly useful for describing reasonably foreseeable environmental trends and analyzing the effects of planned actions in the area. A programmatic EIS will often analyze the effects reasonably foreseeable as typical of the individual actions that make up a program, as well as the total effects of the overall program.

When preparing a tiered EA or EIS:

1. State that it tiers to another EA or EIS,
2. Describe the relationship between the tiered document and the existing NEPA analysis, and
3. Summarize and incorporate by reference the relevant portions of the EA or EIS to which it is tiered (cite and summarize, as described in *Incorporation by Reference* above). Concentrate on the issues discussed in the broader EA or EIS that are specific to the subsequent proposed action.

When considering a narrower action, a bureau may tier to an EA or EIS for a broader action The analysis in the EA or EIS for the new proposed action tiers to the analysis in the existing EA or EIS, not to the decision. Note that tiering applies only to EAs and EISs; an EA or EIS cannot tier to a document that is not an environmental document as defined under NEPA. In a DNA or similar document, the bureau is relying on an existing EA or EIS, but this reliance is not considered tiering because there is no development of alternatives or analysis of issues in a DNA. Tiering is not applicable when using a CE, as CE determinations are not environmental analyses.

*Relying on another agency's EA or EIS.* A bureau may use another agency's EA or EIS to support decision-making, consistent with the following requirements:

- If a bureau is a cooperating agency in the preparation of the EA or EIS, and the bureau determines that (a) the EA or EIS adequately addressed the environmental impacts of the bureau's proposed action; (b) the EA or EIS satisfies the bureau's requirements; and (c) the EA or EIS adequately addressed the bureau's comments and suggestions, then the bureau may rely the EA or EIS. The Bureau should, to the extent practicable, prepare a joint Record of Decision (ROD) or concurrent decision document with the lead agency. If the bureau makes these determinations but does not issue a joint or concurrent decision, however, the bureau may later rely on that EA or EIS without republishing it.
- If the bureau is not a cooperating agency in the preparation of an EA or EIS, the bureau may rely on it after republishing the document consistent with the following requirements:
    - If the actions analyzed in the original EIS and the bureau's proposed action are substantially the same, the bureau should republish the relied upon statement.

- A bureau must issue its own ROD on a relied upon EIS for which it was not a cooperating agency and must document its reliance of the EIS and its conclusion regarding the adequacy of the EIS in the ROD.
- If the bureau concludes that the actions analyzed in the original EA are substantially the same as the bureau's proposed action, and the EA addresses the environmental impacts of the proposed action and satisfies the bureau's requirements, and the bureau elects to proceed with the action, it must issue its own FONSI to document formal reliance on the EA and its conclusions regarding the adequacy of the EA.
- The FONSI relying on the original EA must be made publicly available. In certain limited circumstances, a bureau's program requirements may require the bureau to publish or otherwise make the FONSI available in draft for public review for 30 days prior to any bureau decision being made in reliance on the FONSI.

Relying on a portion of another agency's EA or EIS should be accomplished through incorporation by reference of the material into the new EA or EIS. *See* DOI NEPA Handbook 3.5.

*Relying on Another Agency's Categorical Exclusion Determination*. A bureau may rely on another agency's determination that a CE applies to a proposed action for the bureau's decision-making. A bureau may rely on the other agency's CE determination even if the CE used is not on the Departmental or bureau lists of CEs. However, the bureau must ensure that its proposed action is substantially the same action as that which is the subject of the original agency's CE determination. "Substantially the same" in this case means that the bureau's proposed action and the other agency's proposed action are for the same project or activity (not simply the same type of project or activity) and the bureau's proposed action and the other agency's proposed action would result in similar non-significant environmental effects, including similar ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects.

The Department recommends that bureaus approach reliance on a CE determination similarly to reliance another agency's EA or EIS and coordinate on development of a joint CE determination that addresses both agencies' requirements and is documented by both agencies. However, if this is not feasible, the Responsible Official may rely on a CE determination by documenting the determination (with explanation) that the proposed action is substantially the same as the action covered by the original CE. In either circumstance, the Responsible Official must document decisions in accordance with bureau-specific requirements.

## 4. Analytical Elements Common to Environmental Assessments (EA) and Environmental Impact Statements (EIS)

A bureau must prepare an EA when the proposed action cannot be statutorily or categorically excluded, and when it is unknown whether the proposed action would result in potentially significant impacts. One purpose of an EA is to determine whether the proposed action will have reasonably foreseeable significant environmental impacts. If the answer to that question is yes, the bureau should prepare an EIS. If the answer to that question is no, it should prepare a FONSI. Both EISs and FONSIs are discussed in further detail below.

Preparation of an EA or EIS involves briefly discussing (1) the purpose and need for the proposed action based on the bureau's statutory authority (including the applicant's goals, if applicable); (2) the proposed action and alternatives to the extent required by NEPA § 102(2)(H), 42 U.S.C. § 4332(2)(H); and (3) the reasonably foreseeable effects of the proposed action and the alternatives considered (covered in Section 5, below).

(1) *Purpose and need.* In the purpose and need section of the EA or EIS, present a brief statement of what the proposal is and why the bureau is considering the action (i.e., what are the underlying needs to which the bureau is responding). This statement helps define the scope of the proposed action and limit the range of alternatives for detailed analysis to those that meet the purpose and need.

- "Purpose" and "need" are not differentiated in the DOI NEPA Procedures; however, thinking of these terms as separate concepts can be helpful in some circumstances. For example, the "purpose" can be described as an outcome that the bureau is trying to reach. Often, the "purpose" can be presented as the solution to the problem described in the "need" for the action. For example, the "need" for a culvert replacement project might describe how the existing culvert blocks fish passage; the "purpose" might be to replace the culvert with one that allows fish passage.
- The purpose and need statement for an externally generated action should be informed by the applicant's or external proponent's goals.
- Draft the bureau purpose and need statement early in the NEPA process and include the statement with any scoping materials to help focus any scoping discussions or input.
- Reexamine and update the bureau purpose and need statement as appropriate throughout the NEPA process, especially when refining the proposed action and developing action alternatives for analysis. This is particularly important since all action alternatives must meet the purpose and need for action.
- A carefully crafted purpose and need statement can be an effective tool to control the scope of the analysis and thereby increase efficiency by eliminating unnecessary analysis and reducing delays in the process. Again, the purpose and need statement dictates the range of alternatives, because action alternatives are not "reasonable" if they do not respond to the purpose and need for the action. For example, in the culvert replacement example above, the scope of the analysis would be narrowed by describing a more specific "purpose" of replacing the existing culvert to allow cutthroat trout fish passage in the spring; reasonable alternatives might include analyzing various culvert sizes or moving the culvert. Conversely, the scope of the analysis would be unnecessarily broadened by describing a more general "purpose" of improving fish passage; reasonable alternatives to such an unnecessarily broad purpose might include culvert removal and road decommissioning.

(2) *Proposed action and alternatives.* The proposed action should be defined in terms of the Federal decision to be made. If there are no unresolved conflicts about the proposed action with respect to alternative uses of available resources, the Responsible Official need only evaluate the proposed action in comparison to what would occur absent such action. If no other action alternatives are included for detailed analysis, the EA or EIS should explain why. If there are reasonable alternatives warranting discussion, this section of the EA or EIS

should describe those alternatives in a manner that is brief and tightly focused on potentially significant issues.

- **"No action alternative."** A "no action alternative" may be considered as part of the NEPA analysis when doing so would set a useful reference against which the effects of the proposed action (and any action alternatives) would be measured. A "no action alternative" consists of a continuation of the reasonably foreseeable environmental trends and planned actions as they would occur should the bureau not implement the proposed action or any action alternatives. The "no action alternative" is therefore often described as "the future without the proposed major Federal action." While EISs and EAs do not require a separate "No Action Alternative," incorporating such an alternative into those documents is often useful to compare the effects of the proposed action to the future without the Federal action.

- **Identification of alternatives.** Action alternatives include the proposed action and reasonable alternatives that will be evaluated in detail in the EA or EIS. Bureaus should use their expert judgment and exercise their discretion in identifying the reasonable alternatives, which should be technically and economically "feasible."[5]
  - NEPA does not require bureaus to identify a preferred alternative in an EA or an EIS, although it may be helpful for situations in which the bureau considers a broad range of alternatives. The Responsible Official should review program-specific requirements on this issue.
  - Alternatives considered but eliminated from detailed study do not need to be addressed in an EA; however, in an EIS, the bureau may describe in brief the reasons for such elimination. Whether the bureau is preparing an EA or an EIS, the bureau should explain its reasons for not evaluating alternatives, particularly when those alternatives have been recommended for consideration through scoping or other public participation, including any public comments. If appropriate, the Responsible Official can provide such explanation in an appendix.

- **Description of alternatives.** The description of alternatives, including the no action alternative, may include the following items:
  - Location of alternatives
  - Alternative project features
  - Estimated acres to be affected
  - Numbers, locations, and photographs or drawings of structures to be constructed
  - Description of project operations and maintenance
  - Mitigation and/or restoration plans
  - Estimated costs associated with the alternative
  - Modifications or removal of existing facilities or structures, including numbers, locations, and photographs or drawings of those structures

- **Comparison of Alternatives.** The bureau must present analysis for each action alternative analyzed in detail so that the decision-maker may evaluate the environmental

[5] *See Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S. 168, 181–82 (2025).

impacts of each action alternative by comparing them to each other and to the no action alternative. An EA does not require the same level of detailed analysis of alternatives that is required for an EIS; these discussions in an EA should be brief and tightly focused on potentially significant issues. An EA or EIS must include a focused scientific and analytic comparison of the proposed action and alternatives, including what may occur in the absence of agency action. In this section, often called the "Environmental Consequences" section, the bureau will discuss the effects of all the feasible action alternatives selected to analyze and compare each to the reasonably foreseeable trends and planned actions that would continue in the absence of the Federal action. When making this comparison, an EIS must consider both the negative and positive environmental impacts associated with implementing the proposed action and action alternatives,[6] but both EISs and EAs should compare the effects of the proposed action in relation to the reasonably foreseeable trends and planned actions that would continue in the absence of the Federal action. The analysis of the effects should focus on those resources that may be affected in a significant way by implementation of the proposed action. The bureau should present both potential beneficial and adverse effects. If implementation of the proposed action would not affect critical environmental areas, wetlands, endangered species, or other scarce, sensitive, or important resources, your EA or EIS should state this, as well. Bureaus should use their expert judgment and exercise their discretion when determining how much each alternative should be discussed, as well as the effects of each action alternative, including any significant effects.[7]

- **Mitigation measures.** Mitigation measures address potential impacts by avoiding, minimizing, or compensating for adverse effects. Bureaus may consider mitigation measures in different alternatives, specific design features within alternatives, or as separate mitigation measures the bureau may impose on any alternative selected for implementation. However, NEPA does not require bureaus to evaluate or select any specific form of mitigation. In addition, NEPA itself does not authorize bureaus to approve or implement mitigation; any such authority must be provided by other applicable laws.

- **Affected Environment.** The Affected Environment section succinctly describes the existing condition and trends of the environment that may be affected by implementing the proposed action or any of the alternatives. The EA or EIS should emphasize only those resources, or resource uses, that may be affected by the proposed action or action alternatives, and only to the extent necessary to enable an understanding of the extent and context of the anticipated environmental effects, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects. Describe the present condition and any reasonably foreseeable trends of the affected resources within the identified geographic scope and timeframe of the analysis.

[6] By evaluating any positive environmental effects, in addition to negative environmental effects, resulting from implementation of the proposed action or action alternatives, DOI bureaus will comply with NEPA's requirement to include in EISs "an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative." 42 U.S.C. § 4332(2)(C)(iii).

[7] *See Seven County*, 605 U.S. at 181–83.

In most cases, bureaus should combine the description of the affected environment, which comprises the reasonably foreseeable environmental trends and planned actions in the area that may be affected by the proposed action, with the description of future conditions without the authorization or implementation of the proposed action or any action alternatives. That is, the no action alternative represents a continuation of the affected environment absent the Federal action under consideration.

**5. Reasonably Foreseeable Effects of the Proposed Action and Any Action Alternatives.**

The comparison of alternatives, whether in an EA or EIS, must include a concise description of the reasonably foreseeable effects of the proposed action and all action alternatives identified; this discussion is the scientific and analytic base of the EA or EIS and allows comparison between the reasonably foreseeable effects of the Federal action, including any reasonable alternatives, and what would occur absent the Federal action. The bureau *must* consider the environmental effects, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects, resulting from the "project at hand."[8] The bureau *may* determine "how far to go" in considering indirect environmental effects, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects, from the project at hand. *Id.* at 11. In addition, the bureau is **not** required to consider environmental effects, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects, from *other projects* that (1) are separate in time or place from the project at hand, (2) fall outside an agency's regulatory authority, or (3) are carried out independently by third parties. *Id.* Ultimately, "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect."[9]

For example, downstream oil refining and upstream oil drilling are separate projects from the construction and operation of an 88-mile railroad line. These are "future or geographically separate projects that may be built (or expanded) as a result of or in the wake of the immediate project under consideration."[10] Even then, however, the Responsible Official may still exercise discretion to determine where to draw the line, so long as it's reasonable and documented. Since the U.S. Surface Transportation Board (STB) approves railroad lines; it does not regulate oil drilling, oil wells, oil and gas leases, or oil refineries. *Id.* at 17. As such, in another example, the STB was not required to analyze the environmental effects, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects, of projects over which they do not exercise regulatory authority, such as the environmental effects, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects, from oil refineries along the Gulf Coast. *Id.* at 20.

---

[8] *See Seven County*, 605 U.S. at 182–83.

[9] *Department of Transportation v. Public Citizen*, 541 U.S. 752, 770 (2004).

[10] *See Seven County*, 605 U.S. at 187.

### 6. Significance, including Reaching a Finding of No Significant Impact (FONSI)

The primary purpose of an EA is to determine whether the reasonably foreseeable effects of the proposed action will be *significant*. Actions likely to have significant environmental impacts require preparation of an EIS; actions that will not have significant environmental impacts do not require preparation of an EIS and can be supported by a FONSI.

Section 1.2 of the DOI NEPA Procedures set forth several considerations the Responsible Official may weigh when determining the "significance" of a proposed action. Here is more detail on each of the considerations:

(1) **Both short- and long-term effects.** In analyzing the degree of effects, consider both the short- and long-term duration of the effects. When addressing this consideration, you may focus solely on the duration of the effect to assist you in determining whether duration is a substantial contributor to the significance of the effect. However, identifying an effect as short-term does not, by definition, translate to non-significance and a long-term effect does not, by definition, translate to a significant effect. Whether short-term and long-term effects are significant also depends on the specific circumstances of the situation and the degree of the effect. As a result, it may be useful to combine this consideration with your discussion of beneficial and adverse effects as described below.

(2) **Both beneficial and adverse effects.** In analyzing the degree of effects, consider that effects may be both beneficial and adverse. Even if the effect of an action will be beneficial on balance, significant adverse effects may exist. For example, removing oil or other hazardous substances may have long-term beneficial effects on restoring natural resource services. However, the process of removing the oil or hazardous substances may have short-term adverse effects on the natural resources.

In determining whether short- and long-term effects and adverse effects may be significant consider the following (among other factors): the uniqueness of the resource impacted and the nature and extent of the impact; whether the impact sets a precedent; established thresholds such as those articulated in land use plans; other similar impacts determinations within the resource; and uncertainty with respect to the impacts.

*Although your EA or EIS must evaluate the degree of both beneficial and adverse effects of the proposed action, rather than simply the net effects, only adverse effects can rise to the level of significance warranting preparation of an EIS.*

(3) **Effects on public health and safety.** Consider the degree to which the action would affect public health and safety –for example, evaluation of hazardous and solid wastes, air and water quality. In the context of evaluating significance, describe resource effects in consideration of their relation to established regulatory thresholds if they exist. There may be instances of effects to public health and safety without defined regulatory thresholds. In these cases, consider the setting and degree of effects in your evaluation of significance. For instance, subsidence areas with

residential structures may be analyzed to assess public health and safety even though there are no regulatory thresholds.

(4) **Economic effects.** Consider the degree to which the action, including any changes to the natural and physical environment, would affect economic activity. This may require evaluation of jobs and income, spending and output, property values, and/or other economic factors. When evaluating significance, evaluate the degree of the economic effects against an established baseline where possible. If quantitative assessments are not available, consider the qualitative information and the degree of the effects in your evaluation of significance. Economic effects by themselves generally do not require preparation of an EIS. Consider effects on the local economy and not only those to the State or national economy. The impacts of a closure of an area or a limitation on livestock grazing in an area may not have any impact to the State, but it may have impacts on the local county or municipality economy.

(5) **Effects on the quality of life of the American people**. Consider the degree to which the action, including any changes to the natural and physical environment, would affect the quality of life of the American people. For evaluating quality of life in an environmental document, we recommend you consider the following:

- Access to products, which may include evaluations of opportunities to consume, use, possess, or purchase products extracted or produced from Federal lands and in the Outer Continental Shelf.
- Visitor experience, which may include evaluations of recreation access and visitor services.
- Public services, which may include evaluations of provisioning of emergency services, public water supply, transportation, education, social services, etc.
- Way of life and culture for Native Americans, which may include evaluations of traditional land and water use and practices, and their cultural heritage.
- Passive use of ecosystems, which may include evaluations of stewardship, existence values, and bequest values.
- Education and knowledge, which may include evaluations of learning, interpretation, and research opportunities related to cultural, historic, and natural resources.
- These effects should be evaluated at the local level (county or municipality) and, if applicable, separately at the State or national level.

When evaluating significance, evaluate the degree of effects of the proposed action compared to reasonably foreseeable environmental trends and planned actions (i.e., the Affected Environment). It may be beneficial to consider the economic effects in context with the effects on the quality of life because these effects may be interrelated. If quantitative assessments are not available, consider the qualitative information and the degree of the effects in your evaluation of significance.

The DOI NEPA Procedures also require agencies to consider the potentially affected environment in determining significance. This includes any connected actions, as defined in 6.1,

the affected area (national, regional, or local) and its resources. The Department recommends that bureaus identify any unique characteristics of the affected area.

## 7. Formal Aspects of Environmental Documents

*Format for an EA or EIS.* A suggested format for EAs or EISs is shown below:

- Title page
- Table of contents
- Introduction, including:
  - EA or EIS NEPA Number
  - Type of Project
  - Location of the proposed action
  - Name and location of preparing office
  - The subject function code, lease, serial, or case file number (where applicable)
  - Applicant name (where applicable)
- Statement of Purpose and Need for Action
- Decision to be Made i.e., a description of the pending agency action
- Description of Proposed Action and Alternatives
- Evaluation of reasonably foreseeable effects of the Proposed Action and Action Alternatives as compared to the Affected Environment /Description of Conditions that would continue absent Federal Action (i.e., the No Action Alternative)
- Appendices. Appendices are for support of critical analyses in the EA or EIS. An appendix is not a data bank or library for total reference support, but contains major substantiating data, essential relevant descriptions of environmental components, or other information necessary for complete use of the EA or EIS for analytical or decision-making purposes. It may be appropriate to keep other supporting material in the decision file and make it available if requested, instead of including it as an appendix. Supporting material may be included as an appendix documenting a list of the parties consulted including, for example, other Federal agencies, Tribal Governments, cooperating agencies, and other members of the public. Include a record of compliance with other applicable statutes (ESA, CWA, etc.). To the extent possible, integrate any surveys and studies required by the NHPA, FWCA, ESA, other environmental laws, or any appropriate State, Tribal, or local laws. Finally, preparers may create a list of required permits (Federal, State, Tribal, and local), along with a determination of who will be responsible for obtaining these permits. Appendices can also be used for bibliographies or references cited.

  Appendices generally include:

  - References cited
  - Consultation and coordination
  - Lists of permits

- Public Comments and Responses (in an EA/FONSI or final EIS, as appropriate)

*Page limits, deadlines, and certifications.*

NEPA sets out page and time limits for the preparation of EAs and for the preparation of EIS. Bureaus are strongly encouraged to stay well within these limits as these page limits cannot be waived, and requests for extension of these time limits will not be automatically granted. See the DOI NEPA Procedures Sections 1.5 and 2.5 for more information.

Bureaus should complete EAs in one year absent unusual circumstances. One year is measured from the start date to the publication of the EA or the revised EA (if any). See the DOI NEPA Handbook Section 1.5 for more information on how to measure the "start date." Bureaus should complete EISs in two years absent unusual circumstances. For an EIS, the two years is measured from the start date to the publication of the EIS, or final EIS if a draft EIS is issued. See the DOI NEPA Handbook Section 2.5 for more information how to measure the "start date." Bureaus should develop schedules that identify the milestones as appropriate to ensure timely completion of environmental documents.

A bureau that is unlikely to meet a statutory deadline should confer with the Office of the Solicitor to identify options for expediting the preparation the EA or EIS. Document the bureau's rationale for any delays in the event it is needed to report to Congress on missing deadlines.

Any required certification should be placed on the cover page of the EA or EIS. See the DOI NEPA Procedures Sections 1.5 and 2.5 for more information about the content of the certification.

*Circulation, Publication and Filing*

- *Circulation of Environmental Documents*

  Prior to completion of an EIS, circulate the EIS to, and obtain comments from, cooperating agencies, as appropriate. Consider in that circulation the role of the cooperating agency and its relationship to the lead bureau, and any other Federal agency that has jurisdiction by law or special expertise with respect to any environmental effect, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects. When obtaining cooperating agency comment bureaus should provide 30 days for an EIS, to the extent practicable. Cooperating agency comments should be addressed, as appropriate, according to the procedures noted above in *Addressing and responding to public comments*.

- *Publication of Environmental Documents*

  Publish the completed environmental documents as well as (for an EIS) any comments from or views of any appropriate Federal, State, Tribal, and local

agencies and governments. Unless required under specific programs, there is no need to publish bureau-specific notice in the Federal Register for an EIS.

Issue a notice of the availability of an environmental document for public review or comment, when appropriate, on a public website and through notice to participating agencies and interested parties, as applicable.

An EIS does not require a bureau-specific Federal Register notice but should be announced in the Federal Register through the process of filing the EIS with the Environmental Protection Agency (EPA).

- *Filing your EIS with the EPA.*
  You must file each published EIS, including all draft, final, or supplemental EISs, with the EPA, which publishes its own Federal Register notice. The Federal Register publishes a notice prepared by the EPA every Friday. Federal agencies file an EIS by submitting the complete EIS, including appendices, to the EPA through the e-NEPA electronic filing system. For instructions on the steps required to file an EIS with the EPA, refer to the EPA's website.

## 8. Documenting Decisions

The DOI NEPA procedures require development and publication of a concise public decision document for all bureau EA and EIS processes that are concluded. This is often a Record of Decision, or ROD, or another form of a decision, such as a Decision Record. Decision documents must certify that the bureau has considered all relevant information raised in the NEPA process and that the NEPA process has concluded. It is generally preferable to meet the requirements of other statutes, such as the National Historic Preservation Act or Endangered Species Act, prior to issuing a decision.

Your decision must be within the range of alternatives analyzed in detail in the environmental document. You may select an alternative that is intermediate between two alternatives or combines elements of alternatives if the effects of the selected alternative are reasonably apparent in the analysis. This includes selecting an alternative that is intermediate between an action alternative and the no action alternative (that is, partial implementation of an action alternative). When selecting such an intermediate or combined alternative, ensure that the effects do not combine in a manner that would result in effects outside the scope of the effects analyzed in the environmental document.

An environmental document or documentation of use of a CE is not itself a decision document. Prepare a Decision Record or bureau- or program- specific decision document for a proposed action evaluated in an EA, EIS, or relying on a DNA. Some decisions regarding proposed actions analyzed in an EA may also need to be documented in accordance with program-specific requirements.

Follow program-specific requirements on the content and format of a Record of Decision or a decision document. If there are no program-specific requirements or if they are only general, we

recommend that you organize the Record of Decision or decision document using the content outline below:

- Describe conformance with any applicable land or offshore use plans (e.g., BLM Resource Management Plans; National Park Service unit Management Plans; U.S. Fish and Wildlife Service Refuge Management Plans) and compliance with laws pertinent to the decision, such as the Endangered Species Act, Marine Mammal Protection Act, National Historic Preservation Act, Outer Continental Shelf Lands Act, or other statutes.
- Identify the selected alternative. Describe as precisely as possible specific design features of the action approved in the decision or incorporate by reference the description of the selected action from the environmental document.
- Identify mitigation measures and any associated monitoring and enforcement plans that have been selected to be implemented. Although described and analyzed in an environmental document, the mitigation measures that will be implemented are explicitly adopted in the Record of Decision or decision document.
- If the bureau prepared an EA to support the decision, reference the FONSI indicating that the action has been analyzed in an EA and found to have no significant impacts, thus an EIS is not required.
- Summarize any public involvement undertaken and any comments received and describe how the bureau considered any substantive public input in making the decision, including those of cooperating agencies.
- Explain the rationale for the decision. When an EA or EIS supports the decision, explain how the selected alternative addresses the purpose and need for action and why it was selected over other alternatives. You should discuss the preferences among alternatives based on relevant factors including economic and technical considerations and the bureau's statutory mission. State whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and, if not, why they were not.
- Include all program-specific requirements.
- Describe any relevant protest or appeal opportunities that may be applicable to the decision.
- The Responsible Official must sign and date the decision document.
- Provide notice of the signed decision document and associated environmental document.

When appropriate, the decision should be published at the same time as the EA or EIS is published.

## 9. Applicant-Prepared and Contractor-Prepared EAs and EISs

NEPA as amended allows for an applicant or an applicant-directed contractor to prepare an EA or EIS. Bureaus remain responsible for the accuracy, scope, and content of the EA or EIS and must independently evaluate and approve each such analysis before the bureau may rely on it. Bureaus may request more information, revise analysis methodologies, or choose not to rely on an EA or EIS prepared by an applicant or its contractor at any time. If the bureau determines that

the EA or EIS submitted by an applicant or applicant-directed contractor does not meet the bureau's standards, the bureau should work with the applicant or applicant-directed contractor to improve the document with an objective of meeting the bureau's standards while meeting applicable statutory deadline. If necessary, the bureau may elect to complete the EA or EIS itself.

Applicant or applicant-directed contractor preparation of an EA or EIS occurs when the applicant either directly prepares an EA or EIS or the applicant hires a contractor and directs the contractor as its agent to prepare the EA or EIS. Applicant or applicant-directed preparation of an EA or EIS is thus different from circumstances where a bureau uses a bureau-directed contractor who may be funded by the applicant (an arrangement often referred to as "third party contracting"). Bureaus may also select and fund their own contractors to prepare environmental documents for bureau use.

For applicant or applicant-directed contractor prepared EAs and EISs, Responsible Officials should consider implementing the following best practices:

- *Early Coordination*. Early coordination with the applicant improves efficiency both before and after initiation of the NEPA process. Bureaus should coordinate with applicants as soon as applicants present an initial version of an application (e.g., application for permit to drill, application for a special recreation permit, application for a right-of-way, etc.), plan of operation, or plan of development. Bureaus should invite applicants to share drafts of their applications early for bureau input and suggestions for refinement. Bureaus should hold a kick-off meeting with the applicant to identify the information needed for a complete application package as well as respective roles and responsibilities for the bureau and the applicant as soon as practicable after the application is received. These meetings should be documented so changes in bureau personnel do not cause these meetings to be repeated. As part of early coordination, the bureau, cooperating agencies (if applicable) and the applicant should develop a schedule for the applicant to provide information during the application process and the bureau to complete data collection and to establish milestone steps in the NEPA process. Within 60 days of the initial review or meeting, the bureau should identify in writing any additional information needed from the applicant or applicant-directed contractor to initiate the NEPA process.
- *Outlining Responsibilities*. Early in the process, bureaus should engage with the applicant and provide written documentation outlining the bureau's expectations regarding roles, responsibilities, the project schedule, coordination, deliverables (including environmental information, draft and final documents), and supervision. It is recommended that bureaus develop Memoranda of Understanding (MOUs) or other agreements with applicants and applicant-directed contractors to outline roles and responsibilities for all entities involved in the project. The MOU or other appropriate agreement should also describe the quality standards for the environmental analysis as well as any other applicable bureau-specific guidelines. These standards may require use of specific data sources or bureau-approved methodologies. The MOU or other agreement must provide for the applicant or applicant-directed contractor to certify that it will provide the bureau with all relevant supporting information, including all studies, surveys, and technical reports pertaining to the environment prepared by the applicant or applicant-directed contractor for the proposed action. The MOU or other agreement will also include a professional integrity statement

from the applicant certifying that the environmental analysis will be prepared with professional and scientific integrity, using reliable data and resources, and will meet any relevant Federal information quality standards and bureau needs for decision-making. Close coordination with the bureau throughout the NEPA process will increase efficiency and improve the NEPA analysis.

- *Environmental Information*. Once bureaus have sufficient information to identify preliminary issues for analysis and resources that would be potentially affected, bureaus will, as appropriate, request that applicants provide environmental information necessary to inform the level of NEPA analysis. The environmental information may include inventories, surveys, or monitoring and written reports of any relevant results. Bureaus should specify any necessary survey or study protocols while identifying environmental information needed for analysis.
- *Determination of the level of NEPA Review Needed to Support Decision-Making.* To determine the appropriate level of NEPA review for the proposed action, the Responsible Official should have a complete project description and other necessary information, which may include written documentation of likely environmental effects, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects. Bureaus should rely on program-specific requirements to determine what information is necessary for a complete project description.
- *Development of a project schedule.* Once the bureau has enough information to determine the appropriate level of NEPA review needed to support decision-making, the bureau should work with the applicant to develop a project schedule that meets the applicable statutory deadline for completing NEPA.
- *Acceptance of a complete application.* Once the above steps have been completed and the environmental information and reports have been completed, reviewed and evaluated, and accepted by bureau resource specialists, the bureau should accept the application as complete. No later than 30 days of receiving, evaluating, and accepting the information that the bureau identified in writing under "*early coordination,*" the bureau should initiate its NEPA process.
- *NEPA Analysis.* We recommend that the bureau remain in close coordination with the applicant or applicant-directed contractor throughout the NEPA process. This process can be set forth in the MOU or appropriate agreement, as well as in the project schedule.

*Evaluation*

Bureaus must independently evaluate and approve information and analysis provided by the applicant before the bureau may rely on it. To maintain the scientific quality and integrity of the impact assessment, a bureau may confer with another bureau or cooperating agency if in-house subject matter experts are not available for technical evaluations.

- ***Evaluation of environmental information.*** The bureau must evaluate any environmental information provided by an applicant or applicant-directed contractor to determine if the information meets bureau program standards for professional and scientific integrity. The bureau must document the evaluation and its results.

If a Responsible Official intends to rely on an applicant or applicant-directed contractor to prepare any of the following information, the Responsible Official must obtain and independently evaluate such information prior to initiating the NEPA process:

- The purpose and need for the proposed action;
- The proposed action and reasonable alternatives;
- A public engagement plan (if appropriate);
- Permits and authorizations required to implement the proposed action;
- Any agencies the bureau might want to invite to be cooperating agencies;
- The process for consultation with relevant Federal, State, Tribal, and local agencies to ensure compliance with environmental laws and regulations;
- Other issues or resources that may warrant analysis in the EA or EIS, and a summary of any applicable analysis methodology; and
- Schedule for preparation of the EA or EIS.

Bureaus retain the responsibility for compliance with other laws and procedures that are inherently governmental such as NHPA Section 106, ESA Section 7, and government-to-government consultation. Bureaus are responsible for managing any cooperating or participating agency relationships.

The Responsible Official must document the results of the bureau's independent evaluation of these elements, as applicable, for instance in a memorandum for the decision file.

- ***Evaluation of the Analysis in the EA or EIS.*** Once the applicant or applicant-directed contractor has completed the analysis for the EA or EIS, it must certify that the materials provided to the bureau—the EA or EIS, as well as all supporting documentation—are complete for the bureau's independent review and inclusion in its decision file. The bureau will evaluate the analysis and contents of the decision file and, if that evaluation indicates that the analysis satisfies professional integrity, scientific integrity, and program specific requirements, may accept the EA or EIS and analysis contained therein. The bureau should document its evaluation.

## 10. Cooperating Agencies

The cooperating agency relationship is distinctive, moving beyond consultation to engage officials and staff of other agencies and levels of government in working partnerships. Cooperating agencies share skills and resources to help shape bureau environmental analyses that better reflect the policies, needs, and conditions of their jurisdictions or special expertise. The cooperating agency relationship provides a framework for intergovernmental efforts by:

- Gaining early and consistent involvement of cooperating agency partners
- Incorporating local knowledge of economic, social, and environmental conditions, as well as Federal, State, Tribal, and local land use requirements
- Addressing intergovernmental issues
- Avoiding duplication of effort
- Enhancing local credibility of environmental impact statements
- Encouraging cooperating agency support for decisions
- Building relationships of trust and cooperation

- Making better, more informed decisions

In any Federal undertaking, harmonizing national, regional, and local governance entails coordination. Experience shows that there are three primary approaches that can lead to success when working across government boundaries. They are:

(1) Federal, State, Tribal, and local partners need to recognize that the cooperating agency relationship is a forum for sharing information and expertise, not for asserting authority. Engaging in a cooperating agency relationship neither augments nor diminishes an entity's jurisdiction and authority. However, mutual respect for each agency's authority and jurisdiction is critical.
(2) Bureau Responsible Officials should acknowledge that the cooperating agency relationship requires new ways of doing business. Engaging with government partners as cooperating agencies is a unique form of consultation. Cooperating agencies expect, and should be given, a significant role (commensurate with available time and knowledge) in shaping environmental analyses—instead of merely commenting on them.
(3) All parties will find the cooperating agency relationship most productive when they emphasize mutual, rather than individual, gains and seek solutions that meet others' needs as well as their own.

Cooperating agencies are typically not treated as advisory committees under the purview of the Federal Advisory Committee Act (FACA, 5 U.S.C. App.). This is because meetings held exclusively between Federal officials and elected officers of State, Tribal, and local governments (or their designated employees authorized to act on their behalf) acting in their official capacities are generally exempt from the requirements of FACA when the meetings are solely for the purpose of exchanging views, information, or advice related to implementation of Federal programs established pursuant to a public law that provides intergovernmental responsibilities or administration (2 U.S.C. 1534(b)).

Both lead agencies and cooperating agencies assume significant obligations in offering and accepting the cooperating agency relationship, meaning:

- As a lead agency, the bureau is expected to use the analyses and proposals of a cooperating agency to the maximum extent possible consistent with its responsibility.
- Cooperating agencies accept obligations to contribute staff to the environmental impact statement team, develop and review analyses for which they have particular expertise, and fund their own participation.

Responsible Officials are expected to make a reasonable effort to identify Federal, State, Tribal, and local entities possessing jurisdiction by law or special expertise concerning an environmental impact statement. Once these entities are identified, Responsible Officials must extend invitations to eligible agencies and governments for an environmental impact statement process and when the bureau determines useful, for an environmental assessment process. Requests from other Federal, State, Tribal and local entities for cooperating agency should not be arbitrarily denied.

Bureaus should work with cooperating agencies to develop and adopt a Memorandum of Understanding or other appropriate documented agreement that describes their respective roles, assignment of issues, schedules, and staff commitments so that the NEPA process remains on track and on time. It is important that agreements establishing a cooperating agency relationship be completed in a timely manner—preferably before the notice of intent or initiation of the NEPA process. Memorandums of Understanding, however, cannot limit the ability of the agency to participate in any protest, appeal or other administrative or federal court proceedings.

Cooperating agencies may, by agreement with the lead bureau, assist in doing the following:

- Identifying issues to be addressed
- Arranging for the collection and/or assembly of necessary resource, environmental, social, economic, and institutional data
- Analyzing data
- Developing alternatives
- Evaluating alternatives and estimating the effects of implementing each alternative
- Carrying out any other tasks necessary for the development of the environmental analysis and documentation

Working with other government officials through the cooperating agency relationship makes better outcomes more likely and can establish a foundation for long-term cooperation that benefits all partners.

# DOI Handbook of NEPA Procedures

# Appendix 2

## Bureau Categorical Exclusions

U.S. Department of the Interior

February 2026

The following pages include all the Department of the Interior (Department) Categorical Exclusions (CEs) established or adopted for the use of bureaus. While the CEs are grouped by bureau, the DOI NEPA procedures provide that any bureau can use another bureau's CE, including those listed under CEs adopted from other agencies. *See* DOI NEPA Handbook, Appendix 1, 2. Categorical Exclusions (CE) and Extraordinary Circumstances Review Protocol, *Identifying potential CEs for use*. An asterisk (*) indicates a requirement to document the applicability of the CE and review of extraordinary circumstances. Even if it is not required to document a categorical exclusion, the Responsible Official may document the use of a CE at their discretion. Citations to these CEs should follow this format: DOI NEPA Handbook, Appendix 2, *[SECTION NUMBER], [PARAGRAPH NUMBER OR LETTER]*. Subject areas are purely for organization and do not limit application of a CE to a specific program area.

## Office of Native Hawaiian Relations

7.5 Categorical Exclusion. Approval of conveyances, exchanges, and other transfers of land or interests in land between Department of Hawaiian Homelands, and an agency of the State of Hawaii, or a Federal agency, where no change in the land use is planned. This activity is a single, independent action not associated with larger, existing, or proposed complexes or facilities.

## U.S. Fish and Wildlife Service (Service)

8.5 Categorical Exclusions.

A. General.

(1) Changes or amendments to an approved action when such changes have no or minor potential environmental impact.

(2) Personnel training, environmental interpretation, public safety efforts, and other educational activities, which do not involve new construction or major additions to existing facilities.

(3) The issuance and modification of procedures, including manuals, orders, guidelines, and field instructions, when the impacts are limited to administrative effects.

(4) The acquisition of real property obtained either through discretionary acts or when acquired by law, whether by way of condemnation, donation, escheat, right-of-entry, escrow, exchange, lapses, purchase, or transfer and that will be under the jurisdiction or control of the United States. Such acquisition of real property shall be in accordance with 602 DM 2 and the Service's procedures, when the acquisition is from a willing seller, continuance of or minor modification to the existing land use is planned, and the acquisition planning process has been performed in coordination with the affected public.[11]

B. Resource Management. Prior to carrying out these actions, the Service should coordinate with affected Federal agencies and State, tribal, and local governments.

(1) Research, inventory, and information collection activities directly related to the conservation of fish and wildlife resources which involve negligible animal mortality or habitat destruction, no introduction of contaminants, or no introduction of organisms not indigenous to the affected ecosystem.

(2) The operation, maintenance, and management of existing facilities and routine recurring management activities and improvements, including renovations and replacements which result in no or only minor changes in the use, and have no or negligible environmental effects on-site or in the vicinity of the site.

[11] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 3908.

(3) The construction of new, or the addition of, small structures or improvements, including structures and improvements for the restoration of wetland, riparian, instream, or native habitats, which result in no or only minor changes in the use of the affected local area. The following are examples of activities that may be included.
   (a) The installation of fences.
   (b) The construction of small water control structures.
   (c) The planting of seeds or seedlings and other minor revegetation actions.
   (d) The construction of small berms or dikes.
   (e) The development of limited access for routine maintenance and management purposes.[12]

(4) The use of prescribed burning for habitat improvement purposes, when conducted in accordance with local and State ordinances and laws.[13]

(5) Fire management activities, including prevention and restoration measures, when conducted in accordance with Departmental and Service procedures.[14]

(6) The reintroduction or supplementation (e.g., stocking) of native, formerly native, or established species into suitable habitat within their historic or established range, where no or negligible environmental disturbances are anticipated.

(7) Minor changes in the amounts or types of public use on Service or State-managed lands, in accordance with existing regulations, management plans, and procedures.

(8) Consultation and technical assistance activities directly related to the conservation of fish and wildlife resources.

(9) Minor changes in existing master plans, comprehensive conservation plans, or operations, when no or minor effects are anticipated. Examples could include minor changes in the type and location of compatible public use activities and land management practices.

(10) The issuance of new or revised site, unit, or activity-specific management plans for public use, land use, or other management activities when only minor changes are planned. Examples could include an amended public use plan or fire management plan.

(11) Natural resource damage assessment restoration plans, prepared under sections 107, 111, and 122(j) of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA); section 311(f)(4) of the Clean Water Act; and the Oil Pollution Act; when only minor or negligible change in the use of the affected areas is planned.

[12] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 3908.
[13] NPS adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 24644.
[14] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

C. Permit and Regulatory Functions.

(1) The issuance, denial, suspension, and revocation of permits for activities involving fish, wildlife, or plants regulated under 50 CFR Chapter 1, Subsection B, when such permits cause no or negligible environmental disturbance. These permits involve endangered and threatened species, species listed under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), marine mammals, exotic birds, migratory birds, eagles, and injurious wildlife.

(2) The issuance of ESA section 10(a)(1)(B) incidental take permits that, individually or cumulatively, have a minor or negligible effect on the species covered in the habitat conservation plan.

(3) The issuance of special regulations for public use of Service-managed land, which maintain essentially the permitted level of use and do not continue a level of use that has resulted in adverse environmental effects.

(4) The issuance or reissuance of permits for limited additional use of an existing right-of-way for underground or above ground power, telephone, or pipelines, where no new structures (i.e., facilities) or major improvement to those facilities are required; and for permitting a new right-of-way, where no or negligible environmental disturbances are anticipated.[15]

(5) The issuance or reissuance of special use permits for the administration of specialized uses, including agricultural uses, or other economic uses for management purposes, when such uses are compatible, contribute to the purposes of the refuge system unit, and result in no or negligible environmental effects.

(6) The denial of special use permit applications, either initially or when permits are reviewed for renewal, when the proposed action is determined not compatible with the purposes of the refuge system unit.

(7) Activities directly related to the enforcement of fish and wildlife laws, not included in 43 CFR 210. These activities include:
- (a) Assessment of civil penalties.
- (b) Forfeiture of property seized or subject to forfeiture.
- (c) The issuance or reissuance of rules, procedures, standards, and permits for the designation of ports, inspection, clearance, marking, and license requirements pertaining to wildlife and wildlife products, and for the humane and healthful transportation of wildlife.

(8) Actions where the Service has concurrence or co-approval with another agency and the action is a categorical exclusion for that agency. This would normally involve one Federal action or connected actions where the Service is a cooperating agency.

[15] BLM adopted this CE prior to the 2025 DOI NEPA Regulations Procedures. *See* 90 FR 3908.

(9) The adding of species to the list of injurious wildlife regulated under the Lacey Act (18 U.S.C. section 42, as amended) as implemented under 50 CFR subchapter B, part 16, which prohibits the importation into the United States and interstate transportation of wildlife found to be injurious.

D. Recovery Plans. Issuance of recovery plans under section 4(f) of the ESA.

E. Financial Assistance.

(1) State, local, or private financial assistance (grants and/or cooperative agreements), including State planning grants and private land restorations, where the environmental effects are minor or negligible.

(2) *Grants for categorically excluded actions in paragraphs A, B, and C, above; and categorically excluded actions in 43 CFR 46.210 and for categorically excluded actions adopted under NEPA Section 109.

## U.S. Geological Survey (USGS)

9.5 Categorical Exclusions. The following USGS actions are designated categorical exclusions unless one or more of the Department's extraordinary circumstances applies. The categorical exclusions shall apply to internal program initiatives performed in the United States and its Trust Territories and Possessions, including Federal lands and the Outer Continental Shelf.

A. Topographic, land use and land cover, geological, mineralogic, resources evaluation, and hydrologic mapping activities, including aerial topographic surveying, photography, and geophysical surveying.

B. Collection of data and samples for geologic, paleontologic, hydrologic, mineralogic, geochemical and surface or subsurface geophysical investigations, and resource evaluation, including contracts therefor.[16]

C. Acquisition of existing geological, hydrological or geophysical data from private exploration ventures.

D. Well logging, aquifer response testing, digital modeling, inventory of existing wells and water supplies, water-sample collection.

E. Operation, construction, installation, and removal – including restoration of sites to the pre-structure condition or equivalent of the surrounding environment – of hydrologic and water quality monitoring structures and equipment including but not limited to weirs, cableways, stream-gaging stations, groundwater wells, and meteorologic structures.

F. Routine exploratory or observation groundwater well drilling operations that do not

[16] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

require a special access road, and that use portable tanks to recycle and remove drilling mud, and create no significant surface disturbance.[17]

G. Test or exploration drilling and downhole testing, including contracts therefor.[18]

H. Establishment of survey marks, placement and operation of field instruments, and installation of any research/monitoring devices.[19]

I. Digging and subsequent site restoration of exploratory trenches not to exceed one acre of surface disturbance.[20]

J. Establishment of seasonal and temporary field camps.

K. Off-road travel to drilling, data collection, or observation sites that do not impact ecologically sensitive areas such as wilderness areas, wetlands, or areas of critical habitat for listed endangered or threatened species.[21]

L. Hydraulic fracturing of rock formations for the singular purpose of in situ stress measurements.

M. Reports to surface management agencies, or any state, territorial, tribal, commonwealth, or Federal agencies concerning mineral and water resources appraisals.

N. Other actions where USGS has concurrence or co-approval with another Department bureau and the action is a categorical exclusion for that bureau.

O. Minor, routine, or preventive maintenance activities at USGS facilities and lands, and geological, hydrological, or geophysical data collection stations; and

P. Minor activities required to gain or prepare access to sites selected for completion of exploration drilling operations or construction of stations for hydrologic, geologic, or geophysical data collection.[22]

---

[17] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.
[18] BLM adopted this CE prior to the 2025 DOI NEPA Regulations Procedures. *See* 90 FR 42432.
[19] NPS adopted this CE prior to the 2025 DOI NEPA Regulations Procedures. *See* 90 FR 24644.
[20] BLM adopted this CE prior to the 2025 DOI NEPA Regulations Procedures. *See* 90 FR 42432.
[21] BLM adopted this CE prior to the 2025 DOI NEPA Regulations Procedures. *See* 90 FR 42432.
[22] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

# Bureau of Indian Affairs (BIA)

10.5 Categorical Exclusions.

A. *Operation, Maintenance, and Replacement of Existing Facilities. Examples are normal renovation of buildings, road maintenance and limited rehabilitation of irrigation structures.

B. Transfer of Existing Federal Facilities to Other Entities. Transfer of existing operation and maintenance activities of Federal facilities to tribal groups, water user organizations, or other entities where the anticipated operation and maintenance activities are agreed to in a contract, follow BIA policy, and no change in facility operations or maintenance is anticipated.

C. Human Resources Programs. Examples are social services, education services, employment assistance, tribal operations, law enforcement and credit and financing activities not related to development.

D. Administrative Actions and Other Activities Relating to Trust Resources. Examples are: Management of trust funds (collection and distribution), budget, finance, estate planning, wills and appraisals.

E. Self-Determination and Self-Governance.

(1) Self-Determination Act contracts and grants for BIA programs listed as categorical exclusions, or for programs in which environmental impacts are adequately addressed in earlier NEPA analysis.

(2) Self-Governance compacts for BIA programs which are listed as categorical exclusions or for programs in which environmental impacts are adequately addressed in earlier NEPA analysis.

F. Rights-of-Way.

(1) *Rights-of-Way inside another right-of-way, or amendments to rights-of-way where no deviations from or additions to the original right-of-way are involved and where there is an existing NEPA analysis covering the same or similar impacts in the right-of-way area.

(2) *Service line agreements to an individual residence, building or well from an existing facility where installation will involve no clearance of vegetation from the right-of-way other than for placement of poles, signs (including highway signs), or buried power/cable lines.

(3) *Renewals, assignments, conversions, or temporary construction easements within existing rights-of-way where there would be essentially no change in use and continuation would not lead to environmental degradation.

G. Minerals.

(1) Approval of permits for geologic mapping, inventory, reconnaissance and surface sample collecting.

(2) Approval of unitization agreements, pooling or communitization agreements.

(3) Approval of mineral lease adjustments and transfers, including assignments and subleases.

(4) Approval of royalty determinations such as royalty rate adjustments of an existing lease or contract agreement.

H. Forestry.

(1) Approval of free-use cutting, without permit, to Indian owners for on-reservation personal use of forest products, not to exceed 2,500 feet board measure when cutting will not adversely affect associated resources such as riparian zones, areas of special significance, etc.

(2) Approval and issuance of cutting permits for forest products not to exceed $5,000 in value.

(3) *Approval and issuance of paid timber cutting permits or contracts for products valued at less than $25,000 when in compliance with policies and guidelines established by a current management plan addressed in earlier NEPA analysis.

(4) *Approval of annual logging plans when in compliance with policies and guidelines established by a current management plan addressed in earlier NEPA analysis.

(5) Approval of Fire Management Planning Analysis detailing emergency fire suppression activities.

(6) *Approval of emergency forest and range rehabilitation plans when limited to environmental stabilization on less than 10,000 acres and not including approval of salvage sales of damaged timber.

(7) *Approval of forest stand improvement projects of less than 2000 acres when in compliance with policies and guidelines established by a current management plan addressed in earlier NEPA analysis.

(8) *Approval of timber management access skid trail and logging road construction when consistent with policies and guidelines established by a current management plan addressed in earlier NEPA analysis.

(9) *Approval of prescribed burning plans of less than 2000 acres when in compliance

with policies and guidelines established by a current management plan addressed in earlier NEPA analysis.

(10) *Approval of forestation projects with native species and associated protection and site preparation activities on less than 2000 acres when consistent with policies and guidelines established by a current management plan addressed in earlier NEPA analysis.

(11) *Harvesting live trees not to exceed 70 acres, requiring no more than 0.5 mile of temporary road construction. Such activities:
- (a) Shall not include even-aged regeneration harvests or vegetation type conversions.
- (b) May include incidental removal of trees for landings, skid trails, and road clearing.
- (c) May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BIA or Tribal transportation systems and not necessary for long-term resource management. Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and
- (d) Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment by artificial or natural means, of vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area. Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract. Examples include, but are not limited to:
  - (i) Removing individual trees for sawlogs, specialty products, or fuelwood.
  - (ii) Commercial thinning of overstocked stands to achieve the desired stocking level to increase health and vigor.

(12) *Salvaging dead or dying trees not to exceed 250 acres, requiring no more than 0.5 mile of temporary road construction. Such activities:
- (a) May include incidental removal of live or dead trees for landings, skid trails, and road clearing.
- (b) May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BIA or Tribal transportation systems and not necessary for long-term resource management. Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and
- (c) Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment, by artificial or natural means, of vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area. Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination

of the contract.

(d) For this CE, a dying tree is defined as a standing tree that has been severely damaged by forces such as fire, wind, ice, insects, or disease, such that in the judgment of an experienced forest professional or someone technically trained for the work, the tree is likely to die within a few years.
Examples include, but are not limited to:
    (i) Harvesting a portion of a stand damaged by a wind or ice event.
    (ii) Harvesting fire damaged trees.

(13) *Commercial and non-commercial sanitation harvest of trees to control insects or disease not to exceed 250 acres, requiring no more than 0.5 miles of temporary road construction. Such activities:

(a) May include removal of infested/infected trees and adjacent live uninfested/uninfected trees as determined necessary to control the spread of insects or disease; and
(b) May include incidental removal of live or dead trees for landings, skid trails, and road clearing.
(c) May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BIA or tribal transportation systems and not necessary for long-term resource management. Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and
(d) Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment, by artificial or natural means, of vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area. Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract. Examples include, but are not limited to:
    (i) Felling and harvesting trees infested with mountain pine beetles and immediately adjacent uninfested trees to control expanding spot infestations (a buffer); and
    (ii) Removing or destroying trees infested or infected with a new exotic insect or disease, such as emerald ash borer, Asian longhorned beetle, or sudden oak death pathogen.

I. Land Conveyance and Other Transfers.

Approvals or grants of conveyances and other transfers of interests in land where no change in land use is planned.

J. Reservation Proclamations.

Lands established as or added to a reservation pursuant to 25U.S.C. 467, where no change in land use is planned.

K. Waste Management.

(1) *Closure operations for solid waste facilities when done in compliance with other federal laws and regulations and where cover material is taken from locations which have been approved for use by earlier NEPA analysis.

(2) *Activities involving remediation of hazardous waste sites if done in compliance with applicable federal laws such as the Resource Conservation and Recovery Act (P.L. 94-580), Comprehensive Environmental Response, Compensation, and Liability Act (P.L. 96-516) or Toxic Substances Control Act (P.L. 94-469).

L. Roads and Transportation.

(1) *Approval of utility installations along or across a transportation facility located in whole within the limits of the roadway right-of-way.

(2) *Construction of bicycle and pedestrian lanes and paths adjacent to existing highways and within the existing rights-of-way.

(3) *Activities included in a "highway safety plan" under 23 CFR 402.

(4) *Installation of fencing, signs, pavement markings, small passenger shelters, traffic signals, and railroad warning devices where no substantial land acquisition or traffic disruption will occur.

(5) Emergency repairs under 23 U.S.C. 125.

(6) *Acquisition of scenic easements.

(7) Alterations to facilities to make them accessible for the elderly or handicapped.

(8) Resurfacing a highway without adding to the existing width.

(9) *Rehabilitation, reconstruction or replacement of an existing bridge structure on essentially the same alignment or location (e.g., widening, adding shoulders or safety lanes, walkways, bikeways or guardrails).

(10) Approvals for changes in access control within existing rights-of-way.

(11) *Road construction within an existing right-of-way which has already been acquired for a HUD housing project and for which earlier NEPA analysis has already been prepared.

(12) *Oversight of a Tribe's Tribal Transportation Program (TTP) activities under 25 CFR Part 170, when the categorical exclusions under NEPA at 23 CFR 771.117 governing the use of funds made available through title 23 apply to qualifying TTP projects involving the construction or maintenance of roads. (25 CFR 170.453)

M. Other.

(1) *Data gathering activities such as inventories, soil and range surveys, timber cruising, geological, geophysical, archeological, paleontological and cadastral surveys.

(2) *Establishment of non-disturbance environmental quality monitoring programs and field monitoring stations including testing services.

(3) *Actions where BIA has concurrence or co-approval with another Bureau and the action is categorically excluded for that Bureau.

(4) *Approval of an Application for Permit to Drill for a new water source or observation/geotechnical monitoring well.

(5) *Approval of conversion of an abandoned oil well to a water well if water facilities are established only near the well site.[23]

(6) *Approval and issuance of permits under the Archaeological Resources Protection Act (16 U.S.C. 470aa-ll) when the permitted activity is being done as part of an action for which a NEPA analysis has been, or is being prepared.

(7) *Approval of leases, easements or funds for single-family homesites and associated improvements, including but not limited to, construction of homes, outbuildings, access roads, and utility lines, which encompass five acres or less of contiguous land, provided that such sites and associated improvements do not adversely affect any tribal cultural resources or historic properties and are in compliance with applicable federal and tribal laws. Home construction may include up to four dwelling units, whether in a single building or up to four separate buildings.

## Bureau of Land Management (BLM)

11.9 Categorical Exclusions. The following BLM actions are designated categorical exclusions unless one or more of the Department's extraordinary circumstances apply. As proposed actions are designed and then reviewed against the CE list, proposed actions or activities must be, at a minimum, consistent with DOI and BLM manuals, handbooks, policies, and applicable land use plans regarding design features, best management practices, terms and conditions, conditions of approval, and stipulations.

CEs established by statute, adopted under Section 109 or marked by an asterisk require documentation. For most other actions that are categorically excluded using administrative CEs, BLM recommends that the Responsible Official document which CX applies. Documentation would often not be necessary for:

[23] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

- Actions that have no environmental effect (e.g., personnel actions (43 CFR 46.210(a)), routine financial transactions (43 CFR 46.210(c)), mineral lease transfers (DOI NEPA Handbook, Appendix 2, 11.9 (B)(2)), or transfer of rights-of-way from one agency to another (DOI NEPA Handbook, Appendix 2, 11.9 (E)(10)); or

- Actions that have negligible environmental effect (e.g., nondestructive data collection (43 CFR 46.210(e)), installation of routine signs and markers (DOI NEPA Handbook, Appendix 2, 11.9 (G)(2)), placement of portable sanitation devices (DOI NEPA Handbook, Appendix 2, 11.9 (G)(4)), or installation of small monitoring devices (DOI NEPA Handbook, Appendix 2, 11.9 (K)(3)).

A. Fish and Wildlife.

(1) Modification of existing fences to provide improved wildlife ingress and egress.

(2) Minor modification of water developments to improve or facilitate wildlife use (e.g., modify enclosure fence, install flood valve, or reduce ramp access angle).

(3) Construction of perches, nesting platforms, islands, and similar structures for wildlife use.

(4) Temporary emergency feeding of wildlife during periods of extreme adverse weather conditions.

(5) Routine augmentations, such as fish stocking, providing no new species are introduced.

(6) Relocation of nuisance or depredating wildlife, providing the relocation does not introduce new species into the ecosystem.[24]

(7) Installation of devices on existing facilities to protect animal life, such as raptor electrocution prevention devices.

B. Oil, Gas, and Geothermal Energy.

(1) Issuance of future interest leases under the Mineral Leasing Act for Acquired Lands, where the subject lands are already in production.

(2) Approval of mineral lease adjustments and transfers, including assignments and subleases.

(3) Approval of unitization agreements, communitization agreements, drainage agreements, underground storage agreements, development contracts, or geothermal unit or participating area agreements.

---

[24] NPS adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 24644.

(4) Approval of suspensions of operations, force majeure suspensions, and suspensions of operations and production.

(5) Approval of royalty determinations, such as royalty rate reductions.

(6) Approval of Notices of Intent to conduct geophysical exploration of oil, gas, or geothermal, pursuant to 43 CFR 3150 or 3250, when no temporary or new road construction is proposed.

(7) *Approval of an operations plan and associated Geothermal Drilling Permits for a geothermal resource confirmation project pursuant to 43 CFR part 3200, subpart 3260; which:
(a) Does not include resource utilization;
(b) Does not exceed 20 acres of total (contiguous or noncontiguous) surface disturbance;
(c) Requires reclamation of all surface disturbances when their intended purpose has been fulfilled;
(d) Requires reclamation of temporary routes when their intended purpose(s) has been fulfilled, unless through a separate review and decision-making process the BLM incorporates and appropriately designates the route as part of its transportation system;
(e) Does not make a temporary route available for public use unless the temporary route is specifically intended to accommodate public use;
(f) Requires temporary routes to be constructed or used so as to allow for the reclamation, by artificial or natural means, of vegetative cover on the temporary route and areas where the vegetative cover was disturbed by the construction or use of the route, and requires such treatment to be designed to reestablish vegetative cover as soon as possible, but at most within 10 years after approved reclamation commences; and,
(g) Includes design elements to protect resources and resource uses consistent with the applicable Resource Management Plan, laws, regulations, and lease terms

(8) Approval of a Notice of Intent to Conduct Geothermal Resource Exploration Operations, pursuant to 43 CFR part 3200 subpart 3250, that:
(a) Does not include the direct testing of geothermal resources or resource utilization;
(b) Does not exceed 10 acres of total (contiguous or noncontiguous) surface disturbance;
(c) Requires reclamation of surface disturbances when their intended purpose has been fulfilled;
(d) Requires reclamation of temporary routes when their intended purpose(s) has been fulfilled, unless through a separate review and decision-making process the BLM incorporates and appropriately designates the route as part of its transportation system.
(e) Does not make a temporary route available for public use unless the temporary route is specifically intended to accommodate public use;
(f) Requires temporary routes to be constructed or used so as to allow for the reclamation, by artificial or natural means, of vegetative cover on the

temporary route and areas where the vegetative cover was disturbed by the construction or use of the route, and requires such treatment to be designed to reestablish vegetative cover as soon as possible, but at most within 10 years after approved reclamation commences; and,

(g) Includes design elements to protect resources and resource uses consistent with the applicable Resource Management Plan, laws, regulations, and any lease terms (as applicable).

C. Forestry.

(1) Land cultivation and silvicultural activities (excluding herbicide application) in forest tree nurseries, seed orchards, and progeny test sites.

(2) Sale and removal of individual trees or small groups of trees which are dead, diseased, injured, or which constitute a safety hazard, and where access for the removal requires no more than maintenance to existing roads.

(3) Seeding or reforestation of timber sales or burn areas where no chaining is done, no pesticides are used, and there is no conversion of timber type or conversion of non-forest to forest land. Specific reforestation activities covered include: seeding and seedling plantings, shading, tubing (browse protection), paper mulching, bud caps, ravel protection, application of non-toxic big game repellant, spot scalping, rodent trapping, fertilization of seed trees, fence construction around out-planting sites, and collection of pollen, scions and cones.

(4) Pre-commercial thinning and brush control using small mechanical devices.

(5) Disposal of small amounts of miscellaneous vegetation products outside established harvest areas, such as Christmas trees, wildings, floral products (ferns, boughs, etc.), cones, seeds, and personal use firewood.

(6) Felling, bucking, and scaling sample trees to ensure accuracy of timber cruises. Such activities:

(a) Shall be limited to an average of one tree per acre or less,
(b) Shall be limited to gas-powered chainsaws or hand tools,
(c) Shall not involve any road or trail construction,
(d) Shall not include the use of ground based equipment or other manner of timber yarding, and
(e) Shall be limited to the Coos Bay, Eugene, Medford, Roseburg, and Salem Districts and Lakeview District, Klamath Falls Resource Area in Oregon.

(7) Harvesting live trees not to exceed 70 acres, requiring no more than 0.5 mile of temporary road construction. Such activities:

(a) Shall not include even-aged regeneration harvests or vegetation type conversions.
(b) May include incidental removal of trees for landings, skid trails, and road clearing
(c) May include temporary roads which are defined as roads authorized by

contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management. Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and

(d) Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment by artificial or natural means, or vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area. Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract. Examples include, but are not limited to:
  (i) Removing individual trees for sawlogs, specialty products, or fuelwood.
  (ii) Commercial thinning of overstocked stands to achieve the desired stocking level to increase health and vigor.

(8) Salvaging dead or dying trees not to exceed 250 acres, requiring no more than 0.5 mile of temporary road construction. Such activities:
  (a) May include incidental removal of live or dead trees for landings, skid trails, and road clearing.
  (b) May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management. Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and
  (c) Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment, by artificial or natural means, of vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area. Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract.
  (d) For this CX, a dying tree is defined as a standing tree that has been severely damaged by forces such as fire, wind, ice, insects, or disease, and that in the judgment of an experienced forest professional or someone technically trained for the work, is likely to die within a few years. Examples include, but are not limited to:
    (i) Harvesting a portion of a stand damaged by a wind or ice
    (ii) Harvesting fire damaged trees.

(9) Commercial and non-commercial sanitation harvest of trees to control insects or disease not to exceed 250 acres, requiring no more than 0.5 miles of temporary road construction. Such activities:
  (a) May include removal of infested/infected trees and adjacent live uninfested/uninfected trees as determined necessary to control the spread of insects or disease; and

(b) May include incidental removal of live or dead trees for landings, skid trails, and road clearing.

(c) May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management. Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and

(d) Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment, by artificial or natural means, of vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area. Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract. Examples include, but are not limited to:

  (i) Felling and harvesting trees infested with mountain pine beetles and immediately adjacent uninfested trees to control expanding spot infestations; and

  (ii) Removing or destroying trees infested or infected with a new exotic insect or disease, such as emerald ash borer, Asian longhorned beetle, or sudden oak death pathogen.

D. <u>Rangeland Management</u>.

(1) Approval of transfers of grazing preference.

(2) Placement and use of temporary (not to exceed one month) portable corrals and water troughs, providing no new road construction is needed.

(3) Temporary emergency feeding of livestock or wild horses and burros during periods of extreme adverse weather conditions.

(4) Removal of wild horses or burros from private lands at the request of the landowner.

(5) Processing (transporting, sorting, providing veterinary care, vaccinating, testing for communicable diseases, training, gelding, marketing, maintaining, feeding, and trimming of hooves of) excess wild horses and burros.

(6) Approval of the adoption of healthy, excess wild horses and burros.

(7) Actions required to ensure compliance with the terms of Private Maintenance and Care agreements.

(8) Issuance of title to adopted wild horses and burros.

(9) Destroying old, sick, and lame wild horses and burros as an act of mercy.

E. Realty.

(1) Withdrawal extensions or modifications, which only establish a new time period and entail no changes in segregative effect or use.

(2) Withdrawal revocations, terminations, extensions, or modifications; and classification terminations or modifications which do not result in lands being opened or closed to the general land laws or to the mining or mineral leasing laws.

(3) Withdrawal revocations, terminations, extensions, or modifications; classification terminations or modifications; or opening actions where the land would be opened only to discretionary land laws and where subsequent discretionary actions (prior to implementation) are in conformance with and are covered by a Resource Management Plan/EIS (or plan amendment and EA or EIS).

(4) Administrative conveyances from the Federal Aviation Administration (FAA) to the State of Alaska to accommodate airports on lands appropriated by the FAA prior to the enactment of the Alaska Statehood Act.

(5) Actions taken in conveying mineral interest where there are no known mineral values in the land under Section 209(b) of the Federal Land Policy and Management Act of 1976 (FLPMA).

(6) Resolution of class one color-of-title cases.

(7) Issuance of recordable disclaimers of interest under Section 315 of FLPMA.

(8) Corrections of patents and other conveyance documents under Section 316 of FLPMA and other applicable statutes.

(9) Renewals and assignments of leases, permits, or rights-of-way where no additional rights are conveyed beyond those granted by the original authorizations.

(10) Transfer or conversion of leases, permits, or rights-of-way from one agency to another (e.g., conversion of Forest Service permits to a BLM Title V Right-of-way).

(11) Conversion of existing right-of-way grants to Title V grants or existing leases to FLPMA Section 302(b) leases where no new facilities or other changes are needed.

(12) Grants of right-of-way wholly within the boundaries of other compatibly developed rights-of-way.[25]

(13) Amendments to existing rights-of-way, such as the upgrading of existing facilities, which entail no additional disturbances outside the right-of-way boundary.

(14) Grants of rights-of-way for an overhead line (no pole or tower on BLM land)

[25] NPS adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 24644.

crossing over a corner of public land.

(15) Transfers of land or interest in land to or from other bureaus or federal agencies where current management will continue and future changes in management will be subject to the NEPA process.

(16) Acquisition of easements for an existing road or issuance of leases, permits, or rights-of-way for the use of existing facilities, improvements, or sites for the same or similar purposes.

(17) Grant of a short rights-of-way for utility service or terminal access roads to an individual residence, outbuilding, or water well.

(18) Temporary placement of a pipeline above ground.

(19) Issuance of short-term (3 years or less) rights-of-way or land use authorizations for such uses as storage sites, apiary sites, and construction sites where the proposal includes rehabilitation to restore the land to its natural or original condition.

(20) One-time issuance of short-term (3 years or less) rights-of-way or land use authorizations which authorize trespass action where no new use or construction is allowed, and where the proposal includes rehabilitation to restore the land to its natural or original condition.

F. Solid Minerals.

(1) Issuance of future interest leases under the Mineral Leasing Act for Acquired Lands where the subject lands are already in production.

(2) Approval of mineral lease readjustments, renewals, and transfers including assignments and subleases.

(3) Approval of suspensions of operations, force majeure suspensions, and suspensions of operations and production.

(4) Approval of royalty determinations, such as royalty rate reductions and operations reporting procedures.

(5) Determination and designation of logical mining units.

(6) Findings of completeness furnished to the Office of Surface Mining Reclamation and Enforcement for Resource Recovery and Protection Plans.

(7) Approval of minor modifications to or minor variances from activities described in an approved exploration plan for leasable, salable, and locatable minerals (e.g., the approved plan identifies no new surface disturbance outside the areas already identified to be disturbed).

(8) Approval of minor modifications to or minor variances from activities described in an approved underground or surface mine plan for leasable minerals (e.g., change in mining sequence or timing).

(9) Digging of exploratory trenches for mineral materials, except in riparian areas.

(10) Disposal of mineral materials, such as sand, stone, gravel, pumice, pumicite, cinders, and clay, in amounts not exceeding 50,000 cubic yards or disturbing more than 5 acres, except in riparian areas.

G. Transportation.

(1) Incorporation of eligible roads and trails in any transportation plan when no new construction or upgrading is needed.

(2) Installation of routine signs, markers, culverts, ditches, waterbars, gates, or cattleguards on/or adjacent to roads and trails identified in any land use or transportation plan, or eligible for incorporation in such plan.

(3) Temporary closure of roads and trails.

(4) Placement of recreational, special designation, or information signs, visitor registers, kiosks, and portable sanitation devices.

H. Recreation Management. Issuance of Special Recreation Permits for day use or overnight use up to 14 consecutive nights; that impacts no more than 3 staging area acres; and/or for recreational travel along roads, trails, or in areas authorized in a land use plan. This CX cannot be used for commercial boating permits along Wild and Scenic Rivers. This CX cannot be used for the establishment or issuance of Special Recreation Permits for "Special Area" management (43 CFR 2932.5).

I. Emergency Stabilization.

(1) Planned actions in response to wildfires, floods, weather events, earthquakes, or landslips that threaten public health or safety, property, and/or natural and cultural resources, and that are necessary to repair or improve lands unlikely to recover to a management-approved condition as a result of the event. Such activities shall be limited to: repair and installation of essential erosion control structures; replacement or repair of existing culverts, roads, trails, fences, and minor facilities; construction of protection fences; planting, seeding, and mulching; and removal of hazard trees, rocks, soil, and other mobile debris from, on, or along roads, trails, campgrounds, and watercourses. These activities:
(a) Shall be completed within one year following the event;
(b) Shall not include the use of herbicides or pesticides;
(c) Shall not include the construction of new roads or other new permanent infrastructure;
(d) Shall not exceed 4,200 acres; and
(e) May include temporary roads which are defined as roads authorized by

contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management. Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and

(f) Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment by artificial or natural means, or vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area. Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract. [26]

J. Habitat Restoration

Reserved.

K. Other.

(1) Reserved.

(2) Acquisition of existing water developments (e.g., wells and springs) on public land.

(3) Conducting preliminary hazardous materials assessments and site investigations, site characterization studies and environmental monitoring. Included are siting, construction, installation and/or operation of small monitoring devices such as wells, particulate dust counters and automatic air or water samples.

(4) Use of small sites for temporary field work camps where the sites will be restored to their natural or original condition within the same work season.

(5) Reserved.

(6) A single trip in a one month period for data collection or observation sites.

(7) Construction of snow fences for safety purposes or to accumulate snow for small water facilities.

(8) Installation of minor devices to protect human life (e.g., grates across mines).

(9) Construction of small protective enclosures, including those to protect reservoirs and springs and those to protect small study areas.

(10) Removal of structures and materials of no historical value, such as abandoned automobiles, fences, and buildings, including those built in trespass and reclamation

[26] NPS adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 24644.

of the site when little or no surface disturbance is involved.

(11) Actions where the BLM has concurrence or co-approval with another DOI agency and the action is categorically excluded for that DOI agency.

(12) Rendering formal classification of lands as to their mineral character, waterpower, and water storage values.

11.10 <u>Categorical Exclusions Established or Directed by Statute</u>

A. The Energy Policy Act of 2005 (Public Law 109-58) (42 USC 15942) established actions for categorical exclusion from NEPA analysis. Use of Energy Policy Act categorical exclusions does not require review for extraordinary circumstances. This is because these CXs are established by statute, and their application is governed by that statute. Section 390 of the Energy Policy Act of 2005 provides:

(a) NEPA Review.—Action by the Secretary of the Interior in managing the public lands, with respect to any of the activities described in subsection (b), shall be subject to a rebuttable presumption that the use of a categorical exclusion under the National Environmental Policy Act (NEPA) of 1969 would apply if the activity is conducted pursuant to the Mineral Leasing Act for the purpose of exploration or development of oil or gas.

(1) Activities Described.—The activities referred to in subsection (a) are the following: Individual surface disturbances of less than 5 acres so long as the total surface disturbance on the lease is not greater than 150 acres and site- specific analysis in a document prepared pursuant to NEPA has been previously completed.

(2) Drilling an oil or gas well at a location or well pad site at which drilling has occurred previously within 5 years prior to the date of spudding the well.

(3) Drilling an oil or gas well within a developed field for which an approved land use plan or any environmental document prepared pursuant to NEPA analyzed such drilling as a reasonably foreseeable activity, so long as such plan or document was approved within 5 years prior to the date of spudding the well.

(4) Placement of a pipeline in an approved right-of-way corridor, so long as the corridor was approved within 5 years prior to the date of placement of the pipeline.

(5) Maintenance of a minor activity, other than any construction or major renovation of a building or facility.

B. Section 3023 "Grazing Permits and Leases" of Public Law 113-291, The Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act for Fiscal Year 2015, amended Section 402 of FLPMA. The amended text is now included in FLPMA, as amended, as Section 402(h). Therefore, the BLM may use the grazing permit categorical exclusion (1) or the trailing and crossing categorical exclusion (2). Application of either categorical exclusion requires extraordinary circumstances review. Section 402(h) of FLPMA provides:

(1) IN GENERAL.—The issuance of a grazing permit or lease by the Secretary

concerned may be categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) if—

(A) the issued permit or lease continues the current grazing management of the allotment; and

(B) the Secretary concerned—

(i) has assessed and evaluated the grazing allotment associated with the lease or permit; and

(ii) based on the assessment and evaluation under clause (i), has determined that the allotment—

(I) with respect to public land administered by the Secretary of the Interior—

(aa) is meeting land health standards; or

(bb) is not meeting land health standards due to factors other than existing livestock grazing; or

(2) TRAILING AND CROSSING.—The trailing and crossing of livestock across public land and the implementation of trailing and crossing practices by the Secretary concerned may be categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.)

C. The Agriculture Improvement Act of 2018 (P.L. 115-334) amended Title VI of the Healthy Forests Restoration Act of 2003 (HFRA) (16 U.S.C. 6591 et seq.) to add Section 606. Section 606 directed development of a categorical exclusion for covered vegetation management activities carried out to protect, restore, or improve habitat for greater sage-grouse or mule deer (HFRA, Section 606(b)(1)). This categorical exclusion may be used to carry out a "covered vegetation management activity" (defined at HFRA, Section 606(a)(1)(B)) whose purpose is for the management of greater sage-grouse and mule deer habitat on public lands that was designated under HFRA section 602(b), on December 20, 2018 (HFRA, Section 606(g)(2)). Application of this categorical exclusion requires extraordinary circumstances review. Section 606 of HFRA provides:

(a) Definitions.—In this section:

(1) COVERED VEGETATION MANAGEMENT ACTIVITY.—

(A) IN GENERAL.—The term 'covered vegetation management activity' means any activity described in subparagraph (B) that—

(i) (II) is carried out on public land administered by the Bureau of Land Management;

(ii) with respect to public land, meets the objectives of the order of the Secretary of the Interior numbered 3336 and dated January 5, 2015;

(iii) conforms to an applicable land use plan;

(iv) protects, restores, or improves greater sage-grouse or mule deer habitat in a sagebrush steppe ecosystem as described in—

(I) Circular 1416 of the United States Geological Survey entitled 'Restoration Handbook for Sagebrush Steppe Ecosystems with Emphasis on Greater Sage-Grouse Habitat—Part 1. Concepts for

Understanding and Applying Restoration' (2015); or

(II) the habitat guidelines for mule deer published by the Mule Deer Working Group of the Western Association of Fish and Wildlife Agencies;

(v) will not permanently impair—

(I) the natural state of the treated area;

(II) outstanding opportunities for solitude;

(III) outstanding opportunities for primitive, unconfined recreation;

(IV) economic opportunities consistent with multiple-use management; or

(V) the identified values of a unit of the National Landscape Conservation System;

(vi)

(I) restores native vegetation following a natural disturbance;

(II) prevents the expansion into greater sage-grouse or mule deer habitat of—

(aa) juniper, pinyon pine, or other associated conifers; or

(bb) nonnative or invasive vegetation;

(III) reduces the risk of loss of greater sage-grouse or mule deer habitat from wildfire or any other natural disturbance; or

(IV) provides emergency stabilization of soil resources after a natural disturbance; and

(vii) provides for the conduct of restoration treatments that—

(I) maximize the retention of old-growth and large trees, as appropriate for the forest type;

(II) consider the best available scientific information to maintain or restore the ecological integrity, including maintaining or restoring structure, function, composition, and connectivity;

(III) are developed and implemented through a collaborative process that—

(aa) includes multiple interested persons representing diverse interests; and

(bb)

(AA) is transparent and nonexclusive; or

(BB) meets the requirements for a resource advisory committee under subsections (c) through (f) of section 205 of the Secure Rural Schools and Community Self-Determination Act of 2000 (16 U.S.C. 7125); and

(IV) may include the implementation of a proposal that complies with the eligibility requirements of the

Collaborative Forest Landscape Restoration Program under section 4003(b) of the Omnibus Public Land Management Act of 2009 (16 U.S.C. 7303(b)).

(B) DESCRIPTION OF ACTIVITIES.—An activity referred to in subparagraph (A) is—

(i) manual cutting and removal of juniper trees, pinyon pine trees, other associated conifers, or other nonnative or invasive vegetation;

(ii) mechanical mastication, cutting, or mowing, mechanical piling and burning, chaining, broadcast burning, or yarding;

(iii) removal of cheat grass, medusa head rye, or other nonnative, invasive vegetation;

(iv) collection and seeding or planting of native vegetation using a manual, mechanical, or aerial method;

(v) seeding of nonnative, noninvasive, ruderal vegetation only for the purpose of emergency stabilization;

(vi) targeted use of an herbicide, subject to the condition that the use shall be in accordance with applicable legal requirements, Federal agency procedures, and land use plans;

(vii) targeted livestock grazing to mitigate hazardous fuels and control noxious and invasive weeds;

(viii) temporary removal of wild horses or burros in the area in which the activity is being carried out to ensure treatment objectives are met;

(ix) in coordination with the affected permit holder, modification or adjustment of permissible usage under an annual plan of use of a grazing permit issued by the Secretary concerned to achieve restoration treatment objectives;

(x) installation of new, or modification of existing, fencing or water sources intended to control use or improve wildlife habitat; or

(xi) necessary maintenance of, repairs to, rehabilitation of, or reconstruction of an existing permanent road or construction of temporary roads to accomplish the activities described in this subparagraph.

(C) EXCLUSIONS.—The term 'covered vegetation management activity' does not include—

(i) any activity conducted in a wilderness area or wilderness study area;

(ii) any activity for the construction of a permanent road or permanent trail;

(iii) any activity conducted on Federal land on which, by Act of Congress or Presidential proclamation, the removal of vegetation is restricted or prohibited;

(iv) any activity conducted in an area in which activities under

subparagraph (B) would be inconsistent with the applicable resource management plan; or.

(2) SECRETARY CONCERNED.—The term 'Secretary concerned' means—

(B) the Secretary of the Interior, with respect to public land.

(3) TEMPORARY ROAD.—The term 'temporary road' means a road that is—

(A) authorized—

(i) by a contract, permit, lease, other written authorization; or

(ii) pursuant to an emergency operation;

(B) not intended to be part of the permanent transportation system of a Federal department or agency;

(C) not necessary for long-term resource management;

(D) designed in accordance with standards appropriate for the intended use of the road, taking into consideration—

(i) safety;

(ii) the cost of transportation; and

(iii) impacts to land and resources; and

(E) managed to minimize—

(i) erosion; and

(ii) the introduction or spread of invasive species.

(b) Categorical Exclusion.—

(1) IN GENERAL.—Not later than 1 year after the date of enactment of this section, the Secretary concerned shall develop a categorical exclusion (as defined in section 1508.4 of title 40, Code of Federal Regulations (or a successor regulation)) for covered vegetation management activities carried out to protect, restore, or improve habitat for greater sage-grouse or mule deer.

(2) ADMINISTRATION.—In developing and administering the categorical exclusion under paragraph (1), the Secretary concerned shall—

(A) comply with the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.);

(C) with respect to public land, apply the extraordinary circumstances procedures under section 46.215 of title 43, Code of Federal Regulations (or successor regulations), in determining whether to use the categorical exclusion; and

(D) consider—

(i) the relative efficacy of landscape-scale habitat projects;

(ii) the likelihood of continued declines in the populations of greater sage-grouse and mule deer in the absence of landscape-scale vegetation management; and

(iii) the need for habitat restoration activities after wildfire or other natural disturbances.

(c) Implementation Of Covered Vegetative Management Activities Within The Range Of Greater Sage-Grouse And Mule Deer.—If the categorical exclusion developed under subsection (b) is used to implement a covered vegetative management activity in an area within the range of both greater sage-grouse and mule deer, the covered vegetative management activity shall protect, restore, or

improve habitat concurrently for both greater sage-grouse and mule deer.

(d) Long-Term Monitoring And Maintenance.—Before commencing any covered vegetation management activity that is covered by the categorical exclusion under subsection (b), the Secretary concerned shall develop a long-term monitoring and maintenance plan, covering at least the 20-year period beginning on the date of commencement, to ensure that management of the treated area does not degrade the habitat gains secured by the covered vegetation management activity.

(e) Disposal Of Vegetative Material.—Subject to applicable local restrictions, any vegetative material resulting from a covered vegetation management activity that is covered by the categorical exclusion under subsection (b) may be—

- (1) used for—
  - (A) fuel wood; or
  - (B) other products; or
- (2) piled or burned, or both.

(f) Treatment For Temporary Roads.—

- (1) IN GENERAL.—Notwithstanding subsection (a)(1)(B)(xi), any temporary road constructed in carrying out a covered vegetation management activity that is covered by the categorical exclusion under subsection (b)—
  - (A) shall be used by the Secretary concerned for the covered vegetation management activity for not more than 2 years; and
  - (B) shall be decommissioned by the Secretary concerned not later than 3 years after the earlier of the date on which—
    - (i) the temporary road is no longer needed; and
    - (ii) the project is completed.
- (2) REQUIREMENT.—A treatment under paragraph (1) shall include reestablishing native vegetative cover—
  - (A) as soon as practicable; but
  - (B) not later than 10 years after the date of completion of the applicable covered vegetation management activity.

(g) Limitations.—

- (1) PROJECT SIZE.—A covered vegetation management activity that is covered by the categorical exclusion under subsection (b) may not exceed 4,500 acres.

D. Section 11318 of the Infrastructure Investment and Jobs Act (Pub. L. 117-58) established a CE for sundry notices or rights-of-way for gathering lines and associated field compression or pumping units on Federal land servicing oil and gas wells under the conditions described below.

Section 11318. CERTAIN GATHERING LINES LOCATED ON FEDERAL LAND AND INDIAN LAND of the Infrastructure Investment and Jobs Act provides:

(a) Definitions.--In this section:

- (1) Federal land.-
  - (A) In general.--The term ``Federal land'' means land the title to which is held by the United States.
  - (B) Exclusions.--The term ``Federal land'' does not include—
    - (i) a unit of the National Park System;

(ii) a unit of the National Wildlife Refuge System;
(iii) a component of the National Wilderness Preservation System;
(iv) a wilderness study area within the National Forest System; or
(v) Indian land

(2) Gathering line and associated field compression or pumping unit.

(A) In general.--The term ``gathering line and associated field compression or pumping unit'' means—

(i) a pipeline that is installed to transport oil, natural gas and related constituents, or produced water from 1 or more wells drilled and completed to produce oil or gas; and
(ii) if necessary, 1 or more compressors or pumps to raise the pressure of the transported oil, natural gas and related constituents, or produced water to higher pressures necessary to enable the oil, natural gas and related constituents, or produced water to flow into pipelines and other facilities.

(B) Inclusions.--The term ``gathering line and associated field compression or pumping unit'' includes a pipeline or associated compression or pumping unit that is installed to transport oil or natural gas from a processing plant to a common carrier pipeline or facility.

(C) Exclusions.--The term ``gathering line and associated field compression or pumping unit'' does not include a common carrier pipeline.

(3) Indian land.--The term ``Indian land'' means land the title to which is held by—

(A) the United States in trust for an Indian Tribe or an individual Indian; or
(B) an Indian Tribe or an individual Indian subject to a restriction by the United States against alienation.

(4) Produced water.--The term ``produced water'' means water produced from an oil or gas well bore that is not a fluid prepared at, or transported to, the well site to resolve a specific oil or gas well bore or reservoir condition.

(5) Secretary.--The term ``Secretary'' means the Secretary of the Interior.

(b) Certain Gathering Lines.—

(1) In general.--Subject to paragraph (2), the issuance of a sundry notice or right-of-way for a gathering line and associated field compression or pumping unit that is located on Federal land or Indian land and that services any oil or gas well may be considered by the Secretary to be an action that is categorically excluded (as defined in section 1508.1 of title 40, Code of Federal Regulations (as in effect on the date of enactment of this Act)) for purposes of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) if the gathering line and associated field compression or pumping unit—

i) are within a field or unit for which an approved land use plan or an environmental document prepared pursuant to the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) analyzed transportation of oil, natural gas, or produced water from 1 or more oil or gas wells in the field or unit as a reasonably foreseeable activity;

ii) are located adjacent to or within—

(1)any existing disturbed area; or

(2)an existing corridor for a right-of-way; and

iii) would reduce—

(1)in the case of a gathering line and associated field compression or pumping unit transporting methane, the total quantity of methane that would otherwise be vented, flared, or unintentionally emitted from the field or unit; or

(2) in the case of a gathering line and associated field compression or pumping unit not transporting methane, the vehicular traffic that would otherwise service the field or unit.

b) Applicability.--Paragraph (1) shall apply to Indian land, or a portion of Indian land—

i) to which the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) applies; and

ii) for which the Indian Tribe with jurisdiction over the Indian land submits to the Secretary a written request that paragraph (1) apply to that Indian land (or portion of Indian land).

2) Effect on Other Law.--Nothing in this section—

a) affects or alters any requirement—

i) relating to prior consent under—

(1)section 2 of the Act of February 5, 1948 (62 Stat.18, chapter 45; 25 U.S.C. 324); or

(2) section 16(e) of the Act of June 18, 1934 (48 Stat. 987, chapter 576; 102 Stat. 2939; 114 Stat. 47; 25 U.S.C. 5123(e)) (commonly known as the ``Indian Reorganization Act");

ii) under section 306108 of title 54, United States Code; or

iii) under any other Federal law (including regulations) relating to Tribal consent for rights-of-way across Indian land; or

b) makes the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) applicable to land to which that Act otherwise would not apply.

E. Section 40806 of the Infrastructure Investment and Jobs Act (Pub. L. 117-58) excludes forest management activities for the establishment of fuel breaks in forests and other wildland vegetation from preparation of an EA or EIS under NEPA, as described below.

Section 40806. ESTABLISHMENT OF FUEL BREAKS IN FORESTS AND OTHER WILDLAND VEGETATION of the Infrastructure Investment and Jobs Act provides:

(a) DEFINITION OF SECRETARY CONCERNED.—In this section, the term ''Secretary concerned'' means—

(1) the Secretary of Agriculture, with respect to National Forest System land; and

(2) the Secretary of the Interior, with respect to public lands (as defined in section 103 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1702)) administered by the Bureau of Land Management.

(b) CATEGORICAL EXCLUSION ESTABLISHED.—Forest management activities described in subsection (c) are a category of actions designated as being categorically excluded from the preparation of an environmental assessment or an environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) if the categorical exclusion is documented through a supporting record and decision memorandum.

(c) FOREST MANAGEMENT ACTIVITIES DESIGNATED FOR CATEGORICAL EXCLUSION.—

(1) IN GENERAL.—The category of forest management activities designated under subsection (b) for a categorical exclusion are forest management activities described in paragraph (2) that are carried out by the Secretary concerned on public lands (as defined in section 103 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1702)) administered by the Bureau of Land Management or National Forest System land the primary purpose of which is to establish and maintain linear fuel breaks that are—

(A) up to 1,000 feet in width contiguous with or incorporating existing linear features, such as roads, water infrastructure, transmission and distribution lines, and pipelines of any length on Federal land; and

(B) intended to reduce the risk of uncharacteristic wildfire on Federal land or catastrophic wildfire for an adjacent at-risk community.

(2) ACTIVITIES.—Subject to paragraph (3), the forest management activities that may be carried out pursuant to the categorical exclusion established under subsection (b) are—

(A) mowing or masticating;

(B) thinning by manual and mechanical cutting;

(C) piling, yarding, and removal of slash or hazardous fuels;

(D) selling of vegetation products, including timber, firewood, biomass, slash, and fenceposts;

(E) targeted grazing;

(F) application of—

(i) pesticide;

(ii) biopesticide; or

(iii) herbicide;

(G) seeding of native species;

(H) controlled burns and broadcast burning; and

(I) burning of piles, including jackpot piles.

(3) EXCLUDED ACTIVITIES.—A forest management activity described in paragraph (2) may not be carried out pursuant to the categorical exclusion established under subsection (b) if the activity is conducted—

(A) in a component of the National Wilderness Preservation System;

(B) on Federal land on which the removal of vegetation is prohibited or restricted by Act of Congress, Presidential proclamation (including the applicable implementation plan), or regulation;

(C) in a wilderness study area; or

(D) in an area in which carrying out the activity would be inconsistent with the applicable land management plan or resource management plan.

(4) EXTRAORDINARY CIRCUMSTANCES.—The Secretary concerned shall apply the extraordinary circumstances procedures under section 220.6 of title 36, Code of Federal Regulations (or a successor regulation), in determining whether to use a categorical exclusion under subsection (b).

(d) ACREAGE AND LOCATION LIMITATIONS.—Treatments of vegetation in linear fuel breaks covered by the categorical exclusion established under subsection (b)—

(1) may not contain treatment units in excess of 3,000 acres;

(2) shall be located primarily in—

(A) the wildland-urban interface or a public drinking water source area;

(B) if located outside the wildland-urban interface or a public drinking water source area, an area within Condition Class 2 or 3 in Fire Regime Group I, II, or III that contains very high wildfire hazard potential; or

(C) an insect or disease area designated by the Secretary concerned as of the date of enactment of this Act; and

(3) shall consider the best available scientific information.

(e) ROADS.—

(1) PERMANENT ROADS.—A project under this section shall not include the establishment of permanent roads.

(2) EXISTING ROADS.—The Secretary concerned may carry out necessary maintenance and repairs on existing permanent roads for the purposes of this section.

(3) TEMPORARY ROADS.—The Secretary concerned shall decommission any temporary road constructed under a project under this section not later than 3 years after the date on which the project is completed.

(f) PUBLIC COLLABORATION.—To encourage meaningful public participation during the preparation of a project under this section, the Secretary concerned shall facilitate, during the preparation of each project—

(1) collaboration among State and local governments and Indian Tribes; and

(2) participation of interested persons.

# National Park Service (NPS)

12.5 Categorical Exclusions. The following NPS actions are designated categorical exclusions unless the action qualifies as an exception under an extraordinary circumstance.

A. Actions Related to General Administration.

(1) *Changes or amendments to an approved action when such changes would cause no or only minimal environmental impact.[27]

(2) Land and boundary surveys,

(3) *Minor boundary changes,

(4) *Reissuance/renewal of permits, rights-of-way or easements not involving new environmental impacts,

(5) *Conversion of existing permits to rights-of-way, when such conversions do not continue or initiate unsatisfactory environmental conditions,

(6) *Issuances, extensions, renewals, reissuances or minor modifications of concession contracts or permits not entailing new construction,[28]

(7) *Commercial use licenses involving no construction,

(8) *Leasing of historic properties in accordance with 36 CFR Part 18 and NPS-38,

(9) Preparation and issuance of publications,

(10) *Modifications or revisions to existing regulations, or the promulgation of new regulations for NPS-administered areas, provided the modifications, revisions or new regulations do not:
   (a) Increase public use to the extent of compromising the nature and character of the area or causing physical damage to it,
   (b) Introduce noncompatible uses which might compromise the nature and characteristics of the area, or cause physical damage to it,
   (c) Conflict with adjacent ownerships or land uses, or
   (d) Cause a nuisance to adjacent owners or occupants.

(11) *At the direction of the NPS responsible official, actions where NPS has concurrence or coapproval with another bureau and the action is a categorical exclusion for that bureau.

[27] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.
[28] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

B. Plans, Studies and Reports.

(1) *Changes or amendments to an approved plan, when such changes would cause no or only minimal environmental impact.[29]

(2) *Cultural resources maintenance guides, collection management plans and historic furnishings reports.

(3) *Interpretive plans (interpretive prospectuses, audio-visual plans, museum exhibit plans, wayside exhibit plans).

(4) Plans, including priorities, justifications and strategies, for non-manipulative research, monitoring, inventorying and information gathering.

(5) Statements for management, outlines of planning requirements and task directives for plans and studies.

(6) Technical assistance to other Federal, State and local agencies or the general public.

(7) Routine reports required by law or regulation.

(8) Authorization, funding or approval for the preparation of Statewide Comprehensive Outdoor Recreation Plans.

(9) Adoption or approval of surveys, studies, reports, plans and similar documents which will result in recommendations or proposed actions which would cause no or only minimal environmental impact.

(10) Preparation of internal reports, plans, studies and other documents containing recommendations for action which NPS develops preliminary to the process of preparing a specific Service proposal or set of alternatives for decision.

(11) *Land protection plans which propose no significant change to existing land or visitor use.

(12) Documents which interpret existing mineral management regulations and policies, and do not recommend action.

C. Actions Related to Development.

(1) *Land acquisition within established park boundaries.

(2) *Land exchanges which will not lead to significant changes in the use of land.

(3) *Routine maintenance and repairs to non-historic structures, facilities, utilities, grounds and trails.

[29] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

(4) *Routine maintenance and repairs to cultural resource sites, structures, utilities and grounds under an approved Historic Structures Preservation Guide or Cyclic Maintenance Guide; or if the action would not adversely affect the cultural resource.[30]

(5) *Installation of signs, displays, kiosks, etc.

(6) *Installation of navigation aids.[31]

(7) *Establishment of mass transit systems not involving construction, experimental testing of mass transit systems, and changes in operation of existing systems (e.g., routes and schedule changes).

(8) *Replacement in kind of minor structures and facilities with little or no change in location, capacity or appearance.

(9) *Repair, resurfacing, striping, installation of traffic control devices, repair/replacement of guardrails, etc., on existing roads.

(10) Sanitary facilities operation.

(11) *Installation of wells, comfort stations and pit toilets in areas of existing use and in developed areas.

(12) *Minor trail relocation, development of compatible trail networks on logging roads or other established routes, and trail maintenance and repair.

(13) *Upgrading or adding new overhead utility facilities to existing poles, or replacement poles which do not change existing pole line configurations.

(14) *Issuance of rights-of-way for overhead utility lines to an individual building or well from an existing line where installation will not result in significant visual intrusion and will involve no clearance of vegetation other than for placement of poles.

(15) *Issuance of rights-of-way for minor overhead utility lines not involving placement of poles or towers and not involving vegetation management or significant visual intrusion in an NPS-administered area.

(16) *Installation of underground utilities in previously disturbed areas having stable soils, or in an existing utility right-of-way.

(17) *Construction of minor structures, including small improved parking lots,

[30] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.
[31] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

in previously disturbed or developed areas.[32]

(18) *Construction or rehabilitation in previously disturbed or developed areas, required to meet health or safety regulations, or to meet requirements for making facilities accessible to the handicapped.

(19) *Landscaping and landscape maintenance in previously disturbed or developed areas.

(20) *Construction of fencing enclosures or boundary fencing posing no effect on wildlife migrations.

D. Actions Related to Visitor Use.

(1) *Carrying capacity analysis.

(2) *Minor changes in amounts or types of visitor use for the purpose of ensuring visitor safety or resource protection in accordance with existing regulations.[33]

(3) Changes in interpretive and environmental education programs.

(4) *Minor changes in programs and regulations pertaining to visitor activities.[34]

(5) *Issuance of permits for demonstrations, gathering, ceremonies, concerts, arts and crafts shows, etc., entailing only short-term or readily mitigable environmental disturbance.[35]

(6) *Designation of trail side camping zones with no or minimal improvements.

E. Actions Related to Resource Management and Protection.

(1) *Archeological surveys and permits involving only surface collection or small-scale test excavations.

(2) Day-to-day resource management and research activities.

(3) *Designation of environmental study areas and research natural areas.

(4) Stabilization by planting native plant species in disturbed areas.

(5) Issuance of individual hunting and/or fishing licenses in accordance with State and Federal regulations.

---

[32] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 3908.
[33] BLM adopted this CE prior to the DOI NEPA Procedures. *See* 90 FR 42432.
[34] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.
[35] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

(6) *Restoration of noncontroversial native species into suitable habitats within their historic range and elimination of exotic species.[36] (

(7) *Removal of park resident individuals of non-threatened/endangered species which pose a danger to visitors, threaten park resources or become a nuisance in areas surrounding a park, when such removal is included in an approved resource management plan.

(8) *Removal of non-historic materials and structures in order to restore natural conditions.

(9) Development of standards for, and identification, nomination, certification and determination of eligibility of properties for listing in the National Register of Historic Places and the National Historic Landmark and National Natural Landmark Programs.

F. Actions Related to Grant Programs.

(1) *Proposed actions essentially the same as those listed in paragraphs A-E above.

(2) *Grants for acquisition of areas which will continue in the same or lower density use with no additional disturbance to the natural setting.

(3) *Grants for replacement or renovation of facilities at their same location without altering the kind and amount of recreational, historical or cultural resources of the area; or the integrity of the existing setting.

(4) *Grants for construction of facilities on lands acquired under a previous NPS or other Federal grant provided that the development is in accord with plans submitted with the acquisition grant.

(5) *Grants for the construction of new facilities within an existing park or recreation area, provided that the facilities will not:
(a) Conflict with adjacent ownerships or land use, or cause a nuisance to adjacent owners or occupants; e.g., extend use beyond daylight hours;
(b) Introduce motorized recreation vehicles;
(c) Introduce active recreation pursuits into a passive recreation area;
(d) Increase public use or introduce noncompatible uses to the extent of compromising the nature and character of the property or causing physical damage to it; or
(e) Add or alter access to the park from the surrounding area.

(6) *Grants for the restoration, rehabilitation, stabilization, preservation and reconstruction (or the authorization thereof) of properties listed on or eligible for listing on the National Register of Historic Places at their same location and provided that such actions:

[36] BIA, BLM, BOR, FWS, OSMRE, USGS, and Office of Insular Affairs adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 89 FR 101040.

(a) Will not alter the integrity of the property or its setting;

(b) Will not increase public use of the area to the extent of compromising the nature and character of the property; and

(c) Will not cause a nuisance to adjacent property owners or occupants.

## Office of Surface Mining Reclamation and Enforcement (OSMRE)

13.5 Categorical Exclusions.

A. The following OSM actions are deemed not to be major Federal actions within the meaning of Section 102(2)(C) of NEPA under Sections 501(a) or 702(d) of the SMCRA:

(1) Promulgation of interim regulations.

(2) Approval of State programs.

(3) Promulgation of Federal programs where a State fails to submit, implement, enforce, or maintain an acceptable State program.

(4) Promulgation and implementation of the Federal lands program.

B. The following OSM actions (SMCRA sections are in parentheses) are designated categorical exclusions:

(1) Monetary allotments to States for mining and mineral resources institutes (301).

(2) Allocation of research funds to institutes (302).

(3) Any research effort associated with ongoing abandoned mine land reclamation projects where the research is coincidental to the reclamation (401(c)(6)).

(4) Collection of reclamation fees from operators (402(a)).

(5) Findings of fact and entries on land adversely affected by past coal mining (407(a)).

(6) Acquisition of particular parcels of abandoned mine lands for reclamation (407(c)).

(7) Filing liens against property adversely affected by past coal mining (408).

(8) Interim regulatory grants (502(e)(4)).

(9) Disapproval of a proposed State program (503(c)).

(10) Review of permits issued under a previously approved State program (504(d)).

(11) Five-year permit renewal on life-of-mine plans under the Federal lands program or the Federal program for a State where the environmental impacts of continued mining are adequately analyzed in a previous environmental document for the mining operation (506(d)).

(12) Small operator assistance program (507(c)).

(13) Issuance of public notices and holding public hearings on permit applications involving Federal lands or under a Federal program for a State (513).

(14) Routine inspection and enforcement activities (517).

(15) Conflict of interest regulations (517(g)).

(16) Assessment of civil penalties (518).

(17) Releases of performance bonds or deposits for mining on Federal lands or under a Federal program for a State (519).

(18) Issuance of cessation orders for coal mining and reclamation operations (521(a)(2) and (3)).

(19) Suspension or revocation of permits (521(a)(4)).

(20) Federal oversight and enforcement of ineffective State programs (521(b)).

(21) Cooperative agreements between a state and the Secretary to provide for State regulation of surface coal mining and reclamation operations on Federal lands (523(c)).

(22) Development of a program to assure that, with respect to the granting of permits, leases, or contracts for Federally-owned coal, no one shall be unreasonably denied purchase of the mined coal (523(d)).

(23) Annual grants programs to States for program development, administration, and enforcement (705(a)).

(24) Assistance to States in the development, administration, and enforcement of State programs (705(b)).

(25) Increasing the amount of annual grants to States (705(c)).

(26) Submission of the Secretary's annual report to the Congress (706).

(27) The proposal of legislation to allow Indian tribes to regulate surface coal mining on Indian lands (710(a)).

(28) The certification and training of blasters (719).

(29) Approval of State Reclamation Plans for abandoned mine lands (405).

(30) Development of project proposals for AML grants, including field work only to the extent necessary for the preparation and design of the proposal.

(31) Use of AML funds to allow States or tribes to set aside State share funds in a special trust for future AML projects.

(32) Use of AML funds in an insurance pool for the purposes of compensation for damage caused by mining prior to the date of the Act.

(33) AML reclamation projects involving: No more than 100 acres; no hazardous wastes; no explosives; no hazardous or explosive gases; no dangerous impoundments; no mine fires and refuse fires; no undisturbed, noncommercial borrow or disposal sites, no dangerous slides where abatement has the potential for damaging inhabited property; no subsidences involving the placement of material into underground mine voids through drilled holes to address more than one structure, and no unresolved issues with agencies, persons, or groups or adverse effects requiring specialized mitigation. Departmental exceptions in 516 DM 2, Appendix 2 apply to this exclusion. All sites considered in this categorical exclusion would have to first meet the eligibility test in sections 404, 409 and 411 of SMCRA. Also projects that have been declared an emergency pursuant to section 410 of SMCRA, may be candidates for this exclusion.[37]

## Bureau of Reclamation

14.5 Categorical Exclusions. In addition to the actions listed in the Departmental categorical exclusions, the following Bureau actions are designated documented categorical exclusions unless one or more of the extraordinary circumstances applies:

A. General Activities.

(1) *Changes in regulations or policy directives and legislative proposals where the impacts are limited to economic and/or social effects.

(2) *Training activities of enrollees assigned to the various youth programs. Such training may include minor construction activities for other entities.

(3) *Research activities, such as nondestructive data collection and analysis, monitoring, modeling, laboratory testing, calibration, and testing of instruments or procedures and nonmanipulative field studies.

B. Planning Activities.

(1) *Routine planning investigation activities where the impacts are expected to be localized, such as land classification surveys, topographic surveys, archeological

[37] NPS adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 24644.

surveys, wildlife studies, economic studies, social studies, and other study activity during any planning, preconstruction, construction, or operation and maintenance phases.

(2) *Special, status, concluding, or other planning reports that do not contain recommendations for action, but may or may not recommend further study.

(3) *Data collection studies that involve test excavations for cultural resources investigations or test pitting, drilling, or seismic investigations for geologic exploration purposes where the impacts will be localized.

C. Project Implementation Activities.

(1) *Classification and certification of irrigable lands.

(2) *Minor acquisition of land and rights-of-way or easements.

(3) *Minor construction activities associated with authorized projects which correct unsatisfactory environmental conditions or which merely augment or supplement, or are enclosed within existing facilities.

(4) *Approval of land management plans where implementation will only result in minor construction activities and resultant increased operation and maintenance activities.[38]

D. Operation and Maintenance Activities.

(1) *Maintenance, rehabilitation, and replacement of existing facilities which may involve a minor change in size, location, and/or operation.[39]

(2) *Transfer of the operation and maintenance of Federal facilities to water districts, recreation agencies, fish and wildlife agencies, or other entities where the anticipated operation and maintenance activities are agreed to in a contract or a memorandum of agreement, follow approved Reclamation policy, and no major change in operation and maintenance is anticipated.

(3) *Administration and implementation of project repayment and water service contracts, including approval of organizational or other administrative changes in contracting entities brought about by inclusion or exclusion of lands in these contracts.

(4) *Approval, execution, administration, and implementation of water-related contracts and contract renewals, amendments, supplements, and assignments, and water transfers, exchanges, and replacements, for which one or more of the following apply: (a) for minor amounts of long-term water use, where the action does not lead to long-term changes and impacts are expected to be minor and localized; (b) for

[38] NPS adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 24644.
[39] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

temporary (limited to 1 year or less) or interim (limited to 10 years or less) water use where the action does not lead to long-term changes and where the impacts are expected to be minor and localized; or (c) where the only result will be to implement an administrative or financial practice or change. A ''water-related'' contract is any legally binding agreement to which Reclamation becomes a party, pursuant to its authority under Federal law that (1) makes water available from or to the United States; (2) allows water to be stored, removed, introduced, conveyed, carried, or delivered in facilities Reclamation owns, manages, operates, or funds; or (3) establishes operation, maintenance, and replacement responsibilities for such facilities.

(5) *Approval of changes in pumping power and water rates charged contractors by the Bureau for project water service or power.

(6) *Execution and administration of recordable contracts for disposal of excess lands.

(7) *Withdrawal, termination, modification, or revocation where the land would be opened to discretionary land laws and where such future discretionary actions would be subject to the NEPA process, and disposal and sale of acquired lands where no major change in usage is anticipated.

(8) *Issuance or renewal of use authorizations (as defined in 43 CFR 429.2, including crossing agreements which provide rights-of-way) that authorize use of Reclamation land, facilities, or waterbodies where one or more of the following apply: (a) impacts of the action are expected to be minor and localized; (b) the action does not lead to a major public or private action; (c) the only result of the authorization will be to implement an administrative or financial practice or change; or (d) the level of use or impacts to resources is not increased.

(9) *Issuance of permits for removal of gravel or sand by an established process from existing quarries.[40]

(10) Reserved

(11) *Implementation of improved appearance and soil and moisture conservation programs where the impacts are localized.

(12) *Conduct of programs of demonstration, educational, and technical assistance to water user organizations for improvement of project and on-farm irrigation water use and management.

(13) *Follow-on actions such as access agreements, contractual arrangements, and operational procedures for hydropower facilities which are on or appurtenant to Bureau facilities or lands which are permitted or licensed by the Federal Energy Regulatory Commission (FERC), when FERC has accomplished compliance with NEPA (including actions to be taken by the Bureau) and when the Bureau's

[40] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

environmental concerns have been accommodated in accordance with the Bureau/FERC Memorandum of Understanding of June 22, 1981.

(14) Reserved

(15) *Approval of second party water sales agreements for small amounts of water (usually less than 10 acre-feet) where the Bureau has an existing water sales contract in effect.

(16) *Approval and execution of contracts requiring the repayment of funds furnished or expended on behalf of an entity pursuant to the Emergency Fund Act of June 26, 1948 (43 U.S.C. 502), where the action taken is limited to the original location of the damaged facility.

(17) *Minor safety of dams construction activities where the work is confined to the dam, abutment areas, or appurtenant features, and where no major change in reservoir or downstream operation is anticipated as a result of the construction activities.

E. Grant and Loan Activities.

(1) *Financial assistance, cooperative agreements, grants, loans, contracts, or other funding, where (a) the underlying action being funded would be covered by another Reclamation CE if Reclamation were implementing the action itself, or (b) the action is confined to areas already impacted by farming or development activities and the impacts are expected to be minor and localized.

(2) Reserved

(3) Reserved

F. Title Transfer Activities

(1) *Transfer from Federal ownership of facilities and/or interest in lands to a qualifying entity where there are no competing demands for use of the facilities; where the facilities are not hydrologically integrated; where, at the time of transfer, there would be no planned change in land or water use, or in operation, or maintenance of the facilities; and where the transfer would be consistent with the Secretary's responsibilities, including but not limited to existing contracts or agreements, the protection of land resources and water rights held in trust for federally recognized Indian tribes and Indian individuals, and ensuring compliance with international treaties and interstate compacts.

# Bureau of Ocean Energy Management (BOEM), Bureau of Safety and Environmental Enforcement (BSEE)

Categorical exclusions used by the Bureau of Ocean Energy Management (BOEM) and Bureau of Safety and Environmental Enforcement (BSEE), formerly Minerals Management Service (MMS).

15.4 Categorical Exclusions.

A. General.

(1) Inventory, data, and information collection, including the conduct of environmental monitoring and nondestructive research programs.

(2) Actions for which BOEM or BSEE has concurrence or co-approval with another Bureau if the action is a categorical exclusion for that Bureau.

B. Internal Program Initiatives.

(1) *All resource evaluation activities including surveying, mapping, and geophysical surveying which do not use solid or liquid explosives.

(2) *Collection of geologic data and samples including geologic, paleontologic, mineralogic, geochemical, and geophysical investigations which does not involve drilling beyond 50 feet of consolidated rock or beyond 300 feet of unconsolidated rock, including contracts therefor.

(3) Acquisition of existing geological or geophysical data from otherwise private exploration ventures.

(4) Well logging, digital modeling, inventory of existing wells, and installation of recording devices in wells.

(5) *Establishment and installation of any research/monitoring devices.

(6) Test or exploration drilling and downhole testing included in a project previously subject to the NEPA process.

(7) Insignificant revisions to the approved 5-year leasing program.

(8) Prelease planning steps such as the Call for Information and Area Identification.

C. Permit and Regulatory Functions.

(1) *Issuance and modification of regulations, Orders, Standards, Notices to Lessees and Operators. Guidelines and field rules for which the impacts are limited to administrative, economic, or technological effects and the environmental impacts are minimal.

(2) Approval of production measurement methods, facilities, and procedures.

(3) *Approval of off-lease storage in existing facilities.

(4) Approval of unitization agreements, pooling, or communitization agreements.

(5) Approval of commingling of production.

(6) Approval of suspensions of operations and suspensions of production.

(7) Approval of lease consolidation applications, lease assignments or transfers, operating rights, operating agreements, lease extensions, lease relinquishments, and bond terminations.

(8) Administration decisions and actions and record keeping such as:
  (a) Approval of applications for pricing determinations under the Natural Gas Policy Act.
  (b) Approval of underground gas storage agreements from a presently or formerly productive reservoir.
  (c) Issuance of paying well determinations and participating area approvals.
  (d) Issuance of drainage determinations.

(9) *Approval of offshore geological and geophysical mineral exploration activities, except when the proposed activity includes the drilling of deep stratigraphic test holes or uses solid or liquid explosives.

(10) *Approval of an offshore lease or unit exploration. development/production plan or a Development Operation Coordination Document in the central or western Gulf of America (30 CFR 250.2) except those proposing facilities: (1) In areas of high seismic risk or seismicity, relatively untested deep water, or remote areas, or (2) within the boundary of a proposed or established marine sanctuary, and/or within or near the boundary of a proposed or established wildlife refuge or areas of high biological sensitivity; or (3) in areas of hazardous natural bottom conditions; or (4) utilizing new or unusual technology.

(11) *Approval of minor revisions of or minor variances from activities described in an approved offshore exploration or development/production plan, including pipeline applications.

(12) *Approval of an Application for Permit to Drill (APD) an offshore oil and gas exploration or development well, when said well and appropriate mitigation measures are described in an approved exploration plan, development plan, production plan, or Development Operations Coordination Document.

(13) *Preliminary activities conducted on a lease prior to approval of an exploration or development/production plan or a Development Operations Coordination Plan. These are activities such as geological, geophysical, and other surveys necessary to develop a comprehensive exploration plan, development/production plan, or Development Operations Coordination Plan.

(14) Approval of Sundry Notices and Reports on Wells.

(15) *Rights-of-ways, easements, temporary use permits, and any revisions thereto that do not result in a new pipeline corridor to shore.

# Categorical Exclusions Adopted from Other Agencies

Under Section 109 of NEPA, federal agencies are authorized to adopt CEs established administratively by other agencies. DOI bureaus have formally adopted the following list of CEs. Subject headings are for organizational purposes only. Any bureau or program may apply any appropriate CE.

Responsible Officials must document reliance on any CE marked with an asterisk (*). This documentation must include a description of how the proposed action conforms to the terms of the categorical exclusion relied upon and written confirmation that none of the DOI extraordinary circumstances apply and any other noted requirements.

Strikeouts indicate that the CE has been adopted with limitations. Brackets indicate where bureau name can be substituted for establishing agency name or provide other information.

16.1 Adopted Categorical Exclusions

A. Fish and Wildlife.

(1) Department of Energy, 10 CFR 1021(D) (Appendix B1.20), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021Appendix B).

*PROTECTION OF CULTURAL RESOURCES, FISH AND WILDLIFE HABITAT. Small-scale activities undertaken to protect cultural resources (such as fencing, labeling, and flagging) or to protect, restore, or improve fish and wildlife habitat, fish passage facilities (such as fish ladders and minor diversion channels), or fisheries. Such activities would be conducted in accordance with an existing natural or cultural resource plan, if any.

(2) Department of Energy, 10 CFR 1021(D) (Appendix B1.21), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*NOISE ABATEMENT. Noise abatement measures (including, but not limited to, construction of noise barriers and installation of noise control materials).

(3) Department of the Navy, 32 CFR 775.6(f)(40) as adopted by BLM in 90 FR 42432.

*Installation of devices to protect human or animal life (e.g., raptor electrocution prevention devices, fencing to restrict wildlife movement onto airfields, and fencing and grating to prevent accidental entry to hazardous areas);

B. Oil, Gas, and Geothermal Energy.

(1) USDA - U.S. Forest Service, 7 CFR 1b.4(d)(32), as adopted by BLM in 89 FR 28797 and 90 FR 42432. The Department has adopted the following categorical exclusions for the limited purpose of approving Notices of Intent to Conduct

Geothermal Exploration Operations (Form 3200-9).

*Short-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities that may require cross-country travel by vehicles and equipment, construction of less than 1 mile of temporary road, or use and minor repair of existing roads. Examples include, but are not limited to:

(i) Authorizing geophysical investigations which use existing roads that may require incidental repair to reach sites for drilling core holes, temperature gradient holes, or seismic shot holes;

(ii) Gathering geophysical data using shot hole, vibroseis, or surface charge methods;

(iii) Trenching to obtain evidence of mineralization;

(iv) Clearing vegetation for sight paths or from areas used for investigation or support facilities;

(v) Redesigning or rearranging surface facilities within an approved site;

(vi) Approving interim and final site restoration measures; and

(vii) Approving a plan for exploration which authorizes repair of an existing road and the construction of 1/3 mile of temporary road; clearing vegetation from an acre of land for trenches, drill pads, or support facilities.

(2) Department of the Navy, 32 CFR 775.6(f)(39) as adopted by BLM in 89 FR 28797 and 90 FR 42432.

*Pre-lease upland exploration activities for oil, gas, or geothermal reserves, (e.g., geophysical surveys).

(3) Department of Energy, 10 CFR 1021(D) (Appendix B1.17), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*POLYCHLORINATED BIPHENYL REMOVAL. Removal of polychlorinated biphenyl (PCB)-containing items (including, but not limited to, transformers and capacitors), PCB-containing oils flushed from transformers, PCB-flushing solutions, and PCB-containing spill materials from buildings or other aboveground locations in accordance with applicable requirements (such as 40 CFR part 761).

(4) Department of Energy, 10 CFR 1021(D) (Appendix B1.18), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*WATER SUPPLY WELLS. Siting, construction, and operation of additional water supply wells (or replacement wells) within an existing well field, or modification of an existing water supply well to restore production, provided that there would be no drawdown other than in the immediate vicinity of the pumping well, and the covered actions would not have the potential to cause significant long-term decline of the water table, and would not have the potential to cause significant degradation of the aquifer from the new or replacement well.

(5) Department of Energy, 10 CFR 1021(D) (Appendix B1.26), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*SMALL WATER TREATMENT FACILITIES. Siting, construction, expansion, modification, replacement, operation, and decommissioning of small (total capacity less than approximately 250,000 gallons per day) wastewater and surface water treatment facilities whose liquid discharges are externally regulated, and small potable water and sewage treatment facilities.

(6) Department of Energy, 10 CFR 1021(D) (Appendix B3.7), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*NEW TERRESTRIAL INFILL EXPLORATORY AND EXPERIMENTAL WELLS. Siting, construction, and operation of new terrestrial infill exploratory and experimental (test) wells, for either extraction or injection use, in a locally characterized geological formation in a field that contains existing operating wells, properly abandoned wells, or unminable coal seams containing natural gas, provided that the site characterization has verified a low potential for seismicity, subsidence, and contamination of freshwater aquifers, and the actions are otherwise consistent with applicable best practices and DOE protocols, including those that protect against uncontrolled releases of harmful materials. Such wells may include those for brine, carbon dioxide, coalbed methane, gas hydrate, geothermal, natural gas, and oil. Uses for carbon sequestration wells include, but are not limited to, the study of saline formations, enhanced oil recovery, and enhanced coalbed methane extraction. [The BLM will not use this CX to authorize permits for production level applications (i.e., Applications for Permit to Drill, mine plans, drilling permits… etc.).]

(7) Department of Energy, 10 CFR 1021(D) (Appendix B5.(3), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*MODIFICATION OR ABANDONMENT OF WELLS. Modification (but not expansion) or plugging and abandonment of wells, provided that site characterization has verified a low potential for seismicity, subsidence, and contamination of freshwater aquifers, and the actions are otherwise consistent with best practices and DOE protocols, including those that protect against uncontrolled releases of harmful materials. Such wells may include, but are not limited to,

storage and injection wells for brine, carbon dioxide, coalbed methane, gas hydrate, geothermal, natural gas, and oil. Covered modifications would not be part of site closure.

(8) Department of Energy, 10 CFR 1021(D) (Appendix B5.6), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*OIL SPILL CLEANUP. Removal of oil and contaminated materials recovered in oil spill cleanup operations and disposal of these materials in accordance with applicable requirements (such as the National Oil and Hazardous Substances Pollution Contingency Plan).

C. Forestry.

(1) USDA - U.S. Forest Service, 7 CFR 1b.4(d)(29), as adopted by BLM in 90 FR 27655.

*Regeneration of an area to native tree species, including site preparation that does not involve the use of herbicides or result in vegetation type conversion. Examples include, but are not limited to:

(i) Planting seedlings of superior trees in a progeny test site to evaluate genetic worth, and
(ii) Planting trees or mechanical seed dispersal of native tree species following a fire, flood, or landslide.

(2) USDA - U.S. Forest Service, 7 CFR 1b.4(d)(30), as adopted by NPS in 90 FR 24644 and BLM in 90 FR 42432.

*Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction. Examples include, but are not limited to:

(a) Girdling trees to create snags;

(b) Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand;

(c) Prescribed burning to control understory hardwoods in stands of southern pine; and
(d) Prescribed burning to reduce natural fuel build-up and improve plant vigor.

(3) Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A, n. 31, as adopted by BLM in 90 FR 42432.

*The following forest management activities:

(a) Actions to manipulate species composition and age class, including, but not limited to, harvesting or thinning of live trees and other timber stand improvement actions (e.g., prescribed burns, non-commercial removal, chemical control), generally covering up to 125 acres and requiring no more than 1 mile of temporary or seasonal permanent road construction;

(b) Actions to salvage dead and/or dying trees including, but not limited to, harvesting of trees to control insects or disease or address storm damage (including removal of affected trees and adjacent live, unaffected trees as determined necessary to control the spread of insects or disease), generally covering up to 250 acres and requiring no more than 1 mile of temporary or seasonal permanent road construction; and

(c) Actions to regenerate forest stands, including, but not limited to, planting of native tree species upon site preparation, generally covering up to 125 acres and requiring no more than 1 mile of temporary or seasonal permanent road construction.

D. Rangeland Management.

(1) USDA - U.S. Forest Service, 7 CFR 1b.4(d)(33), as adopted by BLM in 90 FR 27655.[41]

*Implementation or modification of minor management practices to improve allotment condition or animal distribution. Examples include, but are not limited to:

(i) Rebuilding a fence to improve animal distribution;
(ii) Adding a stock watering facility to an existing water line; and
(iii) Spot seeding native species of grass or applying lime to maintain forage condition.

E. Realty, Facilities and Utilities

(1) Department of Energy, 10 CFR 1021(D) (Appendix B1.19), as adopted by BIA and BLM in 90 FR 4774 and 90 FR 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B). The use of this CX is restricted to existing communication sites.

*MICROWAVE, METEOROLOGICAL, AND RADIO TOWERS. Siting, construction, modification, operation, and removal of microwave, radio communication, and meteorological towers and associated facilities, provided that the towers and associated facilities would not be in a governmentally designated

[41] Note this language was modified by the USDA in the Interim Final Rule published July 3, 2024 to remove the phrase "when an allotment management plan is not yet in place." As discussed in the rule, the presence or absence of an allotment management plan does not change the on-the-ground effects of a rangeland improvement because AMPs do not override land management plans or grazing decisions. As such, the revision of language in the categorical exclusion is a minor change and technical in nature and does not modify the way rangeland improvements are designed or implemented, nor what is authorized in the land management plan or the grazing decision.

scenic area (see B(4)(iv) of this appendix) unless otherwise authorized by the appropriate governmental entity

(2) Department of Energy, 10 CFR 1021(D) (Appendix B4.6), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*ADDITIONS AND MODIFICATIONS TO TRANSMISSION FACILITIES. Additions or modifications to electric power transmission facilities within a previously disturbed or developed facility area. Covered activities include, but are not limited to, switchyard rock grounding upgrades, secondary containment projects, paving projects, seismic upgrading, tower modifications, load shaping projects (such as reducing energy use during periods of peak demand), changing insulators, and replacement of poles, circuit breakers, conductors, transformers, and crossarms.

(3) Department of Energy, 10 CFR 1021(D) (Appendix B4).7), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*FIBER OPTIC CABLE. Adding fiber optic cables to transmission facilities or burying fiber optic cable in existing powerline or pipeline rights-of-way. Covered actions may include associated vaults and pulling and tensioning sites outside of rights-of-way in nearby previously disturbed or developed areas.

(4) Department of Energy, 10 CFR 1021(D) (Appendix B4.13), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*UPGRADING AND REBUILDING EXISTING POWERLINES. Upgrading or rebuilding existing electric powerlines, which may involve relocations of small segments of the powerlines within an existing powerline right-of-way or within otherwise previously disturbed or developed lands (as discussed at 10 CFR 1021.410(g)(1)). Upgrading or rebuilding existing electric powerlines also may involve widening an existing powerline right-of-way to meet current electrical standards if the widening remains within previously disturbed or developed lands and only extends into a small area beyond such lands as needed to comply with applicable electrical standards. Covered actions would be in accordance with applicable requirements, including the "Integral Elements" listed at the start of appendix B of this part; and would incorporate appropriate design and construction standards, control technologies, and best management practices. This categorical exclusion does not apply to underwater powerlines. As used in this categorical exclusion, "small" has the meaning discussed at 10 CFR 1021.410(g)(2).

(5) Department of Energy, 10 CFR 1021(D) (Appendix B4.14), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*CONSTRUCTION AND OPERATION OF ELECTROCHEMICAL-BATTERY OR FLYWHEEL ENERGY STORAGE SYSTEMS. Construction, operation, upgrade, or decommissioning of an electrochemical-battery or flywheel energy storage system within a previously disturbed or developed area or within a small (as discussed at 10 CFR 1021.410(g)(2)) area contiguous to a previously disturbed or developed area. Covered actions would be in accordance with applicable requirements (such as land use and zoning requirements) in the proposed project area and the "Integral Elements" listed at the start of appendix B of this part, and would incorporate appropriate safety standards (including the current National Fire Protection Association 855, Standard for the Installation of Stationary Energy Storage Systems), design and construction standards, control technologies, and best management practices.

(6) Department of Energy, 10 CFR 1021(D) (Appendix B5.16), as adopted by BIA and BLM in 90 FR 4774 and 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*SOLAR PHOTOVOLTAIC SYSTEMS.
(a) The installation, modification, operation, or decommissioning of commercially available solar photovoltaic systems:

(1) Located on a building or other structure (such as rooftop, parking lot or facility, or mounted to signage, lighting, gates, or fences); or
(2) Located within a previously disturbed or developed area.

(b) Covered actions would be in accordance with applicable requirements (such as land use and zoning requirements) in the proposed project area and the "Integral Elements" listed at the start of appendix B of this part, and would be consistent with applicable plans for the management of wildlife and habitat, including plans to maintain habitat connectivity, and incorporate appropriate control technologies and best management practices.

(7) Department of Energy, 10 CFR 1021(D) (Appendix B5.23), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*ELECTRIC VEHICLE CHARGING STATIONS. The installation, modification, operation, and removal of electric vehicle charging stations, using commercially available technology, within a previously disturbed or developed area. Covered actions are limited to areas where access and parking are in accordance with applicable requirements (such as local land use and zoning requirements) in the proposed project area and would incorporate appropriate control technologies and best management practices.

(8) National Telecommunication and Information Administration, 89 FR 22688, Categorical Exclusions, Operational, C-4 as adopted by BIA and BLM in 90 FR 4774.

*New construction or improvement of land, operations, or support facilities, switching stations, maintenance facilities, and other non-tower structures supporting wired or wireless communications systems in a developed area and/or on previously disturbed ground with no more than 1 acre (0.4 hectare) of ground disturbance where the proposed facility use is generally compatible with the surrounding land use and applicable zoning standards and will not require additional support infrastructure.

(9) National Telecommunication and Information Administration, 89 FR 22688, Categorical Exclusions, Operational, C-5 as adopted by BIA and BLM in 90 FR 4774 and NPS in 90 FR 24644.

*Installing, operating, maintaining, retrofitting, upgrading, repairing, removing, and/or replacement of existing microwave or radio communication towers, instruments, structures, or buildings that do not require ground disturbance outside of the original footprint, including installing or collocating equipment such as antennas, microwave dishes, or power units. For communications towers at or below 199 feet, renovations and equipment additions must not cause the total height of the tower to exceed 199 feet. Existing structures must not be eligible for listing in the National Register of Historic Places.

(10) National Telecommunication and Information Administration, 89 FR 22688, Categorical Exclusions, Operational, C-6 as adopted by BIA and BLM in 90 FR 4774 and NPS in 90 FR 24644.

*New construction or improvement of temporary buildings or experimental equipment (e.g., trailers, prefabricated buildings, and test slabs) on previously disturbed ground, with no more than 1 acre (0.4 hectare) of ground disturbance, where the proposed facility use is generally compatible with the surrounding land use and applicable zoning standards and will not require additional support infrastructure.

(11) National Telecommunication and Information Administration, 89 FR 22688, Categorical Exclusions, Operational, C-7 as adopted by BIA and BLM in 90 FR 4774 and by NPS, in part, in 90 FR 24644.

*New construction of self-supporting (e.g., monopole or lattice) wireless communication towers at or below 199 feet with no guy wires that require less than 1 acre (0.4 hectare) of ground disturbance and where another Federal agency would not require an EA or EIS for its acquisition, installation, operations, or maintenance.

(12) National Telecommunication and Information Administration, 89 FR 22688, Categorical Exclusions, Operational, C-8: as adopted by BIA and BLM in 90 FR 4774 and NPS in 90 FR 24644.

*Acquisition, installation, reconstruction, repair by replacement, and operation of aerial or buried utility (e.g., water, sewer, electrical), communication (e.g., fiber optic cable, data processing cable and similar electronic equipment), and security

systems that use existing rights-of-way, easements, grants of license, distribution systems, facilities, or similar arrangements.

(13) Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A, n. 17, as adopted by BLM in 90 FR 27655.

*Routine modification, repair, and maintenance of, and minor upgrade of and addition to, existing transmission infrastructure, including the addition, retirement, and/or replacement of breakers, transformers, bushings, and relays; transmission line uprate, modification, reconductoring, and clearance resolution; and limited pole replacement. This exclusion also applies to improvements of existing access roads and construction of new access roads outside of the right-of-way that are generally no more than 1 mile in length.

(14) Indian Health Service, categorical exclusion J, 58 FR 569, as adopted by BIA in 90 FR 27657.

*Construction of Sanitation Facilities — Actions associated with construction of sanitation facilities to serve Indian homes and communities, except that the following actions are not excluded: (1) Construction of a sanitary landfill at a new solid waste disposal site, and (2) Construction of a new wastewater treatment facility with direct discharge of treated sewage to surface waters.

(15) Farm Service Agency, 7 CFR 799.31(b)(4), as adopted by BLM in 90 FR 42432.

*Planting actions. The following list includes categorical exclusions for planting proposed actions:

(i) Bareland planting or planting without site preparation;
(ii) Bedding site establishment for wildlife;
(iii) Chiseling and subsoiling;
(iv) Clean tilling firebreaks;
(v) Conservation crop rotation;
(vi) Contour farming;
(vii) Contour grass strip establishment;
(viii) Cover crop and green manure crop planting;
(ix) Critical area planting;
(x) Firebreak installation;
(xi) Grass, forbs, or legume planting;
(xii) Heavy use area protection;
(xiii) Installation and maintenance of field borders or field strips;
(xiv) Pasture, range, and hayland planting;
(xv) Seeding of shrubs;
(xvi) Seedling shrub planting;
(xvii) Site preparation;
(xviii) Strip cropping;
(xix) Wildlife food plot planting; and
(xx) Windbreak and shelterbelt establishment;

(16) U.S. Army Corps of Engineers, 33 CFR 230.9(i), as adopted by BLM in 90 FR 42432.

*Real estate grants for rights-of-way which involve only minor disturbances to earth, air, or water:

(1) Minor access roads, streets and boat ramps.

(2) Minor utility distribution and collection lines, including irrigation.

(3) Removal of sand, gravel, rock, and other material from existing borrow areas.

(17) Department of Energy, 10 CFR 1021(D) (Appendix B4.11), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B)

*ELECTRIC POWER SUBSTATIONS AND INTERCONNECTION FACILITIES. Construction or modification of electric power substations or interconnection facilities (including, but not limited to, switching stations and support facilities).

(18) Department of Energy, 10 CFR 1021(D) (Appendix B5.5), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B)

*SHORT PIPELINE SEGMENTS. Construction and subsequent operation of short (generally less than 20 miles in length) pipeline segments conveying materials (such as air, brine, carbon dioxide, geothermal system fluids, hydrogen gas, natural gas, nitrogen gas, oil, produced water, steam, and water) between existing source facilities and existing receiving facilities (such as facilities for use, reuse, transportation, storage, and refining), provided that the pipeline segments are within previously disturbed or developed rights-of-way.

(19) Department of Energy, 10 CFR 1021(D) (Appendix B5.15), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B)

*SMALL-SCALE RENEWABLE ENERGY RESEARCH AND DEVELOPMENT AND PILOT PROJECTS. Small-scale renewable energy research and development projects and small-scale pilot projects, provided that the projects are located within a previously disturbed or developed area. Covered actions would be in accordance with applicable requirements (such as local land use and zoning requirements) in the proposed project area and would incorporate appropriate control technologies and best management practices.

(20) Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A, n. 16, as

adopted by BLM in 90 FR 42432.

*Construction of new transmission line infrastructure, including electric transmission lines generally no more than 10 miles in length and that require no more than 125 acres of new developed rights-of-way and no more than 1 mile of new access road construction outside the right-of-way; and/or construction of electric power substations or interconnection facilities, including switching stations, phase or voltage conversions, and support facilities that generally require the physical disturbance of no more than 10 acres.

(21) Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A, n. 19, as adopted by BLM in 90 FR 42432.

*Removal of conductors and structures, and/or the cessation of right-of-way vegetation management, when existing transmissions lines are retired; or the rebuilding of transmission lines within or contiguous to existing rights-of-way involving generally no more than 25 miles in length and no more than 125 acres of expansion of the existing right-of-way.

(22) Rural Utility Service, 7 CFR 1970.54(c)(2), as adopted by BLM in 90 FR 42432.

*Construction of electric power lines and associated facilities designed for or capable of operation at a nominal voltage of either:

(iv)Less than 69 kilovolts (kV);

(v) Less than 230 kV if no more than 25 miles of line are involved; or

(iii) 230 kV or greater involving no more than three miles of line, but not for the integration of major new generation resources into a bulk transmission system;

(23) Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A n. 40 as adopted by NPS in 90 FR 24644.

*Demolition and disposal of structures, buildings, equipment and associated infrastructure and subsequent site reclamation, subject to applicable review for historical value, on sites generally less than 10 acres in size.

(24) Department of Energy, 10 CFR 1021(D) (Appendix B1.28), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*PLACING A FACILITY IN AN ENVIRONMENTALLY SAFE CONDITION. Minor activities that are required to place a facility in an environmentally safe condition where there is no proposed use for the facility. These activities would include, but are not limited to, reducing surface contamination, and removing materials, equipment or waste (such as final defueling of a reactor, where there are adequate existing facilities for the treatment, storage, or disposal of the materials,

equipment or waste). These activities would not include conditioning, treatment, or processing of spent nuclear fuel, high-level waste, or special nuclear materials.

(25) USDA - U.S. Forest Service, 7 CFR 1b.4(d)(43), as adopted by BLM in 90 FR 27655.

*Construction, reconstruction, decommissioning, relocation, or disposal of buildings, infrastructure, or other improvements at an existing administrative site, as that term is defined in section 502(1) of Public Law 109-54 (119 Stat. 559; 16 U.S.C. 580d note). Examples include but are not limited to:

(i) Relocating an administrative facility to another existing administrative site;

(ii) Construction, reconstruction, or expansion of an office, a warehouse, a lab, a greenhouse, or a fire-fighting facility;

(iii) Surface or underground installation or decommissioning of water or waste disposal system infrastructure;

(iv) Disposal of an administrative building; and

(v) Construction or reconstruction of communications infrastructure.

(26) Department of Energy, 10 CFR 1021(D) (Appendix B6.10), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B)

*UPGRADED OR REPLACEMENT WASTE STORAGE FACILITIES. Siting, construction, modification, expansion, operation, and decommissioning of a small upgraded or replacement facility (less than approximately 50,000 square feet in area) within or contiguous to a previously disturbed or developed area (where active utilities and currently used roads are readily accessible) for storage of waste that is already at the site at the time the storage capacity is to be provided. These actions do not include the storage of high-level radioactive waste, spent nuclear fuel or any waste that requires special precautions to prevent nuclear criticality. (See also B6.4, B6.5, B6.6 of this appendix, and C16 of appendix C.)

(27) Department of Energy, 10 CFR 1021(D) (Appendix B6.2), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B)

*WASTE COLLECTION, TREATMENT, STABILIZATION, AND CONTAINMENT FACILITIES. The siting, construction, and operation of temporary (generally less than 2 years) pilot-scale waste collection and treatment facilities, and pilot-scale (generally less than 1 acre) waste stabilization and containment facilities (including siting, construction, and operation of a small-scale laboratory building or renovation of a room in an existing building for sample analysis), provided that the action (1) Supports remedial investigations/feasibility

studies under CERCLA, or similar studies under RCRA (such as RCRA facility investigations/corrective measure studies) or other authorities and (2) would not unduly limit the choice of reasonable remedial alternatives (such as by permanently altering substantial site area or by committing large amounts of funds relative to the scope of the remedial alternatives).

(28) Department of Energy, 10 CFR 1021(D) (Appendix B6.4), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B)

*FACILITIES FOR STORING PACKAGED HAZARDOUS WASTE FOR 90 DAYS OR LESS. Siting, construction, modification, expansion, operation, and decommissioning of an onsite facility for storing packaged hazardous waste (as designated in 40 CFR part 261) for 90 days or less or for longer periods as provided in 40 CFR 262.34(d), (e), or (f) (such as accumulation or satellite areas).

F. Solid Minerals.

(1) Department of Energy, 10 CFR 1021(D) (Appendix B5.12), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*WORKOVER OF EXISTING WELLS. Workover (operations to restore production, such as deepening, plugging back, pulling and resetting lines, and squeeze cementing) of existing wells (including, but not limited to, activities associated with brine, carbon dioxide, coalbed methane, gas hydrate, geothermal, natural gas, and oil) to restore functionality, provided that workover operations are restricted to the existing well pad and do not involve any new site preparation or earthwork that would have the potential to cause significant impacts on nearby habitat; that site characterization has verified a low potential for seismicity, subsidence, and contamination of freshwater aquifers; and the actions are otherwise consistent with best practices and DOE protocols, including those that protect against uncontrolled releases of harmful materials.

(2) Department of Energy, 10 CFR 1021(D) (Appendix B1.10), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*ONSITE STORAGE OF ACTIVATED MATERIAL. Routine, onsite storage at an existing facility of activated equipment and material (including, but not limited to, lead) used at that facility, to allow reuse after decay of radioisotopes with short half-lives.

G. Transportation.

(1) USDA - U.S. Forest Service, 7 CFR 1b.4(d)(42), as adopted by BLM in 90 FR 27655.

*Activities that restore, rehabilitate, or stabilize lands occupied by roads and trails, including unauthorized roads and trails and National Forest System roads and National Forest System trails, to a more natural condition that may include removing, replacing, or modifying drainage structures and ditches, reestablishing vegetation, reshaping natural contours and slopes, reestablishing drainage-ways, or other activities that would restore site productivity and reduce environmental impacts. Examples include but are not limited to:

(i) Decommissioning a road to a more natural state by restoring natural contours and removing construction fills, loosening compacted soils, revegetating the roadbed and removing ditches and culverts to reestablish natural drainage patterns;

(ii) Restoring a trail to a natural state by reestablishing natural drainage patterns, stabilizing slopes, reestablishing vegetation, and installing water bars; and

(iii) Installing boulders, logs, and berms on a road segment to promote naturally regenerated grass, shrub, and tree growth.

(2) USDA- U.S. Forest Service, 7 CFR 1b.4(d)(45), as adopted by BLM in 90 FR 27655.

*Road management activities on up to 8 miles of NFS roads and associated parking areas. Activities under this category cannot include construction or realignment. Examples include but are not limited to:

(i) Rehabilitating an NFS road or parking area where management activities go beyond repair and maintenance;

(ii) Shoulder-widening or other safety improvements within the right-of-way for an NFS road; and

(iii) Replacing a bridge along an NFS road.

(3) Department of Energy, 10 CFR 1021(Appendix (B1.13), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 subpart D, appendix B). Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*PATHWAYS, SHORT ACCESS ROADS, AND RAIL LINES. Construction, acquisition, and relocation, consistent with applicable right-of-way conditions and approved land use or transportation improvement plans, of pedestrian walkways and trails, bicycle paths, small outdoor fitness areas, and short access roads and rail lines (such as branch and spur lines).

(4) Federal Highway Administration, 23 CFR 771.117(c)(3) as adopted by NPS in 90 FR 24644.

*Construction of bicycle and pedestrian lanes, paths, and facilities.

(5) Federal Highway Administration, 23 CFR 771.117(c)(26), along with sections (e)(1)-(6) and (d)(13) as adopted by NPS in 90 FR 24644.

*Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (including parking, weaving, turning, and climbing lanes), if the actions meet the constraints [below] ~~in paragraph (e) of this section~~. Actions ~~described in (c)(26), (c)27, and (c)(28) of this section~~ may not be processed as CEs ~~under paragraph (c)~~ if they involve:

(1) An acquisition of more than a minor amount of right-of-way or that would result in any residential or non-residential displacements;

(2) An action that needs a bridge permit from the U.S. Coast Guard, or an action that does not meet the terms and conditions of a U.S. Army Corps of Engineers nationwide or general permit under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899;

(3) A finding of "adverse effect" to historic properties under the National Historic Preservation Act, the use of a resource protected under 23 U.S.C. 138 or 49 U.S.C. 303 (section 4(f)) except for actions resulting in *de minimis* impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act; *de minimis* impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act;

(4) Construction of temporary access or the closure of existing road, bridge, or ramps that would result in major traffic disruptions;

(5) Changes in access control;

(6) A floodplain encroachment other than functionally dependent uses (e.g., bridges, wetlands) or actions that facilitate open space use (e.g., recreational trails, bicycle and pedestrian paths); or construction activities in, across or adjacent to a river component designated or proposed for inclusion in the National System of Wild and Scenic Rivers.

~~Additional~~ Actions ~~that meet the criteria for a CE in the CEQ regulations (40 CFR 1508.4) and paragraph (a) of this section~~ may be designated as CEs only after ~~Administration approval unless otherwise authorized under an executed agreement pursuant to paragraph (g) of this section. The applicant must submit~~ documentation ~~that~~ demonstrates that the specific conditions or criteria for these CEs are satisfied, and that significant environmental effects will not result. ~~Examples of such actions include but are not limited to: Actions described in paragraphs (c)(26), (c)(27), and (c)(28) of this section that do not meet the constraints in paragraph (e) of this section.~~ [If the action triggers a constraint (1)-(6) above, the CE can still be applied if the documentation demonstrates that the action fits within the CE and significant environmental effects will not result.]

(6) Federal Highway Administration, 23 CFR 771.117(c)(28), along with sections (e)(1)-(6) and (d)(13) as adopted by NPS in 90 FR 24644 and BLM in 90 FR 42432.

*Bridge rehabilitation, reconstruction or replacement or the construction of grade separation to replace existing at-grade railroad crossings, if the actions meet the constraints [below] ~~in paragraph (e) of this section~~. Actions ~~described in (c)(26), (c)27, and (c)(28) of this section~~ may not be processed as CEs ~~under paragraph (c)~~ if they involve:

(e)(1) An acquisition of more than a minor amount of right-of-way or that would result in any residential or non-residential displacements;

(e)(2) An action that needs a bridge permit from the U.S. Coast Guard, or an action that does not meet the terms and conditions of a U.S. Army Corps of Engineers nationwide or general permit under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899;

(e)(3) A finding of "adverse effect" to historic properties under the National Historic Preservation Act, the use of a resource protected under 23 U.S.C. 138 or 49 U.S.C. 303 (section 4(f)) except for actions resulting in *de minimis* impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act; *de minimis* impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act;

(e)(4) Construction of temporary access or the closure of existing road, bridge, or ramps that would result in major traffic disruptions;

(e)(5) Changes in access control;

(e)(6) A floodplain encroachment other than functionally dependent uses (e.g., bridges, wetlands) or actions that facilitate open space use (e.g., recreational trails, bicycle and pedestrian paths); or construction activities in, across or adjacent to a river component designated or proposed for inclusion in the National System of Wild and Scenic Rivers.

(d)(13) ~~Additional~~ Actions ~~that meet the criteria for a CE in the CEQ regulations (40 CFR 1508.4) and paragraph (a) of this section~~ may be designated as CEs only after ~~Administration approval unless otherwise authorized under an executed agreement pursuant to paragraph (g) of this section. The applicant must submit~~ documentation that demonstrates that the specific conditions or criteria for these CEs are satisfied, and that significant environmental effects will not result. ~~Examples of such actions include but are not limited to: Actions described in paragraphs (c)(26), (c)(27), and (c)(28) of this section that do not meet the constraints in paragraph (e) of this section.~~ [If the action triggers a constraint (1)-(6) above, the CE can still be applied if the documentation demonstrates that the action fits within the CE and significant environmental effects will not result.]

(7) USDA- U.S. Forest Service, 7 CFR 1b.4(d)(46), as adopted by NPS in 90 FR 24644

and BLM in 90 FR 42432.

*Construction and realignment of up to 2 miles of [NFS] roads and associated parking areas. Examples include but are not limited to:

(i) Constructing an [NFS] road to improve access to a trailhead or parking area;

(ii) Rerouting an [NFS] road to minimize resource impacts; and

(iii) Improving or upgrading the surface of an [NFS] road to expand its capacity.

(8) USDA - U.S. Forest Service, 7 CFR 1b.4(c)(22), as adopted in 90 FR 42432.

*Repair and maintenance of roads, trails, and landline boundaries. Examples include but are not limited to:

(i) Authorizing a user to grade, resurface, and clean the culverts of an established NFS road;

(ii) Grading a road and clearing the roadside of brush without the use of herbicides;

(iii) Resurfacing a road to its original condition;

(iv) Pruning vegetation and cleaning culverts along a trail and grooming the surface of the trail; and

(v) Surveying, painting, and posting landline boundaries.

H. Recreation Management and Visitor Use.

(1) USDA - U.S. Forest Service, 7 CFR 1b.4(c)(23), as adopted by BLM in 90 FR 27655.

*Repair and maintenance of recreation sites and facilities. Examples include but are not limited to:

(i) Applying registered herbicides to control poison ivy on infested sites in a campground;

(ii) Applying registered insecticides by compressed air sprayer to control insects at a recreation site complex;

(iii) Repaving a parking lot; and

(iv) Applying registered pesticides for rodent or vegetation control.

(2) USDA - U.S. Forest Service, 7 CFR 1b.4(c)(29), as adopted by BLM in 90 FR 27655.

*Issuance of a new authorization or amendment of an existing authorization for recreation special uses that occur on existing roads or trails, in existing facilities, in existing recreation sites, or in areas where such activities are allowed. Subject to the foregoing condition, examples include but are not limited to:

(i) Issuance of an outfitting and guiding permit for mountain biking on NFS trails that are not closed to mountain biking;

(ii) Issuance of a permit to host a competitive motorcycle event;

(iii)Issuance of an outfitting and guiding permit for backcountry skiing;

(iv) Issuance of a permit for a one-time use of existing facilities for other recreational events; and

(v) Issuance of a campground concession permit for an existing campground that has previously been operated by the Forest Service.

(3) U.S. Forest Service, 36 CFR 220.6(e)(1), as adopted by BLM in 90 FR 27655 and NPS in 90 FR 24644.

*Construction and reconstruction of trails. Examples include, but are not limited to:

(i) Constructing or reconstructing a trail to a scenic overlook, and

(ii) Reconstructing an existing trail to allow use by handicapped individuals. [This CE cannot be applied to NPS off-road vehicle routes.]

(4) USDA - U.S. Forest Service, 7 CFR 1b.4(d)(44), as adopted by BLM in 90 FR 27655.

*Construction, reconstruction, decommissioning, or disposal of buildings, infrastructure, or improvements at an existing recreation site, including infrastructure or improvements that are adjacent or connected to an existing recreation site and provide access or utilities for that site. Recreation sites include but are not limited to campgrounds and camping areas, picnic areas, day use areas, fishing sites, interpretive sites, visitor centers, trailheads, ski areas, and observation sites. Activities within this category are intended to apply to facilities located at recreation sites managed by the Forest Service and those managed by concessioners under a special use authorization. Examples include but are not limited to:

(i) Constructing, reconstructing, or expanding a toilet or shower facility;

(ii) Constructing or reconstructing a fishing pier, wildlife viewing platform, dock, or other constructed feature at a recreation site;

(iii) Installing or reconstructing a water or waste disposal system;

(iv) Constructing or reconstructing campsites;

(v) Disposal of facilities at a recreation site;

(vi) Constructing or reconstructing a boat landing;

(vii) Replacing a chair lift at a ski area;

(viii) Constructing or reconstructing a parking area or trailhead; and

(ix) Reconstructing or expanding a recreation rental cabin.

(5) Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A, n. 22, as adopted by BLM in 90 FR 27655 and NPS in 90 FR 24644.

*Development of dispersed recreation sites (generally not to exceed 10 acres in size) to support activities such as hunting, fishing, primitive camping, wildlife observation, hiking, and mountain biking. Actions include, but are not limited to, installation of guardrails, gates and signage, hardening and stabilization of sites, trail construction, and access improvements/controls.

(6) Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A, n. 23, as adopted by BLM in 90 FR 27655.

*Development of public use areas that generally result in the physical disturbance of no more than 10 acres, including, but not limited to, construction of parking areas, campgrounds, stream access points, and day use areas.

(7) USDA - U.S. Forest Service, 7 CFR 1b.4(c)(26), as adopted by BLM in 90 FR 42432.

*Approval, modification, or continuation of minor, short-term (1 year or less) special uses of NFS lands. Examples include, but are not limited to:

(i) Approving, on an annual basis, the intermittent use and occupancy by a State-licensed outfitter or guide;

(ii) Approving the use of NFS land for apiaries; and

(iii) Approving the gathering of forest products for personal use.

(8) USDA - U.S. Forest Service, 7 CFR 1b.4(c)(28), as adopted by BLM in 90 FR 42432.

*Issuance of a new special use authorization to replace an existing or expired special use authorization, when such issuance is to account only for administrative changes, such as a change in ownership of authorized improvements or expiration

of the current authorization, and where there are no changes to the authorized facilities or increases in the scope or magnitude of authorized activities. The applicant or holder must be in compliance with all the terms and conditions of the existing or expired special use authorization. Subject to the foregoing conditions, examples include but are not limited to:

(i) Issuing a new authorization to replace a powerline facility authorization that is at the end of its term;

(ii) Issuing a new permit to replace an expired permit for a road that continues to be used as access to non-NFS lands; and

(iii) Converting a transitional priority use outfitting and guiding permit to a priority use outfitting and guiding permit.

(9) USDA - U.S. Forest Service, 7 CFR 1b.4(d)(28), as adopted by BLM in 90 FR 42432.

*Approval, modification, or continuation of special uses that require less than 20 acres of NFS lands. Subject to the preceding condition, examples include but are not limited to:

(i) Approving the construction of a meteorological sampling site;

(ii) Approving the use of land for a one-time group event;

(iii) Approving the construction of temporary facilities for filming of staged or natural events or studies of natural or cultural history;

(iv) Approving the use of land for a utility corridor that crosses a national forest;

(v) Approving the installation of a driveway or other facilities incidental to use of a private residence; and

(vi) Approving new or additional communication facilities, associated improvements, or communication uses at a site already identified as available for these purposes.

I. Emergency Response

(1) USDA- Natural Resource Conservation Service, 7 CFR 1b.4(d)(6) as adopted by NPS in 90 FR 24644.

i. *Replacing and repairing existing culverts, grade stabilization, and water control structures and other small structures that were damaged by natural disasters where there is no new depth required and only minimal dredging, excavation, or placement of fill is required. [This CE may only used for actions that mitigate soil erosion, sedimentation, and downstream flooding; perpetuate native, non-invasive vegetation; are

consistent with Federal principals of natural stream dynamics and processes; incorporate conservation practice standards and do not involve a significant risk of exposure to toxic or hazardous substances.]

(2) USDA- U.S. Forest Service, 7 CFR 1b.4(d)(41) as adopted by NPS in 90 FR 24644 and BLM in 90 FR 42432.

*Removing and/or relocating debris and sediment following disturbance events (such as floods, hurricanes, tornados, mechanical/engineering failures, etc.) to restore uplands, wetlands, or riparian systems to pre-disturbance conditions, to the extent practicable, such that site conditions will not impede or negatively alter natural processes. Examples include but are not limited to:

i. Removing an unstable debris jam on a river following a flood event and relocating it back in the floodplain and stream channel to restore water flow and local bank stability;

ii. Clean-up and removal of infrastructure flood debris, such as, benches, tables, outhouses, concrete, culverts, and asphalt following a hurricane from a stream reach and adjacent wetland area; and

iii. Stabilizing stream banks and associated stabilization structures to reduce erosion through bioengineering techniques following a flood event, including the use of living and nonliving plant materials in combination with natural and synthetic support materials, such as rocks, riprap, geo-textiles, for slope stabilization, erosion reduction, and vegetative establishment and establishment of appropriate plant communities (bank shaping and planting, brush mattresses, log, root wad, and boulder stabilization methods).

(3) Department of Energy, 10 CFR 1021(D) (Appendix B1.28), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*PLACING A FACILITY IN AN ENVIRONMENTALLY SAFE CONDITION. Minor activities that are required to place a facility in an environmentally safe condition where there is no proposed use for the facility. These activities would include, but are not limited to, reducing surface contamination, and removing materials, equipment or waste (such as final defueling of a reactor, where there are adequate existing facilities for the treatment, storage, or disposal of the materials, equipment or waste). These activities would not include conditioning, treatment, or processing of spent nuclear fuel, high-level waste, or special nuclear materials.

(4) Department of Energy, 10 CFR 1021(D) (Appendix B6.1), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B)

*CLEANUP ACTIONS. Small-scale, short-term cleanup actions, under RCRA, Atomic Energy Act, or other authorities, less than approximately 10 million dollars in cost (in 2011 dollars), to reduce risk to human health or the environment from the release or

threat of release of a hazardous substance other than high-level radioactive waste and spent nuclear fuel, including treatment (such as incineration, encapsulation, physical or chemical separation, and compaction), recovery, storage, or disposal of wastes at existing facilities currently handling the type of waste involved in the action. These actions include, but are not limited to:

(a) Excavation or consolidation of contaminated soils or materials from drainage channels, retention basins, ponds, and spill areas that are not receiving contaminated surface water or wastewater, if surface water or groundwater would not collect and if such actions would reduce the spread of, or direct contact with, the contamination;

(b) Removal of bulk containers (such as drums and barrels) that contain or may contain hazardous substances, pollutants, contaminants, CERCLA-excluded petroleum or natural gas products, or hazardous wastes (designated in 40 CFR part 261 or applicable State requirements), if such actions would reduce the likelihood of spillage, leakage, fire, explosion, or exposure to humans, animals, or the food chain;

(c) Removal of an underground storage tank including its associated piping and underlying containment systems in accordance with applicable requirements (such as RCRA, subtitle I; 40 CFR part 265, subpart J; and 40 CFR part 280, subparts F and G) if such action would reduce the likelihood of spillage, leakage, or the spread of, or direct contact with, contamination;

(d) Repair or replacement of leaking containers;

(e) Capping or other containment of contaminated soils or sludges if the capping or containment would not unduly limit future groundwater remediation and if needed to reduce migration of hazardous substances, pollutants, contaminants, or CERCLA-excluded petroleum and natural gas products into soil, groundwater, surface water, or air;

(f) Drainage or closing of man-made surface impoundments if needed to maintain the integrity of the structures;

(g) Confinement or perimeter protection using dikes, trenches, ditches, or diversions, or installing underground barriers, if needed to reduce the spread of, or direct contact with, the contamination;

(h) Stabilization, but not expansion, of berms, dikes, impoundments, or caps if needed to maintain integrity of the structures;

(i) Drainage controls (such as run-off or run-on diversion) if needed to reduce offsite migration of hazardous substances, pollutants, contaminants, or CERCLA-excluded petroleum or natural gas products or to prevent precipitation or run-off from other sources from entering the release area from other areas;

(j) Segregation of wastes that may react with one another or form a mixture that could result in adverse environmental impacts;

(k) Use of chemicals and other materials to neutralize the pH of wastes;

(l) Use of chemicals and other materials to retard the spread of the release or to mitigate its effects if the use of such chemicals would reduce the spread of, or direct contact with, the contamination;

(m) Installation and operation of gas ventilation systems in soil to remove methane or petroleum vapors without any toxic or radioactive co-contaminants if appropriate filtration or gas treatment is in place;

(n) Installation of fences, warning signs, or other security or site control precautions if humans or animals have access to the release; and

(o) Provision of an alternative water supply that would not create new water sources if necessary immediately to reduce exposure to contaminated household or industrial use water and continuing until such time as local authorities can satisfy the need for a permanent remedy.

J. Habitat Restoration.

(1) USDA - U.S. Forest Service, 7 CFR 1b.4(d)(31), as adopted by BLM in 90 FR 3908 and NPS in 90 FR 24644.

i. *Modification or maintenance of stream or lake aquatic habitat improvement structures using native materials or normal practices. Examples include, but are not limited to:
ii. Reconstructing a gabion with stone from a nearby source;

iii. Adding brush to lake fish beds; and

(iii) Cleaning and resurfacing a fish ladder at a hydroelectric dam.

(2) USDA - U.S. Forest Service, 7 CFR 1b.4(d)(40), as adopted by BLM in 90 FR 3908 and by NPS in 90 FR 24644.

*Restoring wetlands, streams, riparian areas or other water bodies by removing, replacing, or modifying water control structures such as, but not limited to, dams, levees, dikes, ditches, culverts, pipes, drainage tiles, valves, gates, and fencing, to allow waters to flow into natural channels and floodplains and restore natural flow regimes to the extent practicable where valid existing rights or special use authorizations are not unilaterally altered or canceled. Examples include but are not limited to:

i. Repairing an existing water control structure that is no longer functioning properly with minimal dredging, excavation, or placement of fill, and does not involve releasing hazardous substances;

ii. Installing a newly-designed structure that replaces an existing culvert to improve aquatic organism passage and prevent resource and property damage where the road or trail maintenance level does not change;

iii. Removing a culvert and installing a bridge to improve aquatic and/or terrestrial organism passage or prevent resource or property damage where the road or trail maintenance level does not change; and

iv. Removing a small earthen and rock fill dam with a low hazard potential classification that is no longer needed.

(3) USDA - U.S. Forest Service, 7 CFR 1b.4(d)(47), as adopted by NPS in 90 FR 24644 and BLM in 90 FR 42432.

*Forest and grassland management activities with a primary purpose of meeting restoration objectives or increasing resilience. Activities to improve ecosystem health, resilience, and other watershed and habitat conditions may not exceed 2,800 acres.

i. Activities to meet restoration and resilience objectives may include, but are not limited to:

a. Stream restoration, aquatic organism passage rehabilitation, or erosion control;
b. Invasive species control and reestablishment of native species;
c. Prescribed burning;
d. Reforestation;
e. Road and/or trail decommissioning (system and non-system);
f. Pruning;
g. Vegetation thinning; and
h. Timber harvesting.

ii. The following requirements or limitations apply to this category:

a. Projects shall be developed or refined through a collaborative process that includes multiple interested persons representing diverse interests;
b. Vegetation thinning or timber harvesting activities shall be designed to achieve ecological restoration objectives, but shall not include salvage harvesting as defined in Agency policy; and
c. Construction and reconstruction of permanent roads is limited to 0.5 miles. Construction of temporary roads is limited to 2.5 miles, and all temporary roads shall be decommissioned no later than 3 years after the date the project is completed. Projects may include repair and maintenance of [NFS] roads and trails to prevent or address resource impacts; repair and maintenance of [NFS] roads and trails is not subject to the above mileage limits.

(4) Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A n. 29 as adopted by NPS in 90 FR 24644.

*Actions to restore and enhance wetlands, riparian, and aquatic ecosystems that generally involve physical disturbance of no more than 10 acres, including, but not limited to, construction of small water control structures; revegetation actions using native materials; construction of small berms, dikes, and fish attractors; removal of debris and sediment following natural or human-caused disturbance events; installation of silt fences; construction of limited access routes for purposes of routine maintenance and management; and reintroduction or supplementation of native, formerly native, or established species into suitable habitat within their historic or established range.

(5) Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A n. 30 as adopted by NPS in 90 FR 24644 and BLM in 90 FR 42432.

*Actions to maintain, restore, or enhance terrestrial ecosystems that generally involve physical disturbance of no more than 125 acres, including, but not limited to, establishment and maintenance of non-invasive vegetation; bush hogging; prescribed fires; installation of nesting and roosting structures, fencing, and cave gates; and reintroduction or supplementation of native, formerly native, or established species into suitable habitat within their historic or established range. [Herbicide and pesticide use is not covered under this CE.]

K. Other.

(1) Department of Energy, 10 CFR 1021(D) (Appendix B1.11), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*FENCING. Installation of fencing, including, but not limited to border marking, that would not have the potential to significantly impede wildlife population movement (including migration) or surface water flow.

(2) National Telecommunications and Information administration, 89 FR 22688, Categorical Exclusions, Operational, C-2, as adopted BIA and BLM in 90 FR 4774.

*Outdoor research activities conducted in compliance with all applicable laws, regulations, and requirements. Examples include types of research, development, testing, and evaluation activities conducted outdoors where no new ground disturbance occurs and no sensitive resources (e.g., threatened or endangered species, archaeological sites, Tribal resources, wetlands, and waterbodies) are present, such as radar testing, radio noise measurements, and public safety communications research.

(3) Federal Highway Administration, 23 CFR 771.117(c)(24) as adopted by NPS in 90 FR 24644.

*Localized geotechnical and other investigation to provide information for preliminary design and for environmental analyses and permitting purposes, such as drilling test bores for soil sampling; archeological investigations for archeology resources assessment or similar survey; and wetland surveys.

(4) DHS- U.S. Coast Guard, Department of Homeland Security Instruction Manual 023-01-001-01, Rev 01, Appendix A, Table 1 *L42 as adopted by NPS in 90 FR 24644.

*Environmental site characterization studies and environmental monitoring including: siting, constructing, operating, and dismantling or closing of characterization and monitoring devices. Such activities include but are not limited to the following:

(a) Conducting geological, geophysical, geochemical, and engineering surveys and mapping, including the establishment of survey marks.
(b) Installing and operating field instruments, such as stream-gauging stations or flow-measuring devices, telemetry systems, geochemical monitoring tools, and geophysical exploration tools.
(c) Drilling wells for sampling or monitoring of groundwater, well logging, and installation of water-level recording devices in wells.
(d) Conducting aquifer response testing.
(e) Installing and operating ambient air monitoring equipment.
(f) Sampling and characterizing water, soil, rock, or contaminants.
(g) Sampling and characterizing water effluents, air emissions, or solid waste streams.
(h) Sampling flora or fauna.
(i) Conducting archeological, historic, and cultural resource identification and evaluation studies in compliance with 36 CFR part 800 and 43 CFR part 7.
(j) Gathering data and information and conducting studies that involve no physical change to the environment. Examples include topographic surveys, bird counts, wetland mapping, and other inventories.

(5) DHS- U.S. Coast Guard, Department of Homeland Security Instruction Manual 023-01-001-01, Rev 01, Appendix A, Table 1 *L26 as adopted by NPS in 90 FR 24644.

*Maintenance dredging and debris disposal where no new depths are required, applicable permits are secured, and disposal will be at an existing approved disposal site.

(6) Department of Homeland Security, 18 CFR Part 1318, Subpart C, Appendix A, n. 34, as adopted by BLM in 90 FR 42432.

*Proposed activities and operations to be conducted in an existing structure that would be compatible with and similar in scope to its ongoing functional uses and would be consistent with previously established safety levels and in compliance with applicable Federal, Tribal, State, or local requirements.

(7) Department of Energy, 10 CFR 1021(D) (Appendix B)(B3)(1), as adopted by BLM in 90 FR 42432.

*SITE CHARACTERIZATION AND ENVIRONMENTAL MONITORING. Site characterization and environmental monitoring (including, but not limited to, siting, construction, modification, operation, and dismantlement and removal or otherwise proper closure (such as of a well) of characterization and monitoring devices, and siting, construction, and associated operation of a small-scale laboratory building or renovation of

a room in an existing building for sample analysis). Such activities would be designed in conformance with applicable requirements and use best management practices to limit the potential effects of any resultant ground disturbance. Covered activities include, but are not limited to, site characterization and environmental monitoring under CERCLA and RCRA. (This class of actions excludes activities in aquatic environments. See B3.16 of this appendix for such activities.) Specific activities include, but are not limited to:

(a) Geological, geophysical (such as gravity, magnetic, electrical, seismic, radar, and temperature gradient), geochemical, and engineering surveys and mapping, and the establishment of survey marks. Seismic techniques would not include large-scale reflection or refraction testing;

(b) Installation and operation of field instruments (such as stream-gauging stations or flow-measuring devices, telemetry systems, geochemical monitoring tools, and geophysical exploration tools);

(c) Drilling of wells for sampling or monitoring of groundwater or the vadose (unsaturated) zone, well logging, and installation of water-level recording devices in wells;

(d) Aquifer and underground reservoir response testing;

(e) Installation and operation of ambient air monitoring equipment;

(f) Sampling and characterization of water, soil, rock, or contaminants (such as drilling using truck- or mobile-scale equipment, and modification, use, and plugging of boreholes);

(g) Sampling and characterization of water effluents, air emissions, or solid waste streams;

(h) Installation and operation of meteorological towers and associated activities (such as assessment of potential wind energy resources);

(i) Sampling of flora or fauna; and

(j) Archeological, historic, and cultural resource identification in compliance with 36 CFR part 800 and 43 CFR part 7.

(8) Animal and Plant Health Inspection Service, 7 CFR 372.5(c)(1), as adopted by BLM in 90 FR 42432.

*Routine measures.

(i) Routine measures, such as identifications, inspections, surveys, sampling that does not cause physical alteration of the environment, testing, seizures, quarantines, removals, sanitizing, inoculations, control, and monitoring employed by agency programs to pursue their missions and functions. Such measures may include the use—according to any label

instructions or other lawful requirements and consistent with standard, published program practices and precautions—of chemicals, pesticides, or other potentially hazardous or harmful substances, materials, and target-specific devices or remedies, provided that such use meets all of the following criteria (insofar as they may pertain to a particular action):

(A) The use is localized or contained in areas where humans are not likely to be exposed, and is limited in terms of quantity, i.e., individualized dosages and remedies;

(B) The use will not cause contaminants to enter water bodies, including wetlands;

(C) The use does not adversely affect any federally protected species or critical habitat; and

(D) The use does not cause bioaccumulation.

(ii) Examples of routine measures include:

(A) Inoculation or treatment of discrete herds of livestock or wildlife undertaken in contained areas (such as a barn or corral, a zoo, an exhibition, or an aviary);

(B) Use of vaccinations or inoculations including new vaccines (e.g., genetically engineered vaccines) and applications of existing vaccines to new species provided that the project is conducted in a controlled and limited manner, and the impacts of the vaccine can be predicted; and

(C) Isolated (for example, along a highway) weed control efforts.

(9) Department of Energy, 10 CFR 1021(D) (Appendix B1.2), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*TRAINING EXERCISES AND SIMULATIONS. Training exercises and simulations (including, but not limited to, firing-range training, small-scale and short-duration force-on-force exercises, emergency response training, fire fighter and rescue training, and decontamination and spill cleanup training) conducted under appropriately controlled conditions and in accordance with applicable requirements.

(10) Department of Energy, 10 CFR 1021(D) (Appendix B1.8), as adopted by BLM in 90 FR 42432.

*SCREENED WATER INTAKE AND OUTFLOW STRUCTURES. Modifications to screened water intake and outflow structures such that intake velocities and volumes and water effluent quality and volumes are consistent with existing permit limits.

(11) Department of Energy, 10 CFR 1021(D) (Appendix B1.12), as adopted by BLM in 90

FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*DETONATION OR BURNING OF EXPLOSIVES OR PROPELLANTS AFTER TESTING. Outdoor detonation or burning of explosives or propellants that failed (duds), were damaged (such as by fracturing), or were otherwise not consumed in testing. Outdoor detonation or burning would be in areas designated and routinely used for those purposes under existing applicable permits issued by Federal, state, and local authorities (such as a permit for a RCRA miscellaneous unit (40 CFR part 264, subpart X)).

(12) Department of Energy, 10 CFR 1021(D) (Appendix B1.16), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*ASBESTOS REMOVAL. Removal of asbestos-containing materials from buildings in accordance with applicable requirements (such as 40 CFR part 61, ''National Emission Standards for Hazardous Air Pollutants''; 40 CFR part 763, ''Asbestos''; 29 CFR part 1910, subpart I, ''Personal Protective Equipment''; and 29 CFR part 1926, ''Safety and Health Regulations for Construction''; and appropriate state and local requirements, including certification of removal contractors and technicians).

(13) Department of Energy, 10 CFR 1021(D) (Appendix B1.29), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*DISPOSAL FACILITIES FOR CONSTRUCTION AND DEMOLITION WASTE. Siting, construction, expansion, modification, operation, and decommissioning of small (less than approximately 10 acres) solid waste disposal facilities for construction and demolition waste, in accordance with applicable requirements (such as 40 CFR part 257, ''Criteria for Classification of Solid Waste Disposal Facilities and Practices,'' and 40 CFR part 61, ''National Emission Standards for Hazardous Air Pollutants'') that would not release substances at a level, or in a form, that could pose a threat to public health or the environment.

(14) Department of Energy, 10 CFR 1021(D) (Appendix B1.33), as adopted in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*STORMWATER RUNOFF CONTROL. Design, construction, and operation of control practices to reduce stormwater runoff and maintain natural hydrology. Activities include, but are not limited to, those that reduce impervious surfaces (such as vegetative practices and use of porous pavements), best management practices (such as silt fences, straw wattles, and fiber rolls), and use of green infrastructure or other low impact development practices (such as cisterns and green roofs).

(15) Department of Energy, 10 CFR 1021(D) (Appendix B1.34), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10

CFR 1021 Appendix B).

*LEAD-BASED PAINT CONTAINMENT, REMOVAL, AND DISPOSAL. Containment, removal, and disposal of lead-based paint in accordance with applicable requirements (such as provisions relating to the certification of removal contractors and technicians at 40 CFR part 745, "Lead Based Paint Poisoning Prevention In Certain Residential Structures").

(16) Department of Energy, 10 CFR 1021(D) (Appendix B1.35), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*DROP-OFF, COLLECTION, AND TRANSFER FACILITIES FOR RECYCLABLE MATERIALS. Siting, construction, modification, and operation of recycling or compostable material drop-off, collection, and transfer stations on or contiguous to a previously disturbed or developed area and in an area where such a facility would be consistent with existing zoning requirements. The stations would have appropriate facilities and procedures established in accordance with applicable requirements for the handling of recyclable or compostable materials and household hazardous waste (such as paint and pesticides). Except as specified above, the collection of hazardous waste for disposal and the processing of recyclable or compostable materials are not included in this class of actions.

(17) Department of Energy, 10 CFR 1021(D) (Appendix B6.9), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).
*MEASURES TO REDUCE MIGRATION OF CONTAMINATED GROUNDWATER. Small-scale temporary measures to reduce migration of contaminated groundwater, including the siting, construction, operation, and decommissioning of necessary facilities. These measures include, but are not limited to, pumping, treating, storing, and reinjecting water, by mobile units or facilities that are built and then removed at the end of the action.

(18) Department of Energy, 10 CFR 1021(D) (Appendix B6.10), as adopted in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*UPGRADED OR REPLACEMENT WASTE STORAGE FACILITIES. Siting, construction, modification, expansion, operation, and decommissioning of a small upgraded or replacement facility (less than approximately 50,000 square feet in area) within or contiguous to a previously disturbed or developed area (where active utilities and currently used roads are readily accessible) for storage of waste that is already at the site at the time the storage capacity is to be provided. These actions do not include the storage of high-level radioactive waste, spent nuclear fuel or any waste that requires special precautions to prevent nuclear criticality. (See also B6.4, B6.5, B6.6 of this appendix, and C16 of appendix C.)

L. Cultural Resources.

(1) Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A, n. 34, as adopted by BLM in 90 FR 27655 and NPS in 90 FR 24644.

*Reburial of human remains and funerary objects under the Native American Graves Protection and Repatriation Act that are inadvertently discovered or intentionally excavated on [TVA] land.

(2) The Presidio Trust, 36 CFR 1010.7(a)(21) as adopted by NPS in 90 FR 24644.

*Rehabilitation, modification, or improvement of historic properties that have been determined to be in conformance with the Secretary of the Interior's "Standards for the Treatment of Historic Properties" at 36 CFR part 68 and that would have no or only minimal environmental impact.

(3) Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A, n33 as adopted by NPS in 90 FR 24644.

*Actions to protect cultural resources including, but not limited to, fencing, gating, signing, and bank stabilization (generally up to 1/2 mile in length when along stream banks or reservoir shoreline).

# Final Regulatory Flexibility Analysis for the Rescission of the Regulatory Definition of "Harm"

October 2025

**U.S. Fish and Wildlife Service**

The U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) (collectively referred to as the Services) are rescinding the regulatory definition of ''harm'' in the Services' Endangered Species Act (ESA or the Act) regulations. This Final Regulatory Flexibility Analysis (FRFA) considers the extent to which the impacts resulting from the rescission of the regulatory definition of "harm" under ESA may be borne by small businesses. The analysis presented is conducted pursuant to the Regulatory Flexibility Act (RFA) as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996. Information for this analysis was gathered from the U.S. Small Business Administration (SBA), FWS, U.S. Census Bureau, U.S. Department of Agriculture (USDA), Dun & Bradstreet, and relevant ESA permitting documents.

## A. Introduction

First enacted in 1980, the RFA was designed to ensure that Federal Agencies consider the potential for regulations to unduly inhibit the ability of small entities to compete. The goals of the RFA include increasing the government's awareness of the impact of regulations on small entities and encouraging agencies to exercise flexibility to provide regulatory relief to small entities.

When a Federal agency promulgates a final rule, the RFA requires the agency to prepare an analysis that describes the effect of the rule on small entities (i.e., small businesses, small organizations, and small government jurisdictions).[1] For this rulemaking, the analysis takes the form of an FRFA. Under 5 U.S.C., Section 603(b) of the RFA, an FRFA is required to contain:

1. A succinct statement of need for and objectives of the rule;
2. A statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;
3. The response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;
4. A description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply or an explanation of why no such estimate is available;
5. A description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;
6. A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected;
7. A description of any significant alternatives to the proposed rule that accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities.

[1] 5 U.S.C. 601 et seq.

## B. Need and Objectives of the Final Rule

The final rule would rescind the regulatory definition of "harm" in the ESA regulations. The existing regulatory definition of "harm," which includes habitat modification, runs contrary to the best meaning of the statutory term "take." This change adheres to the single, best meaning of the ESA.

## C. Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis

During the public comment period, the Services received more than 357,000 public comments through Regulations.gov. Although some public comments voiced support for the rule, many comments voiced concerns about potential adverse effects of the rule on small entities. The comments below summarize the issues raised by the public comments and FWS responses.

Comment: Many comments stated that the rule would create uncertainty; the statutory term of "harm" is vague without a definition, which would adversely affect small businesses.

> Response: By rescinding the regulatory definition of "harm," the Services are aligning the interpretation of "take" with the single, best reading of the statute, consistent with *Loper Bright*. While the current definition of "harm" has been in place for decades, its inclusion of habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns as a form of "take" has led to interpretive challenges and regulatory uncertainty, particularly in determining when habitat modification rises to the level of "take." The Services conclude that using the single, best meaning of the statutory text will reduce inconsistency and regulatory uncertainty by focusing on acts which actually kill or injure listed species.
>
> Rescinding the definition of "harm" is setting prospective standards only; previously issued permits or incidental take statements will not be required to be reevaluated solely because of this final rule, nor does it invalidate prior conservation agreements or other conservation or recovery efforts.

Comment: Several comments stated that the initial regulatory flexibility analysis (IRFA) did not account for potential negative effects, such as impacts on small businesses that currently benefit from eco-tourism/recreation (retail trade, guides, hotels, gas, etc.) or ecosystem services related to habitat conservation, including entities that research endangered species and habitat, entities that conduct species mitigation projects, entities that manage conservation banks, and entities that restore habitat. Commenters also stated that effects on small businesses due to stranded investments (such as existing and pending conservation offsets without a market) should be included in the FRFA.

> Response: FWS emphasizes that the rescission of the regulatory definition of "harm" does not diminish the importance of habitat conservation under the ESA. Habitat-related impacts are more appropriately addressed through other provisions of the ESA, including section 7 consultations and section 5 land acquisition authorities. FWS will continue to use these tools to conserve habitat for listed species. We have conducted a FRFA that includes consideration of directly regulated entities as required under the RFA.

Comment: Multiple commenters stated that small businesses would benefit from the rule. They stated that small businesses that would benefit would include those involved in agriculture, oil and gas, home developers, timber harvests, sawmills, mining, construction, grazing, and road construction and maintenance. Other commenters stated that the burden is speculative.

Response: FWS agrees that the FRFA is required to include regulated entities. The FRFA includes these potentially affected industries that are directly regulated by the rule and discusses potential benefits to affected small entities.

Comment: Some commenters stated that the IRFA should include potential negative effects on Tribes due to lost benefits from eco-tourism/recreation (retail trade, guides, hotels, gas, etc.), commercial fishing, and habitat restoration projects (local consulting, engineering, and construction jobs). Commenters stated that commercial and subsistence fishing are deeply engrained cultural traditions and that rescinding the definition of "harm" would affect ESA-listed Chinook, steelhead and bull trout, among other aquatic species.

Response: FWS emphasizes that the rescission of the regulatory definition of "harm" does not diminish the importance of habitat conservation under the ESA. Habitat-related impacts will be addressed under other provisions of the ESA, including section 5 land acquisition, section 7 consultations and critical habitat designations. FWS will continue to use these tools to conserve habitat for listed species. FWS disagrees that entities benefiting from eco-tourism/recreation and habitat restoration projects should be included in the FRFA because they are not regulated entities for the purpose of the RFA. Only directly regulated entities are required to be considered under the RFA.

## D. Small Business Administration Comments

The Services received comment from the Chief Counsel for Advocacy of the Small Business Administration regarding the proposed rule. The Chief Counsel for Advocacy is supportive of the proposed rule and IRFA. Advocacy stated that the agencies could better illustrate the benefits of the proposed rule and requested some changes.

Requested Change: Advocacy requested including a description of the types of impacted small businesses using North American Industry Classification System (NAICS) codes, and an estimate of the number potential small businesses impacted, including primary industry sectors, small entities looking to expand their physical footprint, and small governmental jurisdictions.

Response: The FRFA includes an estimate of the number and type of potential small businesses that would be impacted by the final rule. FWS added qualitative discussion of the potential for small entities to expand their physical footprint beyond what would have occurred absent the final rule as well as potential effects on small governmental jurisdictions.

Requested Change: Advocacy requested quantifying the direct costs relieved by the rule, such as reductions in the need for habitat consultants as well as reductions in project delays.

Response: Entities may still voluntarily pursue permits issued under section 10(a) of the ESA although some may choose not to. If an entity chooses not to pursue a section 10(a) permit, then they may decrease the need for habitat consultants or project delays. The FRFA includes discussion of potential costs that could be avoided, including conservation costs and potential delays. The actual impact of the final rule on the number of future ESA section 10(a) permits is uncertain.

Requested Change: Advocacy requested discussing the "opportunity costs" that would be relieved by the proposed rule, such as removing barriers for small entities to expand their businesses.

Response: The FRFA discusses potentially avoided opportunity costs associated with delays associated with permitting as well as potential restrictions on development activities that could occur under the final rule. Specifically, to the extent that HCP implementation costs would have prevented small businesses from expanding their physical footprint, either by limiting construction to particular areas or through required

mitigation ratios that otherwise would have constrained such development, some constraints on the locations of development may not occur under the final rule.

Requested Change: Advocacy requested discussing potential impacts to small governments, stating that governments can be impacted by delays and cost increases to construction projects within their jurisdictions by ESA-related regulatory obligations.

Response: The FRFA includes small governments and Tribes as potentially affected entities. The FRFA estimates that approximately 19 small governments could be affected by the final rule annually.

Requested Change: Advocacy requested attempting to quantify the regulatory relief the rule will provide. The agencies should assess if there are paperwork burdens that could be relieved by the rule.

Response: The FRFA discusses potential regulatory relief in the section "Description of the projected reporting, record keeping, and other compliance requirements for small entities." The FRFA recognizes that the rule would not impose any new reporting, recordkeeping, or other compliance costs on any small entities. Further, to the extent that fewer ESA section 10(a) permits are issued, lower administrative and recordkeeping costs are likely. The FRFA describes potential per permit cost savings, noting that the actual impact of the final rule on the number of future ESA section 10(a) permits is uncertain.

## E. Description of Small Entities Affected by the Rule

### E.1. Definition of a Small Entity

Three types of small entities are defined in the RFA:

- **Small Business.** Section 601(3) of the RFA defines a small business as having the same meaning as "small business concern" under section 3 of the Small Business Act. This includes any firm that is independently owned and operated and is not dominant in its field of operation. The U.S. SBA has developed size standards to carry out the purposes of the Small Business Act, and those size standards can be found in 13 CFR 121.201. The size standards are matched to NAICS industries. The SBA definition of a small business applies to a firm's parent company and all affiliates as a single entity. For agricultural businesses, this analysis utilizes USDA size standards to ensure consistency with farm operations data from the Census of Agriculture.

- **Small Governmental Jurisdiction.** Section 601(5) defines small governmental jurisdictions as governments of cities, counties, towns, townships, villages, school districts, or special districts with a population of less than 50,000. Special districts may include those servicing irrigation, ports, parks and recreation, sanitation, drainage, soil and water conservation, road assessment, etc. Most tribal governments will also meet this standard. When counties have populations greater than 50,000, those municipalities of fewer than 50,000 can be identified using population reports. Other types of small government entities are not as easily identified under this standard, as they are not typically classified by population.

- **Small Organization.** Section 601(4) defines a small organization as any not-for-profit enterprise that is independently owned and operated and not dominant in its field. Small organizations may include private hospitals, educational institutions, irrigation districts, public utilities, agricultural co-ops, etc. Depending upon state laws, it may be difficult to distinguish whether a small entity is a government or non-profit entity. For example, a water supply entity may be a cooperative owned by its members in one case and in another a publicly chartered small government with the assets owned publicly and officers elected at the same elections as other public officials.

## E.2. Description of the Type of Small Entities to Which the Rule Will Apply

The final rule removes the definition of the term "harm," which is contained in the definition of "take" in section 3 of the ESA. The ESA authorizes the Service to exempt parties, including small entities, from its take prohibitions under certain circumstances.

Under section 7 of the ESA, the Services and Federal agencies engage in consultation on proposed Federal actions. If the Federal agency determines the proposed action is likely to adversely affect listed species or critical habitat, the Service conducts an analysis and issues a biological opinion that includes an incidental take statement if “take” of listed wildlife is anticipated. The incidental take statement estimates the expected incidental take of a listed wildlife species resulting from the action and specifies those terms and conditions required to implement the reasonable and prudent measures necessary or appropriate to minimize this incidental take. If the proposed action is conducted in accordance with these terms and conditions, the incidental take is exempted from the ESA's “take” prohibitions. Under the RFA, as amended, and as understood in light of recent court decisions, Federal agencies are required to evaluate the potential incremental impacts of rulemaking on those entities directly regulated by the rulemaking itself; in other words, the RFA does not require agencies to evaluate the potential impacts to indirectly regulated entities. Section 7 of the ESA requires Federal agencies, in consultation with the Service, to ensure that any action authorized, funded, or carried out by the agency is not likely to destroy or adversely modify critical habitat. Therefore, only Federal action agencies are directly subject to the specific regulatory requirement (avoiding destruction and adverse modification) imposed by section 7. Therefore, because small entities are not directly regulated by the requirements of section 7, the FRFA does not analyze or consider the potential impacts of the final rule on those small entities.

Under section 10(a)(1)(A), the FWS may issue an Enhancement of Survival (EOS) Permit that authorizes “take” of species that may result from implementing conservation measures or from ongoing land management undertaken by the property owner under a Conservation Benefit Agreement (CBA). A CBA is a voluntary agreement involving private or other non-federal property owners where the actions in the agreement provide a net conservation benefit to the species and contribute to the conservation or recovery of the agreement’s covered species. Covered species can include species listed as endangered or threatened under the ESA and/or non-listed at-risk species. The agreement is between cooperating non-federal property owners and FWS.

Prior to April 12, 2024, FWS issued EOS permits for Safe Harbor Agreements and Candidate Conservation Agreements with Assurances (CCAAs) under Section 10(a)(1)(A). FWS revised its regulations for Section 10(a)(1)(A) at 50 CFR 17.22(c)(1) and § 17.32 (c)(1) to remove and consolidate these agreement types into a new agreement type called a CBA. This analysis uses the EOS permit data over time, regardless of the associated agreement name, to evaluate impacts to small entities.

Under section 10(a)(1)(B), the Services may also permit non-Federal parties to “take” a listed species if such a taking is incidental to, and not the purpose of, an otherwise legal activity. Prior to receiving an incidental take permit pursuant to 10(a)(1)(B), a non-Federal party must prepare a permit application and habitat conservation plan. A habitat conservation plan must contain a description of: (1) the impact that will likely result from the taking; (2) what steps the applicant will take to minimize and mitigate to the maximum extent practicable, the impacts and how these steps will be funded; (3) what alternative actions to the “take” were considered and why they are not being utilized; and (4) any measures the Secretary (Commerce or Interior) may require as being necessary or appropriate for the purposes of the habitat conservation plan (16 U.S.C. 1539(a)(2)(A)). If the Secretary finds that the applicant will minimize and mitigate to the maximum extent practicable the impacts of any incidental take, and will meet other requirements of section 1539 (a)(2)(B), the Secretary issues a permit, legally binding the applicant to the conservation measures set forth in the habitat conservation plan.

The recipients of these permits may include individual landowners or businesses, not-for-profit organizations, local jurisdictions, state entities, or combinations of these. During the past five years (2020-2024), FWS issued an average of 119 ESA section 10(a) permits annually (including both ITP and EOS permits).[2] Table 1 summarizes the distribution of ESA section 10(a) permits by type across entities during this period. As shown, the majority of section 10(a) permits (91 percent) are typically ITPs. NMFS reporting indicates that it issues approximately two ESA section 10(a) permits per year that are not included in these totals.[3]

**Table 1. Average Annual ESA Section 10(a) Permits, 2020-2024**

| ESA SECTION 10(a) PERMIT TYPE | NUMBER OF ESA SECTION 10(a) PERMITS PER YEAR[1] | PERCENT |
|---|---|---|
| ITP permits (for HCPs) | 108 | 91% |
| EOS Permits (for CBAs)[2] | 11 | 9% |
| **Total ESA section 10(a) permits** | **119** | **100%** |

Source: E-permits data provided by FWS, September 2025.

[1] NMFS reporting indicates that it issues approximately two ESA section 10(a) permits per year that are not included in these totals. National Oceanic and Atmospheric Administration, Permits for Incidental Taking of Endangered or Threatened Species, OMB Control No. 0648-0230 Supporting Statement Part A, Paperwork Reduction Act. Accessed at https://www.reginfo.gov/public/do/DownloadDocument?objectID=147054100

[2] As of April 12, 2024 (89 FR 26070), SHAs and candidate conservation agreements with assurances (CCAA) were combined into CBAs. For purposes of this analysis these agreement types are combined.

Entities that voluntarily undertake ESA section 10(a) permits range from private landowners, local jurisdictions, counties, states, and combinations of these types of entities. A review of ESA section 10(a) permits issued by FWS between 2020 and 2024 identified crop production, cattle ranching and farming, forestry, electric power generation, commercial and residential building construction, and mining as the most common industries that were the subject of section 10(a) permits. Table 2 presents industry sectors most likely to be affected by the final rule, as defined by the NAICS system and SBA as well as USDA size standards. The size standards represent the annual receipts or number of employees that represent the maximum allowed for a concern and its affiliates to be considered small.

[2] E-permits data provided by FWS, September 2025.

[3] National Oceanic and Atmospheric Administration, Permits for Incidental Taking of Endangered or Threatened Species, OMB Control No. 0648-0230 Supporting Statement Part A, Paperwork Reduction Act. Accessed at https://www.reginfo.gov/public/do/DownloadDocument?objectID=147054100

**Table 2. Industry Sectors Anticipated to be Directly Affected by the Final Rule**

| NAICS | INDUSTRY AND DESCRIPTION | SIZE STANDARD (MILLIONS OF DOLLARS IN ANNUAL RECEIPTS OR EMPLOYMENT) |
|---|---|---|
| **11 Agriculture, Forestry, Fishing and Hunting** | | |
| 111 | **Crop Production** - Industries in the Crop Production subsector grow crops mainly for food and fiber. The subsector comprises establishments, such as farms, orchards, groves, greenhouses, and nurseries, primarily engaged in growing crops, plants, vines, or trees and their seeds. | $350,000 in revenue[1] |
| 1121 | **Cattle Ranching and Farming** - This industry group comprises establishments primarily engaged in raising cattle, milking dairy cattle, or feeding cattle for fattening. | $350,000 in revenue[1] |
| 113 | **Forestry and Logging** - Industries in the Forestry and Logging subsector grow and harvest timber on a long production cycle (i.e., of 10 years or more). Long production cycles use different production processes than short production cycles, which require more horticultural interventions prior to harvest, resulting in processes more similar to those found in the Crop Production subsector. Consequently, Christmas tree production and other production involving production cycles of less than 10 years, are classified in the Crop Production subsector. | 500 employees (NAICS code 113310 Logging) |
| **21 Mining, Quarrying, and Oil and Gas Extraction** | | |
| 211 | **Oil and Gas Extraction** - Industries in the Oil and Gas Extraction subsector operate and/or develop oil and gas field properties. Operation and development activities include exploration for crude petroleum and natural gas; drilling, completing, and equipping wells; operating separators, emulsion breakers, desilting equipment, and field gathering lines for crude petroleum and natural gas; and all other activities in the preparation of oil and gas up to the point of shipment from the producing property. This subsector includes the production of crude petroleum, the mining and extraction of oil from oil shale and oil sands, the production of natural gas, sulfur recovery from natural gas, and recovery of hydrocarbon liquids. | 1,250 employees (NAICS code 211120 and 211130) |
| 212 | **Mining (except Oil and Gas)** - Industries in the Mining (except Oil and Gas) subsector primarily engage in mining, mine site development, and beneficiating (i.e., preparing) metallic minerals and nonmetallic minerals, including coal. The term "mining" is used in the broad sense to include ore extraction, quarrying, and beneficiating (e.g., crushing, screening, washing, sizing, concentrating, and flotation), customarily done at the mine site. | 961 employees (average of NAICS codes within subsector 212) |
| 21231 | **Stone Mining and Quarrying** - This industry comprises (1) establishments primarily engaged in developing the mine site, mining or quarrying dimension stone (i.e., rough blocks and/or slabs of stone), or mining and quarrying crushed and broken stone and/or (2) preparation plants primarily engaged in beneficiating stone (e.g., crushing, grinding, washing, screening, pulverizing, and sizing). | 500 employees (NAICS code 212311) |
| **22 Utilities** | | |
| 22 | **Utilities** - The Utilities sector comprises establishments engaged in the provision of the following utility services: electric power, natural gas, steam supply, water supply, and sewage treatment and disposal. Within this sector, the specific activities associated with the utility services provided vary by utility: electric power includes generation, transmission, and distribution; natural gas includes | 832 employees (average of sector 22) |

| NAICS | INDUSTRY AND DESCRIPTION | SIZE STANDARD (MILLIONS OF DOLLARS IN ANNUAL RECEIPTS OR EMPLOYMENT) |
|---|---|---|
| | distribution; steam supply includes provision and/or distribution; water supply includes treatment and distribution; and sewage removal includes collection, treatment, and disposal of waste through sewer systems and sewage treatment facilities. | |
| 2211 | **Electric Power Generation, Transmission and Distribution** - This industry group comprises establishments primarily engaged in generating, transmitting, and/or distributing electric power. Establishments in this industry group may perform one or more of the following activities: (1) operate generation facilities that produce electric energy; (2) operate transmission systems that convey the electricity from the generation facility to the distribution system; and (3) operate distribution systems that convey electric power received from the generation facility or the transmission system to the final consumer. | 800 employees (average of NAICS codes in subsector 2211) |
| 221114 | **Solar Electric Power Generation** - This U.S. industry comprises establishments primarily engaged in operating solar electric power generation facilities. These facilities use energy from the sun to produce electric energy. The electric energy produced in these establishments is provided to electric power transmission systems or to electric power distribution systems. | 500 employees |
| 22112 | **Electric Power Transmission, Control, and Distribution** - This industry comprises establishments primarily engaged in operating electric power transmission systems, controlling (i.e., regulating voltages) the transmission of electricity, and/or distributing electricity. The transmission system includes lines and transformer stations. These establishments arrange, facilitate, or coordinate the transmission of electricity from the generating source to the distribution centers, other electric utilities, or final consumers. The distribution system consists of lines, poles, meters, and wiring that deliver the electricity to final consumers. | 1,025 employees (average of NAICS codes in subsector 2112) |
| 22131 | **Water Supply and Irrigation Systems** - This industry comprises establishments primarily engaged in operating water treatment plants and/or operating water supply systems. The water supply system may include pumping stations, aqueducts, and/or distribution mains. The water may be used for drinking, irrigation, or other uses. | $41 million in revenue |
| **23 Construction** | | |
| 236 | **Construction of Buildings** - The Construction of Buildings subsector comprises establishments primarily responsible for the construction of buildings. The work performed may include new work, additions, alterations, or maintenance and repairs. The on-site assembly of precut, panelized, and prefabricated buildings and construction of temporary buildings are included in this subsector. Part or all of the production work for which the establishments in this subsector have responsibility may be subcontracted to other construction establishments--usually specialty trade contractors. | $45 million in revenue (average of NAICS codes in subsector 236) |
| 2361 | **Residential Building Construction** - This industry comprises establishments primarily responsible for the construction or remodeling and renovation of single-family and multifamily residential buildings. Included in this industry are residential housing general contractors (i.e., new construction, remodeling, or renovating existing residential structures), for-sale builders and remodelers of residential structures, residential project construction management firms, and residential design-build firms. | $45 million in revenue |

| NAICS | INDUSTRY AND DESCRIPTION | SIZE STANDARD (MILLIONS OF DOLLARS IN ANNUAL RECEIPTS OR EMPLOYMENT) |
|---|---|---|
| 2362 | **Nonresidential Building Construction** - This industry group comprises establishments primarily responsible for the construction (including new work, additions, alterations, maintenance, and repairs) of nonresidential buildings. This industry group includes nonresidential general contractors, nonresidential for-sale builders, nonresidential design-build firms, and nonresidential project construction management firms. | $45 million in revenue |
| 237 | **Heavy and Civil Engineering Construction** - The Heavy and Civil Engineering Construction subsector comprises establishments whose primary activity is the construction of entire engineering projects (e.g., highways and dams), and specialty trade contractors, whose primary activity is the production of a specific component for such projects. Specialty trade contractors in the Heavy and Civil Engineering Construction subsector generally are performing activities that are specific to heavy and civil engineering construction projects and are not normally performed on buildings. The work performed may include new work, additions, alterations, or maintenance and repairs. | $42 million in revenue (average of NAICS codes in subsector 237) |
| 238 | **Specialty Trade Contractors** - The Specialty Trade Contractors subsector comprises establishments whose primary activity is performing specific activities (e.g., pouring concrete, site preparation, plumbing, painting, and electrical work) involved in building construction or other activities that are similar for all types of construction, but that are not responsible for the entire project. The work performed may include new work, additions, alterations, maintenance, and repairs. The production work performed by establishments in this subsector is usually subcontracted from establishments of the general contractor type or for-sale builders, but especially in remodeling and repair construction, work also may be done directly for the owner of the property. Specialty trade contractors usually perform most of their work at the construction site, although they may have shops where they perform prefabrication and other work. Establishments primarily engaged in preparing sites for new construction are also included in this subsector. | $19 million in revenue (average of NAICS codes in subsector 238) |
| **48-49 Transportation and Warehousing** | | |
| 486 | **Pipeline Transportation** - Industries in the Pipeline Transportation subsector use transmission pipelines to transport products, such as crude oil, natural gas, refined petroleum products, and slurry. Industries are identified based on the products transported (i.e., pipeline transportation of crude oil, natural gas, refined petroleum products, and other products).<br><br>The Pipeline Transportation of Natural Gas industry includes the storage of natural gas because the storage is usually done by the pipeline establishment and because a pipeline is inherently a network in which all the nodes are interdependent. | 1,500 employees (NAICS codes 486110 and 486910); $44 million (average of codes 486210 and 486990) |
| **71 Arts, Entertainment, and Recreation** | | |
| 7139 | **Other Amusement and Recreation Industries** - This industry group comprises establishments primarily engaged in operating golf courses and country clubs; skiing facilities; marinas; fitness and recreational sports centers; bowling centers; and providing other amusement and recreation services. | $17 million in revenue (average of NAICS codes in subsector 7139) |

| NAICS | INDUSTRY AND DESCRIPTION | SIZE STANDARD (MILLIONS OF DOLLARS IN ANNUAL RECEIPTS OR EMPLOYMENT) |
|---|---|---|
| 713990 | **All Other Amusement and Recreation Industries** - This industry comprises establishments (except amusement parks and arcades; gambling industries; golf courses and country clubs; skiing facilities; marinas; fitness and recreational sports centers; and bowling centers) primarily engaged in providing recreational and amusement services. | $9 million in revenue |
| **72 Accommodation and Food Services** | | |
| 721 | **Accommodation** - Industries in the Accommodation subsector provide lodging or short-term accommodations for travelers, vacationers, and others. There is a wide range of establishments in these industries. Some provide lodging only, while others provide meals, laundry services, and recreational facilities, as well as lodging. Lodging establishments are classified in this subsector even if the provision of complementary services generates more revenue. The types of complementary services provided vary from establishment to establishment. The subsector is organized into three groups: (1) traveler accommodation, (2) recreational accommodation, and (3) rooming and boarding houses, dormitories, and workers' camps. | $19 million in revenue (average of NAICS codes in subsector 721) |
| **81 Other Services (except Public Administration)** | | |
| 81 | **Other Services (except Public Administration)**- The Other Services (except Public Administration) sector comprises establishments engaged in providing services not specifically provided for elsewhere in the classification system. Establishments in this sector are primarily engaged in activities such as equipment and machinery repairing, promoting or administering religious activities, grantmaking, advocacy, and providing drycleaning and laundry services, personal care services, death care services, pet care (except veterinary) services, photofinishing services, temporary parking services, and dating services. | $19 million in revenue (average of NAICS codes in sector 81) |

[1] The analysis uses USDA size standards for crop production, cattle ranching and farming in order to align with USDA data for these industries.

Sources: Table of Small Business Size Standards Marched to North American Industry Classification System Codes (U.S. Small Business Administration, Version March 2023). Accessed September 2025 at https://www.sba.gov/document/support--table-size-standards; North American Industry Classification System (U.S. Census Bureau, Version 2017). Accessed September 2025 at https://www.census.gov/naics/; USDA. 2025. "Farmers First: Small Family Farms Policy Agenda." May 19, 2025. Accessed at https://www.usda.gov/sites/default/files/documents/farmers-first-small-family-farms-policy-agenda.pdf.

## E.3. Estimate of the Number of Small Entities to Which the Rule Will Apply

Federal courts and Congress have indicated that an RFA analysis should be limited to small entities directly regulated by the regulation.[4] As such, this section focuses on entities engaged with ESA section 10(a) permits, including applicants and covered industry activities for these permits. This analysis acknowledges and describes indirectly regulated entities where possible.

The number of small entities affected by future ESA section 10(a) permits have the potential to vary widely depending on the entities involved, the geographic scale covered by the permit, as well as the covered

[4] *Mid-Tec Elec. Coop v. FERC*, 773 F.2d 327 (D.C. Cir. 1985).

activities that are part of the permit. This analysis utilizes recent ESA section 10(a) permits as a proxy for estimating the number and type of small entities that may be affected by this final rule on an annual basis. The analysis assumes impacts on regulated small entities associated with future ESA section 10(a) permits may be reduced or avoided as a result of the final rule except in cases where permitted activities are known to injure or kill individuals of listed species.[5]

As articulated in public comments and summarized in Section C, the final rule also has the potential to result in adverse effects on small entities that would otherwise benefit from conservation efforts and related habitat benefits associated with ESA section 10(a) permitting activities, including entities involved in eco-tourism activities, recreation, research, or mitigation projects. These entities are not directly regulated by the Services and would be indirectly affected.

The FWS ECOS database includes 66 HCPs, CCAAs, and SHAs issued between 2020 and 2024 associated with 77 ESA section 10(a) permits.[6] For each permit in the sample, the analysis classified applicants by type (private, NGO, local, county/multi-county, or state/multi-state). In addition to the applicants, the analysis also identified industries participating in covered permit activities. The methodology used to estimate the number of affected small entities is summarized as follows:

For private applicants:

- The analysis assigned a relevant NAICS industry code based on the applicant's permit information.
- The analysis determined whether private applicants are small businesses using published revenue and employment data for the specific named entities[7] and the size standards described in Table 2. NGO applicants were assumed to be small organizations.

For local, county, state, and multiple jurisdiction permits:

- The analysis determined whether local or county government entity applicants are small entities using Census population data. State applicants are not small entities.
- The analysis used the type of applicant (local, county, state, or multiple jurisdictions) to identify the appropriate geographic scale at which each industry for each permit would be affected.[8] The analysis assigned NAICS industry codes for each permit-covered industry.
- At geographic scales relevant to the geographic area covered by each permit, the analysis extracted the total number of business entities for each permit-covered industry in each affected geography from U.S. 2023 Census County Business Patterns (CBP) or USDA 2022 Agricultural Census, depending on relevant industry.[9]

---

[5] For example, it is assumed that future permits following the final rule associated with wind energy developments would be similar to past permits because the covered activities would result in injury or death of listed wildlife.

[6] Conservation Plans Region Summary HCP, EOS Environment Conservation Online System, accessed at https://ecos.fws.gov/ecp/report/conservation-plans-region-summary?region=5&type=HCP , September 2025.

[7] Dun & Bradstreet. *Company Search* [Hoover's Database]. https://app.hoovers.dnb.com/search/company. Accessed September 2025.

[8] By assuming that all businesses in particular geographies would be affected by a particular section 10 permit, the analysis may overstate the number of businesses that would actually have been affected by section 10 permits.

[9] U.S. Census Bureau. "All Sectors: County Business Patterns, including ZIP Code Business Patterns, by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2023." Table CB2300CBP. https://data.census.gov/table/CBP2023.CB2300CBP?q=CB2300CBP. Accessed September 2025; USDA NASS Quick Stats. 2022 Census of Agriculture. NAICS Classification of Farm Operations. https://quickstats.nass.usda.gov/. Accessed September 2025. Note that farming entities with revenues below $10,000 are considered to be noncommercial entities consistent with USDA (see, for example, USDA, 2010. "Small Farms in the United States." https://ers.usda.gov/sites/default/files/_laserfiche/publications/44460/8727_eib63_1_.pdf?v=43757/.

- To estimate the likelihood of affected entities being small businesses, the analysis used national sales and employment data from the U.S. Census 2022 Economic Census, U.S. Census 2023 County Business Patterns, USDA 2022 Agricultural Census, and ProSight (formerly known as Risk Management Association) Sector Summaries (for sectors without publicly released cost or employment data, typically due to small sample sizes leading to disclosure concerns)[10] and the small business size standards in Table 2 to establish the proportion of businesses in each industry that are considered to be small.[11] This proportion was then then applied to business entity counts in affected geographies to estimate the number of affected small businesses for each industry and geographic area.[12] These numbers were then summed to estimate the total number of small businesses affected by each permit.

Because the ECOS data represent only a sample of all permits issued, the analysis scales the number of permits in the analytical sample up and annualized the sample using E-permit data to estimate the average total number of ESA section 10(a) permits issued annually, as well as the corresponding number of small entities likely to be affected by these permits.

As noted above, the analysis assumes that all future ESA section 10(a) permits would be affected by the final rule (i.e., would benefit from reduced burden) other than those that are known to injure or kill individuals of listed species. Table 3 presents estimates of small entities affected annually for ESA section 10(a) permits by applicant type and industry using the scaled estimate of annual permits and corresponding affected small entities. As shown, the analysis estimates that the rule could affect approximately 61,000 small entities annually across an average of 119 ESA section 10(a) permits. The majority of affected entities are anticipated to be associated with the state or multi-state permits (81 percent of affected small entities). Because of the large number of agricultural entities captured in multi-state ESA section 10(a) permits, the largest number of potentially affected small entities each year are estimated to be agricultural industry businesses that are part of state or multi-state permits. Specifically, small agricultural entities, which include those involved in crop production, cattle ranching and farming, and forestry and logging activities, represent 80 percent of all small entities affected by ESA section 10(a) permits. The analysis estimates that approximately 19 small government jurisdictions as well as two small organizations (not-for-profit enterprises) would also be affected annually. Overall, the analysis estimates that an ESA section 10(a) permit may affect 510 businesses on average. However, as noted above, by assuming that all businesses in relevant industries and geographies for each ESA section 10(a) permit would be affected, the analysis may overstate the number of businesses that would have been affected by ESA section 10(a) permits absent the final rule.

---

[10] ProSight (formerly known as Risk Management Association). Annual Statement Studies: Financial Ratio Benchmarks, 2024-2025. Accessed September 2025.

[11] U.S. Census Bureau. "All Sectors: County Business Patterns, including ZIP Code Business Patterns, by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2023." Table CB2300CBP. https://data.census.gov/table/CBP2023.CB2300CBP?q=CB2300CBP. Accessed September 2025; U.S. Census Bureau. U.S. Census Bureau. "Selected Sectors: Sales, Value of Shipments, or Revenue Size of Establishments for the U.S.: 2022." Economic Census, ECN Core Statistics Economic Census: Establishment and Firm Size Statistics for the U.S., Table EC2200SIZEREVEST. Accessed September 2025; USDA NASS Quick Stats. 2022 Census of Agriculture. NAICS Classification of Farm Operations. https://quickstats.nass.usda.gov/. Accessed September 2025. Note that farming entities with revenues below $10,000 are considered to be noncommercial entities consistent with USDA (see, for example, USDA, 2010. "Small Farms in the United States." https://ers.usda.gov/sites/default/files/_laserfiche/publications/44460/8727_eib63_1_.pdf?v=43757/.

[12] These sources do not always align with SBA small business standards (e.g., a size standard of $35 million and the Economic Census uses $25 to $99 million as the closest bracket). Where this occurred, the analysis used the closest reasonable size bracket and included the total estimate within that bracket without any adjustments. This may result in an over or under estimation of small businesses given the uncertainty of where firms fall within the bracket. However, for the reviewed NAICS codes there were very few large firms generally and thus the impact of this approach is likely minimal.

**Table 3. Number of Small Entities Affected by the Final Rule, by Applicant Type and Industry (Annual)**

| NAICS CODE AND INDUSTRY | PRIVATE / NGO | LOCAL | COUNTY / MULTI-COUNTY | STATE / MULTI-STATE | TOTAL | PERCENT OF AFFECTED SMALL ENTITIES |
|---|---|---|---|---|---|---|
| 11- Agriculture, Forestry, Fishing and Hunting | | | 2,700 | 46,000 | **49,000** | 80% |
| 21- Mining, Quarrying, and Oil and Gas Extraction | 2 | | 150 | | **150** | <1% |
| 22- Utilities | 6 | 13 | 84 | | **100** | <1% |
| 23- Construction | | 1,300 | 3,500 | 3,100 | **7,900** | 13% |
| 71- Arts, Entertainment, and Recreation | 3 | | 230 | | **230** | <1% |
| 72- Accommodation and Food Services | | | 110 | | **110** | <1% |
| 81- Other Services (except Public Administration) | | | 17 | | **17** | <1% |
| 00- Uncertain Industry[2] | | | 3,400 | | **3,400** | 5.5% |
| Small Government Jurisdiction | | 5 | 14 | | **19** | <1% |
| Small Organization | 2 | | | | **2** | <1% |
| **Total Affected Small Entities** | **12** | **1,300** | **10,000** | **50,000** | **61,000** | 100% |
| **Percent of All Affected Small Entities** | <1% | 2% | 17% | 81% | 100% | - |
| | | | | | | |
| Number of HCP, CBA, and SHAs | 67 | 5 | 20 | 11 | 100 | - |
| Number of ESA Section 10(a) Permits | 67 | 5 | 33 | 16 | 120 | - |
| **Average Number of Small Entities per ESA Section 10(a) Permit** | **0** | **290** | **310** | **3,200** | **510** | - |

[1] By assuming that all businesses in relevant industries and geographies for each ESA section 10(a) permit would be affected, the analysis may overstate the number of businesses that would have been affected by ESA section 10(a) permits absent the final rule.
[2] One sample permit affected all businesses in a particular location. As such, the uncertain category is meant to represent a mix of a variety of business types.

Sources: Review of FWS ESA Section 10(a) permits issued between 2020-2025, Conservation Plans Region Summary HCP, ECOS Environment Conservation Online System, accessed at https://ecos.fws.gov/ecp/report/conservation-plans-region-summary?region=5&type=HCP, September 2025; E-permits data provided by FWS, September 2025. Business county and employment:

U.S. Census Bureau. "All Sectors: County Business Patterns, including ZIP Code Business Patterns, by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2023." Table CB2300CBP. https://data.census.gov/table/CBP2023.CB2300CBP?q=CB2300CBP. Accessed September 2025;

U.S. Census Bureau. U.S. Census Bureau. "Selected Sectors: Sales, Value of Shipments, or Revenue Size of Establishments for the U.S.: 2022." Economic Census, ECN Core Statistics Economic Census: Establishment and Firm Size Statistics for the U.S., Table EC2200SIZEREVEST. Accessed September 2025. ProSight (formerly known as Risk Management Association). Annual Statement Studies: Financial Ratio Benchmarks, 2024-2025. Accessed September 2025; USDA NASS Quick Stats. 2022 Census of Agriculture. NAICS Classification of Farm Operations. https://quickstats.nass.usda.gov/. Accessed September 2025. Note that farming entities with revenues below $10,000 are considered to be noncommercial entities consistent with USDA (see, for example, USDA, 2010. "Small Farms in the United States." https://ers.usda.gov/sites/default/files/_laserfiche/publications/44460/8727_eib63_1_.pdf?v=43757/.

## F. Description of Reporting, Recordkeeping efforts, and Compliance Requirements

The final rule is deregulatory and could result in fewer ESA section 10(a) permits being issued each year. This rule would not impose any new reporting, recordkeeping, or other compliance costs on any small entities. To the extent that fewer future ESA section 10(a) permits are issued, lower administrative and recordkeeping costs are likely. Based on FWS-reported Paperwork Reduction Act estimates, filing of new ESA section 10(a) permits and providing reporting are estimated to cost approximately $200 per permit and $450 per respondent annually.[13] In addition, development of HCPs would have costs of approximately $100,000 per HCP.[14] Annual monitoring costs are anticipated to require an average of approximately $30,000 per permit.[15] To the extent that project delays would have occurred associated with development of these permits, these delays would not occur following the final rule. These avoided costs could benefit small entities as well as small government applicants that otherwise would have incurred these costs.

ESA section 10(a)(1)(B) incidental take permits typically include avoidance and minimization measures during any construction or other land-disturbing activities, as well as compensatory mitigation, and compliance monitoring and reporting. Costs of HCP implementation are widely variable, with annual costs ranging in the evaluated sample from $30,000 to $11 million annually per HCP (i.e., across all affected entities).[16] Some portion of these costs may be borne by small entities. To the extent that future permits are not issued or are issued in a more limited capacity, some portion of otherwise-affected small entities would benefit by avoiding these costs. In addition, to the extent that HCP implementation costs would have prevented small businesses from expanding their physical footprint, either by limiting construction to particular areas or through required mitigation ratios that otherwise would have constrained such development, some constraints on the locations of development may not occur.

To the extent that reduced habitat protections associated with efforts that would have been conducted as part of ESA section 10(a) permits also lead to a reduction in the demand for services provided by entities engaged in restoration and habitat protection, mitigation activities, scientific research, and other related activities, small entities associated with these activities could be adversely affected by the final rule relative to the baseline. Similarly, to the extent that reductions in ESA section 10(a) permitting activity results in adverse effects to populations of threatened and endangered species relative to the baseline, small entities engaged in wildlife watching and other tourism-related activities that rely on healthy habitat conditions could be adversely affected in areas where ESA section 10(a) permits would have benefited these species.

## G. Steps Taken to Minimize Significant Economic Impact on Small Entities

A FRFA should include a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes.

However, the final rule is deregulatory and would benefit small entities impacted by the ESA. As stated in the final rule, the Service has concluded that the regulatory definition of "harm" does not reflect the single, best meaning of the ESA. No replacement definition is needed as the ESA itself defines "take," and defining one

---

[13] U.S. Fish and Wildlife Service. Permits for Incidental Taking of Endangered or Threatened Species, OMB Control No. 1018-0094 Burden Calculations, Paperwork Reduction Act. Dated April 10, 2024.

[14] Ibid.

[15] Ibid.

[16] For example: Albany Pine Bush Preserve Commission. Habitat Conservation Plan for the Karner Blue Butterfly (*Plebejus = [Lycaeides] melissa samuelis*) and Frosted Elfin (*Callophyrus irus irus*) in the Albany Pine Busy Preserve. July 2020. Accessed September 2025 at https://ecos.fws.gov/docs/plan_documents/thcp/thcp_3163.pdf; Pacific Gas & Electric Company (PG&E). Multiple Region Operations and Maintenance Habitat Conservation Plan. Prepared by ICF for PG&E. May 2020. Accessed September 2025 at https://ecos.fws.gov/docs/plan_documents/thcp/thcp_3087.pdf.

subcomponent of the definition — "harm"—is unnecessary. Any replacement definition would likely have adverse impacts on small entities.

## G.1. Description of Alternatives to the Final Rule that would Minimize Significant Economic Impacts on Small Entities

An FRFA should include a description of any significant alternatives to the proposed rule that minimize significant economic impacts on small entities while accomplishing the agency's objectives. The final rule is deregulatory and is generally expected to benefit small entities impacted by the ESA. However, to the extent that reduced habitat protections lead to reduced activities on the part of entities engaged in restoration and habitat protection activities, entities engaged in these activities could be adversely affected. Similarly, to the extent that species populations are reduced associated relative to the baseline, wildlife watching and other tourism related activities could be adversely affected.

# Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities

Companion Manual for NOAA Administrative Order 216-6A

**Effective: June 30, 2025**

# Table of Contents

**I. General** .......... **1**
A. Purpose .......... 1
B. Roles and Responsibilities .......... 1
**II. Determining When NEPA Applies** .......... **2**
A. Proposed Actions for Which Another Statute's Requirements Serve the Function of Agency Compliance with the Act .......... 2
1. Incidental Take Statements .......... 3
2. Additional Endangered Species Act Considerations .......... 3
B. Proposed Actions that are Nondiscretionary Actions with Respect to Which Such Agency Does Not Have Authority to Take Environmental Factors into Consideration in Determining Whether to Take The Proposed Action .......... 3
1. Congressionally Directed Spending .......... 3
C. Proposed Actions that are Not Major Federal Actions .......... 3
1. A Non-Federal Action with Minimal Federal Funding .......... 3
2. Other .......... 4
**III. Determining the Appropriate Scope of Issues for Analysis** .......... **4**
**IV. Determining the Appropriate Level of NEPA Review** .......... **4**
A. Significance .......... 5
B. Sources of Information .......... 6
**V. Categorical Exclusions** .......... **6**
A. Establishing and Revising CEs .......... 6
1. Adopting Another Agency's CE .......... 7
B. Removal of CEs .......... 7
C. Application and Documentation .......... 8
D. NOAA Extraordinary Circumstances .......... 9
E. Other Agencies Requesting Adoption of a NOAA CE .......... 9
F. Reliance on a CE Determination Document of Another Agency .......... 10
**VI. Environmental Assessments** .......... **10**
A. Contents .......... 10
B. Scope of Analysis .......... 11
C. Certifications .......... 11
D. Finding of No Significant Impact .......... 12
**VII. Environmental Impact Statements (EIS)** .......... **12**
A. Scoping .......... 13

B. Notice of Intent ..... 13
C. Scope of Analysis ..... 14
D. Contents ..... 14
E. Comments ..... 16
F. Certifications ..... 17
G. Finalization ..... 17
1. NEPA Decision Document ..... 18
a. Example: Record of Decision (ROD) ..... 18
**VIII. Supplementation ..... 19**
**IX. Efficiency and Streamlining ..... 19**
A. Programmatic NEPA Reviews and Reevaluation ..... 19
B. Reliance on Existing Documents ..... 20
1. Incorporation by Reference ..... 20
2. Adequacy of Existing NEPA Documents for New Actions ..... 21
a. Relying on Another Agency's NEPA Analysis ..... 21
C. Reducing Delay ..... 22
D. Deadlines ..... 22
1. Deadline Extensions ..... 23
2. Deadline Exceedances ..... 23
E. Page Limits ..... 24
F. Tracking NEPA Reviews ..... 24
G. Integration of NEPA Documents with other Environmental Requirements ..... 25
H. Public Engagement ..... 26
I. Applicant and Contractor-Prepared Documents ..... 27
1. NOAA-Directed Contractors ..... 28
2. Non-NOAA-Directed Contractors or Applicants ..... 28
**X. NEPA and Collaboration ..... 29**
A. Coordination within NOAA ..... 29
B. Cooperating with Other Agencies ..... 29
1. Designating the Lead Agency ..... 29
2. Inviting Cooperating Agencies ..... 30
3. NOAA as a Cooperating Agency ..... 31
4. Commenting on Another Agency's EIS ..... 31
5. Projects with Accelerated Timelines ..... 31

**XI. Emergencies** .......... 32
**XII. Limitations on Actions** .......... 33
**XIII. Withdrawal or Cancellation** .......... 33
**XIV. Definitions** .......... 34

**Attachments**

Appendix A - NOAA's Categorical Exclusions

# I. General

## A. Purpose

This Companion Manual establishes the National Oceanic and Atmospheric Administration's (NOAA) procedures for the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. §§ 4321 et seq.), as amended by the Fiscal Responsibility Act (Pub. L. 118-5) (June 3, 2023) and supersedes all prior NOAA NEPA procedures.

The Companion Manual is authorized by NOAA Administrative Order (NAO) 216-6A which establishes NOAA's policy for implementing NEPA.

In addition to the process for establishing or revising categorical exclusions set forth in Section V, NOAA will consult with the Council on Environmental Quality ("CEQ") while developing or revising its proposed NEPA implementing procedures, in accord with NEPA § 102(2)(B), 42 U.S.C. § 4332(B).

For additional information on NEPA and NEPA at NOAA, staff are encouraged to consult the NOAA NEPA Intranet and the NOAA NEPA website at noaa.gov/nepa. Additional resources issued by the Council of Environmental Quality (CEQ) are available at NEPA.gov.

## B. Roles and Responsibilities

There are several key roles and responsibilities necessary to implement NEPA at NOAA:

(1) NOAA NEPA Coordinator: The Chief of the Environmental Review and Coordination Section of NOAA's Office of General Counsel is the NOAA NEPA Coordinator. The NOAA NEPA Coordinator is responsible for, among other things, assisting decision makers and their staff in a cooperative manner in applying NEPA; coordinating NOAA-wide NEPA reporting and NOAA-wide comments on NEPA documents prepared by other agencies; and preparing, clearing, issuing, and maintaining agency-wide NEPA procedures, including this Companion Manual. The NOAA NEPA Coordinator and the staff of the Environmental Review and Coordination Section are collectively referred to as "NOAA NEPA." Any notifications to NOAA NEPA should be sent to noaa.nepa@noaa.gov.

(2) Decision Maker: The "decision maker" for an action, as defined in NAO 216-6A and used in this Companion Manual, is the individual who has the authority and responsibility to make the NOAA decision that is being informed by the NEPA process. The decision maker is responsible for ensuring that the NEPA process is fully and effectively conducted to support that decision making. Specific NEPA responsibilities (such as drafting documents or submitting information to NOAA NEPA) may be executed by NOAA staff.

(3) Office NEPA Coordinators: Several NOAA offices are supported by at least one designated Office NEPA Coordinator to assist with their NEPA compliance and liaise

with the NOAA NEPA Coordinator. Specific responsibilities of Office NEPA Coordinators may vary by office at the discretion of the designating Assistant Administrator or Office Director.

(4) General Counsel: Each NOAA office is supported by a designated section of NOAA's Office of General Counsel. Offices should always seek the advice and counsel of their respective General Counsel for any legal question. NOAA NEPA is available to assist in discussions related to NEPA compliance and implementation, but cannot replace or supersede the legal opinions of a NOAA office's designated General Counsel.

NOAA offices are encouraged to further define the roles and responsibilities for NEPA implementation within their respective offices.

## II. Determining When NEPA Applies

In determining whether NEPA applies to a proposed action, decision makers will consider only the action or project at hand.

Decision makers will determine that NEPA does not apply to a proposed action when:

(1) The proposed action is not a final agency action within the meaning of such term in the Administrative Procedure Act, 5 U.S.C. § 704, or other relevant statute that also includes a finality requirement;
(2) The proposed action is exempted from NEPA by law;
(3) Compliance with NEPA would clearly and fundamentally conflict with the requirements of another provision of law;
(4) The proposed action is an action for which another statute's requirements serve the function of agency compliance with the Act (see Section II(A));
(5) The proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action (see Section II(B)); or
(6) The proposed action is not a "major Federal action" (see Section II(C)). The terms "major" and "federal action," each have independent force. NEPA applies only when both of these two criteria are met. Determining whether both of these criteria are met is inherently bound up in the facts and circumstances of each individual situation.
(7) The issuance or update of NOAA's NEPA procedures is not subject to NEPA review.

For questions on applicability of any of the following statutory exemptions, decision makers and staff should consult with their General Counsel, Office NEPA Coordinator, and/or NOAA NEPA.

### A. Proposed Actions for Which Another Statute's Requirements Serve the Function of Agency Compliance with the Act

NOAA has determined the following actions are actions for which another statute's requirements serve the function of agency compliance with the Act:

### *1. Incidental Take Statements*

Generally, Incidental Take Statements (ITSs) issued by the National Marine Fisheries Service (NMFS) in its role as the consulting agency under Section 7 of the Endangered Species Act (ESA) are not permits or authorizations or otherwise major Federal actions requiring compliance with NEPA. As set forth in Section 7(o) of the ESA, NMFS issues an ITS to provide an exemption from the ESA's take prohibition and prepares the ITS as part of the ESA Section 7 consultation process on Federal actions, meaning that the requirement to comply with NEPA falls on the action agency to evaluate the impacts of the action being undertaken by that agency. When NMFS is both the consulting agency and the action agency under the ESA Section 7 consultation process, NMFS as the action agency should comply with NEPA for the underlying major Federal actions.[1]

### *2. Additional Endangered Species Act Considerations*

Certain decisions made by NOAA under the ESA do not require NEPA compliance:

(1) Determinations whether a species should be listed as threatened or endangered;
(2) Determinations that a species should be delisted;
(3) Determinations that a species should be reclassified as threatened or endangered; and
(4) Determinations whether to designate, amend, or rescind critical habitat.

## B. Proposed Actions that are Nondiscretionary Actions with Respect to Which Such Agency Does Not Have Authority to Take Environmental Factors into Consideration in Determining Whether to Take The Proposed Action

### *1. Congressionally Directed Spending*

NOAA has determined that, unless otherwise indicated by statute, allocating funds for a specific entity named by Congress in an appropriations act for a defined purpose (e.g., Congressionally Directed Spending) constitutes a type of non-discretionary action not subject to NEPA, as outlined in Section 106(a)(4) of NEPA, 42 U.S.C. § 4336(a)(4). In these instances, NOAA does not have authority to take environmental factors into consideration in determining whether to take the proposed action (i.e., issue the funding to the entity).

## C. Proposed Actions that are Not Major Federal Actions

### *1. A Non-Federal Action with Minimal Federal Funding*

A decision maker may determine—on a case-by-case or program-specific basis—that a non-Federal action receives "minimal Federal funding" and is thus not a "major Federal action," as outlined in Section 111(10)(B)(i)(I) of NEPA, 42 U.S.C. § 4336e(10)(B)(i)(I).

[1] NMFS may be required to comply with NEPA for issuance of an ITS in the narrow circumstance where NMFS is consulting on actions related to two Pacific salmon fisheries for which the courts have ruled such compliance is required. For additional questions, the decision maker should contact their General Counsel.

"Minimal," under this section, can be determined in two ways:

(1) A percent threshold of the overall costs of the project; or
(2) A specific dollar amount.

A determination of "minimal Federal funding" will be a fact-specific inquiry and decision makers should consult with their appropriate General Counsel and/or Office NEPA Coordinator for case-specific assistance and alert NOAA NEPA for awareness.

### *2. Other*

There are several other general categories of exclusions from the definition of "major Federal action" set forth in Section 111(10) of NEPA, 42 U.S.C. § 4336e(10), including:

(1) Non-Federal actions with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project;
(2) Loans, loan guarantees, or other forms of financial assistance where the Federal agency does not exercise sufficient control and responsibility over the effects of such assistance;
(3) Judicial or administrative civil or criminal enforcement actions;
(4) Extraterritorial activities or decisions, which means agency activities or decisions with effects located entirely outside of the jurisdiction of the United States; and
(5) Activities or decisions that are non-discretionary and made in accordance with the agency's statutory authority.

## III. Determining the Appropriate Scope of Issues for Analysis

If a decision maker determines that NEPA applies to a proposed activity or decision, the next step is to determine the scope of issues for analysis. At all steps in the process, the decision maker will consider the proposed activity or decision or project at hand and its effects.

This includes identifying substantive issues that meaningfully inform the consideration of environmental effects and the resulting decision on how to proceed, and eliminating from further study non-substantive issues. The decision maker should use the "rule of reason" and use common sense in deciding which issues will be useful to discuss in the decision making process.

This also includes identifying that the proposed activity or decision is not part of a larger NOAA action, and can therefore be reviewed independently from other actions under NEPA (i.e., would be considered a separate project).

## IV. Determining the Appropriate Level of NEPA Review

If the decision maker determines that NEPA applies to a proposed activity or decision, they will then determine the appropriate level of NEPA review in the following sequence and manner:

(1) If NOAA has established, or adopted pursuant to Section 109 of NEPA, 42 U.S.C.

§ 4336c, a categorical exclusion (CE) that covers the proposed activity or decision (see Section V and Appendix A), the decision maker will analyze whether to apply the CE to the proposed activity or decision and apply the CE, if appropriate, pursuant to Section V(C).

(2) If another agency has already established a CE that covers the proposed activity or decision, the decision maker will consider whether to adopt that CE pursuant to Section V(A)(1) so that it can be applied to the proposed activity or decision at issue, and to future activities or decisions of that type.

(3) If the proposed activity or decision warrants the establishment of a new CE, or the revision of an existing CE, pursuant to Section V(A), the decision maker will consider whether to establish or revise, and then apply the CE to the proposed activity or decision pursuant to Section V(C).

(4) If the decision maker cannot apply a CE to the proposed activity or decision consistent with paragraphs (1)–(3) above, the decision maker will consider the proposed activity or decision's reasonably foreseeable effects consistent with Section IV(A), and then will:
   (a) If the proposed activity or decision is not likely to have reasonably foreseeable significant effects or the significance of the effects is unknown, develop an environmental assessment (EA), as described in Section VI; or
   (b) If the proposed activity or decision is likely to have reasonably foreseeable significant effects, develop an environmental impact statement (EIS), as described in Section VII.

### A. Significance

The determination of "significance" is central to establishing what level of NEPA review is required for a proposed activity or decision. NEPA requires agencies to prepare an EIS for any proposed activity or decision "significantly affecting the quality of the human environment." Only adverse effects can be considered significant.

When considering whether the reasonably foreseeable effects of the proposed activity or decision are significant, the decision maker will analyze the potentially affected environment and degree of the effects of the activity or decision.

In considering the potentially affected environment, the decision maker may consider, as appropriate to the specific action, the affected geographic area, and the national, regional, and local contexts. The decision maker should identify the resources in the geographic area that they reasonably foresee being adversely impacted by the proposed activity or decision. Important resources to consider may include:

(1) Ecological (e.g., natural resources, including stocks of marine mammals as defined under the Marine Mammal Protection Act (MMPA), managed fishery resources and essential fish habitat (EFH) as defined under the Magnuson-Stevens Fishery Conservation and Management Act (MSA); components, structures, and functioning of affected ecosystems; listed species and designated critical habitat under the Endangered Species Act);
(2) Aesthetic;

(3) Historic (e.g., listed or eligible sites under the National Historic Preservation Act);
(4) Cultural (e.g., Tribal sacred sites and resources);
(5) Economic (e.g., employment);
(6) Social; and
(7) Public health and safety resources.

In considering the degree of effects, the decision maker may consider the following, as appropriate to the specific action:

(1) Both short- and long-term effects;
(2) Both beneficial and adverse effects;
(3) Effects on public health and safety;
(4) Economic effects; and
(5) Effects on the quality of life of the American people.

Decision makers should keep the analysis focused and tailor the length of the discussion to the complexity of foreseeable adverse effects.

### B. Sources of Information

In making a determination of the appropriate level of NEPA review, the decision maker:

(1) May make use of any reliable data source;
(2) Is not required to undertake new scientific or technical research unless the new scientific or technical research is essential to a reasoned choice among alternatives, and the overall costs and time frame of obtaining it are not unreasonable; and
(3) Will make clear in the relevant NEPA document if there is incomplete or unavailable information that cannot be obtained at a reasonable cost or the means to obtain it are unknown.

## V. Categorical Exclusions

As defined in Section 111(1) of NEPA, 42 U.S.C. § 4336e(1), a "categorical exclusion" means "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment within the meaning of Section 102(2)(C)." NOAA's CEs are listed in Appendix A.

### A. Establishing and Revising CEs

To establish or revise a categorical exclusion, NOAA will determine that the category of actions normally does not significantly affect the quality of the human environment. In making this determination, a decision maker will:

(1) Develop a written record containing information to substantiate its determination;
(2) Consult with their Office NEPA Coordinator and NOAA NEPA;
(3) Through NOAA NEPA, consult with CEQ on its proposed categorical exclusion,

including the written record, for a period not to exceed 30 days prior to providing public notice as described in subparagraph (4); and

(4) In coordination with NOAA NEPA, provide public notice in the *Federal Register* of NOAA's establishment or revisions of the categorical exclusion and the location (e.g., website) of availability of the written record.

### *1. Adopting Another Agency's CE*

Pursuant to Section 109 of NEPA, 42 U.S.C. § 4336c, a NOAA decision maker may seek to adopt a CE listed in another agency's NEPA procedures. Adoption would allow NOAA to use the other agency's CE for a category of proposed activities or decisions, specifically in the form as written in the other agency's NEPA procedures.

If a decision maker is interested in adopting another agency's CE, they must:

(1) Notify and coordinate with their Office NEPA Coordinator and NOAA NEPA;
(2) Consult, alongside NOAA NEPA, with the agency that established the CE;
(3) Draft a CE adoption memo that includes a brief description of the proposed activity or decision or category of proposed activities or decisions to which NOAA intends to apply the adopted CE, the process that NOAA will use to evaluate for extraordinary circumstances, and a brief description of NOAA's consultation with the establishing agency;
(4) Send the CE adoption memo to NOAA NEPA for review prior to finalization; and
(5) Finalize with the decision maker's signature.

Once adopted, any use of the adopted category should follow the process outlined for application and documentation under Section V(C), below.

NOAA offices may reach out to NOAA NEPA for assistance in drafting the CE adoption memo. NOAA NEPA will send a copy of the near final CE adoption memo to CEQ for a courtesy review. Upon finalization, NOAA NEPA will post the final CE adoption memo on the NOAA NEPA website to notify the public of NOAA's adoption of the CE category. NOAA offices have the option to post the CE adoption memo on other publicly available websites as well or publish a Notice in the *Federal Register*.

### B. Removal of CEs

To remove a CE from NOAA's list of CEs in Appendix A, NOAA will, with the concurrence of all NOAA offices:

(1) Develop a written justification for the removal;
(2) Consult with CEQ on its proposed removal of the categorical exclusion, including the written justification, for a period not to exceed 30 days prior to providing public notice as described in subparagraph (3); and
(3) Provide public notice of NOAA removal of the categorical exclusion and the written justification in the *Federal Register*.

### C. Application and Documentation

A CE may only be applied to a proposed activity or decision when:

(1) The proposed activity or decision is not part of a larger NOAA action, and can therefore be reviewed independently from other actions under NEPA (i.e., would be considered a separate project); and
(2) There are no extraordinary circumstances that preclude the application of the CE (see Section V(D) below).

NOAA has determined the actions described in CEs denoted with asterisks (*) in Appendix A do not require CE documentation because they have virtually no potential for significant environmental effects and no known or likely mechanisms by which they may trigger any extraordinary circumstance requiring the preparation of an EA or EIS. A decision maker may, for any reason, choose to prepare a document to evaluate the applicability of any asterisked CE to a proposed activity or decision.

The default is for decision makers to document use of all CE categories without an asterisk. However, there may be circumstances where a decision maker determines that a proposed activity or decision falling within a CE category without an asterisk has virtually no potential for significant environmental effects and meets the applicability criteria listed above. In that case, the decision maker may not need to prepare documentation when applying a CE for that proposed activity or decision.

A CE evaluation document can take the form of a memorandum to record, a checklist, or other similar document, so long as the following components are included and demonstrate that the application of the CE is appropriate to the proposed activity or decision:

(1) A description of the proposed activity or decision;
(2) The CE category number, title, and CE category text that applies to the activity or decision;
(3) A determination that the proposed activity or decision is not part of a larger NOAA action, and can therefore be reviewed independently from other actions under NEPA (i.e., would be considered a separate project); and
(4) An evaluation of whether any extraordinary circumstances exist, and if so, an explanation of why the presence of the extraordinary circumstance(s) does not have the potential to result in significant effects.

Before the action is implemented, the decision maker should sign the CE evaluation document to indicate that use of the CE is appropriate. The decision maker should keep the original, signed document as part of the record for the action. Each NOAA office may have additional guidance or requirements regarding the content and format of any CE evaluation document.

### D. NOAA Extraordinary Circumstances

A decision maker must evaluate a proposed activity or decision for the presence of extraordinary circumstances before applying a CE. Extraordinary circumstances are conditions for which NOAA has determined further NEPA analysis may be required because they present a situation in which a normally excluded action may have a significant effect. The mere presence of one or more extraordinary circumstances does not preclude the use of a CE. If one or more extraordinary circumstances exist, a decision maker may still apply a CE if they determine that the proposed activity or decision does not have the potential to result in significant effects, notwithstanding the extraordinary circumstance, or if the activity or decision is modified to avoid the potential to result in significant effects.

Examples of extraordinary circumstances include:

(1) Considerable adverse effects on human health or safety;
(2) Considerable adverse effects on an area with unique environmental characteristics (e.g., wetlands and floodplains, national marine sanctuaries, federal marine protected areas, or marine national monuments;
(3) Considerable adverse effects on species or habitats protected by the Endangered Species Act, Marine Mammal Protection Act, Magnuson-Stevens Fishery Conservation and Management Act, National Marine Sanctuaries Act, or Migratory Bird Treaty Act;
(4) The potential to generate, use, store, transport, or dispose of hazardous or toxic substances, in a manner that may have a significant effect on the environment;
(5) Adverse effects on properties listed or eligible for listing on the National Register of Historic Places authorized by the National Historic Preservation Act of 1966, National Historic Landmarks designated by the Secretary of the Interior, or National Monuments designated through the Antiquities Act of 1906; Federally recognized Tribal and Native Alaskan lands, cultural or natural resources, or religious or cultural sites that cannot be resolved through applicable regulatory processes;
(6) Contribution to the introduction, continued existence, or spread of noxious weeds or nonnative invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of the species;
(7) A potential violation of Federal, State, or local law or requirements imposed for protection of the environment; and
(8) The potential to establish a precedent for future action or an action that represents a decision in principle about future actions with potentially significant environmental effects.

### E. Other Agencies Requesting Adoption of a NOAA CE

If another agency contacts a NOAA office seeking to adopt a CE listed in NOAA's NEPA procedures, staff must immediately forward the correspondence to NOAA NEPA. NOAA NEPA will coordinate with the NOAA office and any other relevant NOAA offices to begin the consultation process with the outside agency to ensure that the proposed adoption is appropriate.

### F. Reliance on a CE Determination Document of Another Agency

A NOAA decision maker may rely on another agency's determination document that a CE applies to a proposed activity or decision if the action covered by the other agency's CE determination and NOAA's proposed activity or decision are substantially the same and the determination document meets NOAA's standards for an adequate CE determination.

The decision maker must document any reliance on another agency's CE determination and state that the NOAA proposed activity or decision is substantially the same as the action covered by the original CE determination and that, considering NOAA or the other agency's list of extraordinary circumstances, there are no extraordinary circumstances present that require the preparation of an EA or EIS.

## VI. Environmental Assessments

Pursuant to Section 106(b)(2) of NEPA, 42 U.S.C. § 4336(b)(2), NOAA shall prepare an EA with respect to a proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown, unless the agency finds that the proposed agency action is excluded pursuant to one of NOAA's CEs or another agency's CEs consistent with Section 109 of NEPA, or another provision of law.

The EA shall be a concise public document prepared by NOAA to set forth the basis of the decision maker's finding of no significant impact (FONSI) or determination that an EIS is necessary. To avoid undue length, the EA may incorporate by reference background data to support its succinct discussion of the proposal and relevant issues. However, such incorporation by reference will not be used to evade the congressionally mandated 75-page limit for an EA; incorporation by reference will be limited to background data and substantive analysis will not be incorporated by reference.

During the process of preparing any environmental document provided for by these procedures, a decision maker may publish such draft, predecisional materials as in its judgment may assist in fulfilling its responsibilities under NEPA and these procedures.

### A. Contents

For the purpose of providing evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact, environmental assessments will:

(1) Briefly discuss the:
- (a) Purpose and need for the proposed agency action based on NOAA's statutory authority. When the proposed agency action concerns NOAA's duty to act on an application for authorization, the purpose and need for the proposed agency action will also be informed by the goals of the applicant;
- (b) Proposed activity or decision and alternatives to the extent required by NEPA § 102(2)(H), 42 U.S.C. § 4332(2)(H); and

(c) The reasonably foreseeable effects of the proposed agency action and the alternatives considered.

(2) The text of an environmental assessment are strictly prohibited from exceeding 75 pages, not including citations or appendices.
(3) Be completed within one year, unless extended due to necessity (see Section IX(D)(1));
(4) Certify the page limit and deadlines (see Section VI(B));
(5) Provide a unique identification number for tracking purposes, which shall be referenced on all associated environmental review documents prepared for the proposed activity or decision and in any database or tracking system for such documents; and
(6) Include a list of agencies and persons consulted.

### B. Scope of Analysis

In preparing the environmental assessment, the NOAA decision maker will focus its analysis on whether the environmental effects of the action or project at hand are significant.
Similarly, the NOAA decision maker will document in the environmental assessment where and how they drew a reasonable and manageable line relating to its consideration of any environmental effects from the action or project at hand that extend outside the geographical territory of the project or might materialize later in time.

To the extent it assists in reasoned decision-making, the NOAA decision maker may, but is not required to by NEPA, analyze environmental effects from other projects separate in time, or separate in place, or that fall outside of NOAA's regulatory authority, or that would have to be initiated by a third party. If the NOAA decision maker determines that such analysis would assist them in reasoned decision-making, they will document this determination in the environmental assessment and explain where they drew a reasonable and manageable line relating to the consideration of such effects from such separate projects.

### C. Certifications

*Certification Related to Page Limits*. The breadth and depth of analysis in an EA will be tailored to ensure that the environmental analysis does not exceed the statutory page limit. In this regard, as part of the finalization of the EA, the decision maker will certify (and the certification will be incorporated into the EA) that NOAA has considered the factors mandated by NEPA; that the EA represents NOAA's good-faith effort to prioritize documentation of the most important considerations required by the statute within the congressionally mandated page limits; that this prioritization reflects NOAA's expert judgment; and that any considerations addressed briefly or left unaddressed were, in NOAA's judgment, comparatively not of a substantive nature that meaningfully informed the consideration of environmental effects and the resulting decision on how to proceed.

*Certification Related to Deadline.* When the EA is published, the decision maker will certify (and the certification will be incorporated into the EA) that the resulting EA represents NOAA's good-faith effort to fulfill NEPA's requirements within the congressionally mandated timeline; that such effort is substantially complete; that, in NOAA's expert opinion, it has thoroughly considered the factors mandated by NEPA; and that, in NOAA's

judgment, the analysis contained therein is adequate to inform and reasonably explain NOAA's final decision regarding the proposed activity or decision.

### D. Finding of No Significant Impact

A decision maker must prepare a FONSI if they determine, based on the EA, not to prepare an EIS because the proposed activity or decision will not have significant effects. The FONSI shall include the unique identification number for the proposed activity or decision, briefly discuss the underlying purpose and need for the action, and include the EA or incorporate it by reference. The FONSI must also document the reasons why NOAA has determined the selected alternative will not have a significant effect on the quality of the human environment. The FONSI need not repeat any of the discussion in the assessment.

The FONSI must also list any mitigation measures that the agency is adopting and any applicable monitoring or enforcement provisions. If the decision maker finds no significant effects based on mitigation (beyond any incorporated as part of the proposed activity or decision, or alternative), the agency must prepare a mitigated FONSI which identifies the enforceable mitigation requirements or commitments that will be undertaken, and the authority to enforce the mitigation requirements or commitments, such as terms and conditions or other measures in a relevant permit, incidental take statement, or other agreement. As appropriate, the FONSI will include information related to mitigation monitoring and compliance plans, including any templates or forms that the agency provides to applicants.

The decision maker must publish the EA and FONSI on a public website, such as on the NOAA NEPA website.

## VII. Environmental Impact Statements (EIS)

Pursuant to Section 106(b)(1) of NEPA, 42 U.S.C. § 4336(b)(1), an agency shall issue an EIS with respect to a proposed agency action requiring a NEPA document that has a reasonably foreseeable significant effect on the quality of the human environment. Whether an effect rises to the level of "significant" is a matter of NOAA's expert judgment. The EIS must set forth the basis of all necessary findings for the decision maker's determination in a decision document (e.g., a record of decision (ROD)).

Congress has mandated that certain actions be evaluated in an EIS:

(1) Proposed National Marine Sanctuary Designations or initial National Marine Sanctuary management plans require preparation for an EIS, regardless of the level of anticipated impacts, pursuant to the National Marine Sanctuaries Act, 16 U.S.C. § 304(a)(2);
(2) Proposed issuance of any license for ownership, construction, and operation of an ocean thermal energy conversion facility under the Ocean Thermal Energy Conversion Act, 42 U.S.C. § 9117(e);
(3) Proposed issuance of a deep seabed mining license or permit under the Deep Seabed Hard Mineral Resources Act, 30 U.S.C. § 1419(d); 15 C.F.R. § 970.204(a); and

(4) Proposed designations of sites to the National Estuarine Research Reserve System, under the Coastal Zone Management Act, 16 U.S.C. § 1461; 15 C.F.R. § 921.13.

### A. Scoping

Scoping is an early and open process designed to determine the scope of issues to be addressed in depth in the analyses that will be included in the EIS, including identifying substantive issues that meaningfully inform the consideration of environmental effects. Scoping may begin as soon as practicable after the proposal for action is sufficiently developed for consideration. Scoping may include work conducted prior to publication of the NOI.
When acting as the lead agency, as part of the scoping process, NOAA should also:

(1) Identify and eliminate from detailed study the issues that are not important or have been covered by prior environmental review(s), narrowing the discussion of these issues in the EIS to a brief presentation of why they will not be important or providing a reference to their coverage elsewhere;
(2) Allocate assignments for preparation of the EIS among the lead and cooperating agencies, with NOAA retaining responsibility for the EIS;
(3) Identify other environmental review, authorization, and consultation requirements so any co-lead and cooperating agencies may prepare other required analyses and studies concurrently and integrated with the EIS; and
(4) Indicate the relationship between the timing of the preparation of environmental analyses and the agencies' tentative planning and decision-making schedule;
(5) Determine and document the scope of the proposed activity or decision; and
(6) Determine whether connected actions should be addressed in the same environmental document.

As part of the scoping process, NOAA should invite the participation of likely affected Federal, State, Tribal, and local agencies and governments, and any applicant. In addition, NOAA may but is not required to invite members of the public to participate in the scoping process, including likely affected or interested persons.

### B. Notice of Intent

As soon as practicable after determining that a proposal is sufficiently developed to allow for meaningful public comment and requires an EIS, the decision maker will publish an NOI to prepare an EIS, which will include a request for public comment on alternatives or impacts and on relevant information, studies or analyses with respect to the proposed agency action. It is generally expected that NOAA publish the NOI in the *Federal Register*. Decision makers are also encouraged to publish the NOI in accordance with one of the procedures identified in Section IX(G).

The NOI shall include, as relevant:

(1) A brief statement of the underlying purpose and need for the proposed agency action;

(2) A preliminary description of the proposed activity or decision and alternatives the EIS will consider;
(3) A brief summary of expected impacts;
(4) Anticipated permits and other authorizations;
(5) A schedule for the decision-making process;
(6) A description of the public scoping process, including any scoping meeting(s);
(7) A request for public comment on alternatives or impacts and on relevant information, studies, or analyses with respect to the proposed agency action;
(8) Contact information for a person within the agency who can answer questions about the proposed activity or decision and the EIS;
(9) Identification of any cooperating and participating agencies, and any information that such agencies require in the notice to facilitate their decisions or authorizations that will rely upon the resulting EIS; and
(10) A unique identification number for tracking purposes, which NOAA will reference on all NEPA documents prepared for the proposed activity or decision and in any database or tracking system for such documents.

**C. Scope of Analysis**

In preparing the environmental impact statement, NOAA will focus its analysis on whether the environmental effects of the action or project at hand are significant.

Similarly, the NOAA decision maker will document in the environmental impact statement where and how they drew a reasonable and manageable line relating to its consideration of any environmental effects from the action or project at hand that extend outside the geographical territory of the project or might materialize later in time.

To the extent it assists in reasoned decision-making, the NOAA decision maker may, but is not required to by NEPA, analyze environmental effects from other projects separate in time, or separate in place, or that fall outside of NOAA's regulatory authority, or that would have to be initiated by a third party. If the NOAA decision maker determines that such analysis would assist them in reasoned decisionmaking, it will document this determination in the environmental impact statement and explain where it drew a reasonable and manageable line relating to the consideration of such effects from such separate projects.

**D. Contents**

An EIS must:

(1) Contain a brief statement of the underlying purpose and need for the proposed agency action;
(2) Discuss a reasonable range of alternatives that are technically and economically feasible and meet the purpose and need of the proposal and that, where applicable, incorporate any relevant mitigation measures or best management practices, and for alternatives eliminated from detailed study, briefly discuss the reasons for their elimination;

(3) Discuss a no action alternative that includes an analysis of any negative environmental impacts of not implementing the proposed agency action;
(4) Analyze the reasonably foreseeable environmental effects of the proposed activity or decision and any alternatives;
(5) Identify any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;
(6) Discuss the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity;
(7) Discuss any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed activity or decision should it be implemented;
(8) Ensure professional integrity, including scientific integrity, of the discussion and analysis;
(9) Identify any means to mitigate adverse environmental effects of the proposed activity or decision, as appropriate;
(10) Be limited to 150 pages, unless it is for a proposed agency action of extraordinary complexity, in which case be limited to 300 pages, including certifications. Note that the length of an EIS should be proportional to the scope and complexity of the action analyzed in the document. A proposal may be of extraordinary complexity if an otherwise concise document could not complete an adequate analysis in 150 pages; or would cause the decision maker extreme difficulty in determining the significance of a proposed activity or decision's reasonably foreseeable environmental effects;
(11) Be completed within 2 years, unless extended due to necessity (see Section IX(D)(1)); and
(12) Certify the page limit and deadlines (see Section VII(E)).

An EIS should also:

(1) Contain a cover page that includes:
    (a) A list of the responsible agencies, including any cooperating agencies.
    (b) The title of the proposed activity or decision.
    (c) A designation of the statement as a draft, final, or supplement.
    (d) A one-paragraph abstract of the statement.
    (e) The unique identification number for the proposed activity or decision.
(2) Succinctly describe the affected environment, including the reasonably foreseeable environmental trends and planned actions in the area(s) to be affected or created by any alternative under consideration. The description should not be longer than is necessary to understand the effects of the alternatives and shall concentrate effort and attention on important issues;
(3) Identify the preferred alternative or alternatives, if one or more exists;
(4) Include appropriate mitigation measures not already included in the proposed activity or decision or alternatives, to the extent authorized by the organic statute under which the decision maker is acting;
(5) Include a summary of any alternatives, information, and analyses submitted by State, Tribal, and local governments and other public commenters for consideration by the lead and cooperating agencies in developing the EISs;

(6) Include a list of all Federal permits, licenses, and other authorizations that must be obtained in implementing the proposal. If it is uncertain whether a Federal permit, license, or other authorization is necessary, the draft EIS should so indicate;
(7) Include a list of preparers, which lists the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the EIS or significant background papers, including basic components of the statement. Where possible, the EIS should identify the persons who are responsible for a particular analysis, including analyses in background papers. Normally the list should not exceed two pages; and
(8) Include appendices of, as appropriate:
    (a) All comments (or summaries thereof where the response has been exceptionally voluminous) received that identified alternatives, information, and analyses for the agency's consideration;
    (b) Material prepared in connection with an EIS; and
    (c) Material substantiating any analysis fundamental to the impact statement.

### E. Comments

During the process of preparing an EIS, NOAA will seek the comments of:

(1) Any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact of the action or project at hand or is authorized to develop and enforce environmental standards that govern the action or project at hand; and
    (a) NOAA will also submit a draft of any EIS to the Environmental Protection Agency (EPA) prior to publication, allowing no less than 30 days for EPA to perform its statutory duties under Section 309 of the Clean Air Act;
(2) Appropriate State, Tribal, and local agencies that are authorized to develop and enforce environmental standards.

NOAA may also request the comments of:

(1) State, Tribal, or local governments that may be affected by the proposed activity or decision;
(2) Any agency that has requested it receive statements on actions of the kind proposed;
(3) The applicant, if any; and
(4) The public, including by affirmatively soliciting comments in a manner designed to inform those persons or organizations who may be interested in or affected by the proposed activity or decision.

Preparation and publication of a draft EIS (DEIS), while not required by NEPA, is an optional step. During the process of preparing any environmental document provided for by these procedures, the decision maker may publish such draft, predecisional materials as in its judgment may assist in fulfilling its responsibilities under NEPA and these procedures including, if appropriate, sending the DEIS to:

(1) EPA to have Notice of Availability (NOA) for the DEIS published in the *Federal Register*. The procedures for filing the DEIS with the EPA are available on the EPA website;
(2) Any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State, Tribal, or local agency authorized to develop and enforce environmental standards;
(3) State, Tribal, or local governments that may be affected by the proposed activity or decision;
(4) Any agency that has requested it receive statements on actions of the kind proposed;
(5) The applicant, if any; and
(6) Any person, organization, or agency requesting the DEIS.

When not required by other statutory processes, or deemed necessary to meet the deadlines specified in Section IX(D) below, alternate approaches may be followed. A decision maker seeking an alternate process must first consult with their General Counsel to ensure NEPA compliance and alert NOAA NEPA for awareness.

### F. Certifications

*Certification Related to Page Limits*. The breadth and depth of analysis in an EIS will be tailored to ensure that the EIS does not exceed the statutory page limits. In this regard, as part of the finalization of the EIS, the decision maker will certify that NOAA has considered the factors mandated by NEPA; that the EIS represents NOAA's good-faith effort to prioritize documentation of the most important considerations required by the statute within the congressionally mandated page limits; that this prioritization reflects NOAA's expert judgment; and that any considerations addressed briefly or left unaddressed were, in NOAA's judgment, comparatively unimportant or frivolous.

*Certification Related to Deadlines.* When the EIS is published, the decision maker will certify (and the certification will be incorporated into the EIS) that the resulting EIS represents NOAA's good-faith effort to fulfill NEPA's requirements within the congressionally mandated timeline; that such effort is substantially complete; and that, in NOAA's expert opinion, it has thoroughly considered the factors mandated by NEPA; and that, in NOAA's judgment, the analysis contained therein is adequate to inform and reasonably explain NOAA's final decision regarding the proposed activity or decision.

### G. Finalization

Upon completion of the EIS, if a DEIS was published, any substantive comments received on the DEIS (or summaries thereof where the response has been exceptionally voluminous) and any responses to the comments will be appended to the EIS. In all cases, NOAA will also send the entire EIS to:

(1) EPA, consistent with EPA's filing procedures, to have a notice of availability for the EIS published in the *Federal Register*. The procedures for filing the EIS with the EPA are available on the EPA website;

(2) Any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State, Tribal, or local agency authorized to develop and enforce environmental standards;
(3) The applicant, if any; and
(4) Any person, organization, or agency requesting the entire EIS.

In addition, if NOAA has released any predecisional materials for comment while preparing the EIS, NOAA will send any substantive comments received thereon to the recipients listed above as well as any person, organization, or agency that submitted substantive comments thereon, and will upend any responses to comments to the EIS.

### *1. NEPA Decision Document*

In addition to the finalization steps above, the decision maker will :

(1) Prepare a NEPA decision document for the proposed activity or decision, which shall include the unique identification number for the proposed activity or decision;
(2) Sign the decision document;
(3) Submit the EIS and signed decision document to NOAA NEPA via the process outlined on the NOAA NEPA Intranet; and
(4) Retain the EIS and decision document in the agency's record for the action. NOAA NEPA shall also maintain an electronic copy of the EIS and decision document.

The signing of the decision document concludes the EIS process. The decision maker may undertake these steps simultaneously with the finalization steps above; there is no requirement to wait to prepare the decision document until after EIS is finalized.

#### a. Example: Record of Decision (ROD)

In documenting a decision for the proposed activity or decision following an EIS, a decision maker may choose to prepare a Record of Decision (ROD), which is a separate document from the EIS, but may be integrated into other agency decision documents, such as a notice of final rulemaking or a final management plan.

If prepared, generally, a ROD should:

(1) State the decision;
(2) Identify alternatives considered by the agency in reaching its decision;
(3) Identify the environmentally preferable alternative(s);
(4) Identify and discuss all factors that were balanced by NOAA in making its decision, including any essential considerations of national policy, and if applicable, state how those considerations entered into the decision; and
(5) State whether all practicable means to mitigate environmental harm from the selected alternative have been adopted and, if not, why not.

Once signed, a notice of availability for the ROD should be published on a NOAA website. Decision makers are encouraged to also publish such notice in the *Federal Register*. The ROD should be finalized as expeditiously as possible.

## VIII. Supplementation

The decision maker will prepare supplements to environmental documents only if a major Federal action remains to occur, and:

(1) The decision maker makes substantial changes to the proposed activity or decision that are relevant to environmental concerns; or
(2) The decision maker decides, in its discretion, that there are substantial new circumstances or information about the significance of the adverse effects that bearing on the proposed activity or decision or its effects.

In determining whether supplementation is necessary, a decision maker may choose to prepare a Supplemental Information Report (SIR). A SIR is not a NEPA document; it is a decision tool that documents a decision maker's evaluation of new information, changed circumstances, or proposed changes to an action and assists a decision maker in determining whether a supplemental NEPA document is necessary. A SIR, standing alone, cannot repair deficiencies in the original environmental analysis or documentation, nor can it change a decision to implement an action made pursuant to appropriate NEPA procedures.

## IX. Efficiency and Streamlining

### A. Programmatic NEPA Reviews and Reevaluation

Developing a Programmatic NEPA Analysis:
(a) The decision maker may prepare environmental documents for programmatic Federal actions, such as the adoption of new agency programs. The decision maker may evaluate the proposal(s) in one of the following ways:
   1) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.
   2) Generically, including actions that have relevant similarities, such as common timing, effects, alternatives, methods of implementation, media, or subject matter.
   3) By stage of technological development.
(b) Consistent with NEPA § 108, 42 U.S.C. § 4336b, and Section IX(B) of these procedures, after completing a programmatic environmental assessment or environmental impact statement, the decision maker may rely on that document for 5 years if there are not substantial new circumstances or information about the significance of adverse effects that bear on the analysis. After 5 years, as long as the decision maker reevaluates the analysis in the programmatic environmental document and any underlying assumption to ensure reliance on the analysis remains valid and briefly documents its reevaluation and explains why the analysis remains valid considering any new and substantial information or circumstances, the decision maker may continue to rely on the document.

(c) A decision maker must, to the extent possible, identify in the programmatic EA or programmatic EIS any decisions or categories of decisions that NOAA anticipates making in reliance on the programmatic NEPA document, and, as appropriate, employ incorporation by reference and other methods to describe the relationship between the programmatic NEPA document and related individual actions.

Applying a Programmatic: For individual actions that fall within the scope of the programmatic document, decision makers may either:

(1) Rely directly on the programmatic document to analyze those actions and where necessary document the analysis in a site- or project-specific document, such as an inclusion memo or record of environmental consideration (REC); or
(2) Further analyze actions that fall within the scope of the programmatic document in a more specific subsequent NEPA review (tiering).

Reevaluation of a Programmatic: When an agency prepares a programmatic NEPA document for which judicial review was available, the agency may rely on the analysis included in the programmatic NEPA document for related actions as follows:

(1) Within 5 years and without additional review of the analysis in the programmatic NEPA document, unless there are substantial new circumstances or information about the significance of adverse effects that bear on the analysis; and
(2) After 5 years, so long as the agency reevaluates the analysis in the programmatic NEPA document and any underlying assumption to ensure reliance on the analysis remains valid.

### B. Reliance on Existing Documents

Decision makers should appropriately rely on existing analyses in environmental documents and studies through incorporation by reference and supplementation to reduce duplication and paperwork.

#### *1. Incorporation by Reference*

The decision maker should incorporate materials such as planning studies, analyses such as EAs or EISs, or other relevant information into a NEPA document to eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided, as long as doing so does not impede agency and, where applicable, public review of the proposed activity or decision. The NEPA document must be able to stand alone and allow the reader to follow the analysis; incorporation by reference should not result in a loss of comprehension to the reader, or circumvention of the congressionally mandated page limits.

To incorporate material by reference, the decision maker must:

(1) Cite the material incorporated by reference in the NEPA document and briefly describe its content;

(2) Briefly explain the relevance of the incorporated material to the NEPA document; and
(3) Ensure any incorporated material is available to the public for review.

Incorporation by reference may be particularly useful when relying on existing analyses of general matters from broader or programmatic NEPA documents to inform subsequent narrower NEPA documents, where the proposed activity or decision is a more site-specific or project-specific refinement or extension of the existing NEPA document and the existing NEPA document has been reevaluated, as appropriate (see Sections IX(A), (B)).

### *2. Adequacy of Existing NEPA Documents for New Actions*

When reviewing existing NEPA analyses, the decision maker will consider the following to determine whether those analyses adequately cover a new proposed activity or decision under consideration:

(1) Is the new proposed activity or decision a feature of, or essentially similar to, the prior proposed activity or decision or an alternative analyzed in the existing NEPA document?
(2) Is the project within the same analysis area, or if the project location is different, are the geographic and resource conditions sufficiently similar to those analyzed in the existing NEPA document?
(3) Is the range of alternatives analyzed in the existing NEPA document appropriate with respect to the new proposed activity or decision, given the environmental concerns, interests, and resource values relevant to the proposed activity or decision?
(4) Is the existing analysis valid in light of any new information or circumstances?
(5) Are the effects that would result from implementation of the new proposed activity or decision similar (both quantitatively and qualitatively) to those analyzed in the existing NEPA document?
(6) If there are any differences, can the decision maker explain why those differences are not substantial?

When it is determined that the new action has been sufficiently analyzed in the existing NEPA document, the decision maker should document their consideration of these questions in a memo to the record (sometimes referred to as an inclusion memo or REC) to demonstrate that the existing NEPA documents sufficiently cover the proposed activity or decision. In the case of relying on a programmatic document to support future analysis for project or site-specific actions, decision makers should document their considerations of these questions in a memo to the record (e.g., inclusion memo or REC) or subsequent NEPA document (tiering).

#### a. Relying on Another Agency's NEPA Analysis

A NOAA decision maker may wish to rely on all or portions of (e.g., specific analyses, appendices, or specific sections) an EA or EIS prepared by another federal agency, regardless of cooperating agency status. If so, the NOAA decision maker will conduct an independent review of the document, consider the questions outlined above, and determine that the document meets the standards for an adequate NEPA document according to NOAA's NEPA procedures.

In order to rely on the document without supplementation, the NOAA decision maker should:

(1) Conclude that:
  (a) The action addressed in the original document (or portion thereof) is substantially the same as that being considered or proposed by NOAA; and
  (b) The other agency's NEPA document (or portion thereof) fully covers the scope of NOAA's proposed activity or decision, alternatives, and environmental impacts; and
(2) Prepare its own concise decision document.

If the actions evaluated in the original NEPA document are substantially the same as NOAA's proposed activity or decision and NOAA acted as a cooperating agency, NOAA may rely on the NEPA document of a lead agency without republishing the document.

If the actions evaluated in the original NEPA document are substantially the same as NOAA's proposed activity or decision, but NOAA did not act as a cooperating agency, NOAA may rely on the NEPA document but should republish and in the case of an EIS, file the final NEPA document with EPA.

If the actions evaluated in the original NEPA document are not substantially the same as NOAA's proposed activity or decision, or NOAA determines that the document requires supplementation, then NOAA will supplement or otherwise make any modifications that are necessary to render the relied-upon document, or portion thereof, fit for fulfilling NEPA's analytic requirements for action at hand (see Section VIII). NOAA will then prepare its own decision document and publish it along with the modified NEPA document.

### C. Reducing Delay

To avoid delays and identify and resolve issues early in the process, decision makers should:

(1) Integrate the NEPA process with other planning and authorization processes at the earliest reasonable time to ensure that they consider environmental impacts in their planning and decisions; and
(2) Plan early for applicant coordination and engagement and contractor or consultant support, as applicable. This includes outlining the types of information an applicant may be required to submit for agency use in preparing a NEPA document and sharing information necessary for contractor or consultant support.

### D. Deadlines

As the Supreme Court has repeatedly held, NEPA is governed by a "rule of reason." Congress supplied the measure of that reason in the 2023 revision of NEPA by setting the deadlines in NEPA § 107(g), 42 U.S.C. § 4336a(g). These deadlines indicate Congress's determination that an agency has presumptively spent a reasonable amount of time on analysis and the document should issue, absent very unusual circumstances. In such circumstances, an extension will be given only for such time as is *necessary* to complete the analysis. Thus:

EAs: must be completed within 1 year after the date which NOAA determines that NEPA requires the preparation of an EA, unless the deadline has been appropriately extended (see below). The start date for calculating this 1-year deadline is the date on which the decision maker determines that the preparation of an environmental assessment is required.

The completion of an EA is measured by the date the decision maker finalizes the EA or the date NOAA issues an NOI to prepare an EIS.

EISs: must be completed within 2 years after the date the NOI to prepare an EIS is published in the *Federal Register*, unless the deadline has been appropriately extended (see below). The completion of an EIS must be measured by the date an NOA of a Final EIS is published in the *Federal Register*.

### *1. Deadline Extensions*

The environmental assessment or environmental impact statement will publish (unless the deadline is extended pursuant to the provision below) on the day the deadline elapses, in as substantially complete form as is possible.

If the decision maker determines it is not able to meet the deadline prescribed by NEPA § 107(g)(1)(A), 42 U.S.C. § 4336a(g)(1)(A), it must consult with the applicant, if any, pursuant to NEPA § 107(g)(2), 42 U.S.C. § 4336a(g)(2). After such consultation, if needed, and for cause stated, it may establish a new deadline. Cause for establishing a new deadline is only established if the environmental impact statement or environmental assessment is so incomplete, at the time at which NOAA determines it is not able to meet the statutory deadline, that issuance pursuant to this subsection would, in the decision maker's view, result in an inadequate analysis, or where a deadline extension is necessary to ensure NOAA meets its obligations under other statutes. Such new deadline must provide only so much additional time as is necessary to complete such environmental impact statement or environmental assessment or comply with the requirements of other statute(s). The announcement of the new deadline will specify the reason why the environmental impact statement or environmental assessment was not able to be completed under the statutory deadline and whether the applicant, if any, consented to the new deadline.

The decision maker must document the deadline extension into the record for the action with a determination that establishes a new deadline and explains why the extension is necessary.

### *2. Deadline Exceedances*

Pursuant to Section 107(h) of NEPA, 42 U.S.C. § 4336a(h), the Under Secretary of Commerce for Oceans and Atmosphere is required to report any and all deadline exceedances in its June 3 annual report to the Committee on Natural Resources of the House of Representatives and the Committee on Environment and Public Works of the Senate.

By April 3 of each year, each Office NEPA Coordinator must notify NOAA NEPA of any EA or EIS whose deadline has been exceeded from the preceding year with no extension on the record. The email must contain the following information for each EA or EIS:

(1) The title of the EA or EIS (and unique identification number, if known);
(2) The office or program within NOAA responsible for the EA or EIS;
(3) The start date of the environmental review;
(4) An explanation why the deadline could not be met; and
(5) An anticipated deadline of when such EA or EIS will be complete.

The Office NEPA Coordinator must ensure the decision maker for the proposed activity or decision is notified prior to sending a deadline exceedance notification to NOAA NEPA. NOAA offices are encouraged to develop internal guidance outlining the process for deadline exceedance notification.

NOAA NEPA will rely on information submitted through the tracking process outlined on the NOAA NEPA Intranet (see Section IX(E)) to verify compliance with the deadline and extension requirements.

### E. Page Limits

The text of an environmental assessment is strictly prohibited from exceeding 75 pages, not including citations or appendices.
Ordinarily, the text of an environmental impact statement will not exceed 150 pages, not including citations or appendices. An environmental impact statement for a proposed agency action of extraordinary complexity is strictly prohibited from exceeding 300 pages, not including any citations or appendices. NOAA will determine at the earliest possible stage of preparation of an environmental impact statement whether the conditions for exceeding the ordinary, 150-page limit are present.
Appendices are to be used for voluminous materials, such as scientific tables, collections of data, statistical calculations, and the like, which substantiate the analysis provided in the environmental assessment. Appendices are not to be used to provide additional substantive analysis, because that would circumvent the congressionally mandated page limits.

### F. Tracking NEPA Reviews

All NOAA offices will report any new NOAA-led major federal action to NOAA NEPA via the process outlined on the NOAA NEPA Intranet. This includes new EAs, EISs, the reliance on another agency's NEPA document, supplementation, and the use of documented CEs.

Decision makers are responsible for ensuring all content submitted to NOAA NEPA through the process outlined on the NOAA NEPA Intranet is accurate and up-to-date. For EAs and EISs under development, the decision maker should track, maintain, and update all necessary deadlines through the completion of each environmental document. This includes ensuring all links to the final published EA, EIS, and/or decision document are added to the tracking system

in a timely manner, and any signed deadline extension memo is attached and available prior to the associated deadline.

For any decision document relying on another agency's existing NEPA document (see Section IX(B)), a NOAA office will report the action to NOAA NEPA via the process outlined on the NOAA NEPA Intranet prior to finalizing the decision document. Doing so will generate the unique identification number for the action, which will be included in the final decision document. Staff will ensure the link to the published decision document is added to the tracking system in a timely manner.

### G. Integration of NEPA Documents with other Environmental Requirements

NEPA serves as a framework that can help federal agencies coordinate review and implementation of numerous federal statutes, and integrate the NEPA process with other planning and authorization processes to avoid duplication of efforts, create efficiencies, promote transparency and accountability, and support a broad discussion of effects to the human environment.

Thus, decision makers should integrate NEPA with other environmental review and consultation requirements and should do so at the earliest reasonable time to ensure that they consider environmental impacts in their planning and decisions, to avoid delays later in the process, and to head off potential conflicts.

To avoid duplicating analyses or processes required under a separate legal mandate, decision makers should:

(1) Combine NEPA documents with other agency documents; and
(2) Incorporate analyses by reference.

<u>Combining Documents</u>: Decision makers should combine, to the fullest extent practicable, any NEPA document with any other NOAA document to reduce duplication and paperwork. The decision maker may combine a NEPA document with related plans, rules, or amendments as a single consolidated document. The consolidated document should contain and clearly identify the required sections of the NEPA document and should stand on its own as an analytical document which fully informs decision makers and the public of the environmental effects of the proposal and those of the reasonable alternatives. By clearly identifying which parts of the combined document serve the requirements of a NEPA document, as opposed to the related plans, rules, or amendments required under other mandates, NEPA page limit requirements only extend to the pages of the document dedicated to the NEPA requirements. Opportunities for public comment should likewise be coordinated to encourage efficiencies in public comment collection and response. NOAA offices are encouraged to develop program- and/or office-specific guidance for combined documents.[2]

---

[2] Notwithstanding these procedures, NMFS shall comply with the agency's MSA NEPA procedures for fishery management actions taken under the MSA; pursuant to Section 304(i) of the MSA, 16 U.S.C. § 1854(i), the MSA NEPA procedures promulgated on February 23, 2016 remain effective until replaced and superseded. (81 Fed. Reg. 8920).

Incorporation by Reference: As discussed in more detail in Section IX(B)(1), incorporation by reference may also be used as a tool for integration. Decision makers shall incorporate material, such as planning studies, analyses, or other relevant information, into NEPA documents by reference when the effect will be to cut down on bulk without impeding agency and, where applicable, public review of the action.

Statutes commonly applicable to NOAA which may contain environmental analysis components that could substitute certain sections of an EA/EIS through incorporation by reference include, but are not limited to:

(1) Clean Water Act;
(2) Coastal Zone Management Act;
(3) Endangered Species Act;
(4) Federal Power Act;
(5) Fish and Wildlife Coordination Act;
(6) Magnuson-Stevens Fishery Conservation and Management Act;
(7) Marine Mammal Protection Act;
(8) Migratory Bird Treaty Act;
(9) National Historic Preservation Act;
(10) National Marine Sanctuaries Act; and
(11) Applicable state environmental laws.

Decision makers must also cooperate with State, Tribal, and local agencies that are responsible for preparing environmental documents. Such cooperation may include:

(1) Joint planning processes;
(2) Joint environmental research and studies;
(3) Joint public hearings (except where otherwise provided by statute); or
(4) Joint environmental documents.

To the fullest extent possible, NEPA documents should be prepared concurrently with and integrated with environmental impact analyses and related surveys and studies required by other Federal statutes and Executive Orders applicable to the proposed activity or decision. If comments on a NOI or other aspects of a scoping process identify consultations, permits, or licenses necessary under other environmental laws, the NEPA document may contain a section briefly listing the applicable requirements and how NOAA has or will meet them (e.g., permits applied for or received, consultations initiated or concluded).

### H. Public Engagement

Decision makers may plan early for public, State, Tribal, and local governmental engagement and interagency collaboration, as applicable. This includes inviting the participation of likely affected stakeholders to ensure early input, and outlining when to hold and how to provide public notice for any NEPA-related hearings, public meetings, and other opportunities for public involvement. The decision maker should also ensure the availability of NEPA documents so as

to inform those persons and agencies who may be interested or affected by their proposed activity or decision.

In all cases, the decision maker will notify those who have requested notice on an individual action.

Possible methods of notice include:

(1) Publication in the *Federal Register*;
(2) Notice to State, Tribal, and local agencies that may be interested or affected by the proposed activity or decision;
(3) Notice to interested or affected State, Tribal, and local governments;
(4) Following the affected State or Tribe's public notice procedures for comparable actions;
(5) Publication in local newspapers (in papers of general circulation rather than legal papers);
(6) Notice through other local media;
(7) Notice to potentially interested community organizations including small business associations;
(8) Publication in newsletters that may be expected to reach potentially interested persons;
(9) Direct mailing to owners and occupants of nearby or affected property;
(10) Posting of notice on and off site in the area where the action is to be located; and
(11) Notice through electronic media (e.g., a project or agency website, email, or social media).

Other statutes applicable to the proposed activity or decision may have other required methods of public engagement. In such cases, decision makers should observe those other, statutorily required processes, and need not undertake any NEPA specific engagement process.

### I. Applicant and Contractor-Prepared Documents

To help prepare environmental assessments or environmental impact statements, NOAA may hire and directly supervise its own contractors (i.e., NOAA-directed contractors) or, pursuant to Section 107(f) of NEPA, rely on applicants and/or applicant-directed contractors (i.e., non-NOAA-directed contractors).

NOAA is ultimately responsible for the accuracy, scope, and content of all agency NEPA documents. Regardless of whether a NEPA document is prepared by a contractor under the supervision and direction of the agency, or an applicant or applicant-directed contractor pursuant to Section 107(f) of NEPA, the decision maker must independently evaluate the NEPA documents and any supporting information submitted. The applicant prepared document must meet all applicable standards under NEPA, and the decision maker should document the determination of adequacy in the decision document or in a brief memorandum.

NOAA should also require all contractors preparing NEPA documents to sign a nondisclosure statement to protect as confidential any information that is not otherwise publicly available but

which may be used in the production of a NEPA document, including documents and information used in aggregate format.

### *1. NOAA-Directed Contractors*

For environmental assessments and environmental impact statements prepared by a NOAA-directed contractor, NOAA staff should provide guidance to the contractor and participate in and supervise the NEPA document's preparation. The decision maker should include and verify in the NEPA document, the names and qualifications of the persons preparing NEPA documents, and include the names of NOAA staff that oversee the contractor or applicant-prepared work. NOAA staff should also prepare a disclosure statement for the contractor's execution specifying that the contractor has no financial or other interest in the outcome of the action. The statement need not include privileged or confidential trade secrets or other confidential business information.

### *2. Non-NOAA-Directed Contractors or Applicants*

For environmental assessments and environmental impact statements developed by applicants or applicant-directed-contractors for which NOAA is the Federal lead agency, NOAA staff should coordinate with the non-NOAA-directed contractors early in the planning process and should assist the applicant by outlining the types of information required for the preparation of environmental assessments and environmental impact statements . In order to ensure efficient and timely preparation of environmental assessments and environmental impact statements, the applicant should select a contractor with substantive experience in developing and preparing NEPA documents of a similar degree of complexity. At the earliest reasonable time, NOAA staff should work with the non-Federal entity to establish a schedule for completing steps in the NEPA review process, including the preparation of NEPA documents. At a minimum, NOAA staff should review and approve the purpose and need and reasonable alternatives. Major changes to schedule, proposals, content, public involvement strategy, or protocols should be documented through written correspondence.

Any correspondence with stakeholders, as well as factual, scientific, or technical information used or developed by the applicant or applicant-directed-contractor, to support the draft or final NEPA document, should be part of NOAA's record for the action. Decision makers should ensure they receive all such documents and records within 30 days after the final NEPA document is issued and at any other time it requests to ensure that NOAA has a complete administrative record to support the final decision. However, there is no required wait period between the NEPA document and NOAA's final decision. The decision maker should maintain these records in the same fashion as all other records supporting the agency's decision making. NOAA staff should also advise the applicant or their contractor that e-mails, meeting notes, references and other supporting documentation within the record for the action may be the subject of Freedom of Information Act requests and should avoid sensitive information to the extent practicable.

## X. NEPA and Collaboration

### A. Coordination within NOAA

Decision makers from two or more NOAA offices may agree to share the responsibility for preparing the environmental review, such as when multiple NOAA offices are operating under separate statutory authorities for the same proposed activity or decision. In these situations, the decision makers may choose to:

(1) Prepare a single decision document (CE memorandum, FONSI, or ROD) for signature by a NOAA official with the authority to speak for all NOAA offices involved;
(2) Prepare a single decision document to be signed by multiple individuals, who collectively have the authority to speak for all NOAA offices involved; or
(3) Prepare separate decision documents, which collectively represent the decisions of all NOAA offices involved, each signed by the appropriate authority for each decision.

For questions on appropriate internal coordination methods, decision makers should consult with their General Counsel, Office NEPA Coordinator, and/or NOAA NEPA.

### B. Cooperating with Other Agencies

If more than one Federal agency proposes or is involved in the same action, the agencies must identify who will be the lead agency or joint lead agencies. The lead agency is ultimately responsible for completing the NEPA process. When a joint lead relationship is established, the joint lead agencies are collectively responsible for completing the NEPA process. Federal, State, Tribal, or local agencies may serve as joint lead agencies.

Decision makers are encouraged to document the lead and cooperating agency roles and responsibilities through a Memorandum of Understanding or similar document. In particular, it may be useful to document which agency's NEPA procedures will govern the review process and any agreed upon timeframes for the completion of tasks.

#### *1. Designating the Lead Agency*

The agencies must resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement;
(2) Project approval or disapproval authority;
(3) Expertise concerning the action's environmental effects;
(4) Duration of agency's involvement; and
(5) Sequence of agency's involvement.

To the extent practicable, if a proposal will require action by more than one Federal agency and the lead agency determines that it requires preparation of an EA or EIS, the lead and cooperating agencies must evaluate the proposal in a single document.

NOAA may elect to be the lead (or the joint lead) agency when the proposed activity or decision is within NOAA's control and responsibility.

### *2. Inviting Cooperating Agencies*

When NOAA is a lead agency, the decision maker should consider inviting eligible governmental entities (Federal, State, local, and tribal) to participate as cooperating agencies on an EA or EIS. In determining whether an agency is eligible, the decision maker should consider the following factors:

(1) Whether the potential cooperating agency has jurisdiction by law, including, but not limited to, the authority to approve, finance, or issue permits for the proposed activity or decision;
(2) Whether the potential cooperating agency has special expertise related to the proposed activity or decision; and
(3) Whether the potential cooperating agency can provide personnel, expertise, funding, data, facilities, equipment, or other resources to support the NEPA process to proceed in a timely manner.

As a lead agency, NOAA must:

(1) Request the participation of each cooperating agency in the NEPA process at the earliest practicable time;
(2) Throughout the preparation of an EA or EIS, collaborate, to the fullest extent practicable, with all cooperating agencies concerning those issues relating to their jurisdiction or special expertise;
(3) Give consideration to any analysis or proposal created by a cooperating agency;
(4) Meet with a cooperating agency at the cooperating agency's request;
(5) Determine the purpose and need and alternatives in consultation with any cooperating agency; and
(6) Develop a schedule, in consultation with each cooperating agency, the applicant, and any other appropriate entity, for completion of any environmental review, permit, or authorization required to carry out the proposed agency action.

The decision maker must also consider any requests by such entities to participate as a cooperating agency with respect to a particular EIS, and either accept or deny such requests. If such a request is denied, the decision maker will inform the entity, in writing, the reasons for such denial.

### 3. *NOAA as a Cooperating Agency*

The decision maker should consider requesting cooperating agency status from the lead agency if NOAA has jurisdiction by law or has special expertise, or if cooperation would otherwise further the NOAA mission. If invited by the lead agency, NOAA should agree to serve as a cooperating agency when NOAA has jurisdiction by law over any environmental impact involved in the proposed activity or decision. However, if program commitments preclude NOAA from any involvement or the degree of involvement requested by the lead agency, NOAA may decline a lead agency's request or request for reduced involvement.

### 4. *Commenting on Another Agency's EIS*

Even if NOAA is not a cooperating agency, it should, on request from another agency, consider commenting on that agency's EIS. NOAA must consider commenting on an EIS when NOAA has jurisdiction by law or special expertise with respect to any environmental impact involved in the proposed activity or decision. As soon as a NOAA office determines it intends to comment on an EIS, it must inform NOAA NEPA of such intent and provide the contact information for the commenting staff. NOAA NEPA will then identify any other NOAA offices that wish to participate, supply the other interested NOAA offices with the relevant points of contact, and coordinate comments on documents if more than one NOAA office is commenting.

If no other NOAA office intends to provide comments, NOAA NEPA may recommend that the NOAA office provide comments directly with the action agency on a case-by-case basis. The commenting NOAA office must submit an electronic copy of the comments to NOAA NEPA.

### 5. *Projects with Accelerated Timelines*

The provisions in 23 U.S.C. § 139, *Efficient environmental reviews for project decisionmaking and One Federal Decision*, and 42 U.S.C. § 4370m and the Water Resources Reform and Development Act (WRRDA; 33 U.S.C. § 2045), require "accelerated project delivery" of surface transportation (Title 1 of FAST Act), large-scale infrastructure (Title 41 of FAST Act), and Army Corps of Engineers water resources development projects. For actions subject to these statutes, NOAA may be deemed a lead, participating or cooperating agency and, as such, may be subject to specific procedural requirements in addition to those required under NEPA. For example, where serving as a cooperating or participating agency, NOAA offices may be asked to concur on project-specific schedules, may be subject to shorter than typical comment deadlines, and may be obligated to participate in specified dispute resolution procedures. In addition, under 23 U.S.C. § 139, NOAA may participate in a joint EA and FONSI, or EIS and ROD, under the Department of Transportation's NEPA procedures to achieve the goal of One Federal Decision with a single environmental document.

Whenever NOAA has an interest in a qualifying surface transportation, infrastructure, or water resources development project, decision makers should consult the Federal lead agency to ensure that it is aware of its obligations with respect to the project. For additional guidance on agency coordination under FAST-41, please contact the NOAA FAST-41 coordinator at fast41initiation@noaa.gov.

## XI. Emergencies

In certain situations, NOAA may determine that an emergency exists that warrants immediate Federal action to control the emergency. In such situations, NOAA may find that there is insufficient time to prepare a NEPA analysis and any required documentation in accordance with NEPA and these procedures before taking action to address the emergency. When taking such actions to respond to the emergency, the decision maker should, in all circumstances where the exigencies of the emergency permit, take into account the probable environmental consequences of the emergency action and consider taking steps to mitigate reasonably foreseeable adverse environmental effects to the extent practical and consistent with agency authority.

If the emergency action is not likely to result in significant environmental effects, the decision maker should first determine if the action can be covered by one of NOAA's CEs, by adopting another agency's CEs, or by a programmatic environmental document or other existing NEPA analysis. If the proposed emergency response action will not have significant effects, does not fit within a CE, and is not covered by an existing NEPA analysis, the decision maker should prepare a concise and focused EA. However, in no event should the decision maker delay action necessary to prevent imminent threats to public health, safety, or critical infrastructure in order to conduct any of this analysis.

Where emergency circumstances make it necessary for NOAA to take an action with reasonably foreseeable significant effects without observing the provisions of these procedures, NOAA will consult with the CEQ about alternative arrangements for compliance with NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C). If a proposed activity or decision to respond to an emergency situation is expected to have a significant effect on the human environment, the decision maker must immediately notify the NOAA NEPA Coordinator. The NOAA NEPA Coordinator will contact CEQ to establish alternative arrangements for compliance with NEPA. If the NOAA NEPA Coordinator cannot be reached, the decision maker may contact CEQ directly. Alternative arrangements do not waive the requirement to comply with NEPA, but establish an alternative means for compliance for responsive action with significant environmental impacts.

There may be circumstances in which an action that would likely require an EA must be undertaken immediately, before an EA may be prepared and a FONSI issued. In these limited circumstances and consistent with CEQ guidance, decision makers may undertake immediate actions to respond to threats to life or property or to protect valuable resources before preparing an EA. Decision makers must notify the NOAA NEPA Coordinator immediately of the need to undertake the proposed activity or decision. These actions are limited to those necessary to contain the immediate impacts of the action when there is insufficient time to prepare an EA and issue a FONSI and do not include ongoing or follow-up response actions or restoration activities. The decision maker should also coordinate with appropriate Federal, State, and Local stakeholders whose authorities may be engaged in the emergency action.

When acting without preparation of an otherwise necessary EA/FONSI, as soon as practicable after an emergency situation arises, the decision maker must document in a memorandum that an

emergency exists and describe the immediate actions taken in response to the emergency. When preparing the memorandum, the decision maker should include the following information:

(1) A description of the purpose and need for the response action;
(2) Any relevant information considered during the development of the action with respect to potential environmental impacts;
(3) A description of the action and applicable mitigation measures; and
(4) A description of actions taken to comply with other applicable laws (e.g., emergency consultation under EFH and ESA).

## XII. Limitations on Actions

With limited exceptions, as outlined below, until NOAA issues a decision document, no action concerning the proposal may be taken that would have an adverse environmental impact or limit the choice of reasonable alternatives.

If NOAA is considering an application from a non-Federal entity and is aware that the applicant is about to take an action within NOAA's jurisdiction that would have an adverse environmental impact or limit the choice of reasonable alternatives, then NOAA must promptly notify the applicant that the agency will take appropriate action to ensure that the objectives and procedures of NEPA are achieved. Applicants are not precluded from developing plans or designs or performing other activities necessary to support an application for Federal, State, Tribal, or local permits or assistance. If NOAA is considering a proposed activity or decision for Federal funding, it may authorize such activities, including, but not limited to, acquisition of interests in land (e.g., fee simple, rights-of-way, and conservation easements), purchase of long lead-time equipment, and purchase options made by applicants.

While work on a required programmatic environmental review is in progress and the action is not covered by an existing programmatic review, NOAA must not undertake in the interim any major Federal action covered by the program that may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program; and
(2) Is itself accompanied by an adequate environmental review.

## XIII. Withdrawal or Cancellation

NOAA may terminate the NEPA process at any stage if the proposed action or program goals change, support for a proposed action or program diminishes, original analyses become outdated (e.g., the environmental effects analysis is no longer relevant), or other circumstances occur. If the NEPA process is terminated after the publication of an NOI or a DEIS, the decision maker must notify NOAA NEPA, publish an updated notice in the *Federal Register*, and may notify interested parties of the termination of the NEPA process through additional methods if necessary. NOAA NEPA will notify EPA, where necessary, and CEQ. The *Federal Register* notice should clearly reference the original NOI, name of the project in the original notice, unique identification number, and who to contact for additional information.

## XIV. Definitions

As used in these implementing procedures, terms have the meanings provided in Section 111 of NEPA, 42 U.S.C. § 4336e. In addition:

(A) *Act* or *NEPA* means the National Environmental Policy Act, as amended (42 U.S.C. §§ 4321 *et seq.*).
(B) *Agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in the Executive Office.
(C) *Amendment* means a change to a permit or management plan prepared to carry out permitted activities or management objectives.
(D) *Applicant* means an entity, including a project sponsor, that seeks an action by a Federal agency such as granting a permit, license, or financial assistance. Depending on the program, the applicant could be an individual, a private organization, or a Federal, state, tribal, territorial, or foreign governmental body. Fishery Management Councils are not considered applicants because of their unique status under Federal law.
(E) *Authorization* means any license, permit, approval, finding, determination, or other administrative decision issued by an agency that is required or authorized under Federal law in order to implement a proposed activity or decision.
(F) *Connected action* means a separate Federal action within the authority of NOAA that is closely related to the proposed agency action and should be addressed in a single environmental document because the proposed agency action:
   (a) Automatically triggers the separate Federal action, which independently would require the preparation of additional environmental documents;
   (b) Cannot proceed unless the separate Federal action is taken previously or simultaneously; or
   (c) Is an interdependent part of a larger Federal action that includes a separate Federal action, which mutually depend on the larger Federal action for their justification.
(G) *Decision maker* means the individual within NOAA who has the authority and responsibility to make the decision that is being informed by the NEPA process. The decision maker is responsible for ensuring that the NEPA process is fully and effectively conducted to support that decision making.
(H) *Effects* or *impacts* means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives.
   (a) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social or health effects. Effects appropriate for analysis under NEPA may be either beneficial or adverse, or both, with respect to these values.
   (b) A "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. Effects should generally not be considered if they are remote in time, geographically remote, or the product of a lengthy causal

chain. Effects do not include those effects that the agency has no ability to prevent due to the limits of its regulatory authority, or that would occur regardless of the proposed action, or that would need to be initiated by a third party.

(I) *Human environment* means comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment (see also the definition of "effects," above).

(J) *Jurisdiction by law* means agency authority to approve, veto, or finance all or part of the proposal.

(K) *Lead agency* means the agency or agencies, in the case of joint lead agencies, preparing or having taken primary responsibility for preparing the EIS.

(L) *Mitigation* means measures that avoid, minimize, or compensate for effects caused by a proposed action or alternatives as described in a NEPA document or ROD and that have a nexus to those effects. While NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation. Mitigation includes:
  (a) Avoiding the impact altogether by not taking a certain action or parts of an action.
  (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.
  (c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.
  (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.
  (e) Compensating for the impact by replacing or providing substitute resources or environments.

(M) *Negligible* means a level of impact that is below minor to the point of being barely detectable and therefore discountable.

(N) *NEPA document* refers to documents prepared to address requirements under NEPA including, but not limited to environmental assessments, environmental impact statements, documentation of the application of a categorical exclusion, etc.

(O) *NEPA process* means all measures necessary for compliance with the requirements of Sections 2 and 102(2) of NEPA, 42 U.S.C. § 4332(2).

(P) *No action alternative* means either that there is "no change" from a current management direction or level of management intensity (e.g., status quo) or that there is "no project" and the proposed activity would not take place. The no action alternative serves as the baseline against which the proposed action and any other alternatives are compared.

(Q) *Notice of intent (NOI)* means a public notice that an agency will prepare and consider a NEPA document.

(R) *Proposal* and *proposed action* means an action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects.

(S) *Publish* and *publication* mean methods found by the agency to efficiently and effectively make NEPA documents and information available for review by interested persons, including electronic publication. Publication may include but is not limited to: publication in the *Federal Register*, local newspapers, other media, and/or on the Internet.

(T) *Purpose and need* means a statement that briefly summarizes the underlying purpose and need for the proposed agency action. It provides the foundation for determining which

alternatives will be considered and for selecting the preferred alternative. When reviewing an application for authorization, the decision maker shall base the purpose and need on the goals of the applicant and the agency's authority. When more than one agency is involved in a NEPA review, the lead agency must determine the purpose and need (and alternatives) in consultation with any cooperating agency.

(U) *Reasonable alternatives* or *alternatives* means a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal, and, where applicable, meet the goals of the applicant. An EIS will likely involve a greater range of alternatives than an EA; an EA may include only the preferred and "no action" alternatives. The final decision on a proposed action must be within the range of alternatives discussed in the NEPA document.

(V) *Reasonably foreseeable* means sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision.

NOAA FORM 58-5 (4-04)

| | | | |
|---|---|---|---|
| | National Oceanic and Atmospheric Administration | NOAA<br><br>Administrative Order 218-8A | |
| | NOAA<br>ADMINISTRATIVE ORDER SERIES | DATE OF ISSUANCE<br>March 10, 2023 | EFFECTIVE DATE<br>June 27, 2023 |
| | SUBJECT: The National Oceanic and Atmospheric Administration (NOAA) Policy on Government-to-Government Consultation with Federally Recognized Indian Tribal Governments | | |

**SECTION 1. PURPOSE.**

This Order establishes The National Oceanic and Atmospheric Administration (NOAA) Policy on Government-to-Government Consultation with Federally Recognized Indian Tribal Governments.

**SECTION 2. SCOPE.**

The purpose of this Order: strengthens the government-to-government relationship between NOAA and Indian Tribal governments; acknowledges that Indian tribes exercise inherent sovereign powers over their members and territory; and establishes a policy of regular and meaningful consultation and collaboration with tribal officials to address issues concerning Indian tribal self-government, tribal trust resources, and Indian tribal treaty and other rights.

**SECTION 3. DEFINITIONS.**

Federally recognized Indian Tribe ("Indian Tribe" or "Tribe"): As defined in Section l(b) of E.O. 13175, is an Indian or Alaska Native Tribe, Band, Nation, Pueblo, Village, or Community that the Secretary of the Interior acknowledges to exist as an Indian Tribe pursuant to the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. § 5131.

Consultation: As defined in Section 5 of E.O. 13175, refers to an accountable process ensuring meaningful and timely input from tribal officials on NOAA policies that have tribal implications.

Consultation protocol: An agreement between NOAA and a Federally recognized Indian Tribe describing the elements and procedures for implementing government-to-government consultation and E.O. 13175.
Policies that have tribal implications: All regulations, legislative comments, proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal government and Tribes, or on the distribution of power and responsibilities between the Federal government and tribes.

Tribal officials: An elected or duly appointed official of Indian tribal governments or authorized intertribal organizations.

**SECTION 4. POLICY.**

This Order follows the guidelines established in the Department of Commerce (DOC) Administrative Order (DAO) 218-8 requiring the heads of operating units to implement all provisions of the DOC Tribal Consultation Policy, designate an appropriate official to ensure implementation of the DOC Tribal Consultation Policy at the operating unit level, and work with the DOC Tribal Consultation Official to ensure that an accountable process for meaningful and timely consultation on policies with tribal implications is in place.

NOAA will further strengthen its consultation and collaboration with Indian tribes through the policies contained in Executive Order (E.O.) 13175, Consultation and Coordination with Indian Tribal Governments, dated November 6, 2000; Presidential Memorandum, Tribal Consultation, 74 FR 57881, dated November 5, 2009; Office of Management and Budget Memorandum, Guidance for Implementing E.O. 13175, dated July 30, 2010; Tribal Consultation and Coordination Policy for the U.S. Department of Commerce, 78 FR 33331, dated June 4, 2013; and the 2021 White House Presidential Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships (Appendix C), which reaffirmed the policy and requirements of the 2009 Presidential Memorandum. In November 2021, DOC and 16 other federal agencies entered into the Memorandum of Understanding Regarding Interagency Coordination and Collaboration for the Protection of Tribal Treaty Rights and Reserved Rights.

To the extent required by P.L. 108-199 and P.L. 108-447, NOAA will also provide procedures for consultation with Alaska Native Corporations.

This policy is intended only for NOAA internal management purposes and does not create any right or benefit, substantive or procedural, enforceable against the United States, its agencies, entities, or instrumentalities, its officers or employees or any other person.

**SECTION 5. RESPONSIBILITIES.**

Each NOAA Line/Staff Office and Regional Office is responsible for implementing procedures and best practices consistent with the NOAA Handbook titled NOAA Procedures for Government-to-Government Consultation With Federally Recognized Indian Tribes and Alaska Native Corporations, and other procedures or guidance established by the NOAA Tribal Liaison. The NOAA Handbook will be updated as necessary.

The NOAA Administrator will appoint and maintain a "NOAA Tribal Liaison" position in the Office of Legislative and Intergovernmental Affairs (OLIA) to whose functions will include:

1. Developing, adopting, and publishing to the public, guidance and procedures for government-to-government consultation with Federally-recognized Indian Tribes and Alaska Native Corporations (including handbooks, guidances, and procedures);
2. Ensuring the availability of on-line training and other resources for NOAA personnel assisting with tribal consultations;
3. Maintaining documentation of tribal consultation conducted by NOAA and its Line/Staff Offices and Regional Offices as well as those conducted by NOAA headquarters offices; and
4. Meeting reporting requirements established by the Department of Commerce Tribal Liaison and the President's Office of Management and Budget.

To further these policies, NOAA Line/Staff Offices and Regional Offices will establish such internal procedures as necessary to implement E.O. 13175, DAO 218-8, and the DOC Tribal Consultation and Coordination Policy consistent with the guidance, handbook(s) and procedures developed by the NOAA and DOC Tribal Liaisons. Responsible officials include NOAA Assistant Administrators and NOAA Regional Administrators.

**SECTION 6. REFERENCES.**

Existing documents referenced in this Order are as follows:

1. E.O. 13175, Consultation and Coordination with Indian Tribal Governments, 65 FR 67249, 2000.
2. Presidential Memorandum, Tribal Consultation, 74 FR 57881, 2009.
3. Office of Management and Budget Memorandum, Guidance for Implementing E.O. 13175, 2010.
4. Department of Commerce Administrative Order 218-8, Consultation and Coordination with Indian Tribal Governments, 2012.
5. Tribal Consultation and Coordination Policy for the U.S. Department of Commerce, 78 FR 33331, 2013.
6. White House Presidential Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships, January 2021
7. Memorandum of Understanding Regarding Interagency Coordination and Collaboration for the Protection of Tribal Treaty Rights and Reserved Rights, November 2021

**SECTION 7. EFFECT ON OTHER ISSUANCES.**

This Order supersedes NOAA Administrative Order (NAO) issued on June 30, 2014, in its entirety.

The Under Secretary of Commerce for Oceans and Atmosphere signs because there is no delegation of authority for this NAO. An electronic copy of this Order will be posted on the NOAA Office of the Chief Administrative Officer website under the NOAA Administrative Issuances Section.

An electronic copy of this Order will be posted in accordance with Chapter 100 of the NOAA Records Control Schedule on the NOAA Office of the Chief Administrative Officer website under the Administrative Programs' NOAA Administrative Issuances Section. https://www.noaa.gov/organization/administration/noaa-administrative-orders

Under Secretary of Commerce for Oceans and Atmosphere

Offices of Primary Interest:

1. Office of the Under Secretary of Commerce for Oceans and Atmosphere
2. NOAA General Counsel
3. NOAA Office of Legislative and Intergovernmental Affairs

| National Oceanic and Atmospheric Administration | NOAA Administrative Order 216-6A | |
|---|---|---|
| NOAA ADMINISTRATIVE ORDER SERIES | DATE OF ISSUANCE April 22, 2016 | EFFECTIVE DATE April 22, 2016 |
| SUBJECT: Compliance with the National Environmental Policy Act, Executive Orders 12114, Environmental Effects Abroad of Major Federal Actions; 11988 and 13690, Floodplain Management; and 11990, Protection of Wetlands | | |

**SECTION 1. PURPOSE AND SCOPE.**

.01 This Order establishes the National Oceanic and Atmospheric Administration (NOAA) policy and procedures for compliance with the National Environmental Policy Act (NEPA); the Council on Environmental Quality (CEQ) regulations as codified in Parts 1500-1508 of Title 40 of the Code of Federal Regulations (40 CFR 1500-1508); other related authorities; Executive Order (EO) 12114, *Environmental Effects Abroad of Major Federal Actions*; EO 11988, *Floodplain Management*; and EO 11990, *Protection of Wetlands*.

.02 This NOAA Administrative Order (Order) hereby authorizes the development of a Companion Manual entitled *Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities* ("Companion Manual"). The authorized Companion Manual will provide additional, specific policies pursuant to NEPA and related authorities.

**SECTION 2. DEFINITIONS.**

.01 The definitions in 40 CFR 1508; Executive Orders 12114, 11988, 13690 and 11990; and official CEQ interpretations apply to this Order and to the Companion Manual.

**SECTION 3. POLICY.**

.01 It is NOAA's policy to maintain the personnel and resources required to comply with NEPA, CEQ regulations, other related authorities, and Executive Orders 12114, 11988, 13690, and 11990 in order to ensure that agency decision makers, described in Section 4.04 (also referred to as "responsible officials"), are provided with relevant environmental information throughout the decision making process, and consider final NEPA documents before a decision is made. The NOAA NEPA Coordinator, described in Section 4.03 of this Order, serves a supportive role for NOAA decision makers in complying with and using NEPA.

**SECTION 4. ROLES AND RESPONSIBILITIES.**

.01 In accordance with Department Organization Order (DOO) 10-15, section 3, the Under Secretary of Commerce for Oceans and Atmosphere (NOAA Administrator) has been delegated the responsibility to ensure NOAA's compliance with NEPA.

.02 The NOAA Administrator hereby delegates responsibility to oversee the NOAA NEPA program to the NOAA General Counsel, who in turn may delegate these responsibilities to appropriate staff, including to a NOAA NEPA Coordinator.

.03 The NOAA General Counsel is responsible for administering the NOAA NEPA program, including the following duties: (1) assist decision makers and their staff in a cooperative manner in applying NEPA; (2) develop, maintain, and revise agency-wide NEPA policy and procedures, including the Companion Manual; (3) collect best practices to share with all decision makers; (4) provide NEPA tools and training to Line and Staff Offices; (5) serve as the interface on NEPA issues with the Council on Environmental Quality, the Department of Commerce, and other federal agencies; (6) convene a working group of all Line Office and Staff Office NEPA leads to facilitate the sharing of ideas and gain efficiencies, where appropriate, by collectively addressing cross-line-office NEPA issues; and (7) coordinate NOAA-wide NEPA reporting and NOAA-wide comments on NEPA documents prepared by other agencies. The NOAA General Counsel may designate a NOAA NEPA Coordinator to assure these duties are carried out.

.04 Line Office Assistant Administrators and Staff Office Directors are responsible for overseeing the use of NEPA as a decision making tool in their respective offices, including designating a Line/Staff Office NEPA Coordinator to assist with NEPA compliance. These Administrators/Directors may designate additional Line/Staff Office NEPA Coordinators for individual programs or regions (Program/Regional NEPA Coordinators) so long as responsibilities are made clear. The decision maker for a matter is the individual who has the authority and responsibility to make the NOAA decision that is being informed by the NEPA process, and the decision maker is responsible for ensuring that the NEPA process is fully and effectively conducted to support that decision making.

.05 This Order's authorized Companion Manual will have additional information on the responsibilities of NOAA management and staff pertinent to NEPA, CEQ regulations, other related authorities, and Executive Orders 12114, 11988, 13690 and 11990.

## SECTION 5. AUTHORITIES AND REFERENCES.

.01 The authorities listed below are the regulatory drivers for the policies established in this Order.

a. 42 U.S.C. §§ 4321-4361, National Environmental Policy Act.

b. 40 CFR 1500-1508, Regulations for Implementing the National Environmental Policy Act.

c. DAO 216-6, Implementing the National Environmental Policy Act.

d. EO 12114, Environmental Effects Abroad of Major Federal Actions.

e. DAO 216-12; Environmental Effects Abroad of Major Federal Actions.

f. EO 11988 and EO 13690, Floodplain Management.

g. EO 11990, Protection of Wetlands.

h. EO 13141, Environmental Review of Trade Agreements.

i. Other authorities as listed in this Order's authorized Companion Manual.

**SECTION 6. EFFECT ON OTHER ISSUANCES.**

.01 This revision supersedes NOAA Administrative Order NAO 216-6 dated May 20, 1999, with the exception of those provisions implementing CEQ regulation 40 C.F.R. 1507.3(b), including the NEPA categorical exclusions and related provision for extraordinary circumstances. These provisions temporarily remain in effect until superseded by this Order's authorized Companion Manual and any amendments to the Manual. The National Marine Fisheries Service's February 23, 2016, supplement to NAO 216-6, entitled "Revised and Updated NEPA Procedures for Magnuson-Stevens Fishery Management Actions," remains in effect.

.02 The Under Secretary of Commerce for Oceans and Atmosphere signs because the Chief Administrative Officer (CAO) does not have a delegation of authority for the NAO.

An electronic copy of this Order will be posted on the NOAA Office of the Chief Administrative Officer website under the NOAA Administrative Issuances Section.
http://www.corporateservices.noaa.gov/~ocao/index.html

Under Secretary of Commerce
for Oceans and Atmosphere

# Department of the Interior
# Departmental Manual

**Effective Date**: 12/01/95
**Series**: Intergovernmental Relations
**Part 512**: American Indian and Alaska Native Programs
**Chapter 2**: Departmental Responsibilities for Indian Trust Resources

**Originating Office**: Office of American Indian Trust

**512 DM 2**

2.1. **Purpose**. This Chapter establishes the policies, responsibilities, and procedures for operating on a government-to-government basis with federally recognized Indian tribes for the identification, conservation, and protection of American Indian and Alaska Native trust resources to ensure the fulfillment of the Federal Indian Trust Responsibility.

2.2. **Policy**. It is the policy of the Department of the Interior to recognize and fulfill its legal obligations to identify, protect, and conserve the trust resources of federally recognized Indian tribes and tribal members, and to consult with tribes on a government-to-government basis whenever plans or actions affect tribal trust resources, trust assets, or tribal health and safety.

2.3. **Responsibilities**.

A. **Heads of bureaus and offices** are responsible for identifying any impact of Departmental plans, projects, programs or activities on Indian trust resources. Department officials shall:

(1) Establish procedures to ensure that the activities of Departmental organizations impacting upon Indian trust resources are explicitly addressed in planning, decision, and operational documents;

(2) Ensure that bureaus and offices consult with the recognized tribal government whose trust resource, asset, or health and safety is potentially affected by the proposed action, plan, or activity;

(3) Remove procedural impediments to working directly and effectively with tribal governments;

(4) Provide drafts of all procedures or amendments to procedures developed pursuant to this Chapter to the Office of American Indian Trust for review and comment; and,

(5) Designate a senior staff member to serve as liaison between the bureau or office and the Office of American Indian Trust.

B. **Office of American Indian Trust** is responsible for ensuring compliance with the procedures and requirements under this Chapter. The Office of American Indian Trust will serve as the Department's liaison and initial point of contact on all matters arising under this Chapter. All procedures and amendments to procedures shall be submitted by Departmental bureaus and offices to the Office of American Indian Trust for review and comment. After such

review and comment, the procedures and amendments to procedures will be transmitted to the Assistant Secretary - Indian Affairs for final approval.

C. **Assistant Secretary - Indian Affairs** is responsible for approving bureau and office procedures, or amendments thereto, developed pursuant to this Chapter.

2.4. **Procedures**.

A. **Reports**. As part of the planning process, each bureau and office must identify any potential effects on Indian trust resources. Any effect must be explicitly addressed in the planning/decision documents, including, but not limited to, Environmental Assessments, Environmental Impact Statements, and/or Management Plans prepared for the project or activity. The documentation shall:

(1) Clearly state the rationale for the recommended decision; and

(2) Explain how the decision will be consistent with the Department's trust responsibility.

B. **Consultation**. In the event an evaluation reveals any impacts on Indian trust resources, trust assets, or tribal health and safety, bureaus and offices must consult with the affected recognized tribal government(s), the appropriate office(s) of the Bureau of Indian Affairs, the Office of the Solicitor, and the Office of American Indian Trust. Each bureau and office within the Department shall be open and candid with tribal government(s) during consultations so that the affected tribe(s) may fully evaluate the potential impact of the proposal on trust resources and the affected bureau(s) or office(s), as trustee, may fully incorporate tribal views in its decision-making processes. These consultations, whether initiated by the tribe or the Department, shall be respectful of tribal sovereignty. Information received shall be deemed confidential, unless otherwise provided by applicable law, regulations, or Administration policy, if disclosure would negatively impact upon a trust resource or compromise the trustee's legal position in anticipation of or during administrative proceedings or litigation on behalf of tribal government(s).

12/01/95 #3049
Replaces 05/23/95 #3040